## BEFORE THE SPECIAL EDUCATION HEARING OFFICER

In the Matter of the Due Process,    )
Review Hearing for                   )
                                     )
A.B.                                 )        Case No. 21DP512-001
                                     )
vs.                                  )
                                     )
SHAWNEE MISSION SCHOOL               )
DISTRICT USD 512                     )

## NOTICE OF HEARING OFFICER'S DECISION

NOW on this 23rd day of July, 2021, this matter comes before the Special Education Due Process Hearing Officer for decision.

## I.    PROCEDURAL BACKGROUND:

The following represents significant dates in the procedural history of this matter:

1.     August 14, 2020, – Petitioner's file an extensive 30-page Due Process Complaint (Complaint).

2.     August 26, 2020, – The parties participated in a pre-hearing conference, during which counsel requested the resolution period be extended beyond September 14, 2020, due to the complexity of litigation and the need to prepare for anticipated mediation.

3.     August 28, 2020, – The District submitted its Response to the Complaint which denied the allegation that A.B. was denied a FAPE as alleged in problems 1-9.

4.     September 1, 2020, – The parties participated in a second pre-hearing conference.

5.     September 2, 2020, – The Hearing Officer issued a Pre-Hearing Conference Order establishing various deadlines, including discovery deadlines and a new deadline for the resolution period.

6.     September 8, 2020, – The parties served request for production of documents.

7.     September 15, 2020, – The District served its response to Petitioner's Request for Production; and Petitioners provided their response to District's Request for Production.

EXHIBIT
A

8.      September 25, 2020, – The parties participated in a telephone conference with the Hearing Officer, whereby the parties confirmed that they were able to come to terms on the scope and substance of the Pre-Mediation Request of Production of Documents.  It was agreed that document production would occur on or before October 16, 2020.

9.      November 4, 2020, – The parties participated in a telephone conference with the Hearing Officer, during which an agreement was reached as to the briefing schedule. Accordingly, the Hearing Officer issued Scheduling Order No. 1, establishing the briefing schedule as related to a Motion for Judgment on the Pleadings.

10.    November 6, 2020, – The Hearing Officer issued Scheduling Order No. 2 regarding the parties' request to extend the resolution period and establishing that the resolution period was extended until January 14, 2021.

11.    November 25, 2020, - The District filed a Motion for Judgment as a Matter of Law and to Strike. The Motion argued that the Due Process Complaint avers substantive and procedural violations and seeks broad relief not authorized under the IDEA. The Motion argued: (1) that Petitioners may not exceed the two-year statute of limitations – which in the instant matter would be August 14, 2018, - despite the fact that the Complaint began with a "Factual Background" setting forth events going back as far as August 2017; (2) that there is no jurisdiction to consider allegations under Section 504 and ADA; (3) that Petitioners' claims for relief exceeds those allowable by law; and(4) that the overbroad and vague allegations of Petitioners' Complaint should be stricken. The District requested that the Hearing Officer find in favor of the District and against Petitioners on the matters presented in the Motion by dismissing claims alleged to arise prior to August 14, 2020, and, further, by striking those averments and proposed remedies which exceed the jurisdiction of the Hearing Officer to reach or award. The District further requested the Hearing Officer to identify with particularity those allegations relating to the identification, evaluation, or educational placement of A.B., or the provision of a FAPE to A.B. to be heard. On December 23, 2020, Petitioners filed a Response in Opposition to the District's Motion for Judgment as a Matter of Law and to Strike.

12.    December 31, 2020, - The District filed its Reply in Support of its Motion for Judgment as a Matter of Law and to Strike.

13.   January 13, 2021 - The Hearing Officer issued an order stating the District's Motion for Judgment would be treated as a Motion to Dismiss and granting in part and denying in part the District's Motion to Dismiss. Further, the Order granted Petitioners limited and targeted discovery to facts and circumstances surrounding the November 6, 2017, educational evaluation and granted the District similar discovery to include post-evaluation data collection. Finally, the Order scheduled a pre-hearing conference for January 14, 2021.

14.   January 14, 2021 - The parties participated in a telephone conference with the Hearing Officer and discussed extending the resolution period.

15.   January 15, 2021 - The Hearing Officer issued Scheduling Order No. 3, which extended the resolution period through to the conclusion of the due process hearing, which was scheduled for April 15, 16, 19, 20, 21 and 23, 2021. Further the Order scheduled a status conference for February 5, 2021. Finally, the Order established deadlines for Petitioners to file a Motion to Amend Complaint, parties to serve discovery, disclosures of witnesses, and exchange of exhibits.

16.   January 22, 2021 - Petitioners filed a Request to Amend the Due Process Complaint. On January 29, 2021, the District consented to Petitioners' Request.

17.   On or about February 1, 2021 - The District served Interrogatories on Petitioners.

18.   On or about February 1, 2021 - Petitioners served their expert disclosures identifying Dr. Patricia Weigand, PhD, BCBA, LBA and Dr. Joseph Gentry, PhD, BCBA-D.

19.   On or about February 5, 2021 - Petitioners filed an Amended Due Process Complaint. The Amended Due Process Complaint was verbatim to the Complaint in all respects except for the new proposed remedy seeking that the hearing officer order "Private placement at Sherwood Autism Center, and transportation thereto" instead of the "Kansas City Autism Training Center." Complaint, p. 8-9

20.   February 8, 2021 - The Hearing Officer issued Scheduling Order No. 4, which confirmed the resolution period was extended through to the conclusion of the due process hearing, which was scheduled for April 15, 16, 19, 20, 21 and 23, 2021. Further the Order scheduled a status conference for February 5, 2021. Finally, the Order established deadlines

for Petitioners to file a Motion to Amend Complaint, parties to serve discovery, disclosures of witnesses, and exchange of exhibits.

21.    February 18, 2021 - The District filed a Notice of Insufficiency and Motion to Dismiss the Amended Due Process Complaint. The Motion argued that the Amended Complaint raised allegations that (1) were barred by the two-year statute of limitations; (2) are outside the subject-matter jurisdiction of the Hearing Officer; (3) failed to adequately describe the nature of the problem or the facts that form the basis of the complaint; and (4) failed to adequately address the proposed resolution of the problem. The District requested the Hearing Officer order Petitioners to amend the Amended Complaint or, in the alternative, dismiss the Amended Complaint.

22.    February 19, 2021 - The District filed its Answer to the Amended Due Process Complaint.

23.    On or about February 19, 2021 - The District served its expert disclosure identifying Dr. Mitchell Yell, PhD.

24.    February 23, 2021 - Petitioners filed a Motion to Strike the District's Notice of Insufficiency and Motion to Dismiss.

25.    On March 1, 2021 - The District served its Answer and Objections to Petitioners' Interrogatories; and Petitioners served their answers to the District's Interrogatories.

26.    March 5, 2021 - Petitioners filed a motion to issue a non-party subpoena to Todd McCarthy. The Hearing Officer signed the non-party subpoena to Todd McCarthy on March 8, 2021.

27.    March 9, 2021 - The Hearing Officer issued an order denying the District's Notice of Insufficiency and Motion to Dismiss the Amended Complaint.

28.    March 11, 2021 - The District filed motions to issue non-party subpoenas to Children's Mercy, Dr. Katrina Ostmeyer, and Riley ABA & Autism Center. The Hearing Officer signed the non-party subpoenas on March 11, 2021.

29.    March 16, 2021 - Petitioners filed a Motion for Subpoenas to Testify directed to non-parties Todd McCarthy, Jackie Chatman, Lori Grover, and Lori Judd. On or about March 23, 2021, the Hearing Officer executed the requested subpoenas.

30.    March 19, 2021 - The District filed its Motion to Compel Petitioners' Discovery Responses. The Motion stated that as of March 19, 2021, Petitioners had failed to fully respond to the District's discovery requests in that Petitioners had refused to disclose information that was both known to its designated experts and that was within the scope of discovery pursuant to K.S.A. 60-226(b)(1). The Motion requested the Hearing Officer order Petitioners to provide full and complete responses to the District's requests for production and interrogatories, including all information and documentation to obtain information specific about Petitioners' expert witnesses, and to provide a description of any documents Petitioners were withholding pursuant to a claim of privilege or the work- product doctrine so that others may assess the claim. Finally, the District requested the Hearing Officer amend Scheduling Order 4 to allow the District to disclose witnesses beyond the March 25, 2021, disclosure date to identify any witnesses it may call as a result of the information obtained pursuant to the documents and interrogatory responses provided as a result of this Order.

31.    March 22, 2021 - The parties participated in a pre-hearing conference with the Hearing Officer during which counsel for Petitioners raised objections regarding the scope of the document requests set forth in the District's non-party subpoenas to Children's Mercy, Dr. Katrina Ostmeyer, and Riley ABA & Autism Center. The parties agreed to meet and confer regarding outstanding discovery issues, the use of exhibits at hearing, expedited medical records review, and other due process procedural concerns.

32.    March 25, 2021 - The District filed a Motion for Protective Order seeking to limit the retention of the documents subpoenaed from non-parties (Children's Mercy, Dr. Katrina Ostmeyer, and Riley ABA & Autism Center) in accordance with the parties' agreement.

33.    March 26, 2021 - Petitioners served supplemental responses to the District's requests for production, supplemental interrogatory responses, supplemental expert disclosure, expert witness reports, and privilege log. Petitioners' supplemental expert disclosures again identified Dr. Weigand and Dr. Gentry, and further identified Dr. Katie Lindberg, Dr. Katrina Ostmeyer, and Dr. Marion Pierson.

34.    March 31, 2021 - Petitioners filed a Motion for Subpoenas to testify directed to non-parties Dr. Katie Lindberg of Children's Mercy Hospital, Sara Riley of Riley ABA & Autism Center, and Dr. Katrina Ostmeyer of Beyond the Individual. On or about April 2, 2021, the Hearing Officer executed the requested subpoenas.

35.    April 2, 2021 - The District served supplemental answers and objections, and supplemental document production to Petitioners.

36.    April 2, 2021 - The parties participated in a status conference with the Hearing Officer.

37.    April 2, 2021 - The Hearing Officer issued Status Conference Order No. 2 setting out the results of the discussions between counsel regarding outstanding discovery issues, the use of exhibits at hearing, expedited medical records review, and other procedural concerns.

38.    April 9, 2021 - The parties exchanged exhibit and witness lists.

39.    April 9, 2021 - The Hearing Officer issued Status Conference Order No. 3 regarding email exhibits being provided in electronic format, and non-email exhibits being provided in electronic and hard copy.

40.    April 14, 2021 - The District filed a Motion in Limine to exclude testimony of Dr. Patricia Weigand. The Motion argued that no allegation in the Complaint or discovery disclosures indicates that Dr. Weigand's assessments or conclusions were presented to the IEP team to make recommendations as to the provision of a FAPE to A.B. Further, the Motion stated that the IEPs at issue in this due process proceeding were formulated by A.B.'s IEP team in October 2019, and November 2019, and argued that Dr. Weigand never attended an IEP team meeting to give her assessment of A.B.'s education program. The Motion argued retrospective evidence in the form of testimony and opinions based on information and data that was never before an IEP team is not relevant to the appropriateness of an IEP. The District requested that the Hearing Officer exclude such irrelevant matters from being presented by Petitioners at the hearing.

41.    April 17, 2021 - Petitioners filed a Motion for Additional Time to present Petitioners' Case-in-Chief.

42.    April 18, 2021 - The District filed a Motion in Limine to exclude testimony of Dr. Katrina Ostmeyer. The Motion argued that no allegation in the Complaint or discovery disclosures indicates that Dr. Ostmeyer's assessments or conclusions were presented to the IEP team to make recommendations as to the provision of a FAPE to A.B. The Motion stated that Dr. Ostmeyer first evaluated A.B. in January 2021, and the conclusions she formed about

A.B. were based exclusively on testing and assessments that were performed over the course of four dates in January 2021. Thus, not only were Dr. Ostmeyer's conclusions never before the IEP team in formulating A.B.'s education program, but the information on which Dr. Ostmeyer relied to form those conclusions were never before the IEP team. The Motion argued that retrospective evidence in the form of testimony and opinions based on information and data that was never before an IEP team is not relevant to the appropriateness of an IEP. The District requested that the Hearing Officer exclude such irrelevant matters from being presented by Petitioners at the hearing.

43. April 18, 2021 - The District filed a Motion in Limine to exclude testimony of Dr. Joseph Gentry. The Motion argued that no allegation in the Complaint or discovery disclosures indicates that Dr. Gentry's assessments or conclusions were presented to the IEP team to make recommendations as to the provision of a FAPE to A.B. Further, Dr. Gentry's report was prepared on March 15, 2021, and many of the conclusions set forth in that report were based on information and data that was never before A.B.'s IEP team. The Motion argued that retrospective evidence in the form of testimony and opinions based on information and data that was never before an IEP team is not relevant to the appropriateness of an IEP. The District requested that the Hearing Officer exclude such irrelevant matters from being presented by Petitioners at the hearing.

44. April 15-16, 19-21 and 23, 20201 - A six-day administrative hearing was held. Both parties had the opportunity to present evidence and to examine and cross-examine witnesses.

45. During the hearing, the parties stipulated to the entry of the Joint Exhibits which were accepted into evidence.  (Tr. Vol. 1, p. 11:9-12:24 and Vol. 4, p. 987:13-19, Addendum 1).

46. During the hearing, Petitioners and Respondent each moved specific, pre-marked exhibits for admission which were accepted into evidence. Exhibits which were admitted into evidence are listed on Addendum 2 attached hereto and incorporated herein. Further, for each exhibit, a citation to the transcript where each was admitted has been included.

47. The District invoked the witness-exclusionary rule which was enforced by the hearing officer. (Tr. 13:18-22, 14:2-8).

## II.   INTRODUCTORY OVERVIEW:

1.   A.B. is an eight-year-old approaching third grade who was born on ▇▇▇▇▇ 2012.  Natalie and Christopher Beer are A.B.s' parents.  (Tr. Vol. III, 534:22-536:6).  The Beers reside within the Shawnee Mission School District in Westwood, Kansas.  (Tr. Vol. III, 536:7-10, 569:25-570:9).

2. A.B. first enrolled in the District as a tuition-based Pre-K student for the 2017-2018, schoolyear. (Joint Exhibit 1, *hereinafter "(JE-1", p.83*).

3.   During Pre-K, A.B. attended Briarwood Elementary in the District. (JE-1, p.98).

4.   A.B. currently attends Westwood View Elementary ("Westwood View") in the District. (JE-1, p.1612).

5.   A.B. has an Individualized Education Program ("IEP") and receives special education services.  ( J E -1, pp.1612-1626).

6.   This due process proceeding is a matter pursuant to the Individuals with Disabilities Education Act ("IDEA") and its implementing regulations at 34 C.F.R. § 300.507 to .513, K.S.A. 72-3416, and the Kansas Special Education Process Handbook.

7.   During this proceeding, Petitioners, were represented by Matthew J. Rogers and Bethany Roberts of the Law Offices of Barber Emerson LC, 1211 Massachusetts St, Lawrence, KS 66044. (Complaint, p.29; (Tr. 5:5-8).

8.   During this proceeding, the District was represented by Joshua Douglass of Mickes O'Toole, LLC, 12444 Powerscourt Drive, Suite 400, St. Louis, MO 63131. (Tr. 5:11-13).

9.   Hearing Officer Larry R. Rute presided over this due process hearing, Associates in Dispute Resolution LLC, 212 SW 8th Avenue, Suite 207, Topeka, Kansas 66603 (785-357-1800).

## **Procedural History**

10.   On August 14, 2020, Petitioners filed an expansive Due Process Complaint ("Complaint") spanning thirty (30) pages. The Due Process Complaint alleged the District denied A.B. a free, appropriate public education pursuant to the IDEA as well as discriminated against A.B. on the basis of his disability under Section 504 of the Rehabilitation Act and "Title II of the ADA." (Complaint, pp.3-4).

11.   The Complaint is segmented into "Problems," which the Petitioners alleged "constitute a separate instance of the District's wrongful denial of FAPE." (Complaint, p.4).

12.   Problem 1 is titled: "Child find violation, inadequate evaluations, and exclusion." Problem 1 alleges that beginning in the fall of 2017, the District failed to satisfy its child find responsibilities, as follows:

> *During the 2017-2018, school year, the District: (a) failed to identify and conduct a comprehensive, full and individual assessment/evaluation in fall 2017, and (b) unreasonably delayed by making no effort to identify and evaluate [A.B.] or collect additional data in spring 2018, despite newfound suspicions and/or knowledge that [A.B.] was a child with a disability that needed or might need special education services.*

> *During the 2018-2019, school year, the District: (c) failed to identify [A.B.] as a child with a disability in fall 2019 and acted with unreasonable delay and failed to conduct a comprehensive, full and individual assessment/evaluation in 2019-2020, and (d) staff were repeatedly unprepared at IEP team meetings and unnecessarily delayed/prolonged eligibility determinations.*

> *During the 2019-2020, school year, the District: (g) failed to conduct a comprehensive, full and individual assessment/evaluation and instead relied entirely on the inadequate evaluation from the prior year in developing an IEP and BIP.*

(Complaint, p.5).

13.   Problem 1 further alleged that from "fall 2017-January 2020" A.B. was "repeatedly secluded, disciplined, removed from the classroom, excluded, and segregated from his classmates for behaviors associated with his disability." (Complaint, p.5).

14.   Problem 2 is titled: "Dilatory IEP development and implementation: IDEA and Kansas Law." Problem 2 alleges that beginning in November 2018, through December 2019, the District violated the IDEA and Kansas law as follows:

> (a) *failed to complete the initial evaluation within 60 school days after it received parental consent for an evaluation; (b) failed to conduct an IEP team meeting to develop an IEP in the required timeframe after Mrs. Beer requested an evaluation and/or after the District concluded that [A.B.] was a child with a disability in need of special education and related services; (c) failed to develop an IEP in the required timeframe after Mrs. Beer requested an evaluation and/or after the District concluded that [A.B.] was a child with a disability in need of special education and related services, and (d) failed to implement an IEP in the required timeframe after Mrs. Beer requested an evaluation and/or after the District concluded that [A.B.] was a child with a disability in need of special education and related services. The District deprived [A.B.] of educational benefits and a FAPE.*

(Complaint, p.10).

15.   Problem 3 is titled: "Untimely provision of special education and related services: Section 504 and ADA." Problem 3 alleges that beginning in August 2018, through December 2019, the District:

*failed to provide special education and related services designed to meet [A.B.]'s individual educational needs as adequately as the needs of nonhandicapped persons are met, in adherence with applicable procedures. The District deprived [A.B.] of educational benefits and a FAPE. See also Problem 2. In so doing, the District intentionally discriminated against [A.B.] and denied [A.B.] participation in and the benefits of the services, programs or activities of the District, on the basis of his disability, in violation of Section 504 and the ADA. The District acted with personal animosity or ill will or demonstrated deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of [A.B.]'s federally protected rights.*

(Complaint, p.12).

16.   Problem 4 is titled: "IEP not in effect at beginning of 2019-2020, school year." Problem 4 alleges that beginning in August 2019, through December 2019, the District:

*did not ensure an IEP was in effect for [A.B.] at the beginning of the 2019-2020, school year, constituting a substantive violation of IDEA and Kansas law. The District deprived [A.B.] of educational benefits and a FAPE.*

(Complaint, p.14).

17.   Problem 5 is titled: "October 2019, IEP is not reasonably calculated." Problem 5 alleges:

*The IEP dated October 1, 2019, was not reasonably calculated to enable [A.B.] to make progress appropriate in light of his circumstances for several reasons, including but not limited to: (a) the District did not consider the speech IEE performed in May 2019; (b) the District did not consider its own functional behavioral assessment performed in May 2019; (c) the District was unaware of other essential data and/or evaluations; (d) the October 2019, IEP was almost an identical copy of an IEP draft developed in February 2019, by different staff when [A.B.] was in Kindergarten, before the May 2019, evaluations; (e) the October 2019, IEP attached a Behavior Intervention Plan that was almost an identical copy of the BIP circulated in February 2019, before the May 2019, evaluations; (f) the District did not perform observations in [A.B.]'s current learning environment or consider his present levels of academic achievement and functional performance, and/or his need for paraprofessional support; rather, the October 2019, IEP was based entirely off data collected during the preceding school year; and (g) the goals and accommodations were vague, ambiguous, immeasurable, and not tailored to [A.B.]'s individual needs, all in violation of the IDEA and Kansas Law. The District deprived [A.B.] of educational benefits and a FAPE.*

(Complaint, p. 16.)

18.    Problem 6 is titled: "November 2019, IEP not reasonably calculated: 1:1 Paraprofessional Support, No Parent Participation." Problem 6 alleges that beginning in November 2019, and continuing, the District denied A.B. a FAPE as follows:

> *The IEP dated November 20, 2019, is not reasonably calculated to enable [A.B.] to make progress appropriate in light of his circumstances. The District violated Section 504, the ADA, the IDEA, and Kansas law by: (a) unilaterally predetermining not to provide [A.B.] with the paraprofessional services requested by the Beers; (b) implementing an IEP that did not provide a 1:1 paraprofessional during math/afternoon and was not reasonably calculated to enable [A.B.] to make progress appropriate in light of his circumstances; (c) preventing the Beers from meaningfully participating in the IEP process as it related to a 1:1 paraprofessional by: (i) predetermining the services it would provide [A.B.], (ii) denying the Beer's request for educational records, and (iii) holding team meetings to develop the provision of paraprofessional services in the Beer's absence; (d) failing to send appropriate notices prior to holding meetings, discussions, and making decisions related to the provision of 1:1 paraprofessional services to [A.B.]; (e) declining to revise the IEP to include a 1:1 paraprofessional for math/afternoon when information indicated it was necessary to enable [A.B.] to make appropriate progress. The District based its decision on the incorrect belief that: (i) paraprofessional support in the general education classroom constitutes a more restrictive environment, and (ii) paraprofessional support was not available unless there was an academic need. Further, the District failed to implement the November 2019, IEP in that the District did not collect data necessary to track adequate goal progression, but nonetheless completed IEP Progress Reports indicating that [A.B.] was making "adequate progress." The District intentionally discriminated against [A.B.] and denied [A.B.] participation in and the benefits of the services, programs or activities of the District, on the basis of his disability, in violation of Section 504 and the ADA. The District deprived [A.B.] of educational benefits and a FAPE.*

*(*Complaint, p.17).

19.    Problem 7 is titled: "Vague and ambiguous IEP terms: No parent participation, failing to properly implement or revise IEP/BIP." Problem 7 alleges that beginning in November 2019, and continuing, the District denied A.B. a FAPE as follows:

> *The District violated the IDEA and Kansas Law by: (a) denying the Beer's request for educational records and their ability to meaningfully participate; (b) failing to provide prior written notice of IEP team meetings convened to discuss vague IEP/BIP terms, and failing to include the Beers in those meetings; (c) failing to revise the IEP/BIP to define the vague terms, after the District was aware that it and the Beers applied different meanings to the terms, and after it agreed revisions were necessary; and (d) removing [A.B.] from the general education classroom and sending him to a more restrictive environment contrary to the IEP/BIP, and without submitting prior written notice to the Beers. The District deprived [A.B.] of educational benefits and a FAPE.*

(Complaint, p.23).

20.   Problem 8 is titled: "Independent educational evaluation." Problem 8 alleges:

*The District violated the IDEA and Kansas law in that it refused to honor the Beer's request for a behavioral IEE or file a due process complaint. Instead, the District demanded a District employee reevaluate [A.B.]. Moreover, the District failed to provide the Beers with information as to where a behavioral IEE could be obtained or propound a prior written notice indicating the District's refusal to pay for an IEE. The District has acted with unreasonable delay. The District deprived [A.B.] of educational benefits and a FAPE. The District's actions also constitute a violation of Section 504 and the ADA.*

(Complaint, p.25).

21.   Problem 9 is titled: "No Prior Written Notice." Problem 9 alleges:

*The District failed to provide prior written notice consistent with the IDEA and Kansas law for any of the problems described in this due process complaint. This includes but is not limited to the following prior written notices that the District either failed to send at all, or which the District sent but were not consistent with the IDEA and Kansas law: (a) prior written notices describing the evaluation procedures the District proposed to conduct; (b) prior written notices regarding the purported need for additional data, tests, and/or evaluations; (c) prior written notice regarding the District's refusal to evaluate [A.B.] in Spring 2018; (d) prior written notice regarding the extension/delay to complete [A.B.]'s evaluation; (e) prior written notice regarding the extension/delay to complete the IEP team meeting to develop [A.B.]'s IEP; (f) prior written notice regarding the extension/delay in implementing the IEP; (g) prior written notice regarding the District's refusal to provide paraprofessional support; (h) prior written notice regarding the District's proposed paraprofessional "trial intervention;" (i) prior written notice regarding IEP team meetings, such as IEP team meetings regarding paraprofessional support and to clarify vague IEP terms; (j) prior written notice regarding [A.B.]'s removal from the general education classroom and change in placement; (k) prior written notice refusing to grant the Beer's IEE request; and (l) prior written notice regarding the functional behavioral assessment reevaluation. The District deprived [A.B.] of educational benefits and a FAPE.*

(Complaint, p.27).

22.   For Problems 1-9, Petitioners included a "Proposed Resolution." In addition to proposing to find violations of law as alleged in the Complaint, Petitioners requested the following remedies:

(a)   The provision of a free appropriate public education to A.B., to include, inter alia, all recommendations made by Petitioners' expert(s); Private placement at Kansas City Autism Training Center.  (Complaint, p. 8-9).

(b)   Compensatory education from November 6, 2017 – May 2019, August 14, 2019, – December 3, 2019.1 This includes but is not limited to:

1)  Specially Designed Instruction: 320 hours

    2)  For all removals from the classroom from fall 2017-December 2019.

    3)  Related Services, paraprofessional support: 116 hours

    4)  Speech: 35 hours

All recommendations made by Petitioners' expert. (Complaint, p.9).

    (c)  A qualified special education teacher assigned to co-teach with A.B.'s general education teacher for the 2020-2021 school year, and provide remote assistance to A.B. (Complaint, p.9).

    (d)  Payment for a functional behavioral assessment conducted by an independent educational evaluation that includes but is not limited to the ABLL-RS and VB- MAPP assessments, conducted by BCBA of Petitioners' choosing, and an IEP meeting no later than 14 days after the functional behavioral assessment and the parents request an IEP meeting. (Complaint, p.9).

    (e)  Reimbursement for all evaluations, advocate fees, summer 2019, tuition and costs associated with Riley ABA & Autism Center. (Complaint, p.9).

    (f)  Accountability section added to IEP, consisting of (1) six unannounced observations from independent, consulting BCBA each semester, at the District's expense, selected by the Beers; (2) unlimited unannounced observations by parents; (3) compliance with KSDE standards. (Complaint, p.9).

    (g)  Quarterly Progress Reports that identify the observing staff, and that attach copies of the data collections sheets. (Complaint, p.9).

    (h)  Development of an internal District tracking system that allows and requires staff to document concerns related to suspected or known student disabilities and further documents the District's actions related to those suspicions or knowledge, including periodic administrative review of the same. (Complaint, p.9).

    (i)  At least a 40-hour staff training by a mutually acceptable, qualified BCBA as to the District's responsibilities under Child Find and comprehensive evaluations, as recommended by Petitioners' expert. (Complaint, p.9).

    (j)  Pursuant to the Section 504 and ADA claims: Compensatory and punitive damages. (Complaint, p.9).

    (k)  Attorney's fees and costs. (Complaint, p.9).

    (l)  Intensive staff training by a mutually acceptable, qualified BCBA as to the

1) District's responsibilities regarding IEP development and implementation. (Complaint, p.12).

2) Compensatory education for paraprofessional services November 20, 2019– continuing, for 60 minutes each school day. (Complaint, p.22).

3) Behavioral training for all paraprofessionals that will work with A.B., with the Beers present. (Complaint, p.22).

4) Requirement that all paraprofessionals are familiar and comfortable with the terms of A.B.'s IEP and BIP before working with A.B. (Complaint, p.22).

5) Staff training relating to least restrictive environment and distinguishing LRE with supports provided in the general education classroom. (Complaint, p.22).

6) An order compelling the District to revise the November 2019, IEP to require a 1:1 paraprofessional for at least 60 minutes from 12:30 pm to 1:30 pm if receiving in-person instruction or provide a 1:1 paraprofessional to work with A.B. for 60 minutes in the afternoon while receiving or working on remote instruction. (Complaint, p.22).

7) An order compelling the District to complete data collection sheets acceptable to the Beers, that track goal progression throughout the entire school day, and base its IEP progress reports on the same. Further, an order requiring the District to provide copies of the data collection sheets on a biweekly basis. (Complaint, p.22).

8) Training for any and all paraprofessionals that will work with A.B., as recommended by Petitioners' expert. Complaint, p. 22.

9) Compensatory education for the 100 minutes that A.B. was removed from the classroom, and any additional removals identified during discovery. Complaint, p. 25.

## III.   ISSUES TO BE DECIDED BY THE HEARING OFFICER

Pursuant to K.S.A. 72-3430 and 34 C.F.R. 300.507, the following issues are to be decided herein:

A.   Did the District fail to satisfy its "child find" obligation with regard to A.B. as specifically alleged in the Due Process Complaint?   K.S.A. 72-3428 and 34 C.F.R. 300.111(a).

B.   Did the District fail to evaluate A.B. to determine his eligibility to receive special education and related services as specifically alleged in the Due Process Complaint?   K.S.A. 72-3428 and 34 C.F.R. 300.301.

C.  Did the District fail to appropriately determine A.B.'s education placement throughthe development of an Individualized Education Program ("IEP") as specifically alleged in the Due Process Complaint?  K.S.A. 72-3428 and 34 C.F.R. 300.324.

D.  Did the District fail to implement A.B.'s IEP such that he was denied a free appropriate public education as specifically alleged in the Due Process Complaint?  34 C.F.R. 300.17.

E.  Did the District fail to satisfy IDEA's procedural requirements such that: (1) A.B.'s right to a free appropriate public education was impeded; (2) Parent's opportunity to participate in the decision-making process was significantly impaired; (3) A.B. was deprived educational benefits as specifically alleged in the due process complaint?  K.S.A. 72-3416 and 34 CFR § 300.513.

## IV.  <u>FINDINGS OF FACT</u>:

### Pre-Kindergarten

1.  On or about June 5, 2014, A.B. was evaluated by the Johnson County Infant Toddler program to determine eligibility for early childhood services under Part C of the IDEA. Hewas determined eligible for family services coordination and speech-language pathology services. These services were to occur between June 17, 2014, and December 17, 2014.  (JE-1, p. 4-6).

2.  A.B. was determined eligible for Part C services due to a developmental delay of 25% in one developmental area or 20% delay in two or more developmental areas. (JE-1, p. 9).

3.  On June 17, 2014, an Individualized Family Service Plan ("IFSP") was developed for A.B.with the following targeted outcomes:

   (a) Family would like for A.B. to use his words to tell them what he wants to play withand to eat as well as to tell his family what is wrong when he is upset;

   (b) Family would like for A.B. to follow directions such as when they tell him no or stop with safety is a concern;

   (c) Family would like for mealtime to be more enjoyable by A.B. being

able to tell his family when he wants more or when he is all done and for him to not throw his food; and

(d) A.B. would like for A.B. to expand on his play skills by engaging to pretend play and engage in communication with others during play. (JE-1, pp. 8-15).

4.     On December 16, 2014, the IFSP team met to review A.B.'s progress. Both Mrs. Beer and therapist concluded that A.B. "had made a great deal of progress in all areas of development." (JE-1, p. 21). A.B.'s eligibility for services pursuant to the IFSP was extended to June 17, 2015. (JE-1, p. 22).

5.     On March 26, 2015, A.B. was referred to the District for evaluation for eligibility for special education. The referral states: "Initial concerns with Autism but now more with speech, play, social skills and no longer ASD concern." (JE-1, p. 30).

6.     The District and Mrs. Beer met on May 15, 2015, to conduct a transition meeting. According to records of that meeting, A.B. was previously "screened for ASD [autism spectrum disorder] with no concerns and pediatrician did not have concerns." (JE-1, p. 34). During the meeting, Mrs. Beer reported that she no longer had any concerns for A.B. (JE-1, p. 38).

7.     The District completed an evaluation in the area of speech/language on September 15, 2015. According to the evaluation summary, A.B.'s parents described him as cooperative and well behaved. They did not share any concerns about A.B.'s behavior. (JE-1, p. 65).

8.     Following the completion of the District's evaluation on September 10, 2015, the District determined A.B. was not a child with a disability and did not require special education services. (JE-1, p. 69).

## Summer of 2017

9.     During the summer of 2017, when he was Pre-K, A.B. attended "Smiley-Face Camp," a summer enrichment opportunity for young children provided by the District. Summer enrichment is a general education program that families can enroll their children in for one week at a time or for the entire summer.  (Tr. 60:21-61:8, 61:20-24).

10.   At Smiley-Face Camp, A.B.'s lead program teacher was Ashlea Becker. During the

regularschool year, Ms. Becker is employed by the District as a certified early childhood special education teacher.  (Tr. 60:14-61:2, 61:23-24).

11.   A.B. and Ms. Becker interacted during the summer enrichment program. Ms. Becker noticed some differences between A.B. and his peers. (Tr. 63:4-8. A.B. required more prompting than his peers to complete directions. (Tr. 63:18-21).  Therefore, Ms. Becker provided individual instruction to A.B. rather than instructing him a group setting. (Tr. 63:20-23).

12.   Ms. Becker also recalled that A.B. pulled himself away from the group quite frequently, so she worked to include and bring A.B. into whatever the rest of the children were doing at the time. (Tr. 63:23-64:1).

13.   On August 7, 2017, Ms. Becker emailed Lindsey Seitnater, a special educator teacher for the District.  (Tr. 62:8-14); Petitioners' Ex. 1. Ms. Becker believed that A.B. would attend Pre-K at the school where Ms. Seitnater taught.  (Tr. 63:9-17).

14.   Ms. Becker emailed Ms. Seitnater to let her know about A.B. so that Ms. Seitnater could keep an eye out for him during the school year just in case he needed additional supports in Pre-K.  (Tr. 63:12-17).

15.   Ms. Becker testified that she did not believe she and Ms. Seitnater had any formal email exchange concerning A.B. Yet, when school started, Ms. Becker asked if Ms. Seitnater had received her email about A.B. Ms. Seitnater replied she had received it and that she was working on it. They did not have much follow-up; Ms. Becker just confirmed that Ms. Seitnater had received the email. ( T r . 65:3-9; Petitioners' Ex. 1).

16.   Ms. Becker anticipated that A.B. would need additional support when the 2017-2018, school year started. Ms. Becker was looking at the area of social-emotional/behavioral for A.B. Because summer enrichment did not have academics, Ms. Becker was not aware of A.B.'s academic skills.  (Tr. 66:2-19).

   17. Ms. Becker testified that she remembered occasionally speaking with Mrs. Beer at pickup and drop off. Ms. Becker recalled that one time, she spoke with Mrs. Beer at length about the latter's concerns about A.B. going into Pre-K and what that might look like. Ms. Becker further recalled that she tried to reassure Mrs. Beer that the District would provide support for A.B. should he need it.  (Tr. 69:8-16).

18.   Ms. Becker also spoke with Mrs. Beer about observations she had made regarding A.B. and some of the challenges she saw throughout the day. (Tr. 69:17-20).

19.   On August 7, 2017, Ms. Becker alerted District employee and special educator Lindsey Seitnater of her concerns regarding A.B. to make Seitnater aware in the event he would need extra supports to be successful in pre-Kindergarten ("pre-K").  Ms. Becker communicated her concerns to Ms. Seitnater via an email that provided, in part: "Due to social/emotional/behavior needs [A.B.] needed additional support to navigate and participate in the classroom.  Self-regulation, social skills, and following direction were his weaknesses." (Tr. Vol. I, at 62:25-63:18; Pet. Ex. 1).

20.   Mrs. Beer enrolled A.B. in the District's tuition-based Pre-K program for the 2017-2018, school year. (JE-1, p. 82).

## Fall 2017 – Pre-K

21.   Ms. Ruble has a unified early childhood degree and an endorsement in English as a second language. (Tr. 73:24-74:1).

22.   A.B. attended pre-K at Briarwood Elementary in the 2017-2018, school year, within the Shawnee Mission School District.  Emily Ruble was A.B.s' pre-K teacher.  Ms. Ruble, a first-year teacher, had not participated in a special education student evaluation prior to being A.B.s' teacher.  (Tr. Vol. I, at 73:11-17, 74:10-20, 79:18-80:2; Tr. Vol. III, 537:11-538:3).

23.   On August 10, 2017, Ms. Seitnater forwarded Ms. Becker's e-mail expressing "social/emotional/behavior" concerns regarding A.B. to Ms. Ruble.  (Pet. Ex. 1).

24.   School was quite difficult for A.B. in the first few months of pre-K.  He had numerous social problems, both at drop off and throughout the school day.  A.B. was not interacting with his peers.  He was having one-sided conversations and could not empathize with his peers.  (Tr. Vol. III, 538:4-539:2).

25.   Early in the school year, Ms. Ruble observed that A.B. had difficulty building peer relationships, was destructive of materials, and would flee group learning time, finding a "hiding space" in the classroom to "hide himself into a small kind of locker space when he didn't want to participate."  The magnitude of A.B.s'' social-emotional deficits led Ms. Ruble to ask for assistance.  Ms. Ruble also observed that A.B. would greet peers "in his way," meaning he would stand closer in proximity than most people would and would repeatedly greet them if they did not "greet him back in the way that he liked."  (Tr. Vol. I, at 78:13-25, 80:6-81:4, 87:23-88:8).

26.     Ms. Ruble also testified that A.B. appeared unsure about how to play with the other students and also appeared to require guidance on how to do so.  (Tr. 78:13-25).

27.     During a conversation at the beginning of the school year, Ms. Ruble told Ms. Beer that her little brother had autism, and that she believed A.B. was presenting with autism and displaying some of the conditions attributable to a child with autism.  (Tr. Vol. III, 539:3-14).  Soon after, Ms. Ruble told Ms. Beer that she was going to request an evaluation, and Ms. Beer agreed.  (Tr. Vol. III, 539:18-25).

28.     In contrast, Mrs. Beer testified that she never told Ms. Ruble that she thought A.B. had autism and Ms. Ruble never told Mrs. Beer that she thought A.B. had autism.  (Tr. 935:9-14).

29.     On August 23, 2017, Ms. Ruble emailed Ms. Seitnater. The subject of the email concerned ideas for social stories that Ms. Ruble suggested could help A.B. navigate "unsure social situations."  (Petitioners' Ex. 5; Tr. 79:8-14).

30.     On August 30, 2017, following Ms. Ruble's request to evaluate A.B. to determine if he was eligible for special education, the District proposed to conduct an evaluation to determine whether A.B. was a child with an exceptionality in need of special education and related services.  (Tr. 80:8-12; JE-1, p. 116).

31.     By prior written notice dated August 30, 2017, the District requested parental consent to conduct an initial evaluation in the area of "Social/Emotional Status/Behavioral Status."  (JE-1, pp. 116-119).

32.     Mrs. Beer consented to the District's proposal to conduct such an evaluation on August 31, 2017.  (JE-1, p. 119).

33.     During a conversation at the beginning of the school year, Ms. Ruble told Ms. Beer that her little brother had autism, and that she believed A.B. was presenting with autism and displaying some of the conditions attributable to a child with autism.  (Tr. Vol. III, 539:3-14).  Soon after, Ms. Ruble told Ms. Beer that she was going to request an evaluation, and Ms. Beer agreed.  (Tr. Vol. III, 539:18-25).  After the 2017-2018 school year ended, Ms. Ruble and Ms. Beer exchanged several emails wherein Ms. Beer conveyed the possibility that A.B. had autism; Ms. Ruble did not react with surprise to any such communication.  (Tr. Vol. III, 553:16-560:16; Pet. Exs. 24, 32, 39).

34.     Ms. Beer believed the school was evaluating the possibility of autism because of her prior conversation with Ms. Ruble regarding Ms. Ruble's concerns that A.B. was a child

with autism.  (Tr. Vol. III, 539:18-540:11, 564:2-565:13).  Ms. Beer consented to the evaluation on August 31, 2017.  (Tr. Vol. I, 80:6-12; JE-1, pp. 116-119, 183-190).

35.    On September 11, 2017, the District issued a Prior Written Notice of Meeting to Mr. and Mrs. Beer in order to schedule a meeting to review the evaluation, determine eligibility, and, if needed, develop an individualized education program for A.B.  (JE-1, pp. 160-162). The proposed date of the meeting was November 6, 2017.

36.    On September 20, 2017, Ms. Seitnater provided Mrs. Beer a form to fill out as part of A.B.'s evaluation titled, "Parent Interview Questions."  (JE-1, p. 163).

37.    The October 15, 2017, parent interview question form completed by Mrs. Beer provided:

> If behavior is a concern, can you describe his behavior, how many times per day/week it occurs, and where it can occur (home, community, etc)?  Now both [A.B.'s father] and myself are thoroughly pleased with [A.B.'s] progress. He listens to us now and we are using the visual references and we talk about why and what are manners are. How to treat people with empathy and kindness…
>
> P.S. Thank You, for all helping him. We really have seen a vast improvement in him, since the beginning of school.
>
> (JE-1, p. 165).

38.    Mrs. Beer provided her responses to the parent interview questions in plenty of time for Ms. Seitnater to write it up in the report.  (Tr. 971:4-9).

39.    Throughout the 2017-2018, school year, Ms. Ruble used various general education interventions with A.B. For example, in order to increase the amount of time A.B. would stay in circle time, Ms. Ruble used a sand timer with A.B. Initially, Ms. Ruble set the timer to just one minute; and, A.B. would have to stay in circle time until the sand timer ran out. After it did, Ms. Becker would allow A.B. to leave circle time and use his break box, provided he asked for it appropriately. Over time, as A.B. continued to demonstrate success with the use of the sand timer, Ms. Ruble increased the amount of time A.B. was required to stay in circle time before he could exit and use his break box.  (Tr. 83:24-84:8).

40.    Items in his break box were coloring sheets, Play-Doh, Legos, and different manipulatives. After he successfully stayed in circle time until the sand timer ran out, A.B. was free to use his break box items just outside the circle where he could still hear the instruction taking place.  (Tr. 83:24-84:13).

41.    Ms. Ruble used other general education interventions with A.B., like warning him before a transition. Ms. Ruble testified that she warned all of her students before a

transition (e.g., "in one minute we're going to be doing [fill in the blank]"), but she also individually and directly warned A.B. that a change was imminent. In such situations, Ms. Ruble testified that she may have used the timer too. (Tr. 84:14-19).

42.     Another general education intervention that Ms. Ruble used with A.B. was "first-then statements." An example of a first-then statement is: "First, you need to stay at circle time for one minute, then you can use the break box." Using first-then statements with A.B. allowed him to prepare for what was coming. (Tr. 84:20-24).

43.     Ms. Ruble also used "first-then" charts that had picture icons for A.B., as well as for other students. The charts are used quite often and were not created specifically for A.B. (Tr. 85:15-25).

44.     Ms. Ruble's strategies helped A.B. once he got familiar with them and they became a part of the normal routine in the classroom. For instance, the timer would increase and A.B.'s need for a break would decrease. (Tr. 86:1-7).

45.     Ms. Ruble testified that she did not think A.B.'s behaviors impacted his ability to learn. (Tr. 86:8-13. At the beginning of the school year, however, A.B.'s behaviors impacted his ability to form healthy friendships in the classroom. (Tr. 86:13-14).

46.     Ms. Ruble testified that A.B. occasionally did well with greeting peers. A.B. had some peers in the classroom who he wanted to be friends with and so, in his way, he would try to say hello to them or try to play. A.B. would be a little bit closer in proximity than most people would and if someone did not greet him back in the way he liked, he would greet them again. (Tr. 88:2-15; JE1, p. 151-159).

47.     Ms. Ruble testified that sometimes drop-off was tough for A.B., just as it is for many four- year-old children in the middle of the day. (Tr. 88:5-7).

48.     By November 2017, Ms. Ruble felt she had developed a rapport with A.B. and that she had gotten to know him and his family well. (Tr. 926:24-927:6).

49.     At no point in time did Mrs. Beer ever convey dissatisfaction with A.B.'s time in Ms. Ruble's classroom. In fact, it was quite the opposite in that Mrs. Beer often expressed her gratitude to Ms. Ruble for her work with A.B. (Tr. 930:20-23; 931:24-932:12; Ex. SMSD-12, p. 173).

50.     Ms. Ruble never lied to Mrs. Beer, nor withheld any information from Mrs. Beer. (Tr. 934:23-935:2).

51.     The purpose of an evaluation is to determine whether a student has a qualifying disability and whether that student is in need of special education.  Another purpose is to gather information that can later be used to formulate goals.  (Tr. Vol. II, 414:15-20; (Tr. Vol. VI, 1521:18-25, 1546:8-10).  However, Ms. Seitnater testified that evaluations consist of gathering information without thinking about the eligibility category.  (Tr. Vol. IV, 949:18-950:2).

52.     The District's school psychologist, Kathy Ostby, testified that an evaluation can be triggered if a teacher or staff member thinks or suspects a student might have a disability.  (Tr. Vol. IV, 988:2-13; 991:4-13).

53.     The District's school psychologist, Kathy Ostby, testified that an evaluation can be triggered if a teacher or staff member thinks or suspects a student might have a disability.  (Tr. Vol. IV, 988:2-13; 991:4-13).

54.     Ms. Beer completed a parent questionnaire at the request of the school, informing the school about her experiences with A.B. in the home environment.  (Tr. Vol. III, 540:12-541:3).  Some of the input Ms. Beer provided indicated that A.B. spoke with a robotic tone, had a hard time understanding emotions in himself and others, difficulty with stopping conflicts, difficulty with toy play, difficulty in group activities, and lack of empathy.  (Tr. Vol. III, 541:16-543:13; JE-1, pp. 145-148).

55.     Lindsey Seitnater is an early childhood special education teacher with the District who serves the community and District Pre-K.  Students enrolled in the early childhood programare three- to five-years-old.  (Tr. 107:9-16, 942:9-11).

56.     Ms. Seitnater has been employed with the District for 13 years; and, she has been employedby the District as an early childhood special education teacher for six years.  (Tr. 107:9-24).

57.     Ms. Seitnater has a bachelor's degree in early childhood education and elementary education, and a master's degree in special education. (Tr. 107:25-108:4).

58.     As an early childhood special education teacher, Ms. Seitnater evaluates three-, four-, andfive-year-old children before kindergarten.  (Tr. 942:23-25).

59.     Ms. Seitnater testified that in order to qualify for special education services in Kansas, a student has to show a significant discrepancy between his same age peers and has to requireservice beyond what is available in the general education classroom.  (Tr. 943:1-8).

60.     Ms. Seitnater testified that a medical diagnosis does not automatically qualify a student forspecial education. And, while a medical diagnosis provides information, the District, regardless of the medical diagnosis, would still do the same type of testing, interview, andobservation. (Tr. 943:9-16).

61.     Further, Ms. Seitnater testified that there are eligibility categories at ages three, four and five. The category that the District sees the most at ages three, four, and five is developmental delay, but they also have hearing impaired, other health impairment, autism, and learning disability (which is not usually pinpointed this early in their development). (Tr. 943:17-944:1).

62.     The District does not typically conduct functional behavioral assessments to determine eligibility at ages three, four and five.  Ms. Seitnater works with a behavior support teacherwho would do the functional behavioral assessment, but even still, Ms. Seitnater has beena part of only two functional behavioral assessments during her six years as an early childhood special education teacher.  (Tr. 944:2-8).

63.     Ms. Seitnater testified that the District is obligated to follow Child Find through the State of Kansas, which establishes different ways to find children for evaluation. She also testified that the District conducts monthly screenings where parents can bring their kids in, and the District provides transition services, including infant-toddler and pre-K transition services. Ms. Seitnater testified that the best practice is to put interventions intoplace – which they did with A.B. – in conjunction with an evaluation in order to see what kind of progress a student can make with those interventions.  (Tr. 944:25-945:16).

64.     The Child Find obligation is different in Pre-K than it is in kindergarten and after.  General education interventions are mandated for students in kindergarten through twelfth grade but not for students in early childhood or pre-K programs.  (Tr. 945:17-22).

65.     The whole District uses the same evaluation report across all ages. (Tr.945:23-946:1).

66.     Ms. Seitnater knew that A.B. had previously been evaluated for eligibility and that he hadreceived speech and language services from infant/toddler services. She also knew that when he was getting ready to turn three years of age, they had to do that transition to schoolage services.  A.B. was evaluated at that point and he did not qualify.  (Tr. 946:10-17).

67.     When he joined Briarwood Elementary, A.B. was not eligible to receive

services immediately. (Tr. 946:18-20).

68.     Ms. Seitnater met with Mrs. Beer and discussed the scope of the evaluation. Ms. Seitnaterobtained consent and told Mrs. Beer what to expect during the evaluation process. (Tr. 948:17-22).

69.     An evaluation does not include an analysis of every possible qualifying factor; it only looksat what triggered the Child Find obligation.  (Tr. 949:6-10).

70.     The area that the District was going to be evaluating for A.B. was the social-emotional category because of some behaviors they had observed.  The evaluation was limited to just that one component because they did not have concerns in other areas. A.B. did not showany motor, communication, or cognitive concerns. Mrs. Beer did not ask the District to evaluate A.B. in any other area.  (Tr. 948:23-949:17).

71.     In an October 25, 2017, teacher interview as part of the evaluation, Ms. Ruble expressed that A.B. "has a difficult time at circle (whole group)" and that "[s]ome days he doesn't participate at all," was having difficulty with peer interactions, and would hit and kick other students.  When he was mad or upset, he was not redirectable by teachers.  Ms. Ruble described A.B. as demonstrating "huge progress" in peer interactions because, "[i]f he takes something from someone or hits, he understands that isn't kind and will say sorry." (Tr. Vol. I, 89:20-90:19; JE-1, p. 166).

72.     The evaluation for A.B. included a teacher interview, a parent interview, an observation, and the Assessment, Evaluation, and Programming System Test ("AEPS") for ages three to six.  (Tr. 111:15-23, 114:1-2; JE-1, pp. 151-159).

73.     The AEPS is a play-based assessment that involves observations of behaviors in both structured and unstructured activities.  (Tr. 111:15-23, 950:1).

74.     Ms. Seitnater completed the AEPS as part of A.B.'s October 2017 evaluation. (Tr. 112:4- 113:1; JE-1, pp. 151-159).

75.     Ms. Seitnater does not recall what time of day her observations were done. Generally, Ms.Seitnater assesses the subject student's entire day; so, for the AEPS administered for A.B.,she may have conducted several observations throughout the day. Doing so allows Ms. Seitnater to observe various parts of a student's day, including during whole group instruction; small group; centers; recess; snack; and, and different transitions. Getting a fullview of the student's days ensures that the score is accurate. (Tr. 113:6-16).

76.     With regard to the AEPS she conducted for A.B., Ms. Seitnater observed A.B.

multiple times on or just before September 11, 2017, which was the date reflected on the records comprising her observations of A.B. (Tr. 112:7-9, 112:20-113:1, 113:6-16, 952:2-; JE-1, pp. 151-159).

77.     On September 11, 2017, Ms. Seitnater observed A.B. right as they were starting interventions and she filled out the evaluator protocol for the AEPS in the social area. Then, about six weeks later, on October 25, 2017, Ms. Seitnater conducted another observation to document A.B.'s progress. The gap in time between the observations provided Ms. Seitnater a sufficient amount of time to assess whether the intervention employed resulted in measurable progress. It also ensured that the District completed the evaluation within 60 days.  (Tr. 947:9-13, 951:15-952:1, 952:13-23; JE-1, pp. 151-159).

78.     During her observations, Ms. Seitnater looked at A.B.'s behavior in a variety of structured and unstructured settings in the classroom. Ms. Seitnater looked at different piece of the social area development in the classroom. (Tr. 947:9-13, 951:15-952:1, 952:13-23; JE-1, pp. 151-159).

79.     Ms. Seitnater also observed A.B. outside of the observations she recorded on AEPS to ensure she did not miss anything and to confirm what she had found.  Ms. Seitnater did not take notes of these other observations; and the full extent of her observation notes is reflected in the report.  (Tr. 952:24-953:9).

80.     At the end of her AEPS report, Ms. Seitnater included calculations on the bottom of the last page. (JE-1, p. 159; (Tr. 953:10-17. Ms. Seitnater's calculations reflect A.B. received a score of 38% (36 out of 94 points) for September 11, 2017. They also reflect that A.B. received a score of 68% (64 out of 94 points) from the October 25, 2017, observations. Ms. Seitnater also included "the cut[off] scores" on the bottom of the last page of the AEPS report, which allows the District to look at the scores in a variety of ways relative to other children of 61 months. (Tr. 953:10-954:12; JE-1, pp. 151-159).

81.     Ms. Seitnater's analysis shows huge growth with the interventions put into place.  A.B. had 38% of the skills in September 2017, and, in just about six weeks, he almost doubled what he had initially done. It showed that the interventions were working for A.B. and he was able to better participate socially in the classroom.  (Tr. 953:10-954:12; JE-1, pp. 151-159).

82.     Dr. Weigand testified that given the extensive deficits A.B. displayed, it is not a realistic expectation that the skills assessed in the AEPS would develop in the short

timespan between the first and second administration of the assessment. (Tr. Vol. I, at 138:20-141:25). A single socialization evaluation is not sufficient to identify an individual with autism. (Tr. Vol. I, at 151:7-152:6).

83.    Ms. Seitnater performed two classroom observations of A.B. on September 14, 2017, and October 5, 2017. (JE-1, p. 186). Dr. Weigand testified that the observations were of insufficient timeframe and did not provide enough detail to assess a student who was having such difficulty accessing the curriculum and benefiting from instruction. Further, the observation narrative had missing information regarding A.B.'s behaviors. (Tr. Vol I, at 144:9-145:12).

84.    The conclusion that A.B. had made "tremendous progress" contradicted the teacher interview responses, wherein Ms. Ruble indicated she had a great deal of concern regarding A.B.'s ability to interact with others, that he was having difficulty with appropriate interactions with his peers and appropriate play skills, and that he becomes aggressive. (Tr. Vol. I, at 143:3-25; JE-1, pp. 183-190).

85.    A.B.'s behaviors were concerning to Ms. Seitnater. (Tr. Vol. I, at 109:13-110:2).

86.    At the beginning of the 2017-2018, school year, A.B. scored zeros in whole group instruction and small group instruction. He was also escaping and leaving the area, or alternatively, not coming to the area to begin with. But, by October 2017, A.B. was getting scores of two in those areas. A score of two reflects that A.B. was doing it consistently in some of the areas and able to participate in that whole group and small group instruction more fully. (Tr. 954:13-955:3).

87.    In an October 25, 2017, teacher interview as part of the evaluation, Ms. Ruble expressed that A.B. "has a difficult time at circle (whole group)" and that "[s]ome days he doesn't participate at all," was having difficulty with peer interactions, and would hit and kick other students. When he was mad or upset, he was not redirectable by teachers. Ms. Ruble described A.B. as demonstrating "huge progress" in peer interactions because, "[i]f he takes something from someone or hits, he understands that isn't kind and will say sorry." (Tr. Vol. I, 89:20-90:19; JE-1, p. 166).

88.    Despite Ms. Ruble's contemporaneous input that sometimes A.B. did not participate at all in late October 2017, Ms. Seitnater testified that A.B. had demonstrated "huge gains," was participating from a separate area of the classroom behind a table and

receiving instruction.  (Tr. Vol. I, 110:14-116:8; JE-1, p. 166).

89.     Although classroom interventions may have resulted in some increased classroom participation for A.B., there were days that A.B. did not participate at all or receive instruction.  (JE-1, p. 184).  While his peers received instruction during circle time, A.B. was observed sitting at a break timetable coloring.  (JE-1, p. 187).

90.     Ms. Seitnater testified that parents are a valuable part of the evaluation team. (Tr. 955:18-20).

91.     Ms. Seitnater fully included Mrs. Beer on the evaluation team.  (Tr. 955:21-23).

92.     Ms. Seitnater relied on what Mrs. Beer told her. She reported it in the evaluation report under the Parent Interview piece.  (Tr. 955:24-956:1; JE-1, pp. 165, 183-190).

93.     The family also completes an AEPS report so that they can have a look at the whole child,not just what A.B. is doing at school. They also want to see what he's doing at home so they can tell whether it is only something is going on at school. They rely on what the parents tell them in the evaluation process.  (Tr. 951:3-14).

94.     Mrs. Beer completed an AEPS for A.B.  This family report covers all areas of developmentwhere Ms. Seitnater was just doing the social piece of the AEPS. The social piece of the family report and the social piece of Ms. Seitnater's report go hand in hand. It tells them exactly what A.B. is doing in those areas at home and then Ms. Seitnater looks at what heis doing at school. Then Ms. Seitnater combines those scores to get the score for the protocol.  (Tr. 950:7-24; JE-1, pp. 120-149).

95.     On the AEPS, Mrs. Beer reported that A.B. was intelligent, inquisitive, independent, willful, funny, passionate, strong in math, engineering, spatial recognition, art, playful andsensitive. She further stated that A.B. needs to "learn social and emotional skills without breaking his spirit." (JE-1, p. 120. Mrs. Beer further reported that A.B. was smart and a leader, can be bossy, is empathetic but can take his playfulness too far, and is not afraid to"just join in with others." In response to the question, "What social skills do you want yourchild to learn?" Mrs. Beer stated: "This is of course our problem area." (JE-1, p. 148., Tr. 111:15-23, 114:1-2; JE-1, pp. 151-159).

96.     The purpose of the parent interview is to get more information outside of the family reportabout how a student is doing at home, what concerns the parents have, what

behaviors they might see at home, what strategies work at home (which is a really good piece of information to report in case it is a strategy the District had not already thought of). (Tr. 955:7-17).

97.    Mrs. Beer never indicated that she had any additional concerns about A.B. (Tr. 958:5-8). A Strengths and Next Steps chart was completed by Ms. Ruble in October 2017. The Chart characterized A.B.'s "Strengths" as: creativity, able to problem solve during most situations, making progress in peer interactions, and asks high level thinking questions to drive conversation. The Chart characterized A.B.'s "Next Steps" as: increase appropriateness of expressing emotions and increase time spent at whole group. (JE-1, p. 164-167).

98.    Ms. Seitnater also conducted a review of the record, which is where she found A.B. had received infant/toddler services and was evaluated and did not qualify. (Tr. 947:14-17).

99.    A.B.'s Pre-K Evaluation included the AEPS results typed up, including the social/ emotional/behavioral status section, which was the area that A.B. was evaluated in. (Tr. 967:2-11, 969:5-10; JE-1, p. 183-190).

100.    On November 6, 2017, the IEP team determined that A.B. was not a child with an exceptionality and was not in need of specially designed instruction for social-emotional skills because, according to Ms. Seitnater, A.B. did not show a significant discrepancy from same age peers or require resources beyond what was available in the general education classroom. (Tr. Vol. I, at 114:3-15; JE-1, p. 183-190).

101.    The November 6, 2017, IEP team meeting was the first IEP team meeting that Ms. Beer ever attended. (Tr. Vol. III, 543:21-544:5). The team discussed the possibility of autism at the meeting, A.B.s'' progress, and more data collection. (Tr. Vol. III, 544:22-545:6). Ms. Beer was concerned about the effect a disability label would have on A.B. and felt a sense of relief that the evaluation team did not find anything wrong with him. Ms. Beer thought that maybe something was wrong with her parenting. (Tr. Vol. III, 544:6-17).

102.    On November 6, 2017, the District completed a Confidential Education Evaluation report ("Pre-K Evaluation") for A.B. The Pre-K Evaluation includes an itemization of Background Information, Screening Information, including a recitation of anecdotal and screening information from both the teacher and parent; a description of the observations and the use of the AEPS assessment tool. (JE-1, pp. 183-190).

103.   In the area of Social-Emotional/Behavioral Status, the Pre-K Evaluation states that A.B. "has made tremendous progress since the beginning of the school year. At the beginning of the school year, [A.B.] was not able to stay and attend during circle time. Currently, he will stay during longer stretches of circle time (sometimes the whole circle time) and will appropriately ask for a break if he needs one. During his break time, [A.B.] sits at a table behind the circle and colors but will often participate in songs and attend to what the teacher is saying. [A.B.'s] teacher reports that he has made great progress in seeking adult permission and identifying the emotions of others. [A.B.] is also making progress in his ability to interact with peers through his day. He has shown the ability to initiate and response for 2-4 exchanges during play." (JE-1, p. 187).

104.   Dr. Weigand testified that the school's evaluation in fall 2017 was inadequate to determine whether A.B. was a child with an exceptionality in need of special education and related services, even if the school did not have concerns that A.B. was a child with Autism Spectrum Disorder.  The school should have conducted a more sophisticated social and communication evaluation, expanded the scope of the evaluation regarding the concerning social-emotional development and behaviors, administered a screening tool such as the Gilliam Autism Rating Scale ("GARS"), and conducted more evidence-based observational assessments such as the Autism Diagnostic Observational Survey.  (Tr. Vol. I, at pp. 150:22-152:6, 152:21-153:8).

105.   Dr. Weigand testified that the school's evaluation in fall 2017 was not sufficiently comprehensive.  (Tr. Vol. I, at p. 153:21-24).

106.   Dr. Weigand testified that after an evaluation is completed, the school should conduct an evaluation if renewed concerns arise that a child has a disability. (Tr. Vol. I, at 154:23-155:11).

107.   Dr. Weigand testified that immediately after the school suspected A.B. was a child with autism, the District should have conducted additional evaluative assessments, such as the screening tool known as GARS.  The GARS would have given staff the information necessary to determine whether or not additional evaluation was necessary to identify if A.B. was a child with autism.  (Tr. Vol. I, at 145:13-147:2).

108.   GARS is an evidence-based step to identify a child suspected of having autism. (Tr. Vol. I, at 147:3-11).

109.   After the November 6, 2017, meeting, Ms. Beer did not receive any notices

from the District requesting she provide consent for the school to collect additional evaluative data on A.B. through the remainder of the school year.  (Tr. Vol. III, 545:9-12).

110.    Prior written notices (PWNs) are a procedural safeguard afforded to parents, to give them notice before the school initiates or changes the identification, evaluation, educational placement, or the provision of special education related services to their child. (Tr. Vol. VI, 1541:5-17).  The District uses prior written notice to communicate a student's need for special education and related services, and to request written parental consent. (Tr. Vol. II, 392:2-8; Tr. Vol. VI, 1544:3-6).

111.    At no time during the eligibility meeting did Ms. Seitnater state that she would continue to gather data on A.B. to determine eligibility. (Tr. 972:13-16).

112.    The team reviewed the evaluation report and then at the end of that, they summarized the findings. (Tr. 948:1-2).

113.    Then, the team talked about whether there was a significant discrepancy between A.B. and his same age peers and whether or not what A.B. needs is beyond what is available in a general education classroom. (Tr. 947:18-948:9).

114.    The team determined that A.B. did not show a significant discrepancy from same age peers at that point and that A.B. did not require resources beyond what was available in Ms. Ruble's general education classroom.  (Tr. 114:3-15, 947:18-948:9, 972:4-12).

115.    On November 6, 2017, the team determined that the result of the evaluation was that A.B. did not qualify for services. (Tr. 114:3-15, 971:24-972:3; JE-1, pp. 183-190).

116.    The Pre-K Evaluation team relied on the following sources of information: General Education Intervention/Screening, record review, interviews, observation and testing and concluded that A.B. was not eligible for special education because he did not meet the criteria as a child with an exceptionality. The Pre-K Evaluation further concluded that special education services were not necessary to enable A.B. to receive education benefits. (JE-1, p. 189).

117.    Mrs. Beer agreed with the evaluation determination of November 6, 2017, which concluded that A.B. was not eligible for special educational services. (Tr. 971:21-972:3).

118.    Mrs. Beer did not indicate any disagreement with the evaluation determination of November 6, 2017. (Tr. 971:18-20).

119.   All of the members of the Pre-K Evaluation team, including Mrs. Beer, signed the Pre-K Evaluation indicating agreement with the conclusions contained within the report. (JE-1, p. 189-190).

120.   A Prior Written Notice was hand delivered to Mrs. Beer on November 6, 2017, documenting that A.B. was not eligible for special education services. (Tr. 979:12-14, (JE- 1, pp. 173-175).

121.   Ms. Beer does not remember receiving a prior written notice from the District documenting the fact that A.B. was determined not eligible for services at the November 6, 2017, meeting.  (Tr. Vol. III, 660:3-15).

122.   The Prior Written Notice states the evaluation team's conclusion that A.B. was "evaluated and determined not eligible for special education services in the area of social/emotional skills and he will benefit from continuing in his Pre-K general education setting and exposure to age appropriate curriculum…[A.B.] is not discrepant from same age peers and does not demonstrate a need for special education services at this time…It is believed that [A.B.] will continue to progress through general education resources. However, if concerns arise in the future, parent may contact the school district to discuss further options."  (JE-1, pp. 173-175, 183-190).

123.   Ms. Seitnater does not recall whether autism was discussed during the November 6, 2017, meeting. (Tr. 115:1-4).

124.   As of the November 6, 2017, meeting, Ms. Seitnater did not suspect that A.B. might be displaying some behaviors that are consistent with autism because all kids at ages four and five have a variety of different behaviors. Further, A.B.'s behaviors were not affecting his ability to participate in a classroom anymore, so it looked like the variety of behaviors Ms. Seitnater would typically see at that age. (Tr. 115:5-13).

## Spring 2018

125.   In the spring 2018 semester, A.B. began demonstrating more aggressive behavior, such as violent physical incidents on the playground.  He became "obsessed" with another student and directed inappropriate drawings of "TNT" and Angry Birds blowing up toward that student.  (Tr. Vol. III, 545:13-546:23).  The behavior necessitated meetings with the building principal, Mr. Lash.  (Tr. Vol. III, 545:13-546:23, 550:3-7).

126.   Typical behaviors demonstrated by A.B. in spring 2018 included wandering around most of the time and stepping into other children's play in a negative manner; arriving at peer play with the intent of knocking down blocks or removing toys from other students' reach; disinterest in cooperative play; and inappropriate play with classroom materials.  (Tr. Vol. I, at 92:14-94:9; Pet. Ex. 22).

127.   Ms. Seitnater testified that a Student Improvement Meeting ("SIT team") is a general education intervention team. The SIT team meets to discuss students that might be struggling in any developmental area (such as difficulty with transitions). The SIT team problem-solves what they can do to help students in those areas. Members of a SIT team typically comprise of the Pre-K Teacher and Ms. Seitnater. Further, in situations involving a student with a related-services concern, the SIT team would call in an occupational therapist, a physical therapist, or a speech pathologist. Mr. Lash also attended when he could, but he was not at all of them. (Tr. 118:6-17, 973:17-974:12). Mr. Lash was the Principal at Briarwood Elementary when A.B. was in Pre-K during the 2017-2018, school year.  (Tr. 550:6-11).

128.   The SIT team met for Pre-K in Spring regarding A.B.; they discussed A.B. on two different occasions. The members of A.B.'s SIT team were Ms. Ruble and Ms. Seitnater. (Tr. 118:1- 5, 118:11-14).

129.   During the SIT team meeting, there were no concerns about A.B. In the February 2018, meeting, Ms. Ruble mentioned A.B. was obsessed with a friend and she was teaching him how to play with other peers. Ms. Ruble and Ms. Seitnater put a couple of things in place to try with A.B. to see if that would help him be able to play with other friends besides just the one that he was focusing all of his attention on.  (Tr. 118:18-119:3).

130.   During the SIT Team meeting in March 2018, Ms. Ruble noted that A.B. was really sad and was not liking coming to school. Ms. Seitnater referred Ms. Ruble to talk to the school social worker. Ms. Ruble and a social worker at Briarwood Elementary, Mrs. Caren Howes, came up with a social story for A.B.  (Tr. 119:7-21, 976:8-23).

131.   Ms. Seitnater testified that a social story is a common intervention; it is not unique to special education; it is commonly used throughout the school year for general education purposes.  (Tr. 976:24-977:16).

132.   Autism was not discussed in those spring SIT Team meetings for A.B.  (Tr. 119:4-6).

133.   A separate incident in the spring 2018 semester necessitated the District calling a meeting between Ms. Ruble, a District social worker (Caren Howes), and Ms. Beer to discuss A.B.'s behavior.  (Tr. Vol. III, 545:13-546:23).  At that meeting, Ms. Beer questioned whether A.B.'s behavior was associated with autism, but the concern was not addressed, and Ms. Beer left the meeting more confused.  (Id.; Tr. Vol. IV, 976:8-20).

134.   Shortly after the meeting with Ms. Ruble and Ms. Howes in March 2018, Ms. Beer memorialized oral conversations between herself and District staff, including Emily Ruble and Dr. Lash, in handwritten notes that she maintained in binders dedicated to A.B.'s school records.  (Tr. Vol. I, 92:14-94:9; Tr. Vol. III, 547:23-548:19, 549:15-553:7; Pet. Exs. 22, 23).  Among other things, Ms. Beer's notes reference "Dr. Lash," "A.B. is obsessed with being his friend," and "Does this behavior stem from Autism."  (Pet. Ex. 23).

135.   Dr. Weigand testified that the information available to the District during the 2017-2018 school year presented red flags that A.B. possibly had autism.  Those red flags include the social peculiarities of not being able or knowing how to initiate interaction, not knowing how to express emotion, not knowing how to escape a situation that is non-preferred and having symptoms of sensory processing disorder.  By removing himself from social interactions with other people, A.B. demonstrated a "hallmark of autism." (Tr. Vol. I, 148:15-150:21).

136.   Ms. Beer did not know that she could request an evaluation for A.B. at that time and believed the school had previously evaluated the possibility of autism.  (Tr. Vol. III, at 564:2-565:13).  Indeed, Ms. Beer completed a District form enrolling A.B. in kindergarten on or around May 29, 2018, and wrote, in part, that A.B. "was evaluated for autism, social and behavioral at age five via SMS pre-K Briarwood, Ms. Ruble."  (Tr. Vol. III, 562:23-563:8; JE-1, p. 209-214). Ms. Beer did not learn that she could request an evaluation until August 2018.  (Tr. Vol. III, at 565:3-10, 568:22-569:13; Pet. Ex. 46).

137.   Ms. Beer did not definitively learn and understand that A.B. had Autism Spectrum Disorder until January 2019, when she received Dr. Lindberg's report and diagnosis.  (Tr. Vol. III, 565:14-20, 674:10-21).

138.   A.B. did not progress in many areas of his social-behavioral skills during pre-K. A.B.'s report card reflects that he was "emerging" in nine of the fourteen social-behavioral areas in the first, second, and third quarters of pre-K.  (JE-1, p. 107; Tr. Vol. IV, 937:2-939:11). The educational records do not provide any fourth quarter scores.  *Id.*

139.   A.B.'s behaviors and development were discrepant from his peers.

140.   During the 2017-2018, school year, the District did not evaluate A.B. after the November 6, 2017 evaluation, did not send any notices declining to evaluate A.B. to the Beers, and did not send any notices requesting parental consent to evaluate A.B.  (Tr. Vol. III, 566:3-17).

141.    Ms. Ruble and Ms. Seitnater privately predicted that things would not go smoothly for A.B. as he entered into kindergarten.  (Pet. Ex. 214).

## 2018 – 2019 SCHOOL YEAR – WESTWOOD VIEW ELEMENTARY
## (Kindergarten Year)

142.  On May 29, 2018, a Student Enrollment Form & Enrollment Checklist was completed for A.B. to attend Westwood View. (JE-1, pp. 192-196).

143.  A New Parents Guide to Kindergarten at Westwood View was provided to Petitioner. (JE- 1, pp. 197-198).

144.  During the 2018-2019 school year, Ms. Emily Hoffman was A.B.'s kindergarten teacher. (Tr. 263:3-13).

145.  Emily Hoffman has a Bachelor of Science in elementary education and a master's in educational technology. (Tr. 262:16-18).

146.  Ms. Hoffman sent a letter to Petitioners regarding Color Cash, an incentive program for all students in her kindergarten class. (JE-1, p. 199).

147.  After the 2017-2018, school year ended, Petitioners consulted with their pediatrician who recommended A.B. undergo genetic testing.  The August 27, 2018, testing results identify a "15q26.1 loss (deletion)," suggesting A.B. possibly had autism but not providing a definitive diagnosis.  (Tr. Vol. III, 566:18-568:7; JE-1, pp. 221-224).  Ms. Beer communicated the genetic results to Ms. Ruble on September 5, 2018, and Ms. Ruble responded, in part: "Seems pretty spot-on," recommended an educational advocate to Ms. Beer for a second time and provided a hyperlink of a news article about special education problems in the Shawnee Mission School District.  (Tr. Vol. III, 568:22-569:9; Pet. Ex. 46).  Ms. Beer immediately got onto the wait list at Children's Mercy for an evaluation.  (Tr. Vol. III, 569:14-20).

148.  The District was aware that A.B. was on the Children's Mercy Hospital waiting list to evaluate the possibility of autism, but the pending medical evaluation did not hinder the District's evaluation process.  (Tr. Vol. II, 446:19-447:4).  The District could make an eligibility determination without the results of the medical diagnosis.  (Tr. Vol. II, 447:1-4).

149.  A.B. attended kindergarten at Westwood View Elementary, also within the Shawnee Mission School District, during the 2018-2019, school year. (Tr. Vol. III, 569:25-570:12).  Emily Hoffman was A.B.s'' kindergarten teacher.  It was her first-year teaching.  (Tr. Vol. II, 262:5-263:13, 265:9-12).

150.  On August 10, 2018, Mrs. Beer completed a Student Enrollment Form for A.B. (JE-1, pp. 209-212).

151. A Kindergarten Information and Skills Questionnaire was completed for A.B. (JE-1, pp. 213-214). Mrs. Beer wrote:

> [A.B.] is advanced in math, arts, vocabulary, well read…[A.B.] has advanced well this past year Ms. Ruble has been an amazing teacher. [A.B.] is strong willed. I hope his spirit is not broken but nurtured. I am excited to see him learn to read. I hope that "project work" is part of the curriculum and that he learns to work with others…[A.B.] was in parents as teachers at 1 yr. for speech. He was evaluated for Autism at Age 3 via SMSD. [A.B.] was again evaluated for Autism (social and behavioral) at age 5 via SMSD Pre-K Briarwood Ms. Ruble. In both instances he was found not to need an IEP. [A.B.] and I attend a play therapy privately.

152.  The District published a school calendar, indicating what days school was in session for the 2018-2019, and 2019-2020, school years.  (Tr. Vol. III, 575:19-576:3; Pet. Ex. 549; SMSD-3, pg. 4).

153.  Within the first few weeks of the 2018-2019 school year A.B. began constantly perseverating, biting his shirt as a nervous tick; Ms. Hoffman expressed concerns that A.B. was not listening in class, was not participating, or following directions, and was not joining in group activities. (Tr. Vol. III, 570:13-572:20).  A.B.'s desk was at the back of the room, separated from his peers.  He was also ripping up papers and leaving them scattered about. (Tr. Vol. III, 570:13-572:3).

154.  A.B.'s peer interactions were one-sided, and he was not playing with his peers. He did not understand kids' jokes or games they were playing.  (Tr. Vol. III, 572:21-573:9).

155.  The school identified A.B. as at "significant risk of not meeting grade level expectations" in a September 28, 2018, reading assessment, that scored A.B. in the 17th

percentile as compared to his peers.  (Tr. Vol. III, 573:10-575:1; JE-1, pp. 699-700).  Ms. Beer received notification that he would receive instruction from a reading teacher. (Tr. Vol. III, 574:17-575:1).

156.  Ms. Beer attempted to collaborate with Ms. Keith and other District staff to address her concerns about A.B., but perceived Ms. Keith as not wanting to collaborate.  (Tr. Vol. III, 560:17-562:1; Pet. Ex. 39).

157.  At the start of A.B.'s kindergarten school year 2018-2019, Ms. Beer invited Ms. Ruble to attend a meeting with Ms. Hoffman and Principal Keith to discuss A.B. and teaching strategies.  Although Ms. Hoffman was receptive to Ms. Ruble's ideas, Ms. Keith was not "interested in the meeting or the topic."  Ms. Ruble sensed a tension from Ms. Keith directed at Ms. Beer.  (Tr. Vol. I, at 98:4-99:5; 102:8-103:19; Pet. Ex. 34).

158.  Westwood View had a building-wide discipline strategy where a student was sent to a "buddy room" if they were not able to follow directions after prompts.  Ms. Hoffman used the other kindergarten room as A.B.'s "buddy room," but used the nurse's office when A.B. was crying.  (Tr. Vol. II, 267:18-268:1, 272:13-17).  Specials teachers used the office as A.B.'s "buddy room."  (Tr. Vol. II, 274:7-12).

159.  Before sending A.B. to the buddy room, Ms. Hoffman would first seat A.B. in a "buddy seat," which is a seat off by itself in her classroom.  (Tr. Vol. II, 275:7-21).   When A.B. was displaying disruptive behaviors, Ms. Hoffman sent him to the buddy seat due to classroom disruption.  (Tr. Vol. II, 276:1-5).

160.  Ms. Hoffman sent A.B. to the buddy room when he was being disruptive (whether by himself or with other students), going into areas he was not supposed to be, or throwing things.  (Tr. Vol. II, 269:20-270:10).  While in the buddy room, A.B. would just sit and decompress.  He would return to his classroom when directed to do so.  The length of time A.B. spent in the buddy room was not tracked.  (Tr. Vol. II, 271:3-15, 273:19-25).

161.  Ms. Beer requested the District evaluate A.B. on August 29, 2018 (Tr. Vol. III, 575:2-4, 666:1-4; JE-1, pp. 231-234).

162.  Before A.B. arrived at Westwood View, Principal Kathy Keith communicated with speech-language pathologist Amy Shields about A.B.  The conversation was meant, in part, to give Ms. Shields a warning about A.B., and to put him on her radar.  (Tr. Vol. II, at 246:10-251:7).

163.  Daily Attendance and Office Visits for A.B. were recorded between August 10, 2018, and February 6, 2019.  (JE-1, pp. 215-219).

164.  From August 2018, through October 2018, data for a Student Progress Monitoring Graph for First Sound Fluency was recorded for A.B. showed that he was making progress at First Sound Fluency. On three out of four data points, A.B. was above the "aimline," and he scored at or above the benchmark goal on the last two data points (taken end of September and beginning of October 2018).  (JE-1, p. 208).

165.  On August 22, 2018, data was collected regarding A.B.'s ability to make good choices during his morning and afternoon routines. During the morning routine, he received a star for recess. During the afternoon routine, he received a star for math, recess and centers. (JE-1, p. 220).

166.  On August 27, 2018, Lineagen FirstStepDx PLUS' genetic testing results (provider Dr. Marion S. Pierson, MD) were completed for A.B. The results showed A.B. had a chromosome micro-deletion.  (JE-1, pp. 221-224).

167.  Mrs. Beer emailed Ms. Hoffman, Ms. Ostby, Ms. Keith, and Mr. Mirsch to inform them of same on September 4, 2018.  (SMSD-12, p. 403).

168.   Lineagen's genetic testing results for A.B. states that "[t]he clinical consequences caused by this finding, if any, are not currently known. This testing did not identify a genetic diagnosis."  Further, the detection of a chromosomal micro-deletion suggested A.B. various diseases or disorders but it is not a definitive diagnosis.  (JE-1, p. 221).

169.   On August 29, 2018, at 10:00, just after recess had ended, Reinforcement Menu data was collected; among other things, A.B. served as a line leader, played with a friend, and played with toys. As a result, A.B. was rewarded with fun size Reese's pieces.  (JE-1, pp. 225-230).

170.   On August 29, 2018, at approximately 11:56 a.m., Ms. Ruble emailed Mrs. Beer and asked whether A.B. had an official diagnosis of autism or any other diagnosis. Ms. Ruble also asked whether A.B. had met with the school social worker or the psychologist. Further, Ms. Ruble advised Mrs. Beer that she could request a full evaluation in writing by providing the request to the principal. Ms. Ruble advised the school must legally have the evaluation completed and reported back to Mrs. Beer in "60 school (not calendar) days." (Tr. 95:19-96:22; Petitioners' Ex. 35).

171.    On August 29, 2018, at approximately 12:52 p.m., Mrs. Beer submitted her written request for a full evaluation of A.B.  (Tr. 999:14-18; Ex. SMSD-12, p. 313-314).

172.    Further, Mrs. Beer's August 29, 2018, email to numerous District employees also stated:  My son is currently going thru his pediatrician to be evaluated for autism...My son has been evaluated twice by SMSD...He has shown vast improvements at both evaluations so an IEP was not recommended...I have tried to set up a meeting with A.B.'s previous teacher (Ms. Ruble), his new teacher Ms. Hoffman, and the Principal Ms. Keith...It appears that Ms. Keith has an aversion to meeting with all of us in person...The climate at the school is cold. The email response from Principal Ms. Keith lacks etiquette and comes off cold, as well. I do not feel supported by the staff at [Westwood View] at this time...I would like to officially request a full evaluation from [Westwood View] at this time. (As I understand it [Westwood View] has 60 days to complete this.) (Ex. SMSD-12, p. 313).

173.    On August 30, 2018, Ms. Hoffman met with Ms. Ruble, Mrs. Kathy Keith (Westwood View Principal) and Mrs. Beer to brainstorm ideas about what behaviors were happening in preschool and brainstorm some ideas of what strategies and skills work to help A.B. in preschool and kind of figure out how they could adapt those for kindergarten. Ms. Ruble was invited to attend by Mrs. Beer to speak with the team that A.B. was working with at Westwood View about A.B.'s successes and progress he had made in PreK and the strategies that had worked well for him. The meeting took place at Westwood View after school hours. (Tr. 98:4-16, 104:4-105:4, 264:1-17; Petitioners' Ex. 34).

174.    Kathy Ostby is a school psychologist at the District and was referred by Mrs. Beer's request for an evaluation for A.B.  (Tr. 442:9-11).

175.    Ms. Ostby's role in the evaluation of A.B. in the 2018-2019, school year was to organize and facilitate the evaluation. Ms. Ostby was one of the evaluation team members that evaluated A.B.  (Tr. 442:23-443:8, 1023:7-9).

176.    Ms. Ostby has a bachelor's degree in psychology, a master's in school psychology and an ed specialist. (Tr. 442:19-22).

177.    Ms. Ostby has been a school psychologist for 31 years. She has been employed as a school psychologist by the District for 27 years.  (Tr. 442:12-18).

178.    For the past 10 years, Ms. Ostby predominantly worked with elementary students. She has also worked with students in grades K-12 at Arrowhead Day School, which

is a school where services are provided to students who have significant emotional and behavioral issues.  (Tr. 990:12-22).

179.   Ms. Ostby has done hundreds, probably thousands of evaluations over the course of 31 years.  (Tr. 990:9-11).

180.   Ms. Ostby is in charge of facilitating the evaluation process.  (Tr. 443:21-24).

181.   Ms. Ostby's workload was heavy during fall 2018.  She reported to between five and seven schools; commonly school psychologists cover just two schools.  (Tr. Vol. II, 463:2-19).  The functioning of the special education department was challenging because of Kathy Ostby's workload.  (Tr. Vol. II, 484:14-485:12).

182.   Ms. Ostby testified that a student evaluation may be triggered by a parental request; or an evaluation may be triggered by a teacher or staff member who believes or has data to suggest that a student might have a disability, which typically, but not always, develops through general education interventions.  (Tr. 991:4-13).

183.   In the State of Kansas, a two-prong test is used to determine whether a student is eligible for special education services. The first prong of the test looks at exceptionality; the second prong of the test looks at need. After conducting an initial evaluation, either using response to intervention or strengths and weakness, the team takes that data and compares it to one of the categories in the exceptionality, prong 1. Then prong 2 looks at need – does the student demonstrate a need for special education services or specially designed instruction. The District must have data to support indicators on both prongs for a student to be considered eligible for special education in the state of Kansas.  (Tr. 991:25-992:17).

184.   A.B.'s evaluation situation in kindergarten during the 2018-2019, school year was unique. When the District received the request for A.B., he had only been in school for a couple of weeks. Further, his teacher was brand new, and she was trying to learn curriculum and get classroom management established all at the same time.  (Tr. 992:18-993:6).

185.   Ms. Ostby does not generally conduct a functional behavioral assessment to determine eligibility for special education. The functional behavioral assessment is typically done when there is a reason to suspect that the student's behavior might be interfering with their progress in the general education classroom.  (Tr. 993:7-14).

186.   The District did a functional behavioral assessment as part of the initial evaluation for A.B. because there was a reason to suspect that his behavior might be interfering with his progress in the general education classroom.  (Tr. 993:7-14).

187.   Ms. Ostby testified that generally, to conduct a functional behavioral assessment, the District will collect baseline data through a parent report and teacher observation. Then a person on the team, typically the behavior support teacher, will observe the student and obtain more data. Then all of the data is analyzed to determine a target behavior. Additional data is collected within the classroom, which is called ABC data, as well as other data. The District would want to obtain a student interview, teacher interview, review of history, what behavior interventions have been tried in the past, what has and has not worked, whether there is any unique medical information, developmental information, and parent input.  (Tr. 993:15-994:10).

188.   Target behavior is the behavior that is interfering or that they need to figure out the function of it or why the student is engaging in that behavior.  (Tr. 994:11-15).

189.   Ms. Ostby testified that both the IDEA and Kansas law require multiple data points during an evaluation: data from general education interventions, which provides a rich source of information; medical history; interview of the parent, teacher and student, when appropriate; interview of any past teachers; observations in the classroom and across school settings, if needed; test scores; and behavioral rating. The District strives to have a variety of data to look at when doing an initial evaluation because a convergence of data is required.  (Tr. 994:23-995:24).

190.   A student cannot be found eligible based on a medical diagnosis alone. The same requirements are needed for an initial evaluation, whether they have a medical diagnosis or not. Certainly, the medical diagnosis will be considered as part of the data, but a medical diagnosis alone without data is insufficient.  (Tr. 995:25-996:6).

191.   An initial evaluation looks at first-time eligibility for a student. An initial evaluation has general education interventions data either prior to going to the initial or it is done simultaneously while the team conducts the initial evaluation.  (Tr. 1001:8-1002:2).

192.   A.B.'s evaluation was prompted when Mrs. Beer wrote a letter on August 29, 2018, saying that A.B. had been evaluated twice by the District. Ms. Beer wrote that the first evaluation was completed via parents as teachers and again at age five in early childhood. Further, Ms. Beer stated that A.B. "has shown vast improvements at both evaluations" and had not qualified. Even still, she noted that she still had concerns and suspected A.B. may have autism.  (SMSD-12, pp.313-314; (Tr. 996:15-997:14).

193.   Ms. Ostby relied on Ms. Beer's August 29, 2018, letter in initiating A.B.'s initial evaluation.  (Tr. 998:5-7).

194.   When she read Mrs. Beer's August 29, 2018, letter, Ms. Ostby responded by wanting to get the team together, listen to Mrs. Beer's concerns, and then plan the evaluation from there.  (Tr. 996:15-22, 998:10-13; Ex. SMSD-12, p. 313).

195.   The District had 60 school days to complete the evaluation following Mrs. Beer's August 29, 2018, request.  (Tr. 999:4-8; Ex. SMSD-12, p. 313).

196.   After Ms. Ostby read Mrs. Beer's letter, she reached out to Mrs. Beer and scheduled a time to meet.  (Tr. 999:20-1000:7).

197.   Ms. Hoffman was able to incorporate some of the strategies used in Pre-K for Kindergarten. Ms. Ruble talked about how she used the visual schedule with A.B., and from that Ms. Hoffman was able to create her own visual schedule with the support from her own school that suited his kindergarten day and also started to work offering him choices. (Tr. 264:23- 265:8).

198.   In or about August 2018, Petitioners began receiving A.B.'s Color Cash sheets, which noted whether A.B. made great choices all week; whether A.B. showed big improvement; or whether A.B. needed to work on: following directions, listening, staying on task, shouting out, being kind to others, or self-control. (JE-1, p. 200-207).

199.   Within the first few weeks of the 2018-2019, school year A.B. began constantly perseverating, biting his shirt as a nervous tick; Ms. Hoffman expressed concerns that A.B. was not listening in class, was not participating or following directions, and was not joining in group activities. (Tr. Vol. III, 570:13-572:20).  A.B.s'' desk was at the back of the room, separated from his peers.  He was also ripping up papers and leaving them scattered about. (Tr. Vol. III, 570:13-572:3).

200.   A.B.s'' peer interactions were one-sided, and he was not playing with his peers. He did not understand kids' jokes or games they were playing.  (Tr. Vol. III, 572:21-573:9).

201.   A.B. could not read, and the school identified him as a "significant risk of not meeting grade level expectations" in a September 28, 2018, reading assessment, that scored A.B. in the 17th percentile as compared to his peers.  (Tr. Vol. III, 573:10-575:1; JE-1, pp. 699-700).  Ms. Beer received notification that he would receive instruction from a reading teacher. (Tr. Vol. III, 574:17-575:1).

202.   Ms. Beer attempted to collaborate with Ms. Keith and other District staff to address her concerns about A.B., but perceived Ms. Keith as not wanting to collaborate.  (Tr. Vol. III, 560:17-562:1; Pet. Ex. 39).

203.   At the start of A.B.s'' kindergarten school year 2018-2019, Ms. Beer invited Ms. Ruble to attend a meeting with Ms. Hoffman and Principal Keith to discuss A.B. and teaching strategies.  Although Ms. Hoffman was receptive to Ms. Ruble's ideas, Ms. Keith was not "interested in the meeting or the topic."  Ms. Ruble sensed a tension from Ms. Keith directed at Ms. Beer.  (Tr. Vol. I, at 98:4-99:5; 102:8-103:19; Pet. Ex. 34).

204.   Westwood View had a building-wide discipline strategy where a student was sent to a "buddy room" if they were not able to follow directions after prompts.  Ms. Hoffman used the other kindergarten room as A.B.s'' "buddy room," but used the nurse's office when A.B. was crying.  (Tr. Vol. II, 267:18-268:1, 272:13-17).  Special's teachers used the office as A.B.s'' "buddy room."  (Tr. Vol. II, 274:7-12).

205.   Before sending A.B. to the buddy room, Ms. Hoffman would first seat A.B. in a "buddy seat," which is a seat off by itself in her classroom.  (Tr. Vol. II, 275:7-21).   When A.B. was displaying disruptive behaviors, Ms. Hoffman sent him to the buddy seat due to classroom disruption.  (Tr. Vol. II, 276:1-5).

206.   Ms. Hoffman sent A.B. to the buddy room when he was being disruptive (whether by himself or with other students), going into areas he was not supposed to be, or throwing things.  (Tr. Vol. II, 269:20-270:10).  While in the buddy room, A.B. would just sit and decompress.  He would return to his classroom when directed to do so.  The length of time A.B. spent in the buddy room was not tracked.  (Tr. Vol. II, 271:3-15, 273:19-25).

207.   Ms. Beer requested the District evaluate A.B. on August 29, 2018, (Tr. Vol. III, 575:2-4, 666:1-4; JE-1, pp. 231-234).

208.   The District tendered prior written notice dated September 5, 2018, proposing to conduct an initial evaluation and collect new data in the following areas:  health/motor ability, social/emotional status/behavioral status, academic performance, communicative status, transition skills.  (JE-1, pp. 231-34).  The purpose of the evaluation was to determine whether A.B. met eligibility as a child with an exceptionality and demonstrated a need for special education services.  *Id.* Ms. Beer provided written consent on September 5, 2018. (*Id.*; (Tr. Vol I, at 155:24-157:15).

209.   The required timeline to complete the evaluation began on September 5, 2018. (Tr. Vol. I, at 157:5-19; JE-1, at 234).

## September 2018

210.    Ms. Ostby based her next steps on the request for the evaluation. The factual information Mrs. Beer provided her informed how Ms. Ostby proceeded thereafter. (Tr. 1000:8-13.

211.   For A.B., Ms. Ostby had input from other individuals which led to an evaluation planning meeting with Mrs. Beer. During the meeting, they listened to Mrs. Beer's concerns, the classroom teacher's concerns, and reviewed recent observational data.  (Tr. 443:23-444:8).

212.   At the evaluation meeting, the evaluation team first allowed Mrs. Beer to voice her concerns and then allowed A.B.'s classroom teacher to voice her concerns. Then, the evaluation reviewed recent observational data and various team members provided their input. The team – including Mrs. Beer – went over the form of areas for data and determined that new data and additional information were needed in the areas of fine motor and sensory; social, emotional, and behavioral status; academic performance; communication; and transition skills.  (Tr. 443:21-444:9; 1002:15-1003:25; JE-1, pp. 231- 234).

213.   Ms. Ostby organized how the evaluation team was going to collect the necessary information, such as having the occupational therapist look at fine motor and sensory. (Tr. 443:3-14; 443:23-444:8; 1006:8-19; JE-1, pp. 231-234).  There are multiple areas that would go into an evaluation for eligibility in the category of autism, such as sensory, social- emotional and communication.  (Tr. 1005:10-17).

214.   In deciding areas to look at for an evaluation, the evaluation team looks at the (area of need and where there is some data or reason to suspect a discrepant skill in that area.  (Tr. 1005:18-24).

215.   Todd McCarthy is a licensed school psychologist with the Blue Valley School District in Overland Park, Kansas.  Mr. McCarthy was a practicum student with the Shawnee Mission School District from August 2018-December 2018, under the direction of Kathy Ostby.  (Tr. Vol. II, 456:3-457:23, 462:1-4).

216.   In Kansas, a practicum student must complete a 600 hour practicum under the direct supervision of a licensed school psychologist, among other things.  After speaking with

Jackie Chatman and Kathy Ostby, Mr. McCarthy attempted to compress his 600 hour practicum into the fall 2018 semester, so that he could apply for an internship with the District in the spring semester.  (Tr. Vol. II, 457:24-460:20).

217.    Todd McCarthy's workload was also busy; as his practicum progressed, he was assessing students in one school while Ms. Ostby was in another.  (Tr. Vol. II 463:20-465:1).

218.    Mr. McCarthy kept notes of the September 5, 2018, meeting he attended with Kathy Ostby, Kathy Keith, Nicole Wiseman, and Ms. Beer.  (Tr. Vol. II,  478:7-21, 480:20-482:5; Pet. Ex. 514).  Toward the end of the notes, Mr. McCarthy wrote "MOM LEAVES," indicating that all subsequent notes reflect discussions after the parent left the meeting.  (Tr. Vol. II, 479:22-480:19; Pet. Ex. 514).

219.    After Ms. Beer left the September 5, 2018, meeting, Kathy Keith expressed concerns about "other areas" in which A.B. may very well have difficulties, including music class, where A.B.'s sensory issues seemingly triggered his behavior.  (Tr. Vol. II, 479:22-481:19; Pet. Ex. 514).  Staff also discussed Autism Specialist Karen Dallas as a potential resource, but she would only be brought in if Dr. Nicole Wiseman deemed it necessary. (Tr. Vol. II, 481:3-482:2).  Ms. Dallas was not brought in to assist with the evaluation.  (Tr. Vol. II, 483:4-6).

220.    The information discussed outside the presence of Ms. Beer at the September 5, 2018, meeting included topics that Mr. McCarthy, as a practicing school psychologist, would convey to parents.  (Tr. Vol. II, 183:17-484:13).

221.    On September 10, 2018, Ms. Shields sent an email to another district employee stating, in part: "What I have heard through the grapevine, he could possibly be on the spectrum." (Tr. Vol. II, 252:16-253:13; Pet. Ex. 49).

222.    As of September 17, 2018, Ms. Hoffman noticed that A.B. was exhibiting atypical behavior.  A.B. refused to do work, scribbled all over it or ripped it up; refused to be a part of any type of instruction; did not want to sit with the group; did not listen to reading instruction; did not listen to math instruction; struggled with following directions; and didn't go where he was supposed to be.  (Tr. Vol. II, 280:17-281:7).

223.    On September 5, 2018, a Prior Written Notice for Evaluation and Request for Consent was provided to Petitioner. The District proposed conducting an initial evaluation in the areas of health/motor, social/emotional status/behavioral status, academic performance, communicative status, and transition skills to determine if A.B. meets

eligibility criteria as a child with exceptionality and demonstrates a need for special education services. The option to not conduct an evaluation was rejected because of the parent's written request to conduct an initial evaluation. The decision to conduct the initial evaluation was based on parent report, observational data, medical report, early childhood data and tests scores. Mrs. Beer signed the consent on September 5, 2018. Further, the Notice states, "District and Parent agreed to extend evaluation 11-28-18". (JE-1, p. 231-234).

224.   A Prior Written Notice was provided to Mrs. Beer regarding the proposed evaluation and areas to collect additional data. Mrs. Beer signed that form at the evaluation meeting on September 5, 2018, (which is about a week after she had notice to conduct the evaluation per Mrs. Beer's August 29, 2018, request). (Tr. 996:15-22, 998:10-13, 1002:20-1003:5, 1004:1-15, 1005:25-1006:7, 1008:2-8; JE-1, p. 231-234; Ex. SMSD-12, p. 313).

225.   Right after the evaluation meeting was finished, Ms. Ostby emailed Mrs. Beer the Parent Rights Booklet. The Parent Rights Booklet goes over procedural safeguards; timelines that need to be met; what a parent's rights are if they disagree; how to file for due process; how to request mediation; it says they have the right to revoke consent; and it explains all of their options when it comes to participation in the special education identification and evaluation process. (Tr. 1005:25-1006:7, 1007:1-1008:1).

226.   On A.B.'s final evaluation report, the areas checked on the Prior Written Notice would have the box checked for "additional data is needed" to show the scope of the evaluation that was conducted; the "additional data" areas checked on the evaluation will match the areas checked on the Prior Written Notice. The checkmarks in the Prior Written Notice directly correlate to the checkmarks in the evaluation form. (Tr. 1002:20-1003:5, 1004:1- 15, 1096:16-20; JE-1, p. 231-234).

227.   After Mrs. Beer signed the Prior Written Notice on September 5, 2018, consenting to evaluation, general interventions were put in place in the classroom and the evaluation team started gathering data. (Tr. 1008:2-13; JE-1, p. 231-234).

228.   As part of the evaluation process, the team members broke out into roles and determined who would do what assessments, what observations, and who was responsible for data sheets. (Tr. 1008:14-18).

229.   The special education evaluation team worked with Ms. Hoffman to help create the daily behavior sheets that were used for A.B. (Tr. 265:13-25).

230.   Dr. Wiseman sent Mrs. Beer a parent interview form for the functional behavioral assessment. During the evaluation meeting, while Mrs. Beer was going through her concerns, she had told the team about A.B.'s prior IEP evaluations, so Ms. Ostby reached out to the early childhood team to get those records also.  (Tr. 1008:22-1009:17).

231.   The functional behavioral assessment data collection sheets were memorialized daily. The classroom teacher was taking data every single day and then the data was transferred to the ABC data sheets either that same day or within a day or two.  (Tr. 1013:23-1014:9; JE-1, p. 644-691).

232.   Initially, the team collected data on A.B. from September 2018, to November 2018.  (Tr. 1014:10-1015:1; JE-1, p. 644-691).

233.   Westwood View practices BIST. BIST is a behavioral strategy; some schools use the PBIS method. It is a method of behavioral reinforcement, behavioral supports, behavioral strategies. It is very much self-regulation. When this happens, how can you be okay and can you be okay if somebody else is not okay, and just learning those self-regulation type skills. A buddy seat is part of that methodology. Westwood View has a buddy seat system.  (Tr. 1331:20-1332:12).

234.   Beginning on September 6, 2018, through May 21, 2019, Daily Behavior Notes and Clipboard Sheets with Today's Goal were recorded for A.B. The Daily Behavior Reports monitored A.B.'s day and noted behavioral incidents (such as disrupting group instruction, not completing work, not following directions), as well as desired behaviors (such as following directions, participating in group time, completing his work), and whether or not A.B. completed a think sheet. Beginning on November 1, 2018, the Daily Behavior Reports included a column to track use of the "buddy room". *See* (JE-1, p. 346. The Clipboard sheets kept track of daily goals and whether or not A.B. followed directions, was on task, or displayed any unwanted behaviors.  (JE-1, p. 235-639).

235.   On September 10, 2018, Ms. Shields sent an email to another district employee stating, in part: "What I have heard through the grapevine, he could possibly be on the spectrum."  (Tr. Vol. II, 252:16-253:13; Pet. Ex. 49).

236.   Beginning on September 12, 2018, a spreadsheet titled "AB Data Destroyer Spreadsheet" was created to record A.B.'s data. The data collection charts consisted of data recorded regarding A.B.'s Following Directions Data; A.B.'s Behavior by Subject; Frequency of A.B.'s Behaviors; A.B.'s Following Directions Data; Frequency of Behaviors per Day;

Frequency of Target Behaviors; Frequency of Behaviors per Day; Incidents of Target Behavior by Setting; Escalated Incidents in Gen. Ed. & Unstructured Settings; Target Behavior Incidents by Subject; Frequency of Behaviors per Day; Frequency of Behaviors per Day. Data was collected during the 2018/2019, school year on: Sept 12, 18, 24, 30; Oct 6, 12, 18, 24, 30; Nov 5, 11, 17, 23, 29; Dec 5, 11, 17, 23, 29; and Jan 4, 10, 16.  (JE-(*excel spreadsheet*)).

237.   Beginning on September 12, 2018, an additional spreadsheet titled "AB Frequency Data Spreadsheet" was created to record data regarding the frequency of A.B.'s behaviors.  (JE-(*excel spreadsheet*)).

238.   Beginning on September 12, 2018, through January 16, 2019, data collection for A.B. was also recorded as A.B. Frequency of Refusal Behavior. The target behavior was, "Refusal – a response to a given direction that does not match what was being asked of [A.B.]. This could include ignoring the direction, completing work how he wanted to do it and/or saying 'no' to a given direction." Other behaviors observed included disruption (noise making, wondering room, and/or messing with other's materials), verbal aggression (calling peers/teachers names), property destruction (tearing up work or classroom materials), physical aggression (hitting or throwing objects), and inappropriate peer interactions (rough housing). Overall, from September 12, 2018, through January 16, 2019, there were 69 incidents of refusal; 12 disruption; 1 verbal aggression; 5 property destruction; 3 physical aggression; and 3 inappropriate peer interaction. The data points showed that the incidents were more common in September 2018 and were less common by January 2019.  (JE-1, p. 642).

239.   On September 12, 2018, a spreadsheet titled "AB Deep Data Spreadsheet" was created to record A.B.'s data. Data recorded included Incidents of Target Behavior by Setting; Escalated Incidents in Gen. Ed. & Unstructured Settings; Incidents and Removals by Subject; and Frequency of Target Behaviors. Data was collected from 09/12/18-01/18/19.  (JE-1.052 (*excel spreadsheet*))

240.   Beginning on September 12, 2018, additional data was collected as part of the evaluation, including:

(a)   Parent Interview on November 1, 2018.

(b)   Functional Behavioral Assessment Data Collection on:

1. Sept 12, 13, 18, 24, 25, 26, 28;
2. Oct 1, 2, 3, 5, 9, 15, 16, 22, 23, 25, 26, 29;
3. Nov 15, 16, 27, 28, 29;
4. December 3, 4, 6, 7, 10, 11, 12, 13, 14, 17;
5. January 7, 9, 10, 11, 14, 17, 18.

(c) Functional Behavioral Assessment Observation created by Wiseman on September 20, 2018, in reading and PE.

(d) Daily Behavior Reports & Clipboard Sheets, p. 27-48; data collected on Sept 12, 13, 14, 18, 21, 24, 25, 26, 28; Oct 1, 2, 3, 4, 5, 9, 15.



*Chart 1. Frequency of Behaviors per Day*

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)



*Chart 2. Frequency of Behaviors by Activity/Setting*



*Chart 3. Frequency of Behavior by Type*

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)



*Chart 4. Frequency of Functions*



*Chart 5. Frequency of Antecedents*

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)



*Graph 1. Percentage of Antecedents*



*Graph 2. Percentage of Consequences*



*Graph 3. Percentage of Functions*

(JE-1, p. 644-691).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

241.   From September 12, 2018, through January 21, 2019, data was recorded regarding A.B.'s frequency of behaviors per day and that data was used to create a graph showing that during that timeframe, A.B.'s behaviors ranged from 0 (once) to 7 (once), with the most frequent being 1-4 times per day.  (JE-1, p. 891).

242.   The classroom teacher collected data on a daily basis and transferred the data to ABC data collection sheets for the functional behavioral assessment. ABC data collection sheets are used to further analyze the data that was collected. The sheets were then given to Dr. Wiseman and Mrs. Beer.  (Tr. 1011:22-1012:12, 1014:2-7; JE-1, p. 648-668).

243.   The ABC data collection sheets show A.B.'s action, reaction and antecedent behavior. For instance, a behavior would occur in the classroom setting. The trigger for the behavior was a request from an adult. A.B.'s response to that trigger was work refusal and then, Ms. Ostby is assuming, aggression. Then A.B. was asked to leave the classroom because of the aggression and go to the buddy room.  (Tr. 1013:6-16; JE-1, p. 644-691).

244.   Ms. Hoffman reported on A.B.'s daily behavior sheets if he was sent to the buddy room.  (Tr. 268:9-17).

245.   The ABC data collection sheets indicated that A.B. was sent to the buddy room a total of eight times from September 12-October 22, 2018.  (Tr. 1011:22-1012:19; JE-1, p. 648).

246.   Ms. Hoffman testified that a buddy room is a building-wide strategy or system that the entire District uses. Generally, a student might get directed to a buddy room if he or she fails to follow instructions while in his or her own classroom. If, after several prompts and attempts to try redirect the student, the teacher might send the student to the buddy room. And, in Ms. Hoffman's case, the buddy room was the other kindergarten classroom.  (Tr. 267:18-268:8).

247.   When a student is sent to the buddy room, they might fill out a "think sheet" that requires the student to process the reasons they were directed to the buddy room.  (Tr. 267:11-15).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

248.   Ms. Hoffman testified that she did not ordinarily track buddy room usage; but, if a student was sent to the buddy room multiple times, then she may have had a conversation with the student's parent to discuss the implementation of strategies that would prevent or reduce the need to repeatedly use the buddy room.  (Tr. 268:9-16).

249.   Ms. Hoffman also testified that a "sit spot" is a little Velcro circle situated on the floor. Each of the students had a sit spot that they would sit on when the class gathered together at the front of the classroom. The sit spot also served as a student's second learning area, so a student could sit on the carpet in front of board. There were approximately 23 sit spots for every kid in Ms. Hoffman's class. It is a space for the students to sit on the floor.  (Tr. 268:24-269:12).

250.   The main reason Ms. Hoffman sent A.B. to the buddy room was disruptive behavior. A.B. exhibited disruptive behavior in his interactions with other students and by going into different areas of the classroom without permission. Ms. Hoffman testified that while kindergarten has a very structured curriculum, at the end of the day, they have "center time," which is where students can be in the art center or building center. So, for example, during reading time, A.B. might have been in the building center, or messing things up around the room, or throwing things around the art center.  (Tr. 269:23-270:10).

251.   Ms. Hoffman had a buddy seat in her classroom that was used when a student could not manage or following directions. If A.B. or another student was having disruptive behaviors, Ms. Hoffman would send them to the buddy seat so that behaviors would not continue to disrupt the other students. If the disruptive behavior did not stop, then Ms. Hoffman would send the student to the buddy room.  (Tr. 271:16-24, 276:1-5).

252.   The buddy room for A.B. was another kindergarten classroom when he was in Ms. Hoffman's room, but if her class was in specials, the buddy room was in the office. (Tr. 1013:17-22).

253.   Ms. Hoffman does not recall sending A.B. to the office as a buddy room.  (Tr. 272:9-12).

254.   The buddy room from specials was the office. A.B. was sent to the office as the buddy room for specials.  (Tr. 274:10-12).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

255.   Ms. Hoffman recalls one time that A.B. was crying and he went to the nurse's office per protocol that if a student is crying, they can go to the nurse to calm down.  (Tr. 272:13-17).

256.   Ms. Hoffman does not recall feeling like A.B. was going to the nurse's office more than the average kindergartner.  (Tr. 277:11-15).

257.   Ms. Hoffman has a lot of students who had accidents that year, so they went to the nurse's office to change. Every day or so there was student who had to change.  (Tr. 277:16-23).

258.   Amy Shields testified that she has been employed by the District as a speech language pathologist for the past 30 years. (Tr. 246:18-247:7. On September 10, 2018, Ms. Shields sent an email to Tracey Breford, a licensed occupational therapist employed by the District, about a student who may require services. Ms. Shields testified that she emailed other staff members about students frequently, so it would not have been unusual for her to have had an email exchange with another staff member about a student. (Tr., 247:4, 255:19-20, 256:19-22; Petitioners' Ex. 49).

259.   The first time that Ms. Shields became aware of A.B. as a student was toward the beginning of the school year when Kathy Keith, the principal, pulled A.B.'s cumulative file and discussed it with her. Ms. Keith mentioned that A.B. did not qualify for services before entering kindergarten. Ms. Shields stated that she believed that Ms. Keith discussed A.B. with her to put it on her radar as being something they need to be ready for. (Tr. 250:19- 20, 251:3-17).

260.   Ms. Shields testified that her discussion with Ms. Keith is the type of communication she has to ensure that she satisfies the District's Child Find obligation. Those kinds of communications lead to subsequent evaluations and ultimately to the delivery of special education services to students.  (Tr. 258:13-22).

261.   On September 17, 2018, Ms. Wiseman sent an email to Ms. Hoffman discussing the implementation of a reinforcement plan and use of daily behavior sheets to help A.B. with the home to school communication.  (Tr. 278:2-16; Petitioners' Ex. 50).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

262.   Ms. Hoffman testified that it took A.B. about three months to adjust and adapt to his routine. (Tr. 287:23-25. Before adjusting and adapting to the routine, A.B. did not complete much work; minimally participated in the classroom; and, although he was in the classroom, A.B. did not appear fully engaged in the instruction. On multiple occasions, A.B. was sent to the buddy because he failed to follow directions. In the beginning, A.B.'s connections with his peers were minimal, and he might not have even felt that he did not have a single friend in the class.  (Tr. 288:1-14).

263.   Ms. Hoffman testified that in the classroom, as time went on, she saw significant improvements in A.B.'s behavior, his ability to follow directions, and his willingness to complete work. It was not perfect; but Ms. Hoffman does not expect any kindergartener to always follow directions. Nonetheless, she noticed a significant difference in A.B.'s behavior from the beginning of the year to the end of the year. By the end, A.B. would sit down and do his math worksheet, come to meet with the small group in reading, and complete one or two literacy center activities. From her observations in the classroom, A.B. was making progress. (Tr. 289:1-15).

264.   As of September 17, 2018, Ms. Hoffman noticed that A.B. was exhibiting atypical behavior.  A.B. refused to do work, scribbled all over it or ripped it up; refused to be a part of any type of instruction; did not want to sit with the group; did not listen to reading instruction; did not listen to math instruction; struggled with following directions; and didn't go where he was supposed to be.  (Tr. Vol. II, 280:17-281:7).

265.   A.B. presented challenges that Ms. Hoffman did not know how to handle. (Tr. Vol. II, 300:13-18).

266.   During the 2018-2019, school year, A.B. was in kindergarten; his teacher was Emily Hoffman.  (Tr. 263:3-13).

267.   In August and September 2018, A.B. underwent several assessments via Istation's Indicators of Progress ("ISIP") to measure his reading ability. ISIP measures a child's ability in critical areas of reading. Ability scores are used to show reading growth throughout the school year. On September 28, 2018, ISIP generated a "Student Summary Handout Report" detailing the results of those assessments. As of the report date, A.B. was

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

reading at a tier-3 level, which meant he was at significant risk of not meeting grade-level expectations. Among other things, the assessments indicated that A.B. struggled with phonemic awareness, vocabulary, and letter knowledge and that he had ongoing difficulty with listening comprehension.  (JE-1, p. 699-700).

## October 2018

268.   In October 2018, Emily Hoffman and speech-language pathologist Katie Hensler completed a "Socially Savvy Checklist" for A.B.  A.B. received ratings of "1" for eight items (mostly in classroom/group behavior):  a "2" for 35 items; a "3" for 35 items; and a "4" for no items.  (JE-1, p. 701-708).

269.   The Socially Savvy Checklist rating system provides, in pertinent, the following:

    a.   0 = rarely or never demonstrated this skill,

    b.   1 = demonstrated this skill but only on a few occasions,

    c.   2 = can demonstrate this skill but does not do so consistently,

    d.   3 = consistently demonstrates this skill, and

    e.   N/A = not applicable due to setting or because child compensates in other ways.

(JE-1, p. 701).

270.   Another Socially Savvy Checklist was created for A.B.  (JE-1, pp. 709-720).

271.   The final page of the Socially Savvy assessment represents a graph of the preceding pages of the checklist.  The October 2018 Socially Savvy did not include a completed graph for the areas of Social Language or Classroom/Group Behavior.  (Tr. Vol. II, 281:16-283:21; JE-1, pp. 701-708).

272.   Each iteration of the evaluation in the 2018-2019 school year indicated that Ms. Hoffman and a Speech Language Pathologist ("SLP") completed the Socially Savvy Assessment together and had observed A.B. over the duration of the first quarter of school (Tr. Vol. II, 296:3-297:2, 297:20-298:4; JE-1, pp. 802, 824, 881, 1151).  Ms. Hoffman did not prepare the October 2018 Socially Savvy Assessment. (Tr. Vol. II, 412:18-20; JE-1, pp. 701-

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

708).  She did prepare a second assessment on February 19, 2019.  (Tr. Vol. II, 281:13-283:21, 289:16-25).

273.   The Socially Savvy checklist provides a 1-3 rating scale.  A "1" means the student has demonstrated the skill but only on a few occasions, a "2" means the student can demonstrate the skill but does not do so consistently, and a "3" means the student consistently demonstrates the skill.  (Tr. Vol. II, 290:4-10; JE-1, p. 701).

274.   The District maintained copies of the raw data behavior collection sheets for A.B.  (JE-1, p. 721-728).

275.   Todd McCarthy was the member of the evaluation team responsible for conducting the Woodcock-Johnson Test of Academic Achievement for A.B.  (Tr. 465:18-24; 468:16-20; Petitioners' Ex. 515).

276.   Mr. McCarthy felt competent to administer the assessment and provide the results to a licensed psychologist for review.  (Tr. 466:12-14).

277.   Mr. McCarthy cannot speak to what went into the placement of his results into A.B.'s evaluation document because his involvement was to administer the assessment and provide the results to Ms. Ostby.  (Tr. 477:8-12).

### *November 2018*

278.   Nicole Wiseman is a behavior support teacher at the District.  (Tr. 410:15-19).

279.   On November 1, 2018, Ms. Beer completed a parent interview as part of the evaluation process.  Her responses indicated that A.B. told her that he was sent out of the classroom frequently, to the principal's office, the nurse's office, Mr. Sheahan's office downstairs, or Ms. Flint's room.  Ms. Beer conveyed that A.B. seemed fearful and scared, that other children told her that A.B. was the "bad kid" of the class, and that the removals increased A.B.'s behavior problems.  (Tr. Vol. IV, 1009:25-1010:19; JE-1, p. 645).

280.   On November 9, 2018, Ms. Hoffman completed a Children's Mercy Hospital teacher questionnaire for purposes of A.B.'s pending medical autism evaluation.  (Tr. Vol. II, 285:20-286:15).  Ms. Hoffman wrote that it took A.B. "3 months to adjust/adapt to the

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

routine and his peers.  However, he is still far from typical Kindergarten behavior."  (Tr. Vol. II, 287:5-15; JE-1, pp. 748-755).  The far-from-typical behavior consisted of refusing to do work, struggling with following directions, connecting with peers, having conversations, and working through problems with peers.  (Tr. Vol. II, 287:5-15).  A.B.'s non-adaptation consisted of failing to complete the majority of his work; minimal classroom participation; lack of engagement in instruction; not following directions, resulting in being sent to the buddy room; and lack of peer connections.  (Tr. Vol. II, 288:1-14).  A.B. did not feel like he had a friend in the class.  (Tr. Vol. II, 288:1-14).

281.   Ms. Wiseman has an undergraduate degree, master's degree and doctorate degree in special education.  (Tr. 411:2-7).

282.   Ms. Wiseman conducted a functional behavioral assessment and looked at other social-emotional components during A.B.'s evaluation process in his kindergarten year.  The social-emotional components were comprised of rating scales, which included the BASC and a social savvy checklist.  (Tr. 411:19-412:10).

283.   The school psychologist, Kathy Ostby, was in charge of obtaining the information for the BASC and the speech pathologist, Katie Hensler, was in charge of obtaining information for the social savvy.  (Tr. 412:11-20).

284.   It is common to have the speech pathologist interpret the social savvy assessment.  (Tr. 413:10-15).

285.   A.B.'s functional behavioral assessment was the second or third functional behavioral assessment that Ms. Wiseman had conducted as a behavior support teacher.  In Ms. Wiseman's teaching experience, she has been involved and conducted handfuls of functional behavioral assessments.  (Tr. 413:16-23).

286.   The purpose of evaluating a student is to determine if that student has a qualifying disability as well as to gather information that can later be used to formulate goals.  (Tr. 414:20).

287.   A disability category for a student does not necessarily limit the supports that the student receives.  (Tr. 415:1-3).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

288.   Whether district employees who are on a student's IEP team meet together without the parents before an IEP team meeting depends on the circumstances.  The District always wants to make sure they have parent input.  They do not always have a formal meeting prior to an IEP meeting.  Sometimes the team comes together to make sure they are on the same page before presenting information to parents.  (Tr. 415:14-416:5).

289.   On November 5, 2018, a Prior Written Notice was sent scheduling a meeting for November 26, 2018, to review evaluation, determine eligibility, and develop an IEP. (Tr. 1015:2-24, 1099:16-1100:20; JE-1, pp. 729-732).

290.   On November 6, 2018, Ms. Hoffman provided Dr. Wiseman a copy of A.B.'s progress monitoring data.  The data points showed A.B. was above the benchmark goal for First Sound Fluency in October 2018.  A.B. was above the "Aimline" for Phoneme Segmentation Fluency.   (JE-1, p. 736).

291.   On November 9, 2018, Ms. Hoffman completed forms for A.B.'s evaluation, including forms from Children's Mercy Hospitals and Clinics Division of Developmental and Behavioral Sciences.  (Tr. 285:23-286:2; JE-1, pp. 737-755).

292.   On November 14, 2018, Ms. Beer completed a "Behavior Assessment System for Children, Third Edition" ("BASC-3") at the request of the District.  (Tr. Vol. III, 579:18-580:8; JE-1, pp. 758-794).

293.   The BASC-3 is designed to identify areas of concern regarding problem behaviors, inattention, depression, and anxiety.  (Tr. Vol. I, at 168:6-169:6).  The BASC-3 is also a good screening predictor of autism and executive function abilities.  (Tr. Vol. I, at 169:9-170:16).

294.   The parent and teacher complete lengthy questionnaires as part of the BASC-3.  (Tr. Vol. I, at 165:6-15, 169:9-18; JE-1, pp. 800, 870-71, 878).  The input of A.B.'s teacher, Ms. Hoffman, and Ms. Beer rendered results placing A.B. in both the at-risk and clinically significant range.  (Tr. Vol. II, 293:4-22; JE-1, pp. 870-71; Pet. Ex. 503, at 11-12). Per the parent BASC-3 input, A.B. was "at risk" in the following categories:  hyperactivity, aggression, anxiety, depression, internalizing problems, social skills functional communication, activities of daily living, and adaptive skills.  (JE-1, p. 870).  A.B. fell within

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

the clinically significant range in the following categories:  atypicality, withdrawal, and behavior symptoms index.  *Id.*

295.    The BASC-3 results were consistent with Ms. Beer's observations of A.B.  (Tr. Vol. III, 580:4-581:9).

296.    Per Ms. Hoffman's BASC-3 input, A.B. was "at risk" in the following categories:  hyperactivity, conduct problems, anxiety, depression, and internalizing problems.  (Tr. Vol. II, 295:4-19; JE-1, p. 871; Pet. Ex. 503, at 11-12).  A.B. fell within the "clinically significant" range in the following categories:  aggression, externalizing problems, atypicality, withdrawal, behavior symptoms index, adaptability, social skills, and study skills.  *Id.*

297.    A.B.'s executive functioning score was also "at risk."  Executive functioning skills are those functions that enable us to get through our day.  In the classroom environment, executive functions allow a student to locate materials, organize, plan how long it will take to complete an activity or transition to another, and schedule matters.  (Tr. Vol. I, at 170:20-172:20; Pet. Ex. 503, at 11-13).

298.    A.B's "at risk" score for executive functioning could indicate a skill deficit, i.e., it may be that he doesn't have the skills to perform certain tasks and not that he is behaviorally acting out or being noncompliant.  (Tr. Vol. I, at 171:1-172:20; Pet. Ex. 503, at 12-13).

299.    A separate portion of Ms. Beer's BASC-3 questionnaire scored A.B. as "clinically significant" in the areas of Developmental Social Disorders and Autism Probability.  This result was another red flag as to the possibility of autism as a large proportion of children scoring in this range have or later obtain an autism diagnosis. (Tr. Vol. I, 169:10-170:25, 178:20-179:13; JE-1, pp. 758-794; Tr. Vol. III, 582:1-6; Pet. Ex. 503, at 12).

300.    A.B.'s BASC-3 resulted in very high percentile scores, greater than 96 and 83 percent of the normative population in some areas.  (Tr. Vol. I, at 169:10-170:16; JE-1, pp. 870-71).  These scores indicate a need for further evaluation.  (Tr. Vol. I, at 169:10-170:16; Pet. Ex. 503, at 13).  In fact, the complete report of Ms. Beer's BASC-3 questionnaire

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

provides that A.B.'s scores related to behaviors and developmental social disorders, "usually warrants follow-up" by the evaluation team.  (JE-1, pp. 758, 764-65, 767).  The report also indicated follow-up may be necessary as it related to the following results: adaptive skills, externalizing problems, internalizing problems, executive functioning.  (JE-1, pp. 758, 764-65, 768).

301.    Despite concerns that A.B. had autism, the District did not inform Ms. Beer that A.B. scored in the clinically significant range for developmental social disorders and autism probability in the BASC-3 assessment.  (Tr. Vol. III, 582:1-23; JE-1, p. 766).

302.    Mr. McCarthy administered the Woodcock-Johnson test of Academic Achievement for A.B.  (Tr. Vol. II, 465:18-24).  A.B. exhibited behaviors that impeded the successful administration of the assessment.  (Tr. Vol. II, 466:15-467:9).

303.    In the forms she completed, Ms. Hoffman noted that A.B. was receiving reading interventions two and a half hours per week.  (JE-1, p. 743). Further, she stated that A.B. had:   made noticeable progress socially and behaviorally in school. It has taken him about 3 months to adjust/adapt to the routine and his peers. He is far from typical kindergarten behavior.  (JE-1, p. 741).

304.    Ms. Hoffman testified that A.B. was far from typical because of his refusal to do work and his difficulties with following directions, connecting with peers, having conversations, and working through problems with his peers.  (Tr. 287:10-15).

305.    Ms. Hoffman also noted in the evaluation forms that A.B. was well below benchmark on DIBELS reading; had trouble listening and following directions; defied adults; and, had problems with body control, starting and completing tasks, and staying in directed areas.  (JE-1, p. 743).

306.    She stated that A.B. "has troubles making appropriate social connections with peers and detecting other's emotions...he is resistant to any activities he doesn't want to do and [it] has taken about 3 months for him to start to adjust to class structure." (JE-1, p. 743).

307.    On November 9, 2018, Ms. Hoffman completed a teacher rating scales of the BASC3 form for A.B.  (Tr. 293:12-15; JE-1, pp. 745-746, 756-757).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

308.    Ms. Hoffman testified that in looking at A.B.'s grade reports for the 2018-2019, school year, it looked like A.B. was doing fairly well overall and had made progress throughout the course of the school year. (Tr. 298:24-299:22. In the fourth quarter, for example, A.B.'s overall score for English Language Arts skills reflected that A.B. met expected progress toward outcomes in most areas and two areas showed exceptionally good progress toward outcomes, which demonstrated improvement over the year. (JE-1, p. 1232; Tr. 299:16-22). The report card showed that A.B. made progress from the beginning of the year to the end of the year.

309.    On November 13, 2018, Ms. Hensler sent Ms. Wiseman and email that stated, "I don't think I'm going to qualify him for speech/language." (Tr. 419:9-24; Petitioners' Ex. 73).

310.    On November 14, 2018, Mrs. Beer completed a BASC3 form for A.B. (JE-1, pp. 758-794).

311.    On November 15, 2018, at 11:14 a.m., Ms. Ostby emailed Mrs. Beer a draft evaluation. The draft evaluation did not include assessment results for Motor, Reading, and more details in "Assessment Results" for Communication. (JE-1, pp. 795-805).

312.    On November 15, 2018, at 3:21 p.m., Ms. Ostby again emailed Mrs. Beer a draft evaluation. The draft evaluation did not include assessment results for Motor, Reading, and more details in "Assessment Results" for Communication. (JE-1, pp. 806-816).

313.    The first IEP team meeting was scheduled for November 26, 2018, but it was rescheduled to December 6, 2018, due to inclement weather. (Tr. Vol. III, 585:2-16; JE-1, pp. 733-735).

314.    School employee IEP team members met prior to IEP team meetings involving A.B.'s parents, to make sure the employee-members were on the same page before presenting information to the parents. (Tr. Vol. II, 416:1-417:11). One such meeting occurred on November 12, 2018. (Tr. Vol. II, 416:11-417:11; Pet. Ex. 67). Dr. Wiseman stated the purpose of the November 12, 2018, meeting was to "discuss A.B.'s

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

eval. and make sure we know what we are going to do with the information that's been evaluated…." (Pet. Ex. 67).

315. Dr. Wiseman could not recall whether the school employee IEP team members made an eligibility determination at the November 12, 2018, meeting. In a November 13, 2018, e-mail from Dr. Wiseman to Ms. Hensler, Dr. Wiseman wrote that the school employee IEP team members concluded that they were likely not "going to qualify [A.B.]" and that "Kathy O" would be calling Ms. Beer to discuss the same. (Tr. Vol. II, 417:17-418:17; Pet. Ex. 72). Dr. Wiseman sent this e-mail before Ms. Hensler had input the Socially Savvy results into A.B.'s evaluation, and before Ms. Hensler had determined whether A.B. was in need of speech services. (Pet. Exs. 72, 73).

316. Less than three hours after Dr. Wiseman communicated the school employee IEP team members' conclusions from the November 12, 2018, meeting, Ms. Hensler advised Ms. Wiseman and Ms. Ostby "I don't think I'm going to qualify [A.B.] for speech/language." (Tr. Vol. II, 419:9-420:11; Pet. Ex. 73).

317. A.B.'s evaluation documents were confusing. There were multiple iterations of documents that had the same date or lacked any date at all and were not labeled as drafts or adopted documents. (Tr. Vol. II, 396:19-397:19). There were five different November 20, 2019, IEPs, and the Parties ultimately relied on an IEP attached to an email to Ms. Beer as the probable final version at the hearing. (Tr. Vol. II, 397:20-398:19; JE-1, pp. 1612-1669; SMSD-12, pp. 5360-5375).

318. The District provided Confidential Educational Evaluation reports to the Beers on November 15, 2018, and December 18, 2018, both of which are dated November 26, 2018. (Tr. Vol. I, at 158:12-159:12; JE-1, pp. 795-805, 872-885).

319. The District updated its November 15, 2018, evaluation to add a reading and fine motor assessment, in an iteration also dated November 26, 2018. (JE-1, pp. 817-828). There are no other material differences between the November 15 and November 26 evaluation versions. (JE-1, pp. 795-805, 817-828).

320. As part of the evaluation process, the District completed Functional Behavior Assessments ("FBA") because the school suspected A.B.'s behaviors might be

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

interfering with his progress in the general education environment, and the school wanted to evaluate A.B.'s social-emotional status.  (Tr. Vol. I, 188:16-19; Trial Vol. IV, 993:7-14; 1031:2-8).  Social-emotional is one area of A.B.'s evaluation that is specific to determining whether he has autism.  (Tr. Vol. IV, 1005:10-13).  Accordingly, the FBA was an integral component of A.B.'s educational evaluation.

321.    Behavior support teacher Dr. Nicole Wiseman conducted the first FBA beginning in fall 2018.  (Tr. Vol. II, 411:17-25).

322.    An adequate FBA will be based upon observations, clear description of the target behavior, and antecedent/behavior/consequence data, as well as teacher and parent interviews.  (Tr. Vol. V, 1219:12-17).

323.    From September 12, 2018, through January 18, 2019, the District collected data on forms titled "FBA Data Collection."  The form instructed: "PLEASE USE WHEN DISRUPTIVE BEHAVIOR IS PRESENTED (i.e., noise making, talking to students, throwing papers, throwing supplies, talking loudly)."  (JE-1, pp. 648-668).  None of the described behaviors addressed A.B.'s primary target behavior of "not following directions."  (Tr. Vol. I, at 164:4-166:25; Pet. Ex. 503, at 9-10).

324.    The FBA Data Collection sheets were generic forced choice data sheets, meaning the information collected must fit into the forced choices for the observed antecedent, behavior, or consequence, or be separately described under the "other" category.  (JE-1, pp. 648-668; Pet. Ex. 503, at 10).

325.    Dr. Weigand and Ms. Ostby both testified that to determine why a student exhibits challenging behaviors, evaluators need to collect antecedent, behavior, and consequence ("ABC") data.  (Tr. Vol. I, at 164:11-165:8; Tr. Vol. IV, 993:15-994:10).  Without correct ABC data for each occurrence, evaluators are not developing a complete picture of why the behavior is being exhibited.  (Tr. Vol I, at 166:25-167:4).

326.    The purpose of an FBA is to determine the function of behaviors.  (Tr. Vol. I, at 188:20-189:21, 196:5-10).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

327.    If the target behavior is redefined midway through the FBA process, the team should indicate the changed definition in the evaluation and not combine the data. (Tr. Vol. IV, 1071:4-1072:3).

328.    Ms. Hoffman's target behavior changed during the FBA process, as reflected in the daily behavior reports.  The September 10, 2018, daily behavior report provides: "Target Behavior:  Direction following – The student will complete a given direction with no more than 4 verbal prompts," whereas October 2018 daily behavior sheets thereafter provided "Following directions and completing my work with fewer than 3 prompts."  (JE-1, pp. 236, 350-362).

329.    Ms. Ostby testified that Ms. Hoffman filled out daily behavior reports, and Dr. Wiseman used Ms. Hoffman's data to fill out the ABC information in her FBA Data Collection sheets.  (Tr. Vol. IV, 1011:22-1012:12, 1021:25-1022:6, 1066:13-23; JE-1, p. 648).

330.    However, the daily behavior reports failed to collect ABC data.  (Tr. Vol. IV, 1066:24-1068:14).  Indeed, the District's autism coach testified that she looked through Ms. Hoffman's daily reports "to get the gist, but I didn't – they weren't ABC data sheets, or they weren't about antecedent/behavior/consequence."  (Tr. Vol. V, 1222:23-1223:8).

331.    The FBA Data Collection sheets had missing data.  Only 62 percent of the 79 behavioral episodes had complete data, rendering them unreliable for making conclusions regarding why the behavior is occurring.  (Tr. Vol. I, at 164:11-16, 167:5-24; Tr. Vol. IV, 1068:23-1070:4; JE-1, p. 648; Pet. Ex. 503, at 10).  Dr. Wiseman's FBA did not identify the changed definition and combined the data.  (JE-1, pp. 1061-1072).

332.    The District's FBA had several iterations, including December 18, 2018, February 13, 2019, and February 25, 2019, versions.  (JE-1, pp. 886-890, 1061-1072, 1157-1162; Pet. Ex. 139).

333.    The FBA Data Collection sheets collected between September 12, 2018, through January 18, 2019, missing 38 percent of the sought-after data and not consisting of ABC data at all, are the source of the underlying data informing the FBAs.  (Tr. Vol. I, at 192-193:9; Tr. Vol. IV, 1011:22-1012:12, 1021:25-1022:6, 1066:13-23; JE-1, p. 648).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

334.   Dr. Yell testified that to the extent the assessment is wrong, probably everything else is going to be wrong.  (Tr. Vol. VI, 1546:20-23).

335.   Dr. Weigand testified that depicting correct data in an evaluation is important because the team will use data to determine which interventions to put in place. Interventions based on inaccurate data may be ineffective and could result in the incorrect conclusion that the student is not responding to an intervention, when in fact the intervention is not designed to result in the desired behavior from the start.  (Tr. Vol I, at 160:25-161:13).

336.   There was a snow day on November 26, 2018.  Ms. Ostby tried to immediately reschedule the November 26, 2018, meeting for November 28, 2018, but Mrs. Beer was not available.  They attempted to reschedule for December 1, 2018.  However, on November 28, 2018, Mrs. Beer said that she was already booked up for the next two weeks.  Mrs. Beer suggested December 5 or 6, 2018, and the meeting was scheduled for December 6, 2018, at 10:30 a.m.   (Tr. 1015:2-24, 1016:24-1017:6, 1099:16-1100:20, 1101:10-22.; JE-1, pp. 733-735 and 840-843).

337.   On November 26, 2018, the draft evaluation was updated to include assessment results for Motor, Reading, and more details in "Assessment Results" for Communication.  Several individuals were identified as participants on the draft evaluation, including Nicole Wiseman, behavior support teacher, Ali Bivona, instructional coach, Teacher Emily Hoffman, Mother Natalie Beer, and the speech-language pathologist. The evaluation incorporated the results from the general education interventions instructional review whereby A.B.'s progress was monitored weekly using DIBELs. A.B. received general education interventions in following classroom rules, directions, and work completion. Data was taken daily on his ability to follow directions and complete work.  Visual supports, reinforcement system, social stories, schedules sensory and activity breaks, options for assignments and work area and warnings for transition were the interventions that were put in place for A.B.  The evaluation incorporated the assessments that were given to A.B. for the areas of: social/emotional (*i.e.*, BASC3, functional behavioral assessment, parent and teacher interviews, observations, review of

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

file); academics (*i.e.*, Woodcock-Johnson IV (WWJ-IV) Test of Achievement, Curriculum Based Measurements, Number Sense Screener, observations, parent interview, teacher interview, review of records); communication (*i.e.*, Socially Savvy Survey & Test of Pragmatic Language]; and fine motor (*i.e.*, Observation, teacher interview, informal fine motor assessment).  (JE-1, pp. 817-828).

338.   On November 26, 2018, a draft functional behavioral assessment was created for A.B.  The target behavior was direction refusal: "not following a specific direction given by adult or ignoring a direction and engaging in preferred activity."  Indirect and descriptive assessment methods were conducted during the functional behavioral assessment.  Evaluators and staff collected data using ABC data, behavioral observations, review of records, and interviews with staff and parents.  (JE-1, pp. 829-833).

339.   The functional behavioral assessment included information from a teacher interview with Ms. Hoffman.  Ms. Hoffman stated A.B. has made significant improvements to his behavior since beginning school and that he has responded well to the visual supports, verbal praise, and does best when he is given choices and is primed for transitions and changes to schedules.  Ms. Hoffman shared that A.B. had a hard time initiating play with peers and that he will often ask her to help him navigate those conversations; Ms. Hoffman has been modeling that for him and having him practice appropriately interacting with his classmates.  (JE-1, pp. 829-830).

340.   The functional behavioral assessment stated that the previous behavior interventions were positive reinforcement, scheduled activity and sensory breaks, choices provided, daily behavior sheets, first/then visuals, count down system, and providing directions in a variety of ways.  (JE-1, p. 830).

341.   The functional behavioral assessment dated November 26, 2018, also included data collected from instructional coach Ali Bivona's observation of A.B. on August 30, 2018, as well as Dr. Wiseman's observations of A.B. on September 20, 2018, and again on November 1, 2018.  (JE-1, pp. 830-831).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

342.   In August 2018, Ms. Bivona observed that A.B. disruptively talked to his neighbors after several reminders not to talk during instruction; sat at a safe seat during workshop time and colored with crayons; followed directions to turn in work; during literacy centers, threw toys and books around the room; and threw connecting cubes around the art center; and turned stools from the teacher's table upside down. (JE-1, p. 830).

343.   In September 2018, Dr. Wiseman observed that A.B. sat in his own, preferred location during a whole group lesson; ignored a given direction to get a book for their whole group reading lesson; redirected; failed to comply when provided the choice of where to sit. (JE-1, p. 830).

344.   In November 2018, Dr. Wiseman observed A.B. for 20 minutes. During that time, A.B. was on task 70% of the time. He was verbally redirected five times and verbally reinforced for appropriate behavior twice.  (JE-1, p. 830).

345.   The November 26, 2018, functional behavioral assessment included a section recapping the antecedent behavior consequence data ("ABC Data") collected over 16 days from September 12 to October 15, 2018. The functional behavioral assessment's summary of ABC Data included the following notes:

   a.   During the 16 data days, A.B. met the aim goal of 80% (11 out of 16 days).

   b.   A.B. averaged 84% on his daily behavior sheets.

   c.   On five out of 16 days, A.B. had to visit the buddy room because he either acted aggressively or he had to be redirected more than three times.

   d.   A.B. failed to meet the aim goal of 80% during morning work, reading, specials, and math.

   e.   A.B. had 28 recorded instances of work refusal in the regular education setting, 10 instances of aggression, and four instances of ruining his assigned work.

(JE-1, pp. 830-831).

346.   The November 26, 2018, functional behavioral assessment Summary of Data stated:

   In reviewing the data collected during the evaluation period, A.B.'s behaviors were higher in the core subjects (reading/math), as well as

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

> during specials time when A.B. has various adults working with him and
> different expectations then his regular classroom environment.  In
> evaluating the remarks on A.B.'s daily sheets, it appears that the function
> of A.B.'s behavior is to escape or avoid undesired work tasks.

(JE-1, pp. 832).

347.  The functional behavioral assessment's section on behavior intervention recommendations and strategies provided:

> direct teaching of replacement behaviors; teach social skills to increase positive
> peer interactions; warnings for transitions and changes to schedule; teach
> problem solving and processing routines for when he's frustrated; schedule
> sensory breaks; and prompts to utilize pre-taught coping strategies.

(JE-1, pp. 832-833).

348.  On November 26, 2018, a Prior Written Notice was provided to Mrs. Beer scheduling a meeting for January 17, 2019. (JE-1, pp. 834-836. The purposes of the meeting were to review the evaluation, determine eligibility, and develop an IEP. (JE-1 pp. 834-835.

349.  The Prior Written Notice noted that on January 17, 2019, Mrs. Beer "suggested meeting on 2/6/2019, due to her work schedule."  (JE-1, p. 834).

350.  A fall 2018, parent-teacher conference was held.  The teacher's notes for the fall 2018, parent-teacher conference reflect the following:

a.  Reading: A.B. showed great growth with letter and sound identification and that they would continue to work with sight words.

b.  Math: A.B. recognizes the numbers they have studied with ease and counts to 100 without error.

c.  Writing: A.B. creates imaginative drawings that tell a story and that they will continue to work on adding writing to match pictures.

d.  General Comments: "A.B. is a creative, bright friend in class and they enjoy the knowledge and stories he continues to share.  The teacher noted she was proud of all he has accomplished.

e.  DIBELS for Math: A.B. scored above the composite goal (85/26);

f.  DIBELS for Reading: A.B. scored below the composite goal (5/26).

(JE-1, p. 837).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS 66603
(785)357-1800
(785)357-0002 (fax)

351. A first quarter assessment was completed for A.B. (JE-1, pp. 838-839).

352. The first quarter assessment noted that A.B.: could write his name legibly; could identify upper- and lower-case letters and sounds for A, T, S; knows the capital letter P; knows sight words "I" and "a"; could provide rhyming words; and would name the first sounds in a few words. (JE-1, p. 838.

353. The "school behaviors" section of the first quarter assessment noted that A.B. was still working on several behaviors, including the following: raising his hand to speak; listening carefully; following directions; keeping his hands and feet to himself; sitting correctly on the carpet; and finishing assigned tasks. (JE-1, p. 839).

## December 2018

354. On December 1, 2018, a Prior Written Notice was provided to Petitioners stating that the November 26, 2018, meeting was not held due to inclement weather, and that the team agreed to meet on December 6, 2018, to review initial evaluation results to determine if A.B. meets eligible criteria as child with exceptionality and demonstrates a need for services. Mrs. Beer did not sign this Prior Written Notice. (JE-1, p. 840-843).

355. Prior to the December 6, 2018, meeting, Ms. Ostby emailed a draft evaluation report to Mrs. Beer so she would have a chance to review the data. (Tr. 1023:18-1024:2).

356. A.B.'s literacy skills were assessed via Acadience Reading screening and monitoring, and, on December 6, 2018, a report titled, "Student Benchmark Assessment History" was completed. The report measured A.B.'s development as a reader. (JE-1, p. 849).

357. For first sound fluency, A.B. scored at or below the cut point for risk when assessed at the beginning and in the middle of his kindergarten school year. (JE-1, p. 848).

358. For phoneme segmentation fluency, A.B. scored above his benchmark goal when assessed in the middle of his kindergarten school year. (JE-1, p. 848).

359. The evaluation team, including Ms. Beer, met on December 6, 2018. (JE-1, pp. 840-841). The team's discussions focused on the evaluation documents, and not whether A.B. was a child with exceptionality. (Tr. Vol. II, 420:20-421:16).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

360.  Prior to the December 6, 2018, meeting, Ms. Beer hired an educational advocate, Rand Hodgson, to help her navigate the special education process.  (Tr. Vol. III, 669:22-670:8).

361.  The team reviewed one iteration of a Confidential Educational Evaluation dated November 26, 2018, at the December 6, 2018, meeting, and had a lot of "back and forth" regarding discrepancies in the data.  (Tr. Vol. III, 586:14-588:2; JE-1, pp. 817-828).

362.  The November 6, 2017, December 18, 2018, and February 25, 2019, evaluation iterations indicate that "Additional Data is Needed" in numerous areas. (JE-1, pp. 187, 872-885, 1121-1138).

363.  The November 15 and 26, 2018 evaluation iterations purport to document "A.B.'s Daily Behavior," but actually aggregate data in weeks, reducing the sensitivity of the data.  Further, they measure behavior in terms of percentages, but are not grounded in an understandable measure.  (Tr. Vol. I, at 159:5-160:24; JE-1, pp. 796, 819; Pet. Ex. 503, at 11).  Behavior data depicted in A.B.'s evaluations originate from the FBA. (JE-1, pp. 818-819, 830-831).

364.  One concerning behavior exhibited by A.B. was not following directions.  However, the November 15, 26, and December 18, 2018, evaluation iterations studied following directions, the converse of the concerning behavior.  (Tr. Vol. I, at 159:13-160:5; JE-1, pp. 795-805, 817-828, 872-885).

365.  The November 15 and 26 evaluation iterations documented two general education observations by Dr. Wiseman.  The first observation occurred on September 20, 2018, for 30 minutes, and the second observation occurred on November 1, 2018, for 20 minutes.  A separate observation by Alison Bivona was removed from subsequent evaluation reports.  (JE-1, pp. 795-805, 817-828, 872-885).

366.  A.B. displayed challenging behaviors and difficulty following direction in all areas of the school environment.  Dr. Wiseman's observations in the November 15th and 26th evaluation iterations were limited to the general education environment.  (Tr. Vol. I, at 161:14-162:19; JE-1, pp. 795-805, 817-828).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

367.  Dr. Wiseman's observations were inadequate to evaluate A.B.  Dr. Wiseman's observations were of insufficient duration and taken months apart, were not in all areas of the school environment, and did not give a clear picture of how much instruction A.B. was losing.  (Tr. Vol. I, at 161:14-162:19; JE-1, pp. 795-805).

368.  The BASC-3 results displayed in the evaluation reviewed at the December 6, 2018, meeting were the same BASC-3 results described in the findings of fact, paragraphs 91-95.  However, this portion of the evaluation document was not legible, and excluded the results scoring A.B. as "clinically significant" in the areas of Developmental Social Disorders and Autism Probability, described in findings of fact 96-97.  (Tr. Vol. III, 586:14-589:12; JE-1, pp. 817-828, 871, 758-795).

369.  The evaluation reviewed at the December 6, 2018 meeting summarizes the "Socially Savvy" Assessment to evaluate A.B.'s communication status, in part as demonstrating "[o]verall, A.B. is presenting with some really nice social skills….[b]ecause he has made progress in this area and with his skills emerging, social skills can continue to be addressed within the general education setting as opportunities present themselves." (JE-1, pp. 825).  This contradicted Ms. Beer's observations of A.B.'s social development, including interactions with peers at school and his being required to sit by himself at his desk.  (Tr. Vol. III, 589:14-590:11).  Moreover, it was materially inconsistent with Dr. Lindberg's report a few weeks later, dated January 16, 2019.

370.  A.B.'s scores on the Socially Savvy varied throughout all the domains that it measured, some demonstrating inconsistencies with a skill set.  (Tr. Vol. I, 174:25-20; JE-1, pp. 709-720).  The evaluation reports did not discuss areas of weakness; rather, they described these issues in terms of an "emerging" skill. However, the information available was insufficient to inform under what conditions the skill was emerging or whether the skill was developing.  (Tr. Vol. I, at 174:25-176:20; JE-1, pp. 801-02, 824-25, 881-82; Pet. Ex. 503, at 13-14).

371.  The evaluation reviewed at the December 6, 2018, meeting summarizes the Woodcock-Johnson reading assessment.  (Tr. Vol. III, 591:24-592:3; JE-1, p. 823).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

372.  Mr. McCarthy retained his write-up of A.B.'s Woodcock-Johnson after leaving the District and produced it and other documents in response to Petitioners' subpoena. (Tr. Vol. II, 467:10-468:18).  Mr. McCarthy recognized the narrative following the Woodcock-Johnson scores in the December 18th evaluation as something he wrote.  (Tr. Vol. II, 498:13-499:7; JE-1, p. 879).   Mr. McCarthy's narrative and test results also appear in the November 26, 2018, evaluation iteration, which is the evaluation reviewed at the December 6, 2018, meeting that included Ms. Beer.  (Tr. Vol. III, 591:24-592:3; JE-1, pp. 823, 879).

373.  Mr. McCarthy's privately retained Woodcock-Johnson write-up is noticeably different than the November 26, 2018, and December 18, 2018, evaluation report summaries of the Woodcock-Johnson:

   a.  Broad Reading: Mr. McCarthy's write-up had a score of 78, seventh percentile, "very low."  The November 26th December 18th evaluations displayed a score of 78, no percentile, and "low." (Pet. Ex. 515; JE-1, pp. 823, 879).

   b.  Basic Reading: Mr. McCarthy's write-up had a score of 71, third percentile, "extremely low."  The November 26th and December 18th evaluations displayed a score of 71, no percentile, and "low." *Id.*

   c.  Reading Fluency: Mr. McCarthy's write-up had a score of 76, fifth percentile, and "very low."  The November 26th December 18th evaluations do not describe any reading fluency scores. *Id.*

374.   Mr. McCarthy could not explain why his write-up was different than the evaluation.  (Tr. Vol. II, 477:1-20, 497:3-498:8). In his current role as school psychologist, Mr. McCarthy inputs the percentiles and classifications in his student evaluations.  (Tr. Vol. II, 477:22-478:6).

375.  Mr. McCarthy's narrative provides, in part, that A.B.'s scores "would tend to indicate that he shows significant deficits with his overall reading capabilities," and described that A.B. refused to participate on several subtests.  (JE-1, p. 823).

376.  Ms. Beer expressed concerns at the meeting regarding A.B.'s ability to read, and that the assessor was unable to even complete the assessment because of A.B.'s

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

behaviors.  (Tr. Vol. III, 592:4-593:13).  Ms. Beer was not privy to A.B.'s percentile scores, categorization of "very low" and "extremely low," or reading fluency scores depicted in Mr. McCarthy's privately retained Woodcock-Johnson write-up.  (JE-1, pp. 817-829).  Ms. Ostby told Ms. Beer that she would retest A.B. herself, using M&M's as a reward.  (Tr. Vol. III, 592:4-593:13).

377.   Ms. Beer also expressed concerns about A.B.'s robotic tone and speech at the December 6, 2018, meeting.  (Tr. Vol. III, 593:14-23).

378.   The team also reviewed Dr. Wiseman's FBA at the December 6, 2018, meeting, and Ms. Beer expressed concerns regarding inaccuracies in the data underlying the FBA.  (Tr. Vol. IV, 1019:8-1020:11).

379.   As described in findings of facts 115-120, 177-179 there were inconsistencies within Ms. Hoffman's data collection sheets.  (Tr. Vol. IV, 1019:23-1020:11). The behavior summary in the evaluation contradicted A.B.'s daily behavior reports and statements of Ms. Hoffman, as well as Ms. Beer's observations.  (Tr. Vol. III, 591:9-23).

380.   The evaluation reviewed at the December 6, 2018, meeting provides a "summary and conclusions" of A.B.'s evaluation.  (JE-1, p. 826).  The following provisions of the summary and conclusions page of the evaluation demonstrate that the District concluded A.B. did not qualify for special education:

  a.   ". . . social skills can continue to be addressed within the general education setting with the general education teacher."
  b.   "His needs are being met within the general education classroom."
  c.   "A.B.'s behavior is not significantly discrepant from his peers."
  d.   "A.B.'s skills are not discrepant from same age peers."
(JE-1, p. 826).

381.    The summary and conclusions page, as complemented by the District's internal emails preceding the December 6, 2018, meeting and discussions at the December 6, 2018 meeting, indicates that District evaluators determined A.B. did not qualify for

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

services or have a disability.  (Tr. Vol. III, 590:12-591:23, 592:15-593:13; Findings of Fact 101-103).  However, the Socially Savvy, FBA data sheets, BASC-3 results, and removals all revealed red flags for the possibility of autism.  (Tr. Vol. I, at 178:6-179:12).

382.    Ms. Ostby testified that the District had enough information to determine eligibility as far back as the December 6, 2018, IEP team meeting and that A.B. would probably qualify for services.  Ms. Ostby intimated that Ms. Beer's concerns regarding the FBA process delayed an eligibility determination and provision of services.  (Tr. Vol. IV, 1035:19-1037:1, 1073:5-9).  However, each iteration of A.B.'s evaluation preceding the version discussed at the February 6, 2019, meeting contained data summary and conclusions that were the same or similar to those described in paragraph 144, indicating the District evaluation team had concluded A.B. did not qualify—as originally expressed in Dr. Wiseman's November 13, 2018, email.  (Tr. Vol. IV, 1074:1-13, 1075:8-1079:12; JE-1, pp. 826, 872, 882-83; Pet. Ex. 72).  Accordingly, Ms. Ostby's testimony lacks credibility.

383.    At the end of the December 6, 2018, meeting, Ms. Ostby asked Ms. Beer to sign a handwritten note on the back of an unrelated September 5, 2018, prior written notice, which reads: "Shawnee Mission School District & Parent agreed to extend evaluation."  (Tr. Vol. III, 593:24-594:10; JE-1, pp. 231-234).

384.    Ms. Ostby also requested Ms. Beer back-date her signature to 11-28-18 because that was the deadline to complete the evaluation.  (Tr. Vol. III, 593:24-594:10; JE-1, pp. 231-234).  Ms. Ostby did not "recall" requesting Ms. Beer back-date her signature.  (Tr. Vol. IV, 1018:24-1019:1).  Had school been in session each day after Ms. Beer provided consent on September 5, 2018, November 28, 2018, would have marked the 60th school day thereafter.  (Pet. Ex. 549).

385.    Dr. Yell testified that a school must fully inform a parent of all information relevant to the activity for which consent is sought, and consent is only provided if the parent understands and agrees in writing to the carrying out of the activity for which consent is sought and the consent describes that activity.  (Tr. Vol. VI, 1544:11-20).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

386.     Dr. Yell testified that absent parental consent to extend the evaluation, the District had 60 school days to determine eligibility and, if eligible, develop and implement an IEP.  (Tr. Vol. VI, 1545:17-1546:1).

387.     Ms. Beer did not agree to extend the evaluation period beyond the 60-day evaluation period.  (Tr. Vol. III, 725:21-726:7).  Ms. Beer understood her signature as agreeing to extend the evaluation from the meeting cancelled due to inclement weather to the December 6, 2018, meeting.  (Tr. Vol. III, 593:24-594:25).  The document Ms. Beer signed did not provide any explanation of the proposed extension beyond the handwritten note. (JE-1, pp. 231-234).

388.     Inaccuracies and insufficiencies in the District's evaluation process necessitated extending the evaluation period beyond the 60-school day period.  Prolonging the evaluation period beyond the 60-school day period impeded A.B.'s right to a FAPE and deprived him of educational benefits.

389.     Dr. Weigand testified that although the District should have and could have, it  did not take the following evaluation steps: conduct additional direct observations; collect accurate ABC data, with narratives; take data on accommodations; further evaluate the classroom removals to the "buddy room," including how it impacted A.B.'s Free and Appropriate Public Education and whether it reinforced his escape-motivated behavior; look deeper into the item analysis within the BASC-3; more accurately depict the available data in behavior graphs to make the information more understandable; examine the discrepancies between staff reports and the evaluation summary, a red flag indicating more evaluation is warranted; and collect necessary data earlier.  (Tr. Vol. I, at 181:24-187:7; Pet. Ex. 503, at 14-16).

390.     Towards the end of the fall 2018 semester, Mr. McCarthy experienced frustration as a District "student."  Mr. McCarthy did not feel like he was getting the communication and direction he needed as a student.  (Tr. Vol. II, 465:2-10).

391.     Mr. McCarthy testified that he did not know how it would have been possible for Ms. Ostby to provide the appropriate amount of attention to students being evaluated when she was stretched as thin as she was, and that it was not an effective way

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

to operate an evaluation process. (Tr. Vol. II, 489:15-490:9).  This frustrated Mr. McCarthy, and ultimately swayed him from pursuing the internship with the District.  Id. By the end of his practicum, Mr. McCarthy did not receive the instruction necessary to ethically practice as a school psychologist and did not pursue an internship with the District.  (Tr. Vol. II, 486:21-489:14). Mr. McCarthy completed the fall semester and continued for a second semester at a different school district.  (Tr. Vol. II, 487:17-489:14).

392.    After the December 6, 2018, meeting that included the Beers, Ms. Ostby expressed a belief that A.B. was eligible, but did not communicate her opinion to the Beers. On December 6, 2018, after the IEP team meeting that included A.B.'s parent, Ms. Ostby advised Dr. Wiseman: "Nicole We need to decide if [A.B.] qualifies or not – I think he does, and we invite Cindy [Waeckerle] to the meeting."  (Tr. Vol. 422:11-423:14; Pet. Ex. 83).  Dr. Wiseman responded, "I can be okay with that."  Id. Dr. Wiseman did not know whether anyone called the Beers on December 6th or 7th to advise them of Ms. Ostby's determination.  (Tr. Vol. II, 423:21-424:3).  Ms. Ostby did not call the Beers to advise them of her determination.  (Tr. Vol. II, 447:5-448:18).

393.  On December 6, 2018, Ms. Hoffman emailed Mrs. Beer a Pencil and Scissors Grasp Activities for A.B.  (JE-1, p. 849).

394.  On December 6, 2018, the team met to go over the evaluation results.  Mrs. Beer got very upset about the functional behavioral assessment stating that it was inadequate.  At times during the meeting, Mrs. Beer harshly went after Dr. Wiseman with questions about the functional behavioral assessment.  Mrs. Beer expressed that the results did not accurately portray A.B.'s behavior or provide a complete picture of A.B.  Ms. Ostby testified that she could not recall whether Mrs. Beer having any concerns with his reading or math or fine motor.  The team ultimately agreed to go back and do further analysis of the behavioral data through January 18, 2019.  (Tr. 1014:10-1015:1, 1015:2-24, 1019:2-19, 1035:12-18, 1098:12-18).

395.    The team did not make an eligibility determination on December 6, 2018. (Tr. 420:20-421:10).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

396.  The November 26, 2018, draft educational evaluation reflected that A.B. had had one office referral to date. (JE-1, p. 818; (Tr. 1024-14-17).

397.  The draft educational evaluation also set forth the General Education Intervention Instructional Review, which detailed the following:

(e)   A.B. received general interventions in the area of reading or early reading skills. He participated in K-PALs, which uses literacy activities to improve early reading skills especially for students who are below benchmark in phonemic awareness, phonics, and fluency. (Tr. 1025:5-12; JE-1, p. 818).

(f)   Regarding progress on First Sound Fluency, A.B. came into school in August with no such fluency. Interventions were implemented, and A.B.'s progress was monitored using the DIBELs for sound fluency. The data show that A.B. made above typical progress in the area of First Sound Fluency. (Tr. 1025:13-20; JE-1, p.818).

(g)   The dots reflect A.B.'s progress monitoring data. The four lines are the pathways of progress, which show his progress or the future trajectory of his progress and assist in evaluating a student's rate of growth compared to other students with the same levels of initial skills. If a data point is above the blue line, then it means well above typical progress; and, if it is above the green horizontal line, then it means typical progress. A data point falling in the yellow area is below typical progress, and anything under the red line is well below progress. (Tr. 1025:19-1026:21; JE-1, p. 818).



**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

(d)   Kathy Ostby testified that the data show that through "October [2018] with the K-PALs intervention, [A.B.] had made some pretty good progress" on First Sound Fluency.  (Tr. 1026:18-21).

(e)   The data relating to his daily behavior, as reflected in the daily behavior chart, showed that A.B. had not demonstrated a significant decrease or increase in behaviors despite the implementation of interventions that were being used in the classroom during the data collection period. His behaviors were steady. (Tr. 1027:9-17; JE-1, pp. 818-819).

398.   The Anecdotal Information section of the educational evaluation was developed with information taken from his grade card and comments that the teacher might have made.  That section of the evaluation reflects that with the first quarter grades, A.B. received an "improving" in English, language arts, and art.  In personal development, A.B. had "needs improving."  (Tr. 1027:18-25; JE-1, p. 819).

399.   Classroom accommodations reflect what the classroom teacher, Ms. Hoffman, was doing within the general education environment to help A.B. be successful. (Tr. 1028:1-7; JE-1, p. 819).

400.   The Norm Referenced, Standardized Achievement Data on A.B.'s draft evaluation from November 2018, referred to various assessments that kindergarteners take, including the DIBELs Indicators of Early Reading Benchmark Assessments, which is comprised of seven measures aimed at measuring early reading skills.  A.B. did one for sound fluency. Another assessment that kindergarteners take is the DIBELs Math Benchmark Assessments. It looks at different math skills.  On the math assessment, all of A.B.'s scores were extremely high for a kindergartner except for number identification fluency.  (Tr. 1028:8-23; JE-1, p. 819-820).

401.   Under Motor on A.B.'s draft evaluation in November 2018, evaluation, there is a typo that "no additional data" was needed because they did collect new data.  The occupational therapist worked with A.B. and determined that his fine motor skills were not discrepant from his peers.  The OT did recommend some things. (Tr.1030:12-22; JE-1, p. 821).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

402.   On the BASC-3, teacher rating scale for A.B.'s draft evaluation in November 2018, Ms. Hoffman observed A.B. exhibit some aggression and conduct problems within the classroom.  She rated A.B. in the at-risk range on externalizing problems; internalizing, which was the anxiety and depression; school problems for attention and learning problems.  She rated A.B. in the clinically significant range for withdraw, atypicality and that behavioral symptom index.  For adaptive behavior, she rated A.B. as clinically significant for adaptability, study skills and adaptive skills.  She rated A.B. at-risk for everything except functional communication of which she rated him in the average range. (Tr. 1031:21-22, 1032:20, 1033:23-1034:13; JE-1, p. 822 and 871).

403.   On the BASC-3 parent rating scale, Mrs. Beer rated A.B. in the at-risk range for hyperactivity, aggression, and externalizing problems.  She also rated him at risk for anxiety, depression, and internalizing problems.  Mrs. Beer rated A.B. in the clinically significant range for atypicality and withdraw and for that behavioral symptom index. Mrs. Beer rated A.B. in the at-risk range for adaptive behaviors, social skills and functional communication.  The overall adaptive composite was in the at-risk range.  (Tr. 1033:8-22; JE-1, p. 870).

404.   Ms. Ostby did not intend for the data summary and conclusions in the November 2018, draft educational evaluation to suggest that A.B. was not eligible.  (Tr. 1034:14-25; JE-1, p. 826).

405.   In looking at all of the data, Ms. Ostby felt that A.B. was likely to be eligible for special education services.  (Tr. 1035:19-1036:4).

406.   At the December 6, 2018, meeting, Ms. Ostby did not tell Mrs. Beer that she thought A.B. would be eligible. The team did not get to any discussions about eligibility at that meeting.  (Tr. 1036:5-8).

407.   Ms. Ostby does not recall whether anyone at the meeting suggested that A.B. was not eligible for special education.  (Tr. 1036:9-11).

408.   The team felt like they had enough data to make a determination regarding A.B.'s eligibility at the December 6, 2018, meeting.  However, the team did not get to the

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

eligibility part of the evaluation; and, in fact, the team never made it beyond discussing the functional behavioral assessment.  (Tr. 1035:1-11, 1037:9-12, 1076:12-16; JE-1, p. 827).

409.   On December 6, 2018, the team did not proceed with making its eligibility determination because they could not get past the functional behavioral assessment due to a breakdown of the information they had gathered and what Mrs. Beer thought the functional behavioral assessment should look like.  (Tr. 1037:9-21, 1076:12-16).

410.   Legally, the evaluation team could have concluded the evaluation on December 6, 2018.  (Tr. 1037:22-25).

411.   The team was not required to go provide additional data to address Mrs. Beer's concerns on December 6, 2018.  (Tr. 1038:1-4).

412.   The District sought Mrs. Beer's input in the evaluation because parental input is extremely important.  And the team wanted Mrs. Beer's input regarding eligibility, but they were not legally obligated to take another look at the behavioral data just because Mrs. Beer disagreed with it.  The District exerted efforts to figure it out.  (Tr. 1038:5-13).

413.   The eligibility determination on A.B.'s draft evaluation in November 2018, is blank because the team is supposed to review those sections together.  This includes the two prongs necessary in Kansas to find eligibility.  (Tr. 1035:1-11; JE-1, p. 827).

414.   Ms. Ostby shared Mrs. Beers' concerns that there was miscommunication. Ms. Ostby shared concerns that Mrs. Beer was so upset with the functional behavioral assessment and Ms. Ostby wanted to try to understand where she felt like the District misfired. Ms. Ostby wondered whether the data would be any clearer if it was broken down any further.  Ms. Ostby became concerned that there was a breakdown with Mrs. Beers over the data because she was extremely upset about the functional behavioral assessment.  (Tr. 1036:12-1037:1).

415.   There were concerns about the daily note sheets.  The classroom teacher was supposed to mark if A.B. followed or failed to follow a direction and do so during every subject or every 30 minutes.  There were times when the teacher would check "yes, he followed the direction," but then would include an anecdotal that suggested he had not

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

actually followed the direction.  So, there were some inconsistencies there.  (Tr. 1019:23-1020:15; JE-1, p. 236).

416.   The daily behavior sheets tracked A.B.'s response to directions; the number of times he failed to follow directions; whether he followed directions or not; and notes reflecting consequences and antecedent that may aid.  It was done through anecdotal instead of forced choice. (Tr. 1020:12-1021:13, 1067:2-7; JE-1, p. 236).

417.   The daily behavior sheets were a way to collect data.  They had also put some interventions in place within the classroom that they were also tracking.  They used social stories that were reviewed periodically throughout the day.  A.B. had a reinforcement program, a special location in the classroom, a first-then schedule, and other visual supports.  (Tr. 1020:12-15, 1021:10-24; JE-1, p. 236).

418.   The data from daily behavior sheets was used as part of the analysis of data for the functional behavioral assessment because the target behavior was following directions.  (Tr. 1021:25-1022:6, 1067:21-25, 1070:8-9).

419.   If data would lead them to think they did not have the right behavior targeted, then maybe they would redefine the target behavior midway through the functional behavioral assessment process.  However, following directions remained the target behavior for the functional behavioral assessment completed for A.B.  (Tr. 1070:22-1071:3).

420.   If the definition of the target behavior changed, then something would show the definition and state that data was now being taken for that target behavior; however, that did not occur for A.B.  (Tr. 1071:4-1072:3).

421.   At the meeting, Mrs. Beer consented to the extension of the evaluation.  Mrs. Beer again signed the Prior Written Notice dated September 5, 2018. Mrs. Beer dated the Prior Written Notice November 28, 2018, and she agreed to extend the evaluation.  (Tr. 1015:25-1016:3, 1019:2-7; JE-1, p. 234).

422.   Ms. Ostby could not recall why she could not produce another Prior Written Notice from Mrs. Beer to sign and suggested the possibility of computer issues. Regardless, Mrs. Beer agreed to extend the evaluation at the December 6, 2018, evaluation meeting.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

Ms. Ostby had to handwrite it out and have Mrs. Beer sign it.  Ms. Ostby did not write the date; Mrs. Beer signed and wrote the date of November 28, 2018.  Ms. Ostby does not know why Mrs. Beer backdated her signature to November 28, 2018.  (Tr. 1018:22-1019:7; JE-1, p. 234).

423.   Mrs. Beers gave her consent to the District to continue the evaluation.  Mrs. Beer wanted to extend the evaluation because she was so upset about the functional behavioral assessment.  (Tr. 1019:2-7).

424.   Mrs. Beer was not concerned about the extending the evaluation beyond 60 days. (Tr. 726:16-727:3, Ex. SMSD-10, p. 26).

425.   While it is not the District's ordinary practice to extend a 60-day evaluation deadline, it will do so in situations under which a team reaches a consensus that an extension is needed, which was the case with A.B.  The evaluation deadline was extended to address the concerns that Mrs. Beer raised during the meeting.  (Tr. 1017:7-25).

426.   It is lawful to extend an eligibility deadline beyond 60 days (i) if a student moves, (ii) a parent has not made a student available for an evaluation, or (iii) the parent and school district agree to the extension.  Here, the District lawfully extended 60-day eligibility deadline insofar as it and Mrs. Beer, in fact, agreed to extend the deadline.  (Tr. 1017:15-25, 1019:2-7; JE-1, p. 234).

427.   No one at the December 6, 2018, meeting objected to continuing the meeting in order to conduct further analysis of the behavioral data and review more closely A.B.'s reading skills.  (Tr. 1015:2-24, 1016:24-1017:6, 1099:16-1100:20); JE-1, p. 733-735 and 840-843.  On December 6, 2018, a Prior Written Notice was issued that "proposed to collect additional data regarding [A.B.'s] reading skills. It was proposed to conduct further examination of the functional behavioral assessment data."  Further, it indicated that the team had met on December 6: to review initial evaluation data on [A.B.], and after discussion the team determined additional reading data was needed in order to establish his present levels of performance in reading due to lack of participation during the testing session. And that Mrs. Beer requested the team do further analysis of behavioral data collected because she didn't feel it accurately represented [A.B.'s] current level of

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

functioning. The team agreed with the request and a meeting date was scheduled for 1/10/19 due to Mrs. Beer's upcoming surgery.  (Tr. 1042:17-1043:21; JE-1, p. 850-853).

428.   On August 13, 2019, Mrs. Beer signed the Prior Written Notice dated December 6, 2018.  (JE-1, p. 854-857, 1237, 1277-1280).

429.   On December 7, 2018, Ms. Ostby sent an email to Dr. Wiseman asking Dr. Wiseman to complete three additional observations before the team met again.  (Tr. 421:22-10; Petitioners' Ex. 85).

430.   On December 7, 2018, Ms. Ostby emailed Mrs. Beer a Prior Written Notice of Meeting scheduling a meeting on January 10, 2019. The purpose of the meeting was to review evaluation and determine eligibility and to develop an IEP.  (JE-1, p. 858-860).

431.   On December 7, 2018, the Prior Written Notice of Meeting was amended to reschedule the meeting from January 10 to January 17, 2019.  (JE-1, p. 861-863).

432.   In order to address the concerns Ms. Beer expressed during the December 6, 2018, meeting, the team decided to reanalyze the behavioral data and, although Ms. Beer did not ask for it, to obtain additional information in the area of reading.  (Tr. 1040:5-11).

433.   After the December 2018, meeting, Ms. Ostby gathered additional information about A.B.'s reading skills because the team as going to conduct further analysis of the behavior data and, further, because A.B. did not cooperate with Mr. McCarthy on the reading assessment.  A.B.'s classroom teacher, Dr. Wiseman, and Ms. Ostby broke down the behavioral data while Dr. Ostby continued to gather it.  (Tr. 1038:14-25).

434.   Since they were extending the evaluation, Ms. Ostby wanted try to take another look at A.B.'s present level in reading.  (Tr. 1039:9-1040:4).

435.   Ms. Ostby participated in analyzing the behavior data after the December 6, 2018, meeting.  Dr. Wiseman and Ms. Ostby took data and broke it down to a finer level than where it was at the time of the December 6, 2018, report.  To get there, Dr. Wiseman and Ms. Ostby looked for patterns in things like the time of day, class subject, and transitions.  One of the most significant conclusions they reached related to observed acts of aggression. Initially, A.B. was reported to have engaged in 11 acts of aggression; but,

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

when they broke the data down further, they discovered that, in all actuality, A.B. had engaged in only three or four aggressive acts. as the discrepancy arose by the misclassification of roughhousing-like behaviors as aggression.  They also discovered that A.B. had difficulty transitioning from a preferred to non-preferred task.  A further breaking down of the data also suggested that there was a correlation between the subject area being taught and a rise in the incidence of A.B.'s problem behaviors. Most problems occurred during math.  (Tr. 1041: 16-1042:16).

436.   On December 11, 2018, DIBELS were completed for A.B. A.B. mastered blending compound words, blending syllables, blending three-phoneme words, segmenting compound words, production of initial sounds.  A.B.'s skill level was emerging for blending two-phoneme words.  A.B. has not learned segmenting syllables, production of final sounds, segmenting two-, three-, and four-phoneme words.  (JE-1, p. 864-867).

437.   On December 18, 2018, Ms. Hoffman provided Ms. Ostby sight words.  (JE-1, p. 868-869).

438.   On December 18, 2018, Ms. Ostby provided Mrs. Beer a copy of the Parent Rating for BASC-3.  (JE-1, p. 870).

439.   On December 18, 2018, Ms. Ostby provided Mrs. Beer a copy of the Teacher Rating for BASC-3.  (JE-1, p. 871).

440.   On December 18, 2018, Ms. Ostby provided Mrs. Beer a copy of the updated educational evaluation report and updated functional behavioral assessment.  (SMSD-12, pp. 1312-1313; JE-1, pp. 872-890).

441.   The educational evaluation incorporated the results from the general education interventions instructional review where A.B.'s progress was monitored weekly using DIBELs. (JE-1, p. 873).

442.   The evaluation report stated that A.B. received general education interventions in following classroom rules, directions, and work completion. Data was taken daily on A.B.'s ability to follow directions and complete work. Interventions were implemented to aid A.B., including visual supports, reinforcement system, social stories,

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

schedules sensory and activity breaks, options for assignments and work area and

warnings for transition are the interventions that were put in place for A.B. (JE-1, p. 873).

443.   The evaluation incorporated the assessments that were given to A.B. for the

areas of:

| Area Evaluated | Assessment Tools |
|---|---|
| Social/Emotional: | ▪  BASC-3 Behavior Assessment System for Children (3rd Ed.) Assessment |
| | ▪  Functional Behavioral Assessment |
| | ▪  Parent interviews |
| | ▪  Teacher interviews |
| | ▪  Observations conducted on: |
| | ▪ September 20, 2018, |
| | ▪ November 1, 2018, |
| | ▪ December 7, 2018, |
| | ▪ December 11, 2018 |
| | ▪  Review of file |
| Academics: | ▪  Woodcock-Johnson IV (WWJ-IV) Test of Achievement |
| | ▪  Curriculum Based Measurements |
| | ▪  Number Sense Screener |
| | ▪  Observations |
| | ▪  Parent interviews |
| | ▪  Teacher interviews, |
| | ▪  Review of records |
| Communication: | ▪  Socially Savvy Survey |
| | ▪  Test of Pragmatic Language |
| Fine Motor: | ▪  Observations, |
| | ▪  Teacher interview, |
| | ▪  Informal fine motor assessment |

(JE-1, p. 872-890).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

444.    The December 18, 2018, functional behavioral assessment included the same target behavior, parent interview, teacher interview, record review, student strengths, previous behavior interventions, and observations as the November 26, 2018, functional behavioral assessment.  In addition, there were two more observations conducted, including one on December 7 and another on December 11, 2018.  (JE-1, p. 886-890).

445.    The December 18, 2018, functional behavioral assessment provided that A.B.'s target behavior was taken from September 12 through December 7 (45 data days) and A.B. was, like the last time, able to meet the aim goal of 80% of the days. A.B. also averaged 92% on his daily behavior sheet.  (JE-1, p. 888).

446.    The December 18, 2018, functional behavioral assessment's Summary of Data stated, "In evaluating the remarks on [A.B.]'s daily sheets, it appears that the function of [A.B.]'s behavior is to escape or avoid un-preferred work tasks."  (JE-1, p. 889).

447.    The December 18, 2018, functional behavioral assessment Behavior intervention recommendations and strategies included the same as those in the November 26, 2018, version and also added:  check often for understanding of directions; give directions in a variety of ways; consistent expectations; break assignment down into steps. (JE-1, p. 889-890).

448.    School was difficult for A.B. in the spring semester of his kindergarten year. He did not want to play with his peers, and if he did, they would call him a "monster" and run away from him. (Tr. Vol. III, 595:1-20).

449.    Dr. Wiseman revised A.B.'s FBA after the December 6, 2018, IEP team meeting, but it still contained numerous discrepancies.  The December 18, 2018, FBA iteration analyzed following directions, although the target behavior was not following directions.  The graph purporting to demonstrate the percentage by which A.B. followed directions provided percentages without any baseline.  And the graph purporting to demonstrate A.B.'s behavior by subject lacked information necessary to understand the measures and was unclear and inconclusive.  (Tr. Vol. I, at 159:13-160:5, 189:22-190:22; JE-1, pp. 886-890; Pet. Ex. 503, at 16-21).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

450.   The December 18, 2018, FBA iteration following directions graph is identical to the following directions graph depicted on the December 18, 2018, evaluation report.  (JE-1, pp. 874, 888).

451.   The December 18, 2018, and February 13, 2019, FBA iterations provided graphs analyzing new behaviors by frequency, which did not address the behavior of not following directions and did not lead to an understanding as to why the behaviors occurred because they lacked ABC data.  (Tr. Vol. I, 189:22-192:2; JE-1, pp. 886-890; Pet. Ex. 139, at Bates No. BEERCD004017-4022; Pet. Ex. 503, at 16-21).

452.   Further, each iteration of Dr. Wiseman's FBA was founded upon the inaccurate data collected by Ms. Hoffman, which was not the ABC data necessary to develop an IEP and/or a behavior intervention plan ("BIP") that correctly addressed A.B.'s behavior. (Tr. Vol. III, 756:21-758:19; Tr. Vol. IV, 1066:24-1068:14; Tr. Vol. V, 1222:23-1223:8; Findings of Fact, 112-122, 177-179).

## January 2019

453.   On January 11, 2019, an Acadience Reading Assessment was created for A.B. (JE-1, p. 892-894).

454.   Ms. Kading sent a letter to parents regarding Tier 3.  (JE-1, p. 895).

455.   On January 11, 2019, Ms. Ostby provided Mrs. Beer a Prior Written Notice of Meeting scheduling a meeting for January 17, 2019, to review data and revise an IEP. (JE-1, p. 896-898).

456.   On January 14, 2019, a weekly letter handout was provided to Petitioner. (JE-1, p. 902).

457.   On January 16, 2019, Ms. Ruble emailed Mrs. Beer.  On January 17, 2019, Ms. Ruble replied to Mrs. Beer's response and told her she has a brother that is nonverbal and is identified on the autism spectrum.  Ms. Ruble does not recall telling Mrs. Beer about her brother prior to that email.  At the time that A.B. was in her class, Ms. Ruble did not have any particular expertise in identifying students with autism.  There is nothing in Ms. Ruble's experience with her brother that would give her a heightened level of knowledge

Associates in Dispute Resolution LLC
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

with regard to identifying autism in students.  The way that autism has affected Ms. Ruble's family makes her compassionate towards students and families in need and it affects the type of teacher she is, but not directly towards A.B.  (Tr. 932:20-23, 933:24-934:11, 939:14-940:7, Ex. SMSD-12, p. 1468).

458.   On January 16, 2019, Katie Lindberg, PsyD LP of Developmental and Behavior Sciences, completed a Final Report of A.B.'s psychological evaluation.  (JE-1, p. 903-907 and 908-914).

459.   Dr. Lindberg's report reflects that her evaluation of A.B. consisted of an hour-long diagnostic interview and the provision of evaluation services for 90 minutes. (JE-1, p. 914).

460.   Dr. Lindberg had access to A.B.'s Pre-K evaluation.  (Tr. 25:19-26:8).

461.   Dr. Lindberg testified that her Final Report quotes the evaluation the District had completed, which states, "Overall, [A.B.] is presenting with some really nice social skills. Throughout the checklist, [A.B.] rarely scored a 1 indicating that most of his skills are either mastered or emerging, which is common for a 5-year-old in kindergarten." (Tr. 27:19-24; JE-1, p. 909).

462.   Of the tests that Dr. Lindberg administered, the ones that reflect data collected directly from A.B. are the Stanford-Binet scales of intelligence, fifth edition; the selected subtests of the NEPSY-II; and the Childhood Autism Rating Scale-II ("CARS-II"). A.B.'s CARS-II assessment was based on Dr. Lindberg's clinical interview as well as parent interview, so it's kind of half and half.  (Tr. 37:11-17).

463.   Dr. Lindberg noted an example of a social interaction deficit in her behavior observations which was more one-sided conversation versus reciprocal, more related to his area of interest and really more one-sided. That would be one of the indicators of 21 social impairment.  (Tr. 30:12-21).

464.   Dr. Lindberg testified that in some of the subcategories on the NEPSY-II that A.B. was low and in other categories he was above expected.  Based on the tests Dr. Lindberg administered, she would conclude that A.B. had at least some executive functioning skills and that A.B. was able to self-correct.  (Tr. 43:12-22; JE-1, p. 908-914).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

465.   On the basis of her clinical observations, interactions with A.B., the parental diagnostic interview, and A.B.'s test results, the diagnoses of Level 2 autism spectrum disorder and ADHD comprised Dr. Lindberg's evaluation conclusions.  (Tr. 28:17-24, 30:22-24; JE-1, p. 908-914).

466.   Dr. Lindberg testified that "Level 2" for autism spectrum disorder means substantial support, which is contrasted from "Level 1" and "Level 3" diagnoses, which would be minimal to no support and very substantial support, respectively.  (Tr. 30:22-31:7).

467.   Dr. Lindberg made several programming suggestions relative to the appropriate setting, the best way to teach a child with autism, social skills training, adaptive skills, behavior management strategies, as well as some accommodations and modifications that could be implemented based on the ADHD diagnosis. These recommendations were developed through the Children's Mercy autism team.  (Tr. 32:23-33:19).

468.   Dr. Lindberg testified that she believes that A.B. would benefit from peer modeling opportunities and that he should be mainstreamed in a school setting where he has access to typical peers.  (Tr. 40:11-41:6).

469.   The school recommendations in A.B.'s evaluation report were based on the two and a half hours of time that Dr. Lindberg spent with A.B. or looking at A.B.'s needs. (Tr. 50:10-13).

470.   Dr. Lindberg testified that statements in her report where she opines about other things that may happen in the future as A.B. gets older, such as having substantial difficulty learning, are predictive statements.  Dr. Lindberg does not know if any of those statements will come true, nor does she know if any of the statements turned out to be true.  (Tr. 44:18-45:6; JE-1, p. 908-914).

471.   Dr. Lindberg testified that every student would benefit from her recommendations because those skills are needed as students grow older.  A.B. needed it because that is typically an area of struggle for children with ADHD.  At the time, Dr. Lindberg thought that as a heads-up, those might be areas that might be difficult for A.B.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

and so she provided some things that could be done to help with that.  (Tr. 53:18-54:13; JE-1, p. 908-914).

472.   Dr. Lindberg did not talk to anyone from the District about their observations of A.B.  (Tr. 37:18-20).

473.   Dr. Lindberg's report does not include or indicate any written narrative from the District in her evaluation.  (Tr. 39:23-40:1).

474.   Dr. Lindberg does not know from District officials what A.B.'s behavior at school was like.  (Tr. 41:23-42:1).

475.   Dr. Lindberg does not know how many children go to Westwood View, how many children were in A.B.'s class, or who A.B.'s teacher was.  (Tr. 48:5-12).

476.   Dr. Lindberg last saw A.B. in January 2019, for a psychological evaluation. (Tr. 34:12-16.

477.   On January 16, 2019, Mrs. Beer provided Ms. Breford a Sensory Checklist that Mrs. Beer had completed for A.B.  (JE-1, p. 915-916).

478.   At the request of the Beers, psychologist Dr. Katie Lindberg of Children's Mercy Hospital evaluated A.B. Beer in order to determine his appropriate diagnosis and treatment recommendations, resulting in Dr. Lindberg's January 16, 2019, report.  A.B. was 6 years old at the time of this evaluation.  (Tr. Vol. I, 22:10-24:3; Tr. Vol. III, 596:14-24; JE-1, pp. 908-914).

479.   Dr. Lindberg's evaluation consisted of interacting with A.B. and using standardized measures, conducting diagnostic interviews with A.B.'s  parents, and collecting information from outside sources, including the Shawnee Mission School District.  (Tr. Vol. I, at 24:20-25:22).  Dr. Lindberg obtained the following information from the District: an evaluation report completed in 2018 and dated 11/26/18, teacher BASC3 rating scales, and teacher SNAP-IV rating scales.  (Tr. Vol. I, at 25:19-26:8; JE-1, p. 909).

480.   The District evaluation reviewed by Dr. Lindberg described A.B.'s performance on the Socially Savvy: Assessment and Curriculum Guide for Young Children as: "Overall, A.B. is presenting with some really nice social skills.  Throughout the checklist, A.B. rarely scored a 1 indicating that most of his skills are either mastered or emerging,

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

which is common for a 5-year-old in kindergarten." Dr. Lindberg quoted this language in her report. (Tr. Vol. I, at 27:6-28:3; JE-1, pp. 817-828, 908-914). Dr. Lindberg's evaluation of A.B. conflicted with the District's conclusion that A.B. was presenting with nice social skills.

481. Dr. Lindberg concluded that A.B. demonstrated persistent deficits in social communication and social interaction across multiple contexts such that an ASD, Level 2, diagnosis was appropriate. Testing results suggested that A.B. exhibited average range intellectual functioning, moderately low-range adaptive functioning, deficient social perception skills, clinically significant behaviors, and deficient executive functioning. Based on her clinical observations, interactions with A.B., parent interview, and the test results, Dr. Lindberg diagnosed A.B. Beer with Autism Spectrum Disorder, Level 2, with an accompanying language impairment, and Attention Deficit Hyperactive Disorder. (Tr. Vol. I, at 28:17-29:10, 30:22-32:15; JE-1, pp. 908-914).

482. A.B.'s language impairment consisted of a robotic tone and difficulty with conversations, such as reciprocal social conversations. A.B. restricted conversations to his area of interest, and conversations with him were one-sided, not reciprocal. He demonstrated unusual robotic intonation and repetitive comments. Further, A.B. exhibited nonverbal communication impairment, such as looking past individuals when speaking to them and struggling to use nonverbal cues. (Tr. Vol I, 28:25-30:11; JE-1, pp. 908-914).

483. Dr. Lindberg observed that A.B. displayed the repetitive activities or the stereotyped movements of repetitive comments, and social interaction deficits of one-sided, non-reciprocal conversations limited to his area of interest. (Tr. Vol I, 29:16-30:21; JE-1, pp. 908-914).

484. There are three different levels of Autism Spectrum Disorder, ranging from 1 to 3. Level 1 means the child needs minimal to no support. Level 2 means a need for substantial support, and Level 3 a need for very substantial support. Dr. Lindberg diagnosed A.B. with ASD, Level 2, meaning he needed substantial support, including

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

supports within the school setting to support social interactions and social skills. (Tr. Vol I, 30:22-31:25; JE-1, pp. 908-914).

485.   Dr. Lindberg recommended establishing an IEP for A.B. that offered a variety of services and utilized the appropriate instructional setting, teaching methods, social skills and adaptive skills training, and behavior management methods.  Dr. Lindberg developed these suggestions in consultation with the Children's Mercy autism team.  Some of the recommendations were general recommendations for children with A.B.'s diagnosis, and others were individualized to A.B. Beer.  (Tr. Vol I, 32:16-33:19, 52:9-16; JE-1, pp. 908-914).

486.   Dr. Lindberg "strongly encouraged that social skill[s] training be a part of A.B.'s school day" and recommended that A.B. receive social skills training in the following categories: interpretation of  others' social behavior, monitoring speech style (e.g. rhythm, rate, volume), management of social interactions (e.g. shifting, ending topics of conversation; diversity of topics; approaching others to engage in activities; accepting others' desires/wants/needs; cooperation; assertion), social awareness targeted through the explicit identification of the discrepancies between A.B.'s perception and others, and insight into his and other's feelings.  (JE-1, p. 908-914).

487.   Dr. Lindberg recommended A.B. have a "point person" to address executive functioning difficulties and noted that he may need additional support.  (JE-1, p. 913-914). Further, Dr. Lindberg's report provides behavior management suggestions, and warns of disruptive and/or challenging behavior related to individuals with ASD which may be a result of misinterpretation of social interactions and/or anxiety related to a lack of social understanding, not intentional conduct.

488.   On January 17, 2019, the IEP team reconvened to discuss A.B.'s evaluation. The Confidential Educational Evaluation reviewed by the team at the meeting had some minor changes but contained the same data summary and conclusions as described in Findings of Fact paragraph 144, with an additional reading conclusion.  (Tr. Vol. III, 596:20-598:6; JE-1, pp. 872-885).  Ms. Beer's perception was that District staff's

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

conclusion that A.B. did not qualify for special education services was unchanged.  (Tr. Vol. III, 597:9-598:13).

489.   Ms. Beer provided Dr. Lindberg's report to Ms. Ostby at the January 17, 2019, IEP team meeting, and Ms. Ostby said that she needed to look it over and would set up another meeting.  (Tr. Vol. III, 596:9-16, 598:14-19).

490.   At the January 17, 2019, meeting, the team went over A.B.'s reading data. A.B. was making some progress but he showed some weaknesses.  Some of the skills where he showed weaknesses had not yet been taught.  (Tr. 1043:25-1044:6).

491.   At the January 17, 2019, meeting, the team went over A.B.'s behavioral data and described the details of their findings. (Tr. 1043:25-1044:12).

492.   At the January 17, 2019, meeting, the team was ready to discuss whether A.B. was eligible but they did not reach that decision.  (Tr. 1044:13-18).

493.   At the January 17, 2019, meeting, the team discussed A.B.'s eligibility indicators. They discussed one of the categories that they believed might have a data match, which was "other health impaired" ("OHI").  When Ms. Ostby said, "other health impaired," Mrs. Beer got very upset, started to cry, and said she felt like the category of autism was more appropriate. (Tr. 1044:19-1045:2).

494.   The team did not have Dr. Lindberg's report before the January 17, 2019, meeting.  Rather, Mrs. Beer provided Dr. Lindberg's report that day and said she wanted the team to consider it.  Ms. Ostby told Mrs. Beer the team would certainly consider it, but that it would take time to put it into the initial evaluation because she had just given it to her that day.  (Tr. 1045:3-10).

495.   Ms. Ostby subsequently incorporated Dr. Lindberg's information into A.B.'s evaluation report.  (Tr. 1047:9-11).

496.   Ms. Ostby prepared a Prior Written Notice documenting the January 17, 2019, meeting.  The Prior Written Notice stated:

> [The team] proposed to continue the meeting on 2-6 at 9:30 to review data and determine if [A.B.] is eligible and demonstrates a need for special education services. And it was proposed to do further analysis on the functional behavioral assessment . . . . On 1-17 the team, including parent,

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

met to review data. After a lengthy discussion of data, it was determined
to continue the meeting on 2-6 due to time constraints. And that Mrs.
Beers had again expressed concern over the functional behavioral
assessment data…. [C]ontinuing the meeting until 2-6 would delay
determining if [A.B.] is eligible for special education services which may
be viewed as a potential disadvantage. However, the team determined
additional time was needed to review and discuss data in order for the
team to determine eligibility.
(Tr. 1045:11-1046:19; JE-1, p. 923-926).

497.   The decision to delay determining if A.B. was eligible for special education
services was driven by the desire to have consensus among all team members, including
Mrs. Beer.  (Tr. 1046:20-23).

498.   On January 17, 2019, a Prior Written Notice of Meeting was sent to
Petitioners scheduling a meeting for February 6, 2019, to review evaluation data,
determine eligibility, and to develop an IEP.  (JE-1, p. 931-933).

499.   A Recommendations Report for reading data collected between August 20,
2018, and January 18, 2019, and Skills Report dated January 17, 2019, were created for
A.B.  (JE-1, p. 934-936).  The report tracked A.B.'s scores in multiple areas of reading skills.

500.   On January 28, 2019, Ms. Ostby provided Mrs. Beer a Prior Written Notice of
Meeting scheduling a meeting for February 6, 2019, to review the evaluation, determine
eligibility, and develop IEP.  (JE-1, p. 973-975).

501.   On January 29, 2019, Ms. Hensler provided A.B.'s Scores for Self-Regulation
based on the Social Savvy Self-Regulation Section to Dr. Wiseman.  (JE-1, p. 976-977).

502.   On January 29, 2019, Ms. Hensler provided A.B.'s Scores for Social Play
based on the Social Savvy Checklist to Dr. Wiseman.  (JE-1, p. 978-979).

503.   Student baseline data is necessary to develop IEP goals.  (Tr. Vol. II, 425:20-
22).

504.   By January 29, 2019 after over four months of evaluating, the District did
not have sufficient evaluation data to develop goals.  District emails indicate that
evaluators internally recognized "we just don't have baseline data" to develop behavior
goals and considered whether they should perform a "whole body listening" checklist to

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

get a baseline. (Tr. Vol. IV, 1087:22-1088:4; Pet. Ex. 114).  A few days later, on February 1, 2019, the District conducted a ten-minute whole body listening checklist. (JE-1, p. 991).  Dr. Weigand testified that this one-time checklist was not sufficient to establish baseline data necessary to develop goals for A.B.  (Tr. Vol. I, 225:1-226:12).

505.   During the evaluation process, Dr. Wiseman attempted to determine the number of times A.B. had been removed from the classroom.  (Tr. Vol. II, 432:2-5).  Dr. Wiseman confirmed seven removals from Ms. Hoffman's data sheets, occurring on the following dates in 2018: September 12, 18, 25, 28; October 5, and October 22.  Dr. Wiseman did not refer to any other data to track removals and did not know if specials teachers were using the office as a buddy room.  (Tr. Vol. II, 432:6-434:14).  Dr. Wiseman's testimony regarding A.B.'s removal from the classroom is not credible.

506.   Ms. Hoffman's data sheets contradicted Dr. Wiseman's removal calculations. For example, Ms. Hoffman's 9/18 data sheet describes four removals—A.B. was sent to the office two times and sent to the buddy room two times. (JE-1, at p. 684).  Ms. Hoffman's 9/11 data sheet describes a removal to the office not included in Dr. Wiseman's numbers. (JE-1, p. 237).

507.   As a result of the District's deficient record keeping practices, the number of times that A.B. was removed from the general education environment is unknown.

508.   The data collected by Ms. Hoffman was very contradictory, causing the evaluation to take longer than it should.  Although Dr. Wiseman testified that Ms. Hoffman's contradictions did not prolong the evaluation process, she sent an email to Jill Koertner on May 9, 2019, providing, in part: "I had same issue with [Ms. Hoffman]. Or she took data, but it was good [sic] data… very contradictory.  She would mark a certain thing but then her anecdotal information next to it didn't match up.  Frustrating!  Which is part of why we are in the predicament that we are in ⬚." (Tr. Vol. II, 434:20-436:2; Pet. Ex. 163).

509.   As of February 1, 2019, school employee IEP team members determined that A.B. had a qualifying disability under the category of autism.  (Tr. Vol. II, 427:6-21; Pet. Ex. 119).  However, a February 5, 2019 iteration of A.B.'s Confidential Educational

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

Evaluation considers only the category of Other Health Impairment.  (Tr. Vol. II, 429:12-17; JE-1, pp. 993-1009).

510.   In a February 5, 2019, e-mail, Dr. Wiseman communicated her belief to Jill Koertner that the Beers would "be pleased with an iep [sic] in general."  (Tr. Vol. II, 426:11-16; Pet. Ex. 121).

511.   The IEP team, including Ms. Beer, next met on February 6, 2019, to review the evaluation.  (Tr. Vol. II, 428:20-429:4; JE-1, pp. 973-975).

512.   The evaluation discussed at the February 6, 2019, IEP team meeting was the first evaluation document to identify a qualifying disability, "other health impairment." (Tr. Vol. IV, 1050:11-1051:24; JE-1, pp. 817-828, 872-885, 993-1009).

513.   At the February 6, 2019, meeting, Ms. Ostby indicated that A.B. had the qualifying disability of "other health impairment," and Ms. Beer questioned why the District would not identify A.B. under the autism category given his diagnosis.  (Tr. Vol. III, 598:24-600:10).  Ms. Ostby informed Ms. Beer that she could not qualify A.B. under both other health impairment and autism.  Id. After much back and forth, Ms. Ostby agreed that the District should identify A.B. under the disability category of autism.  *Id.*

514.   It is important to identify a child under the correct category of disability. (Tr. Vol. 414:21-415:7).  Ms. Ostby testified that she did not recall District staff discouraging identifying a child under the autism category and did not remember if her supervisor warned that the school might have to provide additional services for a disabled child if that child is identified under the autism category.  (Tr. Vol. II, 451:17-452:3).

515.   Beers maintained that the District made a concerted effort to avoid categorizing A.B. under the category of autism, pursuant to direction from Jackie Chatman, Assistant Special Education Director for the District, with the purpose of denying A.B. services.  (Tr. Vol. II, 444:10-16, 451:24-453:20).  On February 7, 2019, Ms. Ostby sent an email that read, in part: "We agreed to change exceptionality from Other Health to Autism . . . Jackie said by changing it – we might have to provide more services??? But she didn't speak in the meeting when I tried to keep it OHI."  (Pet. Ex. 129). Ms. Ostby testified that she could not remember what happened at the meeting referenced in her February 7th

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

email, but that she would not have written the email if Jackie had not provided the instruction described in her email.  (Tr. Vol. II, 453:4-20).

516.   Dr. Yell testified that it is not acceptable for schools to avoid identifying a child with a disability with the aim to avoid providing services to that child.  (Tr. Vol. VI, 1550:20-25).

517.   Beers maintained that by intentionally avoiding identifying A.B. as a child with autism with the misguided belief that the District would have to provide additional special education services to A.B., the District unnecessarily and unreasonably prolonged the evaluation and IEP development process, deprived A.B. of educational benefit, and impeded his access to a FAPE.

### *February 2019*

518.   On February 1, 2019, Dr. Wiseman sent an email to Ms. Koertner asking that she "consult quarterly." The email stated that A.B. was going to be qualified under "Autism."  (Tr. 427: 6-21; Petitioners' Ex. 119).

519.   A document titled, "Whole Body Listening" was created for A.B.  (JE-1, p. 991).

520.   A proposed IEP had been written by the team on February 5, 2019, and the team "spent almost an entire meeting reviewing and discussing a potential IEP for [A.B.]." The proposed IEP was discussed for almost an hour during the meeting on February 5, 2019.  (Tr. 1415:13-1416:9; Petitioners' Ex. 195).

521.   On February 5, 2019, Ms. Ostby emailed Mrs. Beer a revised evaluation report for the meeting previously scheduled for February 6, 2019.  Further, Ms. Ostby advised Mrs. Beer that at the meeting, they would have a draft IEP with suggested goals and services for discussion by the team, including parent discussion input.  (Tr. 1048:11-22; Ex. SMSD-12, p. 1682; JE-1, p. 993-1009).

522.   The February 5, 2019, Evaluation Report reflects that the team evaluated A.B. in the areas of Social/Emotional, Academics, Communication, and Fine Motor. The evaluation included the use of the following assessment tools: BASC - Behavior

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

Assessment Scale Children - 3rd Edition & Functional Behavioral Assessment, Parent and Teacher interviews, Observations, Review of File, WWJ-IV Test of Achievement, Curriculum Based Measurements, Number Sense Screener, Observations, Parent Interview, Teacher Interview, Review of Records, Socially Savvy Survey & Test of Pragmatic Language, Fine Motor Observation, Teacher Interview, and Informal Fine Motor Assessment. (JE-1, p. 993-1009).

523.   The February 5, 2019, Evaluation Report included additional sources of information and other information relevant to the evaluation determinations, including the following:

(a) [A.B.] is participating in a small group reading instruction daily. The small group utilizes K-PALS. K-PALS is research-based, peer-tutoring program for kindergarten students, K-PALS uses literacy activities to improve early reading skills especially those students who are below benchmark in phonemic awareness, phonics, and fluency. [A.B.]'s progress was monitored weekly using DIBELS first sound fluency.

(b) [A.B.] received general education interventions in following classroom rules, directions and work completion. Data was taken daily on his ability to follow directions and complete work. The following interventions were put in place to aid [A.B.]. Visual supports, reinforcement system, social stories, schedule sensory and activity breaks, options for assignments and work area, warnings for transition.

(c) Interventions were put into place within the classroom to help A.B. better attend to tasks and regulate his behaviors: Visual schedule; Visual Timers; Choices of places to work; Choices of assignments; Modified assignments; Scheduled sensory and activity breaks; First/Then Visuals; Positive reinforcement system for following directions; Social Stories; Warnings before transitions; Visual and verbal redirections with a visual reminder count down system; Daily behavior sheet; and-Break items including putty, theraband and figets.

(d) A.B. received speech/language therapy through Infant/Toddler services of Johnson County. He sees his pediatrician regularly for well child visits. He was recently diagnosed with a chromosome Micro-deletion and parents are seeking an evaluation at Children's Mercy. Mrs. Beer is in the processes of having A.B. evaluated by Children's Mercy Hospital and Clinics. A.B. received diagnosis of ADHD and ASD level 2.

(JE-1, p. 993-1009).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

524.   The February 5, 2019, Evaluation Report provided the following summaries of A.B.:

(a) Based on the Test of Pragmatic Language - 2 and Socially Savvy checklist, [A.B.] is showing that he either has the pragmatic skills that are appropriate for his age, or he has skills that are continuing to emerge within the general education setting. Although [A.B.] has made gains in this area and with other skills emerging, his social skills need to be addressed through specialized instruction in a small group setting.

(b) [A.B.]'s math skills are on target for his age and grade placement. His needs are being met within the general education classroom.

(c) [A.B.] demonstrates delays in consistently responding appropriately across school environments (i.e., following directions, initiating play with peers, academic settings both large and small, and unstructured settings).  This hinders [A.B.]'s ability to appropriately interact with staff and peers, develop relationships, profit from instruction, and demonstrate understanding of school expectations. Data shows that A.B. demonstrates a need for specialized instruction in regulating his behavior in order to make progress across school settings in various age-appropriate environments.

(d) Results from th fine motor evaluation indicate [A.B.]'s skills are not discrepant from same age peers. His fine motor skills allow him to manage classroom tools and materials and thus complete age-appropriate fine motor tasks. Continued exposure to fine motor activities is recommended, especially to promote proper grasp. In addition, [A.B.]'s sensory processing is not significantly discrepant from peers but continued access to break items is recommended such as, but not limited to putty, theraband and figets to increase ready to learn behaviors in the general education environment.

(e) [A.B.] displayed inconsistent performance on reading assessments. His classroom performance has improved since the beginning of the school year. His performance on phonology processing and phonemic awareness assessments indicate he is able to blend compound words, bending syllables to make words, blend two and three phoneme words, segment compound words, syllables and produce initial sounds. [A.B.] demonstrated difficulty with producing final sounds, segmenting two -three phoneme words and segmenting four phoneme words with blends. His ability to access words based on phonology is in the average range when compared to same age peers. It should be noted [A.B.] was reluctant to participate during reading testing. Scores should be interpreted with caution and may not reflect represent his true capabilities. [A.B.]'s reading skills were assessed a second time in order to try and establish his present level in early reading skills. [A.B.] entered the testing session willingly and presented himself as a

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

cooperative and friendly kindergarten. Rapport was established easily with [A.B.], who often engaged in spontaneous conversation with the examiner. He required no redirection.

(JE-1, p. 993-1009).

525.    The February 5, 2019, Evaluation Report proposed to find A.B. was a "child with an exceptionality" and that as a result of that exceptionality, needed "special education and related services." In support of this conclusion, the report stated:

1.  Data shows [A.B.] has the following medical diagnosis: ADHD, Autism Spectrum Disorder and medical or genetic condition or environmental factor (Micro-deletion 15q26.1). [A.B.] demonstrates delays in consistently responding appropriately across school environments (i.e. following directions, initiating play with peers, academic settings both large and small, and unstructured settings).This hinders [A.B.]'s ability to appropriately interact with staff and peers, develop relationships, profit from instruction, and demonstrate understanding of school expectations.

2.  Data shows that [A.B.] demonstrates a need for specialized instruction in regulating his behavior in order to make progress across school settings in various age-appropriate environments.

(JE-1, p. 993-1009).

526.    On February 6, 2019, A.B.'s evaluation team met, including Ms. Ostby, Dr. Wiseman, Ms. Keith, Ms. Hoffman, Mr. McCarthy, Mr. Hodgson, and Mrs. Beer.  (Tr. 1047:12-14; JE-1, p. 1010-1031).

527.    During the meeting, the team discussed finding A.B. eligible in the category of Other Health Impaired. However, Mrs. Beer became upset, and the team rescheduled the meeting for February 25, 2019.  (Tr. 1051:19-1052:7; JE-1, p. 1045).

528.    At the February 6, 2019, meeting, Ms. Beer questioned how the team could develop an IEP and IEP goals when each iteration of the evaluation before the February 6, 2019, meeting indicated A.B. was not discrepant from his peers and did not need services and did not reflect A.B.'s present levels of academic and functional performance. (Tr. Vol. III, 598:24-602:12).

529.    At the February 6, 2019, meeting, Ms. Ostby said the District would collect more data and update information necessary to create goals.  (Tr. Vol. III, 598:24-602:12).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

The District planned to revise the evaluation and meet another time.  (Tr. Vol. III, 603:4-11).

530.   The District did not propose an IEP for A.B. at the February 6, 2019, meeting, and did not request parental consent for the delivery of special education.  (Tr. Vol. III, 602:13-15, 676:4-20).

531.   On February 6, 2019, an IEP stamped "Draft" was created that contained three (3) goals for social, behavior, and communication.  The IEP also provided specially designed instruction services in the special education setting for 20 minutes a day, 3 times per week; and speech services in the special education setting for 20 minutes a day, 1 time per week.  (JE-1, p. 1010-1031).

532.   On February 6, 2019, Ms. Ostby emailed Mrs. Beer a Draft IEP and BIP for A.B.  This IEP differed from the IEP stamped "Draft" on it as it contained alternate language in the sections for Present Level of Academic Achievement, IEP Goal for Behavior, Special Education and Related Services to be Provided.  (JE-1, pp. 1032-1044; Exhibit SMSD-12, p. 1919 and 1943-1955).

533.   On February 6, 2019, Ms. Ostby provided Mrs. Beer a Prior Written Notice of Meeting scheduling a meeting for February 25, 2019, to review evaluation and determine eligibility.  (JE-1, p. 1045-1047).

534.   On February 7, 2019, a Prior Written Notice was created that provided information from the meetings on January 17, and February 6, 2019.  The Prior Written Notice stated that the team met to review the education/assessment data on A.B. – including evaluations and information from A.B.'s parent, current classroom assessments & observations, and teacher and staff observations – to determine whether A.B. was eligible for special education. On January 17, 2019, Mrs. Beer presented the team with Lindberg's Evaluation and the team included it in the initial evaluation report.  A revised copy of the evaluation report was emailed to Mrs. Beer in preparation for the February 6, 2019.  On February 6, 2019, Mrs. Beer wanted exceptionality category of Autism.  The Prior Written Notice stated the team would consider that category even though Autism does not fully take into account A.B.'s other medical diagnosis of ADHD and Gene Deletion.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

The team agreed to update the analysis of data collected during the functional behavioral assessment to provide an expanded picture of A.B.'s present level of functioning and needs in area of behavior. The team agreed to consider Autism as A.B.'s primary exceptionality category.  (JE-1, p. 1048-1049 and 1050-1055).

535.   On February 7, 2019, Ms. Ostby questioned Dr. Lindberg's diagnosis by email to Dr. Wiseman, stating: "I know we don't want to pay for outside [sic] evaluation, but I seriously doubt another evaluation would support the evaluation she gave us...." (Tr. Vol. II, 430:17-431:11; Pet. Ex. 130).

536.   Ms. Ostby provided Mrs. Beer a copy of the February 7, 2019, Prior Written Notice on February 11, 2019.  (JE-1, p. 1052-1055).

537.   On February 13, 2019, A.B.'s functional behavioral assessment was updated. (JE-1, p. 1061-1072).

538.   On February 13, 2019, Ms. Chatman provided Dr. Wiseman a draft functional behavioral assessment with redlines for A.B.  (JE-1, p. 1073-1078).

539.   On February 13, 2019, Ms. Ostby emailed Mrs. Beer a copy of the Evaluation Report determining A.B. was eligible for special education and requires special education services to receive educational benefits, as well as a copy of the Functional Behavioral Assessment and draft IEP.  (Tr. 1052:13-1053:15; JE-1, p. 1104-1120, 1157-1162; Ex. SMSD-12, p. 1919-1955).

540.   Ms. Ostby did not reference an IEP in the body of her email, and Ms. Beer did not observe an IEP attached to the email.  Ms. Ostby's email did not include a request that the Beers consent to the provision of special education services.  (Tr. Vol. III, 603:21-605:16, 679:13-680:5, 727:10-728:14; Pet. Ex. 139).

541.   The draft IEP proposed measurable annual goals for various areas requiring specially designed instruction as follows:

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

| *Area Requiring SDI*: | *Measurable Annual Goal* |
|---|---|
| Behavior: | Within 36 instructional [weeks], [A.B.] will attend to tasks and direction following by demonstrating the four following behaviors, eyes on teacher, following along by tracking with his finger, answering with the group, and completing his work 80% of opportunities on 4 out 5 data days. |
| Social: | Within 36 instructional weeks, [A.B.] will demonstrate the ability to appropriately interact with peers 80% of the opportunities by taking turns, using kind words, etc on 2 out 3 data days. |
| Communication: | Within 36 instructional weeks, [A.B.] will use "flexible thinking" when something unexpected happens and accept alternate options for the situation 80% of opportunities on 4 out 5 data days. |

(JE-1, pp. 1036-1038; SMSD-12, pp. 1947-1949).

542.   The draft IEP proposed to provide A.B. with 20 minutes, 2 times per week of speech/language services to support his positive peer interaction goal and 20 minutes 3 times per week to receive social skills instruction addressing his flexible thinking and whole-body listening goal. (JE-1, p. 1040; SMSD-12, p. 1951).

543.   The draft IEP included the following accommodations/modifications/ supplementary aids and services:

(a) Scheduled breaks throughout his day;

(b) Visual schedule and reminders for changes in routine;

(c) Give him choices when necessary (i.e. where to sit & work, which assignment to complete first, how to display his understanding of the concept, etc.);

(d) Positive reinforcement for expected behaviors - reinforcement system;

(e) Break assignments down into steps - chunking of assignments;

(f)  Check often for understanding - have [A.B.] repeat directions back to teacher. (JE-1, p. 1041; SMSD-12, p. 1952).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

544.   The draft IEP included a Behavior Intervention Plan. In it, "Behavior #1" and the corresponding intervention are as follows:

| Behavior #1 | Behavioral Intervention |
|---|---|
| Not Following Directions | ▪ If . . . [A.B.] is struggling to follow directions, first redirect him verbally. If he follows the given direction reward him with a token. |
| | ▪ If he is still unable to follow the directions, redirect him again and give him choices. If he follows the Behavioral directions, reward him with a token. |
| | ▪ Once . . . [A.B.] earns his set number of tokens, he can then have time (suggested 5 minutes) with a preferred activity (i.e. legos, coloring, building with blocks, game with a friend). |
| | ▪ If [A.B.] becomes aggressive or disruptive despite redirection, he will be asked to utilize the buddy room. If the buddy room is not available, he will utilize the office. Parent will be notified via daily behavior sheet." |

(JE-1, pp. 1043-1044; SMSD-12, pp. 1954-1955).

545.   The behavior goal sent to Ms. Beer on February 13, 2019, provided: "Within 36 instructional [sic], A.B. will attend to tasks and direction following by demonstrating the four following behaviors, eyes on teacher, following along by tracking with his finger, answering with the group, and completing his work 80% of opportunities on 4 out of 5 data days."  (Pet. Ex. 139, at Bates No. BEERCD004027).  Dr. Weigand testified that this behavior goal is immeasurable because it combines four separate behaviors and provides no guidance as to the conditions in which the behaviors should be demonstrated, what acceptable display of the goal behavior looks like, and how goal progression should be measured. (Id.; Tr. Vol. I, 212:5-215:4; Pet. Ex. 503, at 22-24).

546.   The social goal sent to Ms. Beer on February 13, 2019, provided: "Within 36 instructional weeks, A.B. will demonstrate the ability to appropriately interact with peers 80% of the opportunities by taking turns, using kind words, etc. on 2 out 3 [sic] data days." (Pet. Ex. 139, at Bates No. BEERCD004028).  Dr. Weigand testified that this social goal is immeasurable because it does not clearly articulate the desired peer interaction, and uses

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

the term "et cetera," a non-observable behavior.  (Tr. Vol. I, 215:5-216:9; Pet. Ex. 503, at 22-24).

547.   The communication goal sent to Ms. Beer on February 13, 2019, provided: "Within 36 instructional weeks, A.B. will use 'flexible thinking' when something unexpected happens and accept alternate options for the situation 80% of opportunities on 4 out 5 [sic] data days." (Pet. Ex. 139, at Bates No. BEERCD4029).  Dr. Weigand testified that this goal is immeasurable because flexible thinking is not defined, and thus not observable.  (Tr. Vol. I, 216:10-217:24).

548.   Dr. Wiseman drafted the IEP attached to Ms. Ostby's February 13, 2019, email.  (Tr. Vol. IV, 1052:19-1053:2, 1055:16-1056:3).

549.   Dr. Weigand testified that the IEP attached to Ms. Ostby's February 13, 2019, email was not reasonably calculated to enable A.B. Beer to make appropriate progress.  (Tr. Vol. I, 217:25-218:2).

550.   Beers maintained that the data collected by the District and presented in its evaluation documents through February 13, 2019 was not accurate and sufficient enough to develop IEP social goals.  The one-time Socially Savvy Assessment was not sufficiently comprehensive to evaluate A.B.'s social skills.  The assessment itself calls for more than one observation in more than one setting and specifies the length of observation: none of these conditions were met.  (Tr. Vol. I, at 198:5-200:4; JE-1, pp. 701-708).  Moreover, the summation of the Socially Savvy Assessment indicated that A.B. was "presenting with some really nice social skills" and was materially inconsistent with Dr. Lindberg's report.  Findings of Fact 133, 163-164.

551.   The data collected by the District and presented in its evaluation documents through February 13, 2019 was not accurate and sufficient enough to develop behavior-related IEP goals, a behavior intervention plan, or behavior interventions through an IEP. (Tr. Vol. I, at 192:3-198:4).  Only 62 percent of the behavior episodes purported to have complete data, and inadequate data results in an inadequate plan.  (Tr. Vol. I, 192:3-9).

552.   On February 19, 2019, Emily Hoffman completed a Social Savvy Checklist for A.B.  (JE-1, pp. 1079-1087).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

553.   The Social Savvy Checklist's rating system provides the following ratings:

   2)  0 = rarely or never demonstrates the skill
   3)  1 = has demonstrated the skill but only on a few occasions
   4)  2 = can demonstrate the skill but does not do so consistently
   5)  3 = consistently demonstrates this skill
   6)  N/A = not applicable due to setting or because child compensates in
      other ways.

554.   On the Social Savvy Checklist, Joint Attending skill 7 is "[s]hows others objects and makes eye contact to share interest." Ms. Hoffman gave A.B. a rating of 2 on JA-7, which was down from the rating of 3 A.B. had received on the previously completed Social Savvy Checklist. The same was true for JA-8, "[p]oints to objects and makes eye contact to share interest." A.B. received a rating of 2 for JA-8 on the February 2019, Checklist but received a rating of 3 on the prior Checklist. A.B.'s rating reductions for these skills resulted from Ms. Hoffman having had additional opportunities to observe A.B. in those areas. Her opinion changed.  (Tr. 290:17-23; JE-1, pp. 1079-1087).

555.   Ms. Hoffman completed a Socially Savvy Checklist for A.B. on February 19, 2019.  It was Ms. Hoffman's first experience completing this assessment for any student. (Tr. Vol. II, 282:10-16, 283:23-284:17).  This was the second Socially Savvy Checklist conducted by the District during A.B.'s 2018-2019 evaluation.  (JE-1, pp. 701-720, 1079-1087).

556.   Ms. Hoffman testified that she had more systems in place to manage A.B.'s behaviors in February 2019.  (Tr. Vol. II, 284:18-285:8).  She also testified that if A.B.'s behaviors were worse, the systems in place were not working.  (Tr. Vol. II, 285:9-19).

557.   As compared to the October 2018 Socially Savvy Checklist, A.B.'s scores on the February 19, 2019, version were worse.  A.B.'s scores decreased in sixteen areas, and only increased in five areas.  (Tr. Vol. II, 284:18-285:19; JE-1, pp. 701-720, 1079-1087). Accordingly, the systems Ms. Hoffman had in place were not working.  Ms. Hoffman testified that she did not know why A.B.'s scores decreased from the fall to the spring.  (Tr. Vol. II, 292:24-293:3).

558.   On February 21, 2019, Mrs. Beer sent an email to the District which stated

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

After reviewing the educational evaluation, the functional behavioral assessment, the Behavior intervention plan, and the individual education program; we have concluded that the data in regard to the Social Savvy Assessment does not reflect what Dr. Lindberg, Ms. Hoffman's (DBR), and our own observations of our son [A.B.]'s communication and behavior skills. Furthermore, we find that Mrs. Wiseman's data from the daily behavior reports is not in line with our records and is still negligence after two attempts to fix it. Which in turn makes the functional behavioral assessment, BIP, and the IEP documents null... We are requesting an lEE at this time, February 21, 2019. I will be would be happy to discuss the lEE with you on Monday Feb 28, 2019, at our IEP meeting with our advocate in attendance.

(Tr. 1056:18-1058:22; Ex. SMSD-12, p. 2069-2106; JE-1, p. 1088).

559.   Mrs. Beer attached to her February 21, 2019, email the evaluation report, Functional Behavioral Assessment, draft IEP and BIP and a letter containing the narrative that was also included in the body of her email. Except for the letter, these were the same documents that Ms. Ostby had sent her on February 13, 2019.  (Tr. 1058:13-20; Ex. SMSD-12, p. 1919-1955, 2069-2106).

560.   On or about February 21, 2019, Mrs. Beer asked Ms. Hoffman to complete additional forms for A.B., including an Intensive Needs Checklist, Checklist of Existing Environmental Supports & Intensive Needs Rubric. Mrs. Beer requested that Ms. Hoffman complete the forms by February 25, 2019.  (JE-1, p. 1091-1100).

561.   On or about February 21, 2019, Ms. Hoffman completed the Intensive Needs Rubric.  (JE-1, p. 1089-1090).

562.   On February 25, 2019, a Weekly Letter Handout was provided to Petitioner. (JE-1, p. 1101).

563.   Prior to the February 25, 2019, meeting, the eligibility report was revised to add the outside evaluation and to change the exceptionality of prong 1 to autism.  Dr. Wiseman added additional breakdowns of behavior.  (Tr. 1052:8-12, 1053:13-18, 1054:4-9; Ex. SMSD-12, p. 1941).

564.   The summary of data on the February 2019, evaluation report states

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

> "[A.B.] has difficulties responding appropriately across school
> environments, i.e., following directions, initiating play with peers,
> academic settings both large and small and unstructured settings.
> This hinders [A.B.'s] ability to appropriately interact with staff and
> peers, develop relationships, profit from instruction, and demonstrate
> understanding of school expectations. According to data taken from
> September 12th through January 18th, [A.B.] had a total of 82
> behavioral incidents over the reported 51 days, averaging 1.5
> behavior incidents per day. Initial behaviors presented, typically [A.B.]
> was not following direction, so 69 of the 82 incidents were not
> following directions, and then of the 69 incidents of not following
> directions, 21 of the incidents escalated into him tearing up his work
> or being disruptive or being asked to go to the buddy room due to
> physical aggression. This data illustrates that [A.B.] demonstrates a
> need for specialized instruction and regulating behavior in order to
> make progress across school settings in various age-appropriate
> environments."

(Tr. 1054:4-1055:9; Ex. SMSD-12, p. 1941).

565.   Ms. Ostby testified that she believed there were three different drafts of
A.B.'s evaluation created between December 6, 2018, and February 25, 2019.  (Tr.
1023:14-17; JE-1, 795-828, 872-885, 938-966, 993-1009, 1104-1156).

566.   Prior to the February 25, 2019, meeting, Ms. Ostby believes she had some
email communications with Mrs. Beer about the evaluations and her requesting
information about mediation.  Ms. Ostby provided Mrs. Beer a parent rights booklet and
the board policy and the page that she could find out how to request mediation.  (Tr.
1063:12-23).

567.   On February 25, 2019, A.B.'s evaluation team again met to discuss A.B.'s
eligibility.  (JE-1, p. 1121-1138, 1157-1162).

568.   The February 25, 2019, evaluation was the same as the February 2, 2019,
evaluation with the exceptions of:

1. The "GEI Instructional Review" included a chart for "Frequency of Behaviors
   per Day" that had data points from September 12, 2018, through January 16,
   2019.  (JE-1, p. 1123, 1141

2. The "GEI Instructional Review" does not include: "80% was A.B.'s aimline for
   daily behavior"; however, it does include "Red Dotted Line – Trendline".  (JE-
   1, p. 1123, 1141

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

3. Anecdotal Information includes: "Historical information as part of general education intervention." (JE-1, p. 1124, 1142).

4. Observations for December 11, 2018, state: "A.B. was observed during PE class. Upon entering the gymnasium, I found A.B. wrestling on the floor with another student. He had his shirt pulled up over his head and around his neck so that his entire stomach and chest were showing. The class was playing a game where they were running back and forth across the gymnasium. A.B. did not appear to be playing the game, but instead playing wrestling with another classmate.  The gym teacher went over to redirect A.B. and the other student.  The class was then instructed to sit along the wall for instructions for the next game they were going to play.  Instead of going to the wall, A.B. began chasing the same student around the gym and then began climbing on and sitting at the top of some risers that were stacked along another wall. The next game started and A.B. again began chasing the student and wrestling him to the ground. The gym teacher broke the wrestling up and asked that the other student come with him. A.B. was addressed by the gym teacher and reminded not to chase and wrestle students. A.B. began swinging his jacket around in circles above his head and wondering the gymnasium while the game was going on and the teacher was attempting to talk with him. Throughout the 20-minute observation A.B. was redirected a total of 7 times. He did not actively participate in the game the class was being instructed to play for any of the observed period." (JE-1, p. 1126, 1144).

5. Observations includes: "Teacher Interview:  Classroom teacher, Emily Hoffman, shared that A.B. has a difficult time initiating play with other children. She noted that A.B. can be shy at times and would stick by her at the beginning of the year. He has since gotten better about interacting with his peers but not always in appropriate ways. He has a hard time reading the feelings of others and telling when they want him to stop doing something. She feels that A.B. connects well with adults because he has a more mature thought process. On Feb. 6th, Emily shared that A.B. will often get a topic in his head and want to talk only about that topic with peers. Recently this has included his family tree." (JE-1, p. 1126, 1144).

6. "Exclusionary Factors" included a subsection titled "Autism" and further included "Exclusionary Factor…The team shall not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance." and "How to evaluate…The team should rule out the presence of an emotional disturbance. If the data the team collects matches the indicators for emotional disturbance, the child should be identified as a child with an emotional disturbance rather than a child with autism." (JE-1, p. 1134, 1152).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

7. It did not include the "other health impairment" language that was in the February 5, 2019, evaluation.  (JE-1, p. 1134, 1152).

8. Includes "Prong 1" and "Prong 2" indicators that were not in the February 5, 2019, evaluation.  (JE-1, p. 1135, 1154).

9. "Prong 1 - Specific data discussion upon which the team decision was based" states:  "Data shows A.B. has the following medical diagnosis:  Autism Spectrum Disorder Level 2, Attention Deficit Disorder and medical or genetic condition or environmental factor (Micro-deletion 15q26.1) Data shows A.B. demonstrates deficits in pragmatic language and his ability to appropriately adjusting his behavior to varying situations across school settings.  This hinders his ability to navigating large and small group settings, social interactions with peers including initiating contact, perspective taking, cooperating, sharing, turn taking and making friends.  A.B. also demonstrates delays in his ability to transition in the general education classroom and across school settings.  This includes his ability to self-starting, self-direct, switch and self-monitor his behavior. These deficits significantly impact A.B.'s educational performance."  (JE-1, p. 1137, 1155

10. "Prong 2 - Specific data discussion upon which the team decision was based" states: "Data shows A.B. demonstrates a need for specialized instruction in pragmatic language, social skills and regulating/adjusting his behavior to varying situations across school environments i.e., transitioning, following directions, self-starting, self-directing, cooperating, and self-monitoring." (JE-1, p. 1137, 1155).

(JE-1, p. 1121-1138 and 1139-1156.

569.   The District employee members of A.B.'s team signed the Evaluation Report on February 25, 2019, finding A.B. eligible for special education and related services.  (JE-1, p. 1121-1138, 1157-1162).

570.   Ms. Ostby and the whole team felt there was sufficient baseline data to move forward in drafting an IEP in February 2019.  (Tr. 1055:10-12).

571.   A draft IEP was prepared for the February 25, 2019, meeting by Dr. Wiseman and the resource teacher.  In drafting the IEP, the team looked at the data from the initial evaluation, and then looked at what needs the team felt A.B. needed in specialized instruction.  That is where the proposed goals came from.  (Tr. 1055:13-1056:3; Ex. SMSD-12, p. 1943).

572.   Ms. Ostby had the draft IEP at the February 25, 2019, meeting; however, they team did not discuss the draft IEP.  Mrs. Beer arrived at the building with her

advocate but did not come into the conference room where the team was.  Mrs. Chatman went out to talk with Mrs. Beer.  After about 30 to 40 minutes, Mrs. Chatman returned and advised the team that Mrs. Beer was not in any condition to attend the meeting and that Mrs. Beer was upset.  Mrs. Beer thought they were sticking with OHI.  Mrs. Chatman told Mrs. Beer that they were going to determine eligibility today and Mrs. Beer indicated for the team to go ahead with the meeting.  (Tr. 1049:20-1050:10, 1059:15-1060:1).

573.   As of February 25, 2019, the IEP that the team had was just a proposal.  The team had not been able to talk about services because goals needed to be agreed upon and they wanted Mrs. Beer's input for that.  Once goals were established, then the IEP team would talk about proposed services. The IEP team would have to have consent to start any services.  (Tr. 1061:22-1062:8).

574.   On February 25, 2019, Prior Written Notice of Action was provided to Mrs. Beer regarding the February 25, 2019, meeting to determine whether A.B. was eligible, whether special education and related services were needed, and to determine A.B.'s placement.  The District proposed that A.B. meets the eligibility criteria as a child with exceptionality under Autism and demonstrates a need for specially designed instruction in order to meet his unique needs and for him to access and progress in general education curriculum.  The Prior Written Notice stated that the data used as the basis for the proposed action was a review of his file; the January 16, 2019, outside evaluation report by Dr. Lindberg; parent reports; functional behavioral assessment; observations; tests scores; teacher reports; teacher notes; and daily data sheets.  The Prior Written Notice stated that the team considered the social stigma of being identified as a child with exceptionality as a potential disadvantage, however the team determined A.B.'s need for specially designed instruction outweighs any potential disadvantage.  (Tr. 1061:2-4; JE-1, p. 1169-1172).

575.   On February 25, 2019, Ms. Ostby sent Mrs. Beer a letter enclosing the following records:  Final copy of the evaluation report and functional behavioral assessment, including team signatures; February 25, 2019, Prior Written Notice of identification/eligibility for services; February 7, 2019, Prior Written Notice agreeing to

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

conduct a functional behavioral assessment; January 17, 2019, Prior Written Notice regarding continuing the meeting due to time constraint; December 6, 2018, agreeing to assess reading and a functional behavioral assessment; December 1, 2018, Prior Written Notice regarding meeting cancellation and rescheduling due to inclement weather; and a copy of the KSDE Parent Rights.  Ms. Ostby requested Mrs. Beer sign the evaluation report indicating agreement or disagreement with the final team recommendations.  (Tr. 1061:5-21; JE-1, p. 1102).

576.   On February 25, 2019, Ms. Ostby email Mrs. Beer to let her know what she was going to mail a hard copy of A.B.'s evaluation and that the final evaluation indicated that his primary exceptionality was autism.  (Tr. 1060:2-12; Ex. SMSD-12, p. 2287).

577.   A.B.'s evaluation identified all of his needs.  There was a conflict about his eligibility category.  Notwithstanding the eligibility category issue, all of the special education and related services that A.B. needed were identified throughout the evaluation. (Tr. 1102:7-17).

578.   During the evaluation process during the 2018/2019, school year, A.B. did not decline while he was in Ms. Hoffman's class.  The data showed that with the supports put in place, A.B. made some progress.  (Tr. 1102:18-22).

579.   Ms. Ostby was aware that Mrs. Beer was on the waiting list at Children's Mercy to evaluate A.B. for the possibility of autism; however, the pending medical evaluation process did not hinder the IEP process.  (Tr. 446:19-25).

580.   Ms. Beer did not request the District stop the evaluation or IEP development process while waiting on the IEE.  (Tr. Vol. III, 606:15-18).

581.   The District unilaterally stopped A.B.'s evaluation and IEP development on February 25, 2019. (Tr. Vol. II, 301:2-8; Tr. Vol. III, 608:20-609:2; Tr. Vol. IV, 1062:22-1063:11). On February 26, 2019, Ms. Hoffman sent an email to Alison Bivona providing, in part: "A.B.'s evaluation has been stopped (decided after the meeting yesterday), so I do not think he will be receiving services yet."  (Pet. Ex. 145).

582.   After the February 25, 2019, meeting, the District did not request or convene any meetings to develop an IEP through the end of the 2018-2019 school year.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

(Tr. Vol. III, 608:20-609:2).  The District also did not request the Beer's consent to implement an IEP by providing special education services to A.B. through the end of the 2018-2019 school year. (Tr. Vol. III, 609:3-16).

583.   On February 25, 2019, District staff signed the February 25, 2019, iteration of A.B.'s Confidential Education Evaluation, but the evaluation report retained the date of 11/26/2018.  (JE-1, pp. 1139-1156).  The data summary and conclusions page in the February 25, 2019, evaluation report contained narratives similar to those in prior drafts, but with some revisions indicating special education needs in social skills and behavior. (Tr. Vol. IV, 1079:22-1080:23; JE-1, pp. 1135-36).

584.   The February 25, 2019, evaluation report provides the same summary regarding the Socially Savvy Assessment but adds: "Data shows that A.B. demonstrates a need for specialized instruction in regulating his behavior in order to make progress across school settings in various age-appropriate environments."  (Tr. Vol. I, at 202:6-17; JE-1, p. 1151). The District did not add information pertaining to the second Socially Savvy Assessment conducted on February 19, 2019, to the February 25, 2019, evaluation. (JE-1, pp. 1139-1156).

585.   The District's failure to include the second Socially Savvy Assessment in the February 25, 2019, evaluation is a material error because that assessment would directly relate to his IEP goals and demonstrate progress, or lack thereof, and A.B.'s February scores were worse than the first Socially Savvy Assessment scores. (Tr. Vol. I, 202:18-203:22; Tr. Vol. II, 284:18-285:19; JE-1, pp. 701-720, 1079-1087).

586.   Except for an expansion of the Woodcock-Johnson Achievement Test, the February 25, 2019, iteration of A.B.'s Confidential Educational Evaluation was not substantively or materially different from the prior version.  This iteration did not remedy defects in the prior versions.  (Tr. Vol. I, at 201:2-202:5; JE-1, pp. 1139-1156; Pet. Ex. 503, at 22).

587.   The February 25, 2019, evaluation report identified A.B. as a child with the exceptionality of autism and indicated that he needed specialized instruction.  (Tr. Vol. I, 204:10-13; JE-1, pp. 1139-1156).  A prior written notice dated February 25, 2019,

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

provides that A.B. met criteria as a child with an exceptionality and was in need of special education, but did not request parental consent to provide services.  (JE-1, pp. 1169-1171).

588.   Dr. Yell testified that the school has an obligation to make reasonable and prompt efforts to obtain informed consent from the child's parents to provide special education services to the child.  (Tr. Vol. VI, 1544:21-1545:2).  Dr. Yell further testified that he believed Kansas schools were required to develop an IEP for an exceptional child within 30 days from the date the child is determined in need of special education and related services. (Tr. Vol. VI, 1545:5-11).

589.   Dr. Weigand testified that the District should have developed an IEP for A.B. immediately after identifying him as a child with autism.  (Tr. Vol. I, 204:17-205:7).

590.   Dr. Yell testified that a school does not satisfy its IEP development obligation by creating an internal draft and not holding meetings to develop the IEP, and it is the school's responsibility to initiate and conduct meetings to develop the IEP.  (Tr. Vol. VI, 1548:19-1549:10).

591.   On February 25, 2019, Ms. Ostby sent the Beers a letter attaching the final evaluation report, the FBA, and five prior written notices dated December 1, 2018, through February 25, 2019.  None of the prior written notices requested the Beers' consent to provide initial services and placement to A.B. or provided notice of a meeting to develop an IEP.  One of the PWNs did advise that A.B. was eligible for special education in that he was a child with an exceptionality and special education services were necessary for A.B. to receive educational benefit.  (Tr. Vol. III, 612:2-614:25; JE-1, pp. 1240-1286).  Ms. Ostby testified that she did not know why she did not attach a "proposed" IEP to her February 25, 2019, letter.  (Tr. Vol. IV, 1061:22-24).

592.   The February 25, 2019, FBA was slightly rearranged, but was not substantively or materially different from the February 13, 2019, iteration and suffered from the same defects as prior versions, including reliance on incomplete and missing data, and data that had no bearing on determining the function of A.B.'s behavior.  (Tr. Vol.

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

I, 200:5-202:5; JE-1, pp. 1061-1072, 1157-1162; Pl. Ex. 503, pp. 9-11, 16-22; Findings of

Fact, 115-120, 160-161, 223-225).

## *March 2019*

593.   On March 18, 2019, Ms. Chatman emailed Mrs. Beer a Prior Written Notice

of Action in response to Mrs. Beer's request for an IEE. (JE-1, pp. 1179-1182; SMSD-12, pp.

2348-2351. The Prior Written Notice of Action stated, in pertinent part, the following:

> On February 21, 2019, you requested an Independent Educational
> Evaluation (IEE) for your son [A.B.]. You do not believe the information
> provided in the DRAFT Re-Evaluation Report and functional behavioral
> assessment reflect [A.B.]'s unique situation in description and evaluation.

> On February 25, 2019, Jackie Chatman, Assistant Director of Special
> Education met with mom and the family's advocate to discuss the IEE
> request. It was decided Shawnee Mission School District would honor your
> request for an IEE in the areas of speech language and to conduct a new
> functional behavioral assessment The district suggested a private speech
> therapist to conduct the speech/language portion of the IEE and also
> suggested one of the district's Board-Certified Behavior Analyst (BCBA), Jill
> Koertner, complete a Functional Behavioral Assessment. You were not
> comfortable determining who the individual would be to complete the
> speech language portion of the IEE and requested time to investigate other
> resources. You also requested to meet the district BCBA before agreeing
> Ms. Koertner would complete the functional behavioral assessment. It was
> agreed a meeting would be arranged for you to meet Ms. Koertner. It was
> also agreed at the same meeting you would provide the name of the
> therapist the family would like to complete the speech/language portion of
> the IEE. Mrs. Beers requested a meeting not be scheduled until the first
> week of March as her schedule would not accommodate time away from
> work until then. A meeting was scheduled for March 7, 2019. Mrs. Beers
> emailed and cancelled the meeting on March 5, 2019, asking that a new
> meeting not be scheduled until after the week of March 11-15.

At this date (3/18/19) Mrs. Beers has yet to agree to another meeting time.
(SMSD-12, p. 2349).

594.   Mrs. Beer asked for an outside source for speech and a functional behavioral

assessment. (Tr. 1121:15-24, 1122:5-12, 1123:25-1124:2, 1125:25, 1220:15-22).

595.   Jill Koertner is an autism coach for the District.  (Tr. 1104:1-6).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

596.   Ms. Koertner is also a board-certified behavior analyst ("BCBA").  (Tr. 1106:17-22).

597.   As an autism coach, Ms. Koertner does not serve children directly.  Rather, she supports teams who serve kids with autism.  She might go in and help a classroom teacher with a part of the day that is going poorly for an autistic student or help create some visuals or some structure that might help an autistic child be more successful.  She does mostly teamwork and team training.  (Tr. 1104:8-16).

598.   Ms. Koertner primarily works with elementary students K through 6ᵗʰ grade. She has a little bit of interaction with preschool intermittently.  (Tr. 1104:17-22).

599.   Ms. Koertner has a master's degree in applied behavioral science.  (Tr. 1105:7-9).

600.   Ms. Koertner testified that having a behavior analyst on the team helps increase the behavior you want to see more of or decrease the behavior you want to see less of.   Ms. Koertner would help create a plan, maybe for teaching a bunch of behaviors that a student is not engaging in. Ms. Koertner might have a student who goes to general education every day, but he never raises his hand.  Typically, Ms. Koertner assists with identifying ways to change the environment or provide instruction that results in the student raising his hand in the classroom more frequently.  (Tr. 1105:22-1106:11).

601.   Ms. Koertner testified has prepared hundreds of functional behavioral assessments for students in the evaluation stage.  She regularly does functional behavioral assessments as part of an evaluation either before a student qualifies for an IEP, or if they are re-upping their IEP.  Sometimes an IEP is already in place and she'll get called to do a reevaluation because the student might not have a behavior intervention plan ("BIP") and they need one, in which case they would do a functional behavioral assessment and BIP. (Tr. 1108:10-23).

602.   Mr. Koertner also testified that there is nothing unique in doing a functional behavioral assessment for a child with autism.  There are many components to a functional behavioral assessment in terms of how you might do it. The main pieces of a functional behavioral assessment are an indirect piece, which is the interview piece where

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

you would interview the folks in the student's environment. And, then the direct piece, where you take actual data on the behavior on a day-to-day basis. Either way, Ms. Koertner would do that and have both in this district for students with and without autism. (Tr. 1108:24-1109:9).

603.   The function of a functional behavioral assessment is not to classify behaviors as significant, minor, or even troublesome. Instead, the exclusive purpose of a functional behavioral assessment is to identify the function of a particular behavior. No one engages in behavior that does not work for them. So, if a student does something and it works for them, the student will continue doing it, even without the thought process. Ms. Koertner testified that all day, every day our behaviors come in contact with things that work and things that do not work. And what we know is that if a behavior is continuing to occur, it is working in some way or another. That is how behavior works. Therefore, the purpose of a functional behavioral assessment is to determine how a behavior is working and to render it ineffective. So, we ask what the child is getting out of the behavior, or communicatively what they are trying to tell us is not working for them. And that's the purpose of a functional behavioral assessment.  (Tr. 1109:10-1110:11).

604.   There is a correlation between communication and behavior. The less communication you have, the less skilled you are as a communicator, the more likely you are to have challenging behaviors, particularly for students who are maybe in the self-contained autism classroom.  (Tr. 1110:12-1110:18).

605.   Ms. Koertner would not say that there are different tiers of functional behavioral assessments, like an entry-level model and then a Cadillac, but she did testify that there is standard template that all behavior analysts use. a functional behavioral assessment consists of a multitude of components. For example, the interview component has many different tools that might be selected. Also, the manner by which data is collected might appear different. Ms. Koertner's goal is to create a data collection system that maximizes the amount of information collected, and that system is frequently going to be used by a classroom teacher who is also teaching. So, in order to create such a data collection system and do so in a way that ensures accuracy and feasibility, many factors go

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

into its development. In the end, all of those factors are outcome determinative in terms of what the functional behavioral assessment looks like, so there can be significant variations in functional behavioral assessments.  (Tr. 1111:2-22).

606.   The decisions of the BCBA affect what happens during the functional behavioral assessment process too.  The BCBA can decide who to interview and how many people to interview. The point of the interview is to identify what is at issue That includes deciding first what the behavior looks like and when it presents. When a student uses a challenging behavior exclusively during classroom time, never in specials, and never at home such that the student's parents never see it, then Ms. Koertner is less likely to interview the student's mother or father or his specials' teacher. The other discretionary aspects of a functional behavioral assessment might include the different questionnaires that people use and the way in which you collect ABC data around what the behavior actually looks like.  (Tr. 1112:11-1113:10).

607.   Ms. Koertner testified that the first thing she usually does is observes the student.  Ms. Koertner will generally email the student's teacher to identify when the very best time is for her to see the student, which does not necessarily mean the time of the day the student is on his best behavior; but rather, the time of day that might be more challenging. Ms. Koertner testified that she likes to observe the student at both times of the day, but more important is the time of the day that is most challenging to the student. That framework for developing the functional behavioral assessment is based on the fact that during those more challenging times of day, she is more likely to observe the challenging behavior. And, when she does observe the student, she will ask the teacher to do exactly whatever they normally do and not to do anything different because she is present in the room. She then sits in the back of the classroom and takes general notes on what the behavior looks like. In order to take good data, Ms. Koertner needs to be able to describe the behavior, so they are all collecting data on the same behavior.  (Tr. 1113:11-1114:7).

608.   On the teacher's interview in the functional behavioral assessment, Ms. Koertner testified that she checks to see if the teacher sees these behaviors occurring in a

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

chain or if they show up in isolation. Ms. Koertner also testified that she will ask questions like, are there different times of day that the teacher is more or less likely to see the behavior; are there different activities that make it more or less likely that the student will use a particular behavior (*e.g.*, do we always see whenever a particular subject is being taught); are there specific times of the day or activities in which the teacher never sees the behavior. Ms. Koertner testified that she sees her job much like that of a detective, searching for clues. Those clues might be telling her if a behavior occurs exclusively during academic times and not during recess and lunch, but it might be just one clue.  The function of the behavior might be to escape non-preferred tasks.  Those are the types of things that Ms. Koertner tries to identify when she conducts interviews. Her favorite question is, if she wanted to see the behavior right now, what could they do to make the behavior occur.  (Tr. 1114:8-1115:21).

609.   Interviews and questionnaires are the main data collection methods in a functional behavioral assessment and are indirect data. Direct data is the data collected on a day-to-day basis in the classroom, the antecedent, behavior, consequence data.  (Tr. 1116:2-11).

610.   There is no "all students." Ms. Koertner has students with autism who have perfectly great language who need help with social skills. It would be inappropriate to place them in a room by themselves. She also has students for whom placement in a room with many, many kids and learning at a normal pace would not be providing FAPE.  It is 100% individualized.  (Tr. 1120:9-21).

611.   Ms. Koertner designs an individualized program for each specific child based on that child's needs.  (Tr. 1121:6-8).

612.   Mrs. Chatman, Mrs. Beer and Ms. Koertner met in March 2019, so that Mrs. Beer could meet Ms. Koertner and decide whether it would be okay for Ms. Koertner to do the functional behavioral assessment because Ms. Koertner has the same credentials. Mrs. Beer agreed to let Ms. Koertner do the functional behavioral assessment.  Ms. Koertner thought the meeting went well.  (Tr. 1121:15-24, 1122:5-12, 1123:25-1124:2, 1125:25, 1220:15-22).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS 66603
(785)357-1800
(785)357-0002 (fax)

613. Ms. Koertner was tasked with conducting a functional behavioral assessment for A.B. in March 2019. (Tr. 1121:11-14).

## *April 2019*

614. Ms. Koertner met with Mrs. Beer in April 2019, to interview her as part of preparing the functional behavioral assessment. (Tr. 1125:21-25).

615. On April 15, 2019, Ms. Koertner emailed Ms. Hoffman a spreadsheet to measure A.B.'s frequency duration data and requested Ms. Hoffman record data per Mrs. Beer's request for a "redo" on A.B.'s functional behavioral assessment. (JE-1, p. 1186-1187).

616. From April 30, 2019, through May 15, 2019, Ms. Hoffman kept data sheets regarding A.B.'s behavior. (JE-1, p. 1190-1194).

617. In addition, from April 30, 2019, through May 17, 2019, more data was collected in a spreadsheet that provided information regarding A.B.'s classroom behavior, noncompliance, vocal disruption, property disruption, antecedents, consequences, time on task, time in seat, frequency per day for behavior, and challenging behavior percentage per activity. (JE-1.146 (*excel spreadsheet*)).

## *May 2019*

618. District employee Jill Koertner drafted a second FBA, dated May 2019. (Tr. Vol. V, 1147:21-1148:17; JE-1, p. 1196). Ms. Beer met with Jackie Chatman and Jill Koertner as part of the second FBA process. (Tr. Vol. III, 608:20-23, 623:11-624:7). At this meeting, Ms. Beer requested paraprofessional support for A.B. Ms. Chatman and Ms. Koertner responded that "there's kids way worse than A.B. that don't get paras and kids like A.B. don't get paras." (Tr. Vol. III, 623:11-624:7).

619. Ms. Koertner had a hard time getting data from A.B.'s classroom teacher, Ms. Hoffman. (Tr. Vol. V, 1141:3-19; Pet. Ex. 161).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

620.    Ms. Koertner collected new data using ABC data collection sheets.  (Tr. Vol. V, 1139:12-1140:24, 1145:8-11; JE-1, p. 1190).

621.    After reviewing the same information available to Dr. Wiseman, Ms. Koertner identified three target behaviors (noncompliance, vocal disruption, and property disruption), whereas Dr. Wiseman limited her analysis to "refusal/not following directions."  (JE-1, pp. 1157-1162, 1196).

622.    Although Dr. Wiseman's FBA referred to and analyzed collected data as "ABC data," none of the data was in fact ABC data.  (Tr. Vol. IV, 1066:24-1068:14; JE-1, pp. 1157-1162).  Indeed, Ms. Koertner testified that she looked through Ms. Hoffman's daily reports "to get the gist, but I didn't – they weren't ABC data sheets, or they weren't about antecedent/behavior/consequence."  (Tr. Vol. V, 1222:23-1223:8)

623.    From the data collected, Ms. Koertner created the functional behavioral assessment in May 2019.  (JE-1, p. 1196-1201).

624.    In May 2019, a Motivation Assessment Scale, Sensory Checklist & other data collection was created for A.B.  (JE-1, p. 1202-1210).

625.    On May 16, 2019, a Comprehensive Speech Language Evaluation completed by Aleah Brost at Children's Mercy.  (JE-1, p. 1215-1220).

626.    On May 13, 2019, Ms. Koertner emailed Mrs. Beer advising her that she was finishing up the functional behavioral assessment.  On May 15, 2019, Mrs. Beer responded, "Great to hear you are finishing up. Yes, let's meet in person. We are scheduled for a speech evaluation tomorrow, Thursday, at 8:45. Perhaps we could meet up around noon or after noon. I am available Tuesdays and Fridays."  (Tr. 1127:2-11; SMSD-12, p. 2581).

627.    When Ms. Koertner met with Mrs. Beer on May 16, 2019, Mrs. Beer advised her that she thinks the data is different from the doctor's office and what the school has.  (Tr. 1131:11-14; Ex. SMSD-1.001 at 7 minutes, 30 seconds through 8 minutes 28 seconds).

628.    Mrs. Beer recorded the meeting with Ms. Koertner without Ms. Koertner's knowledge or consent. (Tr. 1124:15-17).

629.    During Ms. Koertner's May 16, 2019, meeting with Mrs. Beer, she explained to Mrs. Beer how she was going to define the challenging behavior based on what she saw

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

at school and her interview with the teacher.   (Tr. 1135:16-18; Ex. SMSD-1.001, 30 minutes 36 seconds through 31 minutes 36 seconds).

630.   Mrs. Beer never objected to Ms. Koertner conducting the functional behavioral assessment during that meeting in May 2019.  (Tr. 1138:8-11).

631.   The data that Ms. Koertner tries to get for a functional behavioral assessment is what happened just before the behavior, what behavior occurred, and what happened just after the behavior.  A data collection sheet has an antecedent, behavior, consequence and then a big open square where teachers would write out their observations in longhand.  However, teaching a classroom with children while taking data on challenging behavior does not really allow teachers to take longhand notes.  Therefore, Ms. Koertner made a data sheet that would include the possibilities that she could think of as antecedent plus the possibilities discussed as a behavior and consequence so the teacher could circle the option instead of having to write out longhand what had occurred. (Tr. 1139:12-1140:8; JE-1, p. 1190).

632.   Ms. Koertner collected five or six different days' worth of data from A.B.'s teacher.  (Tr. 1141:13-18; JE-1, p. 1190).

633.   There is not a minimum number of days Ms. Koertner must collect data like what is shown on the data behavior sheets (*see* JE-1, p. 1190).  There is no law or rule that sets out the minimum number of days to collect behavior data. A whole year would be too much and one day would be too little.  Everyone has bad days, but Ms. Koertner was not looking for how bad the problem is, she was looking for when it happens. Ms. Koertner can do pretty well with a minimum amount of data because if it is consistent – such as if it happens five times but all five times were right after a student was given a direction to do a math worksheet – then that is good information.  (Tr. 1142:6-23).

634.   Ms. Koertner's May 2019 functional behavioral assessment report includes the target behaviors that were identified through A.B.'s data sheets – the data that had been taken so far during the 2018/2019, school year – and Ms. Koertner's interview with his classroom teacher.  A.B. had three target behaviors: noncompliance, vocal disruption and property disruption.  (Tr. 1149:3-12; JE1, pp. 1196-1201).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

635.   Ms. Koertner did not have any concern about the target behaviors identified as being insufficiently broad.  The point of an operational definition is to make it as narrow as possible and determine what it looks like when this child engages in this behavior.  (Tr. 1150:5-12; JE1, p. 1196-1201).

636.   Ms. Koertner observed A.B. five (5) different times in the classroom.  (Tr. 1150:18-21; JE1, pp. 1196-1201).

637.   A.B.'s most frequent behavior was noncompliance.  (Tr. 1152:1-6, 23-25; JE1, pp 1196-1201).

638.   Regarding A.B.'s noncompliance, Ms. Koertner observed that most often the antecedent was that a direction was given, then the escape piece, and then most often the consequence was that A.B. received a fair amount of attention when the teacher tried to redirect him back to what he is supposed to be doing.  (Tr. 1157:12-18; JE1, p. 1196-1201).

639.   Ms. Koertner determined that the function of A.B.'s noncompliance is primarily escape for non-preferred tasks and, secondarily, access to preferred tasks.  Likely predictors are a difficult or non-preferred task being presented or having to leave a preferred item or activity.  (Tr. 1159:10-15; JE1, p. 1196-1201).

640.   For vocal disruption, the primary and likely function is attention because they saw that it most often happened when A.B. was not getting a lot of adult attention, and they sometimes saw some vocal disruption secondarily when A.B. was engaged in non-preferred tasks, so the secondary function is escape.  (Tr. 1159:16-22; JE1, p. 1196-1201).

641.   Property destruction by A.B. barely occurred.  Ms. Koertner believes property destruction occurred only once.  (Tr. 1158:6-10; JE-1, p. 1196-1201).

642.   Ms. Koertner's functional behavioral assessment is skewed toward a BIP at the end of the May 2019, report.  The purpose of a BIP is to create a plan to help students be more successful and to help staff be more consistent.  If it is not written down, staff may all be responding differently.  The BIP provides how to help A.B. be more successful and how to delineate it such that the reading teacher, the math teacher, and the PE teacher are all doing it the same way.  (Tr. 1169:20-1170:4; JE-1, p. 1196-1201).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

643.   Ms. Koertner created a Behavior Intervention Plan for A.B. in May 2019.  The BIP provided interventions to use when A.B. exhibited noncompliance or property disruption.  The BIP outlined replacement behaviors such as role playing, use of visuals, daily reminders of appropriate ways to get attention, Further, the BIP provided reinforcers and motivation system (token board).  (JE-1, p. 1211-1213).

644.   The May 2019, functional behavioral assessment was emailed to Mrs. Beer multiple times.  On August 7, 2019, Ms. Dancer emailed Mrs. Beer a copy of the May 2019, functional behavioral assessment, and on October 25, 2019, and November 23, 2019, Ms. Koertner emailed Mrs. Beer a copy of the functional behavioral assessment.  (Tr. 1189:15-21, 1255:14-20; Ex. SMSD-12, p. 3022-3025, 4636-4637; JE-1, p. 1196-1201).

645.   On May 27, 2019, a score sheet for A.B. was created measuring A.B.'s ability to verbalize answers to who and what questions, telling others to "stop", letting other choose, responding to non-preferred questions, joining attention, getting attention, parking lot safety, tone of voice, task analysis, and behavior.  (JE-1, p. 1222-1228).

646.   In the Spring of 2019, there was a parent/teacher conference for A.B.   A.B. had progressed in reading with his letter/sound identification and continued to practice and was working in his reading small group also.  In Math, A.B. had shown great knowledge of number sense and writes numbers neatly and is working to complete his math worksheets with less support. For Writing, A.B. was forming his letters neatly, creating creative and detailed pictures, and was working on holding his pencil the correct way.  DIBELS for Math scored above the composite goal (99/72); and for Reading scored below the composite goal (81/122).  (JE-1, p. 1229).

647.   A.B.'s Second Quarter Assessment noted A.B. could write his name legibly. A.B. could also identify upper- and lower-case letters and sounds for A, O, S, and T; and knew capital and lower-case letters C, H; knew capital letter I and N; knew capital letter and sound of letter P; and knew the sound of letter H.  A.B. knew sight words "I" and "a". A.B. could provide rhyming words.  (JE-1, p. 1230).

648.   Dr. Weigand testified that the evaluation process took longer than it should have, and that in her thirteen years working in the Santa Fe Special Ed Public Education

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

Department she had never experienced the continuation of an educational evaluation similar to A.B.'s. (Tr. Vol. I, 211:10-212:4; Tr. Vol. II, 365:21-366:8). Dr. Weigand further testified that regardless of whether a draft evaluation document violates the IDEA in and of itself, the length of time for an evaluation process can violate the IDEA. (Tr. Vol. II, 389:16-24).

649.   Beers maintained that at the end of A.B.'s 2018-2019 school year, he was significantly behind his peers. He was perseverating very badly and was not reading. (Tr. Vol. III, 609:17-610:5). Although early results of reading interventions summarized in A.B.'s fall 2018 evaluation documents suggested the interventions were working, A.B.'s February 25, 2019, evaluation reflected regression—A.B. scored near the "well below typical" line in first sound fluency. (JE-1, p. 1105).

650.   Beers maintained that the deficiencies in the District's unreasonably prolonged evaluation process—magnified by the District's intentional attempt to identify A.B. under the category of "other health impairment" after his ASD diagnosis because it believed it would have to provide additional special education services to A.B. if it identified him as a child with autism—significantly impeded the Beers' ability to participate in the decision-making process regarding the provision of a FAPE to A.B. Moreover, the District deprived A.B. of a FAPE by failing to promptly develop and implement an IEP for A.B. after it determined he was a child with a disability in need of special education services, no later than January 2019.

## Summer 2019

651.   Jennifer Dancer is the assistant director of special education at the District. (Tr. 1251:6-9).

652.   Dr. Dancer assists the director in all the operations of the special education department, including staffing, retention, recruitment, policy, compliance, anything that the department needs support with, including sitting on IEP teams. (Tr. 1251:10-20).

653.   Dr. Dancer also serves as a building administrator for several elementary buildings within the District. (Tr. 1251:18-20).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

654.   Dr. Dancer is a trained and licensed school psychologist and has a doctorate in educational leadership.  (Tr. 1251:23-1252:1).

655.   Prior to working for the District, Dr. Dancer was a special education administrator for another district for five years, and prior to that, she was a school psychologist from another local school district for ten years.  (Tr. 1252:2-7).

656.   Dr. Dancer has been a part of hundreds of IEP teams.  (Tr. 1252:11-14).

657.   Dr. Dancer started with the District in July of 2019.  Sherry Dumolien provided Dr. Dancer with a working file that belonged to the former coordinator, Jackie Chatman.  Prior to July of 2019, Dr. Dancer was not involved with A.B.  (Tr. 1252:15-21, 1253:19-22).

658.   When Dr. Dancer started with the District in July of 2019, there was an IEP that had been written and drafted for A.B., but it was not signed off on.  (Tr. 1369:8-1)1.

659.   The functional behavioral assessment is not a service or a placement.  It is a document that includes data.  It is not a service of his IEP; it is just data.  (Tr. 1425:9-14).

660.   On July 15, 2019, Mrs. Beer requested a meeting with the Westwood View team to discuss A.B.  (Tr. 1254:1-3.  Ex. SMSD-12, pp. 3022-3025).

## Summer 2019 – A.B. Attends Private School to Makeup for Perceived Lost Educational Benefit

661.   A.B. attended Riley ABA and Autism Center over the summer of 2019 because Ms. Beer recognized that he needed to "get caught up" with his peers, and she wanted to give him that chance.  (Tr. Vol. III, 609:17-610:16).  Ms. Beer advised the District that she enrolled A.B. at Riley ABA over the summer because of "the failure to gain executive functioning skills via Westwood View Elementary."  (JE-1, pp. 1237-1238).

662.   Sara Riley of Riley ABA and Autism Center evaluated A.B. in May 2019 and developed goals to address A.B.'s deficits and areas of need.  (Tr. Vol. II, 526:3-528:7).  Ms. Riley's evaluation report accurately represents A.B.'s present levels as of May 2019.  (Tr. Vol. III, 528:14-17; Pet. Ex. 523).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

663.   Ms. Riley's assessment documented deficits for A.B. in the areas of joint attention, greetings, social play, social communication, adaptive, and community.  The assessment provides goals in these same categories, and documents baseline data for each.  A.B. had a baseline of 0 percent in two joint attention goals, three social play goals, five social communication goals, and five adaptive goals.  (Tr. Vol. III, 528:14-17; Pet. Ex. 523, at 4-8).

664.   Ms. Beer sent the District A.B.'s speech IEE on July 15, 2019.  (SMSD-12, pp. 3023-3024).

## 2019-2020, First Grade Year
### *August 2019*

665.   As the 2019-2020 school year approached, Ms. Beer reached out to the District's Assistant Director of Special Education, Dr. Jennifer Dancer.  Dr. Dancer expressed confusion when she looked at A.B.'s file, describing it as a mess.  (Tr. Vol. III, 610:23-611:16).  Ms. Beer expressed concern about A.B.'s removal from the classroom without her knowledge. (Tr. Vol. VI, 1372:24-1373:7).

666.   During the 2019-2020 school year, A.B. frequently refused academic requests from adults.  (Tr. Vol. IV, 807:10-20).  Ms. Waeckerle testified that "was typical A.B., that he refused a lot of requests from adults, especially academic requests." Id. A.B. was "very content to sit and do absolutely nothing," and A.B. made inappropriate comments about death, violent images, and was mostly negative in his responses.  A.B.'s perseveration moved to his eye; he began poking his eye all the time causing styes and trips to the doctor—a behavior that continued into the spring semester.  (Tr. Vol. III, 624:18-627:2; Tr. Vol. IV, 815:17-21; Pet. Ex. 280).  He did not join in most activities, remaining at his desk while other children were at carpet time.  A.B. refused to complete classroom work presented by his teacher.  (Tr. Vol. V, pp. 1197:16-1198:1).  He completed some assignments only after Ms. Judd negotiated with him, "stay[ed] right with him to get the task completed, and whisk[ed] it away as soon as it is finished, or he will destroy it."

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

(Tr. Vol. IV, 810:7-21; Pet. Ex. 213).  With Ms. Judd's assistance, A.B. was only able to "complete and/or salvage one [language arts] and one math piece each day."  (Pet. Ex. 213). Ms. Judd described her report of A.B. as "sounds terrible, but I'm really okay with it. I think he is doing okay – given all of his eccentricities."  (Pet. Ex. 213).

667.   A.B.'s May 28, 2020, report card indicated that A.B. needed improvement (the lowest scoring mark) in the following fourteen areas:  reads well orally, reads with understanding, completes written assignments correctly, applies language skills in all written work, spells assigned words correctly, applies spelling skills in all written work, works independently, listens and follow directions, uses study time effectively, completes assignments on time, class participation, classroom behavior, knows math facts as studied, and understands mathematical concepts.  (JE-1, pp. 1920-1921).  A.B. scored "expected progress toward outcome" in twelve categories, and "exceptionally good progress" in only one category.  *Id.*

668.   A.B. had fewer passing marks at the end of his first-grade year in 2019-2020 than at the end of kindergarten in 2018-2019.  (Tr. Vol. III, 642:17-20; JE-1, pp. 1232-1233, 1920-1921).

669.   On August 1, 2019, Dr. Dancer and Ms. Keith exchanged email communications about how to progress on A.B.'s IEP.  (Tr. 1413:11-14; Petitioners' Ex. 182).

670.   On August 1, 2019, Ms. Keith emailed Dr. Dancer and said, "I wanted to bring this student to your attention as mom is a hard parent for Westwood View. We did not complete his evaluation last year and we need to make sure we get on this first thing. She already has an advocate and is very difficult to please."  (Tr. 1412:8-14; Petitioners' Ex. 182).

671.   On August 1, 2019, Dr. Dancer responded to Ms. Keith asking, "Can you provide some clarification? Did mom not provide IEE results, or did our SMSD team no complete an evaluation? Our action plan would be totally different depending on the situation."  (Tr. 1412:15-21; Petitioners' Ex. 182).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

672.    On August 1, 2019, Ms. Keith replied to Dr. Dancer and said, "We completed the evaluation but agreed to providing an outside evaluation since she did not agree with our results...We were waiting for mom to provide her results so we could complete the IEP services needed." (Tr. 1411:11-18, 1412:22-1413:6; Petitioners' Ex. 182).

673.    On August 2, 2019, Mrs. Beer emailed Dr. Dancer and asked if she could get the IEE functional behavioral assessment from Dr. Dancer and to set up a time to meet before school starts.  Dr. Dancer emailed a copy of the functional behavioral assessment to Mrs. Beer and scheduled a time to meet with her.  (Tr. 1254:4-12, 1255:11-20; Ex. SMSD-12, pp. 3022-3025).

674.    On August 6, 2019, Dr. Koertner sent A.B.'s functional behavioral assessment to Dr. Dancer.  (Tr. 1371:23-1372:6; Petitioners' Ex. 188).

675.    On August 7, 2019, Ms. Wiseman sent Dr. Dancer an email stating that a proposed IEP had been written on February 5, 2019.  Ms. Wiseman informed Dr. Dancer that the meeting had lasted for almost an hour and that most of the time was spend discussing A.B.'s proposed IEP.  (Tr. 1415:13-1416:9; Petitioners' Ex. 195).

676.    Dr. Dancer met with Mrs. Beer on August 8, 2019.  (Tr. 1256:4-9; Ex. SMSD-12, p. 3022-3025; Ex. SMSD 1.002 (audio recording)).

677.    Dr. Dancer was unaware that Mrs. Beer recorded their meeting on August 8, 2019.  Mrs. Beer made that recording.  Mrs. Beer would have known that she was recording herself during that meeting.  (Tr. 1414:19-1415:12).

678.    Dr. Dancer asked Mrs. Beer if the team had sent the eligibility report and the draft IEP to her previously and Mrs. Beer responded the team had done so.  Dr. Dancer understood that Mrs. Beer had seen the draft IEP prior to meeting with her on August 8, 2019.  (Tr. 1258:14-1259:4; Ex. SMSD 1.002 at 5m 33s - 6m 29s).

679.    Mrs. Beer told Dr. Dancer she was dissatisfied with the functional behavioral assessment.  In Mrs. Beer's opinion, it did not describe A.B. accurately.  (Tr. 1259:12-22; Ex. SMSD 1.002 at 7m 6s - 7m 47s).

680.    Mrs. Beer expressed her appreciation of Briarwood elementary. Mrs. Beer was not happy with Westwood View or the way the principal communicates.  Mrs. Beer

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

stated there should be new staff members there.  (Tr. 1262:2-24; Ex. SMSD 1.002 at 19m 29s - 21m 4s).

681.   Mrs. Beer indicated that she believes that she has requested a para.  Mrs. Beer suggested that the evaluation was tied to the subsequent request for granting of the para.  (Tr. 1264:15-1265:6; Ex. SMSD 1.002 at 25m 52s - 26m 9s).

682.   Dr. Dancer went over the IEP that was sent home to Mrs. Beer earlier in the year.  Mrs. Beer said that she had reviewed that IEP and that she agreed with all of it except the functional behavioral assessment.  Mrs. Beer was aware that there were speech services in the IEP, and she said for 20 minutes per week.  (Tr. 1265:7-21, 1266:6-10, 1417:21-23; Ex. SMSD 1.002 at 26m 50s - 27m 56s).

683.   Speech services do not appear in an evaluation report; minutes for speech services appear in the special education services section of an IEP form.  (Tr. 1265:22-1266:5).

684.   Dr. Dancer explained to Mrs. Beer the difference between a medical plan and a school plan.  There is a misconception about medical model versus educational model.  When Dr. Dancer works with parents, she tries to explain that while they certainly respect and want to consider a medical person's opinion and recommendations that oftentimes a student looks different in his educational setting and ultimately the IEP team can consider those recommendations and input, but then they need to determine what is most appropriate in the educational setting.  (Tr. 1266:11-1267:23; Ex. SMSD 1.002 at 30m 35s - 32m 41s).

685.   Dr. Dancer testified that sometimes parents do not understand the difference between medical definitions and educational definitions.  A lot of times, parents will go and receive an outside evaluation and a certain diagnosis and, sometimes, recommendations from a doctor.  A lot of them are standardized, template recommendations that the parents provide to the team.  Then the parents have false expectations that the IEP team or school team would just take that and roll it into an IEP.  Dr. Dancer does try to educate all of the families who have outside support that while the District wants to work with their medical providers, they will not always take their

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

reports and their recommendations and roll it into an IEP.  They must look at what happens in the school setting.  (Tr. 1377:13-1378:12).

686.    Dr. Dancer and Mrs. Beer discussed the functional behavioral assessment.  Mrs. Beer was disappointed that the functional behavioral assessment did not ultimately indicate the need for a para.   (Tr. 1268:6-17; Ex. SMSD 1.002 at 35m 58s - 36m 36s).

687.    Dr. Dancer suggested that they could have an IEP meeting for A.B. as soon as the following day.  (Tr. 1268:18-20; Ex. SMSD 1.002 at 35m 58s - 36m 36s).

688.    On August 8, 2019, after her meeting with Mrs. Beer, Dr. Dancer sent an email to Ms. Keith, Ms. Guerry and Ms. Wiseman because she wanted to address Mrs. Beer's concern for A.B. being sent out of the general education classroom.  (Tr. 1413:15-16, 1414:7-18; Petitioners' Ex. 197).

689.    A.B.'s IEP team did not meet on August 9, 2019, because Mrs. Beer wanted to invite her advocate who was not available.  (Tr. 1268:25-1269:5).

690.    On August 12, 2019, a Benchmark Scores Table for First Grade was created for A.B.  (JE-1, p. 1235-1236).

691.    On August 13, 2019, Ms. Beer sent the District a letter outlining her concerns regarding the evaluation documents dated February 25, 2019.  Ms. Beer enclosed Ms. Ostby's February 25, 2019, letter and all of the PWNs attached to Ms. Ostby's letter.  Ms. Beer signed several of the prior written notices, but her signature had no effect because the PWNs did not request parental consent to provide services to A.B.  (Tr. Vol. II, 392:2-396:18; Tr. Vol. III, 612:2-614:25, 728:25-730:5; JE-1, pp. 1237-1286).

692.    After Ms. Beer delivered the packet of information with her signatures on August 13, 2019, the District did not begin providing services to A.B. because none of the District's PWNs provided to Ms. Beer requested parental consent to provide services.  (Tr. Vol. III, 729:19-730:22).

693.    On August 13, 2019, Dr. Wiseman emailed Ms. Judd a reward chart for A.B.  (JE-1, p. 1300).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

694.    On August 13, 2019, Mrs. Beer sent an email to Dr. Dancer and requested another copy of the IEP.  Dr. Dancer provided Mrs. Beer with a copy of the IEP and BIP. (Tr. 1276:23-1277:12; Petitioners' Ex. 203; JE-1, p. 1287-1299).

695.    On August 13, 2019, Dr. Dancer sent Ms. Beer a draft IEP dated February 6, 2019, after Ms. Beer requested the same because she did not have a copy. (Tr. Vol. III, 611:17-22, 615:1-20; JE-1, pp. 1287-1299; Pet. Ex. 203).  Dr. Dancer did not attach a PWN requesting the Beer's parental consent to begin providing special education services to A.B. *Id.*

696.    The speech portion of the IEP and the communication goal sent to Ms. Beer lacked any data and had no present level based on his current levels of functioning.  (Tr. Vol. IV, 876:14-877:20, 884:15-22; Pet. Ex. 242).

697.    The draft IEP lacked parental input, contradicted District staff observations, did not reference or consider the May 2019 speech IEE or the District's second FBA completed in May 2019, and utilized goals from kindergarten.  (Tr. Vol. III, 615:18-616:24; Tr. Vol. VI, 1381:21-1382:10; Pet. Ex. 208; JE-1, pp. 1287-1299).

698.    Dr. Weigand testified that the IEP provided to Ms. Beer on August 13, 2019, contained the same immeasurable behavior goal as the February 13, 2019, version.  (Tr. Vol. I, 218:3-219:21).  Dr. Weigand testified the August 13, 2019, version was not reasonably calculated to enable A.B. to make appropriate progress.  (Tr. Vol. I, 219:18-21).

699.    Dr. Dancer informed Ms. Beer that the District had to work off the IEP draft from the prior school year, and the District would collect new data moving forward and propose changes on an ongoing basis, via PWNs.  (Tr. Vol. III, 616:25-617:12).

700.    Ms. Beer requested the District add goals for reading and writing.  (Pet. Ex. 232).  As of September 17, 2019, the District lacked any current information regarding A.B.'s reading and writing.  *Id.*

701.    On August 13, 2019, Mrs. Beer sent a letter to Ms. Dancer with her review of the February 25, 2019, Evaluation.  Mrs. Beer provided the District with a copy of the May 16, 2019, Comprehensive Speech Language Evaluation completed by Aleah Brost at Children's Mercy and an invoice for same.  Mrs. Beer noted she has received the IEE

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

functional behavioral assessment completed by Ms. Koertner.  Mrs. Beer stated she understands the District is approving an IEP for A.B. in the primary category of Autism. Mrs. Beer listed her "dissenting comments" regarding the Evaluation, functional behavioral assessment, and BIP. Mrs. Beer made allegations that Ms. Hoffman was verbally and physically intimidated into not admitting that A.B. needed 1:1 help from her to understand and complete his work. Mrs. Beer's letter stated that the educational evaluation had "no revised content of Dr. Lindberg's diagnosis."  Mrs. Beer's letter further stated, "I continue to disagree with the documentation interpretation of the data collected and created by Ms. Hoffman and Dr. Wiseman." Further, Mrs. Beer expressed her desire that Dr. Wiseman no longer be a part of A.B.'s team.  Finally, Mrs. Beer provided various enclosures including:

(a) Mrs. Beer returned the December 1, 2018, Prior Written Notice on August 13, 2019, with an "X" through the consent page.  (JE-1, p. 844-847, 1237, and 1281-1284).

(b) Mrs. Beer returned the December 6, 2018, Prior Written Notice on August 13, 2019, signed.  (JE-1, p. 854-857, 1237, 1277-1280).

(c) Mrs. Beer returned the January 17, 2019, Prior Written Notice (regarding continuing the meeting to February 6, 2019, and Mrs. Beer's concerns regarding the functional behavioral assessment data) on August 13, 2019, with an "X" through the consent page.  (JE-1, p. 927-930, 1237, 1273-1276).

(d) Mrs. Beer returned the February 7, 2019, Prior Written Notice with an "X" through the consent page on August 13, 2019.  (JE-1, p. 1056-1059, 1237, 1269-1272).

(e) Mrs. Beer did not return the February 25, 2019, Evaluation Report until August 13, 2019.  Mrs. Beer wrote a dissenting opinion on the copy she returned.  (JE-1, p. 1139-1156, 1237, 1241-1258).

(f) Mrs. Beer did not return the February 25, 2019, Functional Behavioral Assessment until August 13, 2019.  (JE-1, p. 1163-1168, 1237, 1259-1264).

(g) Mrs. Beer did not return the February 25, 2019, Prior Written Notice until August 13, 2019.  (JE-1, p. 1173-1176, 1237, 1265-1268); and

(h) Invoice from Children's Mercy for May 2019, Evaluation.  (JE-1, p. 1237, 1285-1286).

(Tr. 1277:21-25, 1278:16-19, 1278:20-25, 1279:1-5; JE-1, p. 1237-1286).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

702.   When Mrs. Beer sent in her executed paperwork from the prior evaluation on August 13, 2019, that was the first time Mrs. Beer had provided the speech and language IEE report.  (Tr. 1417:3-9).

703.   Following Mrs. Beer's August 13, 2019, letter, A.B.'s team scheduled a meeting for September 20, 2019.  However, Dr. Dancer was ill that day, so the meeting was rescheduled for October 1, 2019.  (Tr. 1280:10-10-21).

704.   On August 15, 2019, Dr. Dancer emailed Mrs. Beer and confirmed she was adding documents to A.B.'s file.  Further Dr. Dancer confirmed that Mrs. Beer had received and reviewed the proposed IEP.  Dr. Dancer informed Mrs. Beer that she could sign consent to begin the implementation of the IEP; however, Dr. Dancer told Mrs. Beer that she also saw the benefit of having the IEP meeting to get everybody around the table to discuss his educational supports because they can't implement the IEP without Mrs. Beers consent.  (Tr. 1416:10-1417:2, 1417:13-15, 1418:2-7; Petitioners' Ex. 207).

705.   On August 21, 2019, Dr. Dancer sent an email to A.B.'s team advising them that Mrs. Beer would like to meet to discuss A.B.'s proposed IEP.  Dr. Dancer stated, "This may be a difficult meeting because as you know, the goals were written last spring."  (Tr. 1382:2-7, 1420:15-1421:18; Petitioners' Ex. 208).

706.   On August 22, 2019, Billie Varuska completed an observation of A.B.  (JE-1, p. 1301).

707.   On August 22, 2019, Ms. Guerry provided Ms. Dancer a draft agenda for A.B.'s IEP meeting.  (JE-1, p. 1302).

708.   On August 24, 2019, Ms. Judd emailed Ms. Waeckerle and Ms. Keith regarding A.B.'s behaviors in the classroom.  Ms. Judd noted that A.B. seemed to be listening and would approach later and comment for most activities.  A.B. was doing some of the assignments but there was an element of negotiation.  The teacher must stay with A.B. to get the task completed and whisk it away or it will be destroyed.  (Tr. 808:1-12, 810:14-21; Petitioners' Ex. 213).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

709.   At Westwood View, Libby Kramer is the reading specialist.  She helps students who need additional support in reading.  It is a general education initiative.  (Tr. 1235:16-22.

710.   Libby Kramer has an undergraduate degree in elementary education and a master's degree in curriculum and leadership with additional hours towards her building administrator licensure.  (Tr. 1236:2-6).

711.   Libby Kramer testified that a Tier 3 intervention in the elementary level means that a student is well below benchmark or well below grade level in reading. They provide a pull-out intervention time for 30 minutes to support students who need a little extra individualized time in small group (typically does not exceed five students) with their grade level peers, that just need extra support in reading.  (Tr. 1236:9-23).

712.   Libby Kramer testified that they assess students three times a year – fall, winter, and spring – using DIBELs to identify a student for participation in Tier 3.  Grades K through 2 have nonsense word fluency.  K-1 has phoneme segmentation.  They use DIBELs as a good indicator to provide they what services to provide students.  (Tr. 1237:3-12).

713.   Libby Kramer testified that in primary grades Tier 3 was focused on addressing sounds, decoding, can a student hear the sounds in a word.  (Tr. 1238:19-25).

714.   Libby Kramer testified that she attended an IEP meeting for A.B.  She was part of supporting A.B. but not through his IEP.  (Tr. 1239:1-5).

715.   At the IEP meeting Libby Kramer attended, she told the team that A.B. was responding to intervention.  She was seeing his numbers increase.  His data points were looking nice.  A.B. was responding to interventions.  Tier 3 support was what A.B. needed. At that time, it was in her professional recommendation in reading that she did not think A.B. needed additional reading support outside of what she was providing.  (Tr. 1239:9-23).

716.   Libby Kramer testified that the Tier 3 supports were working for A.B. When she graphed his data through progress monitoring – which was done weekly or biweekly depending on if A.B. was in the building on that day – the data showed a steady increase

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

with being able to identify sounds, being able to identify and read nonsense words, so the data was improving.  (Tr. 1239:24-1240:1).

717.    Libby Kramer also told A.B.'s team that she thought he could read based on working with him, listening to him read, and being a part of the intervention process.  (Tr. 1240:11-18).

718.    A.B. made progress from the time Libby Kramer started working with him through when COVID hit in March 2020.  (Tr. 1240:23-1241:5).

719.    No one disagreed with Libby Kramer when she presented her information to the team regarding A.B.'s progress.  (Tr. 1241:23-1242:3).

## September 2019

720.    On September 12, 2019, A.B. was sent to the office for 30 minutes for being obscene in the hallway.  Mrs. Beer was notified via phone, then visited with A.B. and Ms. Judd later in the day to discuss social stories and suggestions.  A.B. returned to class and integrated back into the classroom setting and completed his work without further difficulties.  (JE-1, p. 1303).

721.    On September 12, 2019, Ms. Waeckerle provided Mrs. Beer a Prior Written Notice of Meeting scheduling a meeting for September 20, 2019, to review data and determine eligibility.  Later, Ms. Waeckerle realized she had checked the incorrect box and on September 13, 2019, emailed Mrs. Beer a corrected Notice of Meeting for September 20, 2019, to develop an IEP.  (Tr. 805:6-18; Petitioners' Ex. 220; JE-1, p. 1304-1306 and 1307-1309).

722.    On September 12, 2019, a Prior Written Notice of Meeting was provided rescheduling the meeting to develop an IEP from September 20, 2019, to October 1, 2019.  (JE-1 p. 1310-1312).

723.    On September 12, 2019, Mrs. Beer provided Ms. Dancer social stories that had been provided to her by Sara Riley at Riley ABA & Autism Center.  (JE-1, p. 1313-1351).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

724.   On September 16, 2019, Mrs. Beer sent a letter to Ms. Dancer regarding additional parental concerns.  Mrs. Beer stated she had reviewed the February 6, 2019, Draft IEP and provided dissenting comments:  no parental input; concerns about bullying; PE concerns; info on present level is vague; goals are not personally related to A.B.  Mrs. Beer stated she wants statistical data for measuring progress on goals.  Mrs. Beer provided options for short term goals and benchmarks.  Mrs. Beer was concerned with the LRE; requested an am/pm check-in person for A.B.; stated A.B.'s needs demand more than 20 minutes a day three times per week; requested 45 minutes per day, 5 days a week of in-classroom of direct teaching.  Mrs. Beer further requested 30 minutes a day, 5 times a week for speech/language instruction.  Mrs. Beer also provided a list of requested accommodations.  (JE-1, p. 1352-1357).

725.   On September 16, 2019, Ms. Guerry emailed Ms. Dancer an agenda for A.B.'s September 20, 2019, IEP meeting.  (JE-1, p. 1358).

726.   On September 16, 2019, Individualized Healthcare Plans were created for A.B.  (JE-1, p. 1359-1364).

727.   Mrs. Beer's September 17, 2019, email regarding parent concerns states, "Upon review of the IEP from February 6, I'm stating parental concerns, dissenting opinions."  The first point listed is "no parental input."  (Tr. 1281:18-22, 1434:19-20, 1435:14-16; Petitioners' Ex. 230).

728.   Mrs. Beer's September 17, 2019, email regarding parent concerns states, "Please consider 45 minutes daily in the classroom direct teaching of goals in cooperation with his teacher, Mrs. Judd, between 8:10 a.m. and 9:55 a.m. by SPED staff.  Would also like to include a.m./p.m. check-in person. The same person would also be a point person."  (Tr. 1282:10-15; Petitioners' Ex. 230).

729.   The District's interpretation of Mrs. Beer's September 16, 2019, parent concern letter was there were goals that she was proposing for the IEP team to consider.  (Tr. 1447:16-20).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

730.   The District was not obligated to accept the suggestions for goals in Mrs. Beer's September 16, 2019, parent concerns letter.  However, the team wanted to reach an agreement with Mrs. Beer.  (Tr. 1462:18-1463:1).

731.   On September 19, 2019, Jo Ann Blevins, RN, BNS, MA, (District Nurse) provided Ms. Keith her Time on Task Observation for A.B.  (JE-1, p. 1369).

732.   On September 25, 2019, a Prior Written Notice of Meeting was provided to Petitioners scheduling a meeting for October 1, 2019, to develop an IEP for A.B.  (JE-1, 1373-1375 (*signed*)).

733.   A plan for providing A.B. with Speech Services was drafted.  (JE-1, p. 1376).

## October 2019

734.   On October 1, 2019, A.B.'s IEP team met to develop an IEP, review the BIP, and to obtain consent for initial placement and services.  The meeting was recorded.  (JE-1, p. 1377; Ex. SMSD-12, 1.003 (*audio*)).

735.   The individuals who were part of A.B.'s October 1, 2019, IEP team were:

- Natalie Beer, parent
- Cindy Waeckerle, case manager
- (JEnnifer Dancer, Assistant Director of Special Education
- Mrs. Laine Guerry, E.Ds., School Psychologist
- Kathy Keith, Principal
- Jill Koertner, BCBA
- Ms. Lori Judd, classroom teacher
- Liz Meitl, parent advocate

(JE-1, p. 1390-1402 at p. 1402).

736.   The October 1, 2019, proposed IEP indicated that A.B.'s behavior impeded his learning or the learning of others, and proposed to address the behaviors by accommodations, goals, and a behavior intervention plan.  (JE-1, pp. 1390-1403, 1414-16).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

737.    According to the agenda prepared for the October 1, 2019, meeting states, the team intended to discuss and determine A.B.'s services, including reviewing the BIP. (Tr. 1171:12-24; JE-1, p. 1377).

738.    During the October 1, 2019, meeting, the IEP team meeting A.B.'s reading needs through a Tier 3 intervention.  (Tr. 1283:25-1284:7; Ex. SMSD 1.003 at 5m 44s - 8m 57s).

739.    The IEP team determined the Tier 3 intervention could be provided to A.B. five days a week.  Mrs. Beer indicated she did not object to the Tier 3 intervention.  (Tr. 1285:3-12; Ex. SMSD 1.003 at 10m 27s - 12m 3s).

740.    Mrs. Beer told the IEP team that A.B. needed to eat a snack in the afternoon. (Tr. 1429:14-16).

741.    Mrs. Beer also told the IEP team that A.B. is great in math and social studies. (Tr. 1287:5-7; Ex. SMSD 1.003 at 12m 59s - 15m 30s).

742.    During the October 1, 2019, meeting, Mrs. Beer requested to have a point person for A.B.  The team discussed her request.  For A.B., the point person was intercepting him first thing in the morning, making sure he was in a good space, reinforcing some of those appropriate social skills, and ensuring that he is ready for the day.  (Tr. 1288:25-1289:2, 1289:17-1290:10; Ex. SMSD 1.003 at 33m 21s - 38m 35s).

743.    Mrs. Beer requested a paraprofessional be assigned to A.B. multiple times during the meeting, including the specific request for 45 minutes in the morning. (Tr. 1292:20-22, 1293:7-10; Ex. SMSD 1.003 at 40m 38s - 42m 33s. (Tr. 1286:3-13, 1429:10-13; Ex. SMSD 1.003 at 12m 59s - 15m 30s).

744.    During the October 1, 2019, meeting, Mrs. Beer asked Ms. Judd to fill out a rating scale that Mrs. Beer had found.  The scale was a weighted distribution sheet that sometimes the state will work with buildings or districts to determine para allocation.  (Tr. 1290:22-1291:7; Ex. SMSD 1.003 at 33m 21s - 38m 35s).

745.    Through collaboration at the IEP team meeting on October 1, 2019, the team agreed that A.B. would benefit from 50 minutes in the morning to work on executive

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

functioning skills.  The team identified Ms. Lori Grover as the individual who would implement these minutes. (Tr. 1172:21-1173:7, 1304:3-7).

746.    Lori Grover is a certified special educator. At the time of the October 1, 2019, IEP meeting, she was a long-term sub in Westwood View.  (Tr. 1181:3-8).[1]

747.    Ms. Meitl told Mrs. Beer that Ms. Grover was great.  Ms. Meitl knew Ms. Grover and thought highly of Ms. Grover.  (Tr. 1292:9-19; Ex. SMSD 1.003 at 33m 21s - 38m 35s).

748.    Mrs. Judd then told the IEP team about A.B.'s improvement with participation and listening in the classroom.  (Tr. 1295:6-17; Ex. SMSD 1.003 at 54m 30s - 55m 18s).

749.    Towards the end of the October 1, 2019, meeting, Dr. Dancer explained revocation of consent.  Dr. Dancer wanted Mrs. Beer to be aware that the IEP team could take the IEP piece by piece to gain consent for those items that the team agreed upon.  Dr. Dancer wanted to make certain that Mrs. Beer was aware that parents can revoke consent for special education services at any time.  (Tr. 1295:18-20; Ex. SMSD 1.003 at 1h 6m 5s – 1h 8m 7s).

750.    The IEP team wanted to start providing services as soon as possible because A.B. was a child identified with an exceptionality.  However, prior to the October 1, 2019, meeting, Petitioners had not consented to specialized instruction. (Tr. 1296:17-23).

751.    The IEP team was able to discuss the A.B.'s social skills need but was not able to reach the other services or goals recommended or proposed.  (Tr. 1296:24-1297:4).

752.    At the end of the October 1, 2019, meeting, Mrs. Beer thanked the team and apologized for any perceived defensiveness.  (Tr. 1297:5-15; Ex. SMSD 1.003 at 1h 17m 4s - 1h 17m 31s).

753.    District staff testified that there were many different versions of the IEP with revisions and "wordsmithing," all in an effort to reach an agreement with the Beers. (Tr. Vol. V, 1185:20-24).  Although dates on the IEPs were changed, the District made no

---

[1] Lori Grover is referred to in the exhibits and testimony as Ms. Lori Grover, Ms. Lori Kramer-Grover, and Ms. Kramer. Herein, she is referred to only by Ms. Grover.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

material changes to the IEPs from February 2019 through October 2019.  (Pet. Ex. 139; JE-1, pp. 1287-1299, 1403-1415).  In other words, the District repeatedly proposed a virtually identical IEP and BIP to the Beers, unnecessarily prolonging the IEP development process and IEP Team meetings.

754.   The October 1, 2019, proposed IEP did not include present level information from A.B.'s speech IEE or the second FBA conducted by the District, and did not materially alter the goals from prior versions. It also proposed to provide no accommodations for state assessments because "State Assessments not required due to age/grade," an incorrect statement carried over from the Kindergarten plan.  (Tr. Vol. III, 617:13-619:14; JE-1, pp. 1390-1402).

755.   The October 1, 2019, proposed IEP included the BIP Dr. Wiseman drafted using her FBA data, instead of using Ms. Koertner's data or the second FBA performed by Ms. Koertner.  (Tr. Vol. V, 1224:8-1225:10; Pet. Ex. 139, at Bates No. BEERCD004034-35; Pet. Exs. 257, 283; JE-1, pp. 1414-1415).

756.   Dr. Weigand testified that the October 1, 2019, IEP was not reasonably calculated to enable A.B. to make appropriate progress.  (Tr. Vol. I, 220:19-221:15).

757.   The first time the District ever requested parental consent to provide any special education services to A.B. was on October 1, 2019.  (Tr. Vol. VI, 1379:24-1380:6; JE-1, pp. 1237-1287).

758.   On October 1, 2019, Ms. Beer provided parental consent to the provision of specially designed instruction for 50 minutes, five times per week.  Ms. Beer did not consent to the entire IEP proposed on October 1, 2019, due to her concerns.  (Tr. Vol. III, 619:15-620:5; JE-1, pp. 1424-1428).

759.   The October 1, 2019, IEP team meeting was the first meeting held by the District following the eligibility determination in February 2019.  (Tr. Vol. V, 1298:23-1299:1).

760.   On October 1, 2019, a Prior Written Notice was provided to and signed by Mrs. Beer.  Section "B.  Initial services and placement" are checked.  Under "Description of the action proposed or refused", it says, "The IEP team, including Mrs. Beer, agree [A.B.] will

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

begin to receive special education services in the area of social/emotional/behavioral and executive functioning.  He'll receive push-in support in the general ed classroom for 50 minutes daily."  Under "Explanation," it says, "Based on parent concern, teacher feedback, and student performance, the IEP team agrees [A.B.] requires special education support in the area of social/emotional/behavior."  (Tr. 1300:10-1301:13; JE-1, p. 1424-1427).

761.   Mrs. Beer signed the October 1, 2019, Prior Written Notice.  Since Mrs. Beer signed the October 1, 2019, Prior Written Notice, A.B. could begin receiving special education services.  (Tr. 1303:1-14; JE-1, p. 1427).

762.   On October 1, 2019, a Prior Written Notice was provided to Petitioners scheduling a meeting for October 17, 2019, to develop A.B.'s IEP.  (JE-1, p. 1436-1438).

763.   On October 16, 2019, Ms. Koertner emailed Ms. Grover proposed social stories for A.B.  (JE-1, p. 1505-1510).

764.   The team next met on October 17, 2019, as a continuation of the October 1, 2019, meeting to discuss his IEP, including goal changes/additions.  During the October 17, 2019, meeting, the team mainly focused on A.B.'s BIP and a token chart.  Mrs. Beer wanted the team to implement a Lego token board and edible token board for A.B. (Tr. 1304:14-16, 1305:1-18; JE-1, p. 1511, 1522).

765.   On October 17, 2019, a Prior Written Notice of Action was provided to Petitioners regarding a proposed "change in services".  The team agreed to implement a token board provided by Mrs. Beer to give positive reinforcement to A.B. consistently across school settings.  Further, the Prior Written Notice stated: "The team will continue to work through the proposed IEP and build consensus around other proposed services."  (Tr. 1177:1-6, 1306:15-19, (JE-1, p. 1513).

766.   Ms. Koertner testified that a motivation system is important.  It does not matter what the token board looked like.  If A.B. had a history with a particular token system, they were happy to use it at school because he already knows how it works.  (Tr. 1177:1-16; JE-1, p. 1512-1515).

767.   A note was sent to the specials teacher that said "[A.B.] is going to have a token board for every class. Each special's teacher will receive a board, so we are consistent

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

throughout the day with our reinforcement system. [A.B.] was introduced to this system over the summer and it was very effective. Mrs. Beer would like to schedule time with everyone to train them during parent/teacher conferences." (Tr. 1178:20-25, 1306:20-1307; JE-1, p. 1548).

768.   On October 17, 2019, a Prior Written Notice of Meeting scheduling a meeting for November 11, 2019, to continue developing A.B.'s IEP was provided to Mrs. Beer.  Mrs. Beer signed this Prior Written Notice.  (JE-1, p. 1519-1521).

769.   Mrs. Beer provided Ms. Waeckerle an editable Lego token board and a Daily Behavior Data Sheet on October 17, 2019.  (JE-1, p. 1522-1545 and 1546-1547).

770.   A.B.'s team worked together on developing and wordsmithing A.B.'s IEP goals.  The entire IEP was built with everybody talking and providing input.  They would have a proposed a goal and then received feedback from Mrs. Beer and then went back to the table to wordsmith things.  Mrs. Koertner, Mrs.  Waeckerle, Mrs. Helzer, and Jill Koertner all word smithed some goals based on feedback from Mrs. Beer.  (Tr. 814:13-22, 1308:10-22).

771.   On October 21, 2019, Ms. Koertner sent an email to A.B.'s team that included two possible data sheets they could use and asking the team to weigh in on what data sheet they thought would be best.  Ms. Koertner asked the team members, including Mrs. Beer, to weigh in on whether they felt the data sheet would cover the things they had discussed in the meeting.  She advised the social skills data sheet would go on the back of whichever sheet the team ultimately decided to use.  Usually, Ms. Koertner would not ask a parent if they liked the data sheet, because data sheets are generally internal.  However, during the meeting, the team discussed all the things they wanted to catch, and, in this scenario, Ms. Koertner was especially seeking out Mrs. Beer's feedback.  (Tr. 1181:9-1182:22; Ex. SMSD-12, p. 4637).

772.   As of October 25, 2019, the District did not have baseline data necessary to develop goals for A.B.  (Tr. Vol. IV, 815:2-16; Pet. Ex. 280).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

773.   In an October 28, 2019, email to Ms. Koertner, Ms. Waeckerle reiterated her concern that the District still had no data necessary to support a reading goal for A.B.  (Pet. Ex. 287).

774.   It is against the District's "standard protocol" to propose goals to parents before the team collects baseline data.  (Tr. Vol. IV, 816:5-9.)  However, in email exchanges on October 28, 2019, District staff internally discussed the need to "[t]ake baseline data on the 3 goals we sent" to the Beers.  (Pet. Ex. 289).

775.   On October 25, 2019, Mrs. Beer replied to Ms. Koertner's October 21, 2019, email, asserting that the people who should comment on the proposed data sheets are Mrs. Judd and Mrs. Grover.  (Tr. 1182:1-22; SMSD-12, p. 4636-4637).

776.   On October 25, 2019, Mrs. Beer sent an email to Ms. Koertner that said, "Pulled directly from my parent concerns letter these are the annual goals that accurately reflect my priorities and the state standards for advancement to second grade. The 3 sub goals that we discussed as a top priority for Mrs. Judd and that Mrs. Grover is to work on with [A.B.] are highlighted in green." (Tr. 1442:20-1443:3; Ex. SMSD-12, p. 4737).

777.   On October 25, 2019, Ms. Koertner emailed Mrs. Beer a copy of the Draft BIP and a copy of the May 2019, functional behavioral assessment.  Ms. Koertner asked for any feedback Mrs. Beer would like to provide regarding the BIP.  (Tr. 1189:15-21; JE-1, p. 1552; Ex. SMSD-12, p. 4636-4637).

778.   Mrs. Beer's initial response regarding the draft IEP was to request that it be inserted into the District's IEP form and sent back to her.  (Tr. 1191:16-20).

779.   On October 25, 2019, Mrs. Beer provided Ms. Koertner with a copy of the September 16, 2019, letter Mrs. Beer had sent to Ms. Dancer regarding Mrs. Beer's review and concerns with the February 6, 2019, Draft IEP.  (JE-1, p. 1352-1357).

780.   The IEP team started taking data in the classroom on the three target behaviors (noncompliance, vocal disruption, property disruption) because they wanted to see if the BIP was working.  If A.B. exhibited a target behavior, they wanted to intervene using the BIP and then see if the target behavior got better. (Tr. 1179:11-20).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

781.   From October 2019, and March 2020, additional data was collected regarding A.B., including:

(a)   ABA Data Sheet to obtain baseline data (JE-1, p. 1554-1555);

(b)   A.B. Behavior Chart measuring compliance, work engagement, orients towards speaker, chorale responding, raising hand, uses paper appropriately, and property disruption (JE-1, p. 1556); and

(c)   Data Collection Charts measuring time, activity, follows directions vs. noncompliance, engages in work, orients towards speaker or materials, answer or respond with group, raises hand, uses paper appropriately, and property disruption. (JE-1, p. 1557 and 1558).

(d)   From October 2019, through March 2020, Ms. Waeckerle kept logs of classroom data regarding A.B.'s classroom behaviors, such as following directions v. noncompliance, eyes on teacher, track with finger, answer with group, complete work / engages in work, shift topics, diversify topics, approach to others.  (JE-1, p. 1439-1503 and 1747-1777).

(e)   Further, from October 15, 2019, through December 19, 2019, data was collected and graphed for A.B.  (JE-1.189 (*excel spreadsheet*)).

## November 2019

782.   District special education teacher Lori Grover expressed concerns regarding A.B.'s fine motor skills, reflected in a November 1, 2019, email transmitted by Ms. Waeckerle asking Stephen Hillyer to observe A.B.  (Tr. Vol. IV, 824:1-18; Pet. Ex. 298).  Ms. Waeckerle testified that she did not know if the fine motor observation occurred.  (Tr. Vol. IV, 824:9-825:2).  The most recent fine motor evaluation for A.B. appears in an evaluation discussed at the December 6, 2018, IEP team meeting.  (Tr. Vol. III, 586:14-588:2; JE-1, p. 821).

783.   On November 10, 2019, Ms. Waeckerle emailed Mrs. Beer a draft IEP.  (JE-1, p. 1559-1570; Exhibit SMSD-12, p. 4858-4874).

784.   The next time the IEP team met was in November 2019.  (Tr. 1308:23-25).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

785.    On November 10, 2019, Ms. Waeckerle emailed Mrs. Beer a draft IEP.  (JE-1, p. 1559-1570; Exhibit SMSD-12, p. 4858-4874).

786.    On November 11, 2019, A.B.'s student profile scores were recorded for reading (158) and math (172).  (JE-1, p. 1571-1574).

787.    On November 11, 2019, the District proposed to provide speech language services 20 minutes per day, two times per week via PWN.  (JE-1, pp. 1583-1586).  Ms. Beer signed the PWN that same day.  *Id.*

788.    The District revised the October 1, 2019 proposed IEP, and circulated an IEP iteration dated November 20, 2019.  (Tr. Vol. III, 621:10-17; SMSD-12, pp. 5360-5375).  The IEP team met on November 20, 2019.  (JE-1, pp. 1590-1592).

789.    On November 11, 2019, Mrs. Beer, a Prior Written Notice of Action was preparing proposing new goals being added to A.B.'s IEP, as well as other goals being discontinued based on collection of new data addressing current behavior concerns.  The team did not feel the goals on the initial IEP were going to adequately meet A.B.'s needs and after collecting data on several behavior concerns, new goals and accommodations are being proposed.  Data used for the basis of the proposed action were data, observation, and teacher and parent reports. An electronic notation indicated that Mrs. Beer consented to the Prior Written Notice.  Ms. Waeckerle emailed Mrs. Beer this Prior Written Notice to Mrs. Beer on November 11, 2019.  (JE-1, p. 1575-1578; Exhibit SMSD-12, p. 4858-4874).

790.    On November 11, 2019, another Prior Written Notice of Action was prepared proposing to provide A.B. with communication services two times per week for 20 minutes based on identified communication needs in his Spring 2019, evaluation reports.  Data used for the basis of the proposed action was parent/teacher input and the 2019, evaluation report.  The Prior Written Notice also stated, "The team will continue to work through the proposed IEP and build consensus around other proposed services."  Mrs. Beer signed this Prior Written Notice on November 11, 2019.  (Tr. 1309:7-13; JE-1, p. 1583-1586 (*signed*)).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

791.   By November 11, 2019, there were various incremental implementations of the IEP:  50 minutes in the morning that was established on October 1, 2019; use of token board that was established on October 17, 2019; and communication services twice per week for 20 minutes that was established on November 11, 2019.  (Tr. 1309:14-21; JE-1, p. 1425, 1513, 1584).

792.   Ms. Helzer began speech services for A.B. on November 11, 2019.  (Tr. 881:13-17).

793.   On November 11, 2019, Ms. Guerry emailed Mrs. Beer a Prior Written Notice scheduling a meeting for November 20, 2019, to discuss possible changes in A.B.'s IEP.  Mrs. Beer signed this Prior Written Notice.  (JE-1, p. 1590-1592 (*signed*)).

794.   On November 11, 2019, Ms. Keith sent an email to Lori Judd that said, "95% - Libby will continue to pull him on A and C days and share data at our next 11-20 meeting date.  If we can be diligent with the above instruction for six to eight weeks, then we can review to see if additional reading support is needed."  This is the normal progression of reading instruction for Tier 3 eligible students.  Libby Kramer normally tracks progression for students in her Tier 3 group.  If Tier 3 is not working, then they meet as a team and reevaluate the intervention that they have in place.  She applied that methodology to A.B.; they did not need to meet because he was still making progress.  (Tr. 1248:11-12, 1248:22-1249:5, 1249:15-1250:4; Ex. SMSD-12, p. 4907).

795.   On November 13, 2019, Ms. Kramer provided Ms. Waeckerle a proposed behavior data point sheet.  (JE-1, p. 1593).

796.   On November 18, 2019, Ms. Waeckerle sent an email to Dr. Dancer regarding the September 16, 2019, parent concern letter.  Ms. Waeckerle states, "Lori Grover and I reviewed the parent letter again to determine what new goals we could use that we felt were appropriate for his needs at school. Two social goals were added, and the behavior goal was revised per mom's request. They are attached. I just need to correct mistakes and add the State Standards, etc." (Tr. 1437:23-25, 1438:1-14; Petitioners' Ex. 318).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

797.   Cindy Waeckerle reached out to Ms. Koertner saying that she and Mrs. Beer had gotten together on three goals.  Ms. Waeckerle asked Ms. Koertner if she would help create them and wordsmith them so that they would be good, observable, measurable IEP goals.  (Tr. 1212:7-13).

798.   While the IEP team was creating and revising A.B.'s IEP, they were also taking data to create a new baseline for A.B.  (Tr. 1189:8-14).

799.   The development of A.B.'s IEP goals was interactive amongst the team and with Mrs. Beer.  (Tr. 1213:6-9).

800.   On November 20, 2019, the IEP team met again to discuss A.B.'s IEP. The following team members were in attendance:

(e)  Natalie Beer, parent

(f)  Cindy Waeckerle, case manager

(g)  Jennifer Dancer, Assistant Director of Special Education

(h)  Laine Guerry, E.Ds., School Psychologist

(i)  Kathy Keith, Principal

(j)  Jill Koertner, Autism teacher/BCBA

(k)  Lori Judd, classroom teacher

(l)  Liz Meitl, parent advocate

(m)  Lori Grover, special education teacher

(n)  Jenny Helzer, SLP

(Tr. 1311:11-17; JE-1, p. 1611).

801.   The November 20, 2019, IEP provides a communication goal of: "Within 36 instructional weeks, after being taught pre-planned strategies, A.B. will identify the situation, what strategies he could use to assist him, what adults could assist him in the problem-solving process in 80% of opportunities on 4 out 5 [sic] data days."  (SMSD-12, pp. 5360-5375).  The Socially Savvy checklist was used to formulate the baseline for A.B.'s communication goal.  *Id.*

802.   The November 20, 2019, IEP provides a social goal of: "Within 36 instructional weeks, A.B. will be able to increase his emotional skills by the following

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

objectives: [[1]] identifying various emotional states in self and why he may be feeling a particular emotion; [[2]] identifying various emotional states in others and why he/she might be feeling a particular emotion; [[3]] identifying a calming strategy to provide an appropriate response to a particular emotional state; [[4]] utilizing a calming strategy to provide an appropriate response to a particular emotional state." The Socially Savvy checklist was used to formulate the baseline for A.B.'s social goal. (SMSD-12, pp. 5360-5375). However, there is no percentage baseline to explain what it meant for A.B. to "increase" his social emotional skills. *Id.*

803. The November 20, 2019, IEP provides a social goal of: "Within 36 instructional weeks, A.B. will develop social understanding skills by demonstrating the following objectives: [[1]] engaging in appropriate social play; [[2]] engaging in appropriate turn taking skills; [[3]] engaging in cooperative social interactions (i.e. story time, large group work, projects with peers) by considering others perspectives and engaging as a team; [[4]] identifying appropriate social rules and codes of conduct for various social situations." (SMSD-12, pp. 5360-5375). The FBA Data Collection sheet data from the 2018-2019 school year was used to formulate the baseline for this social goal. (SMSD-12, pp. 5360-5375).

804. The November 20, 2019, IEP provides a behavior goal of: "Within 36 instructional weeks A.B. will increase his ability to function appropriately within the school environment by receiving a rating of 2 out of 3 on [three described objectives]." (SMSD-12, pp. 5360-5375).

805. At the November 20, 2019, IEP team meeting, Ms. Beer requested the addition of a reading goal. (Tr. Vol. III, 622:2-9). The District declined the requested reading goal. (JE-1, pp. 1677-1681). After Ms. Judd expressed having problems with A.B. during math, Ms. Beer requested the District provide additional paraprofessional support for A.B. during the afternoon. (Tr. Vol. III, 622:2-623:5). The District denied the requested paraprofessional support, describing it as a "want and not a need." (Tr. Vol. III, 622:2-623:5).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

806.     The District maintains a Present Levels and Goals Guidance that indicates student IEPs should document the student's "Present Levels of Educational Performance" or "PLAAFP," which "contains the current, specific, measurable, objective baseline information for each area of need affected by the disability."  (Tr. Vol VI. 1385:3-1386:4).

807.     Most of PLAAFP information contained in A.B.'s November 20, 2019 IEP is from the prior school year.  (Tr. Vol. VI, 1387:13-24; SMSD-12, pp. 5360-5375).  The PLAAFP informing A.B.'s communication goal and one behavior goal were based upon the Socially Savvy assessment performed by Ms. Hensler in October 2018.  (Tr. Vol. II, 412:18-20; SMSD-12, pp. 5360-5375, at 5367(November 20, 2019 IEP); JE-1, p. 1022 (2/6/2019 "DRAFT" IEP); JE-1, pp. 701-708 (10/2018 Socially Savvy)).  A.B.'s communication and behavior goal were based upon outdated and inaccurate baseline data.

808.     The PLAAFP informing A.B.'s social goal was pulled from Dr. Wiseman's fall 2018 FBA. (Tr. Vol. VI, 1390:17-1395:2; JE-1, p. 1016; Pet. Ex. 324, SMSD-12, pp. 5360-5375).

809.     None of the goal PLAAFP baseline data inform the reader of the source of the baseline data used to formulate A.B.'s IEP goals.  (SMSD-12, pp. 5360-5375).  Accordingly, Ms. Beer did not know that the source of information used to develop A.B.'s social goal was derived from the FBA that Ms. Beer had expressed disagreement with, and which the District's autism coach testified lacked necessary ABC data.

810.     The social goal PLAAFP baseline data in A.B.'s November 20, 2019, IEP provides: "Behavior data revealed that 11% of A.B.'s negative behavior was due to inappropriate peer interactions.  A.B. has shown a desire to interact with his peers but is often unable to initiate or interact appropriately with them during unstructured times." (SMSD-12, pp. 5360-5375).  However, the preceding PLAAFP section on the fourth page of the IEP describes that 10 percent of A.B.'s behavior was due to inappropriate peer interactions.  (SMSD-12, pp. 5360-5375).  And the District's discovery responses reveal that, "upon investigation," approximately 4 percent of A.B.'s negative behavior was due to inappropriate peer interactions.  (Tr. Vol. VI, 1397:7-1399:24).  A.B.'s social goal was based upon inaccurate and outdated baseline data.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

811.    While the District desires to work with parents on IEP goals, in the end goals can be proposed and decided upon by the "educational decision-maker," i.e., the District. (Tr. Vol. VI, 1421:22-1422:6).  The District is obligated to develop measurable goals, regardless of parental participation.  (Tr. Vol. VI, 1462:9-17).  Further, the District has an obligation to measure the goals pursuant to the IEP.  (Tr. Vol. VI, 1464:4-9).

812.    Dr. Dancer testified that new baseline data was not necessary.  However, Dr. Dancer also testified that the social goal was based upon data with errors, and her emails recognized that new baseline data might be needed.  (Tr. Vol. VI, 1397:7-1399:24; Pet. Ex. 208).  And the District's speech language pathologist, Ms. Helzer, testified that she was concerned about the goals in A.B.'s IEP:  "The concern was that [Ms. Hensler] didn't write the draft.  I didn't write the draft.  And my concern specifically was that there was no data in that goal, no present level-based data based [sic] on his current levels of functioning. Again, the evaluation was done a year prior and your data will change based on student needs and present levels a lot, especially over the course of a year."  (Tr. Vol. IV, 876:20-877:25).

813.    New baseline data was needed to develop goals for A.B.'s IEP.  Dr. Dancer's testimony to the contrary is not credible.

814.    Dr. Yell testified that if a student's present levels are wrong, the school has likely committed both a procedural and substantive error.  (Tr. Vol. VI, 1549:14-17).

815.    Although Ms. Beer participated in the November 20, 2019, IEP team meeting and development as a starting point, she remained concerned that the November 20, 2019, IEP was informed by the evaluation from the prior school year, an issue she discussed with Dr. Dancer, and which was never alleviated.  (Tr. Vol. III, 610:23-612:23; 624:8-20).  Many of Ms. Beer's requests were not incorporated into A.B.'s IEP by the District.  (Tr. Vol. VI, 1462:9-1463:23).  Dr. Dancer asked Ms. Beer to trust her and told her that the District was trying to collect all new data to address that issue.  (Tr. Vol. III, 624:8-20).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

816.    In a PWN dated November 20, 2019, the District proposed to implement the November 20, 2019, IEP and BIP.   Ms. Beer provided written parental consent on December 2, 2019.  (JE-1, pp. 1677-1681).

817.    Goal progression on the November 20, 2019, IEP was to be tracked by data collection sheets.  (Tr. Vol. III, 624:21-625:10; Tr. Vol. V, 1194:6-21, 1198:2-23; SMSD-12, pp. 5360-5375).  Lori Kramer-Grover developed a behavior data sheet used to document A.B.'s social goal progression, which was intended to be provided to the Beers.   (Tr. Vol. IV, 825:10-826:8, 828:2-20; Tr. Vol. VI, 1403:7-21; Pet. Exs. 308, 309; JE-1, p. 1748).

818.    Ms. Beer requested copies of the data collection sheets, but the District did not provide them.  (Tr. Vol. III, 624:21-625:10).

819.    The goals in the November 20, 2019, IEP were unmeasurable, including the behavior, social 2, and social 3 goals.  (Tr. Vol. I, at 224:2-226:12; Tr. Vol. II, 379:12-23, 381:21-383:4, 398:25-399:22; Pet. Ex. 503, at 29-33).

820.    Dr. Yell testified that goals are the mechanism for determining if a child has made progress, a goal must be both measurable and measured, and a goal that is not measured probably substantively violates FAPE.  (Tr. Vol. VI, 1549:18-1550:10).

821.    Dr. Weigand testified that the November 20, 2019, IEP was not reasonably calculated to enable A.B. to make progress appropriate in light of his circumstances.  (Tr. Vol. I, 226:13-16).

822.    On November 20, 2019, A.B.'s team finalized his IEP which contained a communication goal, two social goals and a behavior goal. The IEP included the special services of daily specially designed instruction for fifty minutes and speech language therapy twice a week for twenty minutes. (Tr. 1312:7-9; JE-1, pp. 1612-1626).

823.    On November 21, 2019, Ms. Waeckerle emailed Mrs. Beer the Final November 20, 2019, IEP.  Exhibit SMSD-12, pp. 5360-5375).

824.    A.B.'s IEP addresses all of the areas of concern.  (Tr. 1315:4-10; Ex. SMSD-12, pp. 5364-5365).

825.    On the November 20, 2019, IEP, one of A.B.'s social goals says "goal ended 11-20-19" because the IEP team took the IEP that was proposed in the spring and

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

modified and edited it.  The social goal was originally proposed in the Spring 2019, and after continued conversations, the IEP team determined that goal would not be implemented.  (Tr. 1315:17-1316:9, 1388:9-13; JE-1, p. 1617; Ex. SMSD-12, p. 5366).

826.   The IEP team aligned the goals in the IEP with the state standards that align with the goal.  (Tr. 1316:14-19; JE-1, p. 1617; Ex. SMSD-12, p. 5366-5371).

827.   A.B.'s communication goal states the "State Standards" are "Standard 1: The student will acquire knowledge, attitudes, and interpersonal skills to understand and respect self and others. Benchmark 2: The student will acquire and use interpersonal skills." Those are preferred components of an IEP goal.  (Tr. 1316:10-11, 1316:20-1317:4; JE-1, p. 1618; Ex. SMSD-12, p. 5367).

828.   A.B.'s communication goal states the "Measurable Annual Goal" is "Within 36 instructional weeks, after being taught pre-planned strategies, [A.B.] will identify the situation, what strategies he could use to assist him, what adults could assist him in the problem-solving process in 80% of opportunities on 4 out 5 data days."  This indicates that on four out of the five days that A.B. would be prompted to use this strategy, he would obtain 80%.  It is quantifiable measurement.  (Tr. 1317:9-17, 1318:18-1319:3; JE-1, p. 1618; Ex. SMSD-12, p. 5367).

829.   A.B.'s communication goal lists short-term objectives and benchmarks, which are not a requirement for a student unless they are on the dynamic learning map (DLM). A.B. is not on the DLM.  However, there are teams who include the short-term objectives and benchmarks to make sure that they are staying on the right track as far as timelines and making sure that the goals are appropriately ambitious.  The short-term objectives and benchmarks help them know what kind of progress they should be looking at within that time frame.  (Tr. 1318:1-17; JE-1, p. 1618; Ex. SMSD-12, p. 5367).

830.   A.B.'s communication goal states progress will be reported quarterly, which is standard in the state of Kansas.  (Tr. 1319:15-23; JE-1, p. 1618; Ex. SMSD-12, p. 5367).

831.   A.B.'s next goal was for behavior, but it states it was ended on 11/20/19, so it was a proposed goal that was never implemented.  (Tr. 1320:4-6, 1388:9-13, 1389:11-14; JE-1, p. 1619; Ex. SMSD-12, p. 5368).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

832.   A.B.'s next goal on the November 20, 2019, IEP is a Social goal.  "Within 36 instructional weeks, [A.B.] will be able to increase his social emotional skills by the following objectives: 1: identifying various emotional states in self and why he may be feeling a particular emotion; 2: identifying various emotional states in others and why he/she might be feeling a particular emotion; 3: identifying a calming strategy to provide an appropriate response to a particular emotional state; and 4: utilizing a calming strategy to provide an appropriate response to a particular emotional state"  The criteria for tracking was 50% on four out of five data days.  The IEP measured progress through data collection sheets; again, that can be determined by the person providing the service.  On objectives 1, 2, 3 and 4, they are broken down into more particularized analysis.  The goal is building on itself. (Tr. 1320:17-16; JE-1, p. 1620; Ex. SMSD-12, p. 5369).

833.   The November 20, 2019, IEP's Social goal is based on language proposed by Mrs. Beer in her September 16, 2019, parent concerns letter.  (Tr. 1450:5-10; Petitioners' Ex. 230, p. 4; JE-1, p. 1620).

834.   A.B.'s next goal on the November 20, 2019, IEP is a Behavior goal, and states: "Within 36 instructional weeks [A.B.] will increase his ability to function appropriately within the school environment by receiving a rating of 2 out of 3 on the following objectives.  The rating scale included: N/A= Not applicable 1= Did not meet expectations 2= some expectations met 3= met consistently."  The objectives are incorporating the short-term objectives listed.  The criteria for this goal are three out of three on four out of five data days.  (Tr. 1321:20-1322:18; JE-1, p. 1621; Ex. SMSD-12, p. 5370).

835.   The short-term objectives set out in the behavior goal are: 1) [A.B.] will demonstrate the following on-task behaviors: orienting toward the teacher/speaker/materials, following the directions given (e.g. getting out the appropriate materials, writing name on paper, etc.), and responding to question through written response, raising hand to volunteer, or participating in chorale responses, completing modified work data collection/observation; 2) When [A.B.] receives correction on his work or if his work is too challenging he will use one of the following strategies: ask for a break, ask for help, or ask for an appropriate outlet for his frustration (e.g. non-work

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

paper that he can rip or a sensory toy) data collection/observation; and 3) Given
visual/verbal cues (copy of revised schedule) and the opportunity to know of changes in
advance, [A.B.] will accept major changes in routine/schedule (e.g. new activities or
missing regularly scheduled activities) by exhibiting appropriate behaviors when the
change occurs.  (Tr. 1453:17-24; Petitioners' Ex. 230, p. 5; JE-1, p. 1621).

836.   The November 20, 2019, IEP's Behavior goal is based on language proposed
by Mrs. Beer in her September 16, 2019, parent concerns letter.  (Tr. 1450:5-10;
Petitioners' Ex. 230, p. 4; JE-1, p. 1620).

837.   A.B.'s next goal on the November 20, 2019, IEP is a social goal that states:
"Within 36 instructional weeks, [A.B.] will develop social understanding skills by
demonstrating the following objectives."  Again, the objectives are incorporating the short-
term objectives listed.  Data collection is the method of monitoring progress.  The criteria
are 50% on four out of five data days.  (Tr. 1323:3-18; JE-1, p. 1622; Ex. SMSD-12, p. 5371).

838.   The November 20, 2019, IEP's second social goal states "Within 36
instructional weeks, [A.B.] will develop social understanding skills by demonstrating the
following objectives."  In Mrs. Beer's September 16, 2019, parent concerns letter, under
subheading 3 goal, states, "Will develop social understanding skills as measured by the
benchmarks listed below." The short-term objectives in the second social goal are: 1)
Engaging in appropriate social play; 2) Engaging in appropriate turn taking skills; 3)
Engaging in cooperative social interactions (i.e., Story Time, large group work, projects
with peers) by considering others perspectives and engaging as a team; and 4) Identifying
appropriate social rules and codes of conduct for various social situations. (Tr. 1450:15-
1451:5; Petitioners' Ex. 230, p. 4; JE-1, p. 1622).

839.   The November 20, 2019, IEP's second social goal is based on language
proposed by Mrs. Beer in her September 16, 2019, parent concerns letter.  (Tr. 1452:14-
22; Petitioners' Ex. 230, p. 3; JE-1, p. 1622).

840.   A service plan chart on an IEP includes components that are required by the
state:  what the service is, the duration of the service, the frequency, the setting that the

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

services will be provided, the begin date, the end date and the provider.  (Tr. 1323:19-1324:3).

841.   A.B.'s November 20, 2019, IEP includes a service plan chart. (Tr. 1323:19-21; JE-1, p. 1623; Ex. SMSD-12, p. 5372).

842.   A.B.'s November 20, 2019, IEP's "Educational Placement" (analysis for least restrictive environment) states, "[A.B.] will receive specially designed instruction in the general education setting and speech instruction in the special education setting. The team feels the benefits of this instruction outweigh any harmful effects of missing time in the general education setting."  (Tr. 1324:20-1325:5; JE-1, p. 1623; Ex. SMSD-12, p. 5372).

843.   Three of the four goals in the November 20, 2019, IEP were taken from Mrs. Beer's parent concerns letter and the goals she proposed. Mrs. Beer made recommendations that the team revised and adopted.  It is a picture of the extent of collaboration that went into developing this IEP. Everyone at the IEP meeting believed that the IEP goals were appropriately drafted. (Tr. 1455:1-12; Petitioners' Ex. 230).

844.   The IEP team used goals that were proposed by Mrs. Beer in a good-faith effort to collaborate with Mrs. Beer and to make sure that she felt like she was part of the IEP team in a way that they could move forward with the IEP.  (Tr. 1464:18-23).

845.   A.B.'s BIP was also finalized on November 20, 2019.  Ms. Koertner emailed Mrs. Beer a copy of the final BIP, along with the functional behavioral assessment write-up, on November 23, 2019.  (JE-1, p. 1670-1672).

846.   The November 20, 2019, Prior Written Notice states, "The IEP team met to continue to review proposed goals, Behavior Intervention Plan (BIP), accommodations, and Mrs. Beer's concerns.  The team agreed to the addition of two social goals, an updated behavior goal, and the addition of accommodations.  Mrs. Beer requested the team consider adding a reading goal and additions to existing accommodations."  (Tr. 1438:20-1439:6; JE-1, p. 1678).

847.   The team concluded that A.B. should receive instruction in the regular classroom because to get a good picture of how A.B. is progressing on the IEP goals, he needs to be around peers.  A.B.'s placement inside the regular classroom was due to his

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

goals regarding executive function, but also because Mrs. Beer was adamant that those goals be worked on in the classroom.  (Tr. 1199:23-1200:15; JE-1, p. 1612-1626).  A.B.'s IEP team had discussed his progress in the IEP meetings.  A.B. was doing well and making progress in all the behaviors they wanted to see less of.  (Tr. 1197:13-1198:1).

848.   Peer modeling was important for A.B.  A.B. is aware of and interested in his peers, so having him in the classroom with peers, particularly with peers who are engaging in appropriate social skills, appropriate language, and appropriate behavior, is important.  (Tr. 1200:16-1201:8; JE-1612-1626).

849.   Ms. Koertner testified she would not have even guessed that A.B. had autism. A.B. was really functioning quite well in many ways.  The team had to get down to the nitty-gritty of why and how A.B. did what he did to find the pieces that might lead you to say he was a student with autism.  (Tr. 1201:20-1202:5).

850.   There were multiple versions of A.B.'s IEP before it was finally approved. There were many, many, many different versions with suggestions and revisions and wordsmithing all to try to get an agreement.  Other drafts of the November 20, 2019, IEP include Exhibits (JE-1, pp. 1627-1642, 1643-1658, and 1659-1669); but those were _not_ the final IEP.  The final IEP was Exhibit (JE-1, pp. 1612-1626, Tr. 1185:16-24).

851.   The current level of performance in A.B.'s IEP included information from November 8, 2019, regarding "follows directions, work engagement".  This section of the IEP listed all the behaviors that the IEP team wanted to see more of, like raising hands and facing the teacher.  Further, a lot of A.B.'s challenging behavior was not engaging in the work when it was provided for him.  The IEP team tried to create an operational definition of what it would look like when A.B. was paying attention.  They broke down those kinds of behaviors to actions such as facing the teacher.  The team was defining what it looks like to be a student doing what students do.  Those are the kind of things they were taking data on in the IEP for A.B. and was based on the data collected since the October 1, 2019, meeting.  (Tr. 1185:11-1187:12; JE-1, p. 1562).

852.   A.B.'s IEP team had many discussions about what the right goals were. There was no IEP adopted on November 11, 2019.  The references to "goal ended

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

November 11, 2019" simply reflects the ongoing creation of an IEP for A.B.  Mrs. Beer was part of those discussions, as was her educational advocate, Liz Meitl.  (Tr. 1188:16-1189:7; JE-1, p. 1563 and 1565).

853.   A.B. did very well with Ms. Helzer after she started providing him speech/language services.  Initially, he wanted to test the limits to see if Ms. Helzer was consistent in her expectations.  Once they established that Ms. Helzer was consistent and she gave A.B. some control within the sessions as to what order of things to do, A.B. did very well.  (Tr. 882:5-12).

854.   Ms. Helzer did not have any concerns about A.B.'s progress on his communication goal.  He made progress and, in many areas, Ms. Helzer saw exemplary progress.  Ms. Helzer saw his socialization skills improve.  (Tr. 882:18-883:4).

855.   The November 20, 2019, IEP is A.B.'s current IEP.  (Tr. 1428:3-6; JE-1, p. 1612-1626).

856.   After the November 20, 2019, IEP was in place, A.B.'s refusal behaviors continued, and the team did not see progress in terms of A.B.'s completing schoolwork presented by his teacher, although they would have expected to see progress in the period after implementation and before school closed due to the pandemic.  (Tr. Vol. IV, 833:17-25; Tr. Vol. V, 1197:16-1198:1, 1215:16-1216:20).  In a January 7, 2020, email, Ms. Waeckerle conveyed to District staff, including Dr. Dancer, that A.B. was "continuing to refuse to do any work when Lori [Kramer-Grover] is present not to mention when she leaves…. Most of the time, he would prefer to do nothing versus getting a reward."  (Tr. Vol. VI, 834:5-835:7; Pet. Ex. 341, 343).

857.   A.B.'s difficulties at school continued through the spring 2020 semester.  His eye-poking perseveration continued.  A.B. did not want to go to school or interact with his peers at the playground.  He continued cutting up and drawing all over his schoolwork.  (Tr. Vol. III, 625:18-627:2).  A.B. did not understand normal peer social interactions and began to grow apart from his only friend and regress socially.  (Tr. Vol. III, 627:3-13).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

## December 2019

858.   On December 2, 2019, Mrs. Beer signed the November 20, 2019, Prior Written Notice, meaning that the entire team, including Mrs. Beer, agreed to the IEP, including the goals and services on December 2, 2019.  (Tr. 1439:15-19; JE-1, p. 1677-1680).

859.   A.B. was out of the District on winter break from December 20, 2019, to January 6, 2020.  (JE-1, p. 1919).

## January 2020

860.   In January 2020, Mrs. Beer expressed concerns that A.B. was being sent to Ms. Waeckerle's room during math.   A.B. went to Ms. Waeckerle's room three times to complete math assignments for approximately 15 to 20 minutes.  Ms. Waeckerle helped A.B. with his math once and her para helped A.B. with his math twice. (Tr. 811:4-18, 812:7-10).

861.   On January 3, 2020, Ms. Waeckerle provided Mrs. Beer a copy of the Progress Report on A.B.'s four IEP goals. (JE-1, p. 1681-1683).

862.   To determine the progress, Lori Kramer determined that A.B. was progressing on the four categories of social-emotional development at a rate of 53% of the time on observed data days.  (Tr. 829:1-8, 829:15-17, 830:13-18; Petitioners' Ex. 446.

863.   The data sheets showed observations for following directions, on task, work completion, eyes on teacher.  (Tr. 831:16-22).

864.   On January 8, 2020, Acadience Data Management – Acadience Reading Assessment Results was created for A.B.  (JE-1, p. 1685-1687).

865.   On January 15, 2020, Mrs. Beer emailed Ms. Helzer copies of a Minecraft positive behavior chart, ASD token reward board, Minecraft to regulation daily check-in chart zones, Minecraft themed sight word card games, and Minecraft token board.  (JE-1, p. 1688-1739).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

866.   On January 16, 2020, Ms. Waeckerle emailed Ms. Keith and stated, "As challenging as this will be, I think [A.B.] needs more support.  He's always willing to do his work when he comes up. He just needs help."  (Tr. 845:11, 845:16-21; Petitioners' Ex. 357).

867.   When Ms. Waeckerle spoke with Ms. Lori Judd, the classroom teacher, and expressed her concern regarding proposing adding a reading goal to A.B.'s IEP, to let her know that A.B. could not read the directions, Ms. Judd said, "Cindy, no one in my class reads the directions.  I read them to them."  (Tr. 838:14-20).

868.   In January 2020, Ms. Grover reported to Ms. Waeckerle that A.B. was continuing to be A.B., meaning that he was still refusing to do work.  (Tr. 849:15-21).

869.   The District developed concerns that A.B. was unable to read in January 2020, that reading testing was skewed because an iPad read questions to him, and that:

"He needs a lot of help however, because he cannot read anything on the page.  I feel that this is at least part of the reason he's not completing work in the classroom.  After working with him for 2 days, he may, in fact, need a reading goal. (Tr. Vol. IV, 836:6-838:8; Pet. Exs. 343, 346)**.**

870.   Although Dr. Dancer testified that there was no data to support implementation of afternoon para support, there was data from special education teacher Cindy Waeckerle.  Indeed, Cindy Waeckerle sent a January 16, 2020, email to Principal Kathy Keith that reads: "As challenging as this will be, I think A.B. needs more support.  He's always willing to do his work when he comes up, he just needs help."  (Tr. Vol. V, 1292:3-6, 1336:14-1337:19, 1347:11-20).  The District internally concluded that A.B. needed additional paraprofessional support as early as January 16, 2020.  (Pet. Ex. 357).

871.   On January 29, 2020, Ms. Koertner emailed Ms. Keith and others A.B.'s BIP in table format.  Ms. Grover replied to Ms. Koertner's emails and provided notes about implementation.  (JE-1, p. 1740).

872.   On January 30, 2020, Ms. Waeckerle sent an email to Mrs. Beer and informed her that, "other teachers reported that on many occasions he was not engaged in their

Associates in Dispute Resolution LLC
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

classroom.  I called a team meeting to address how we could modify the current plan that seemed no longer effective."  (Tr. 849:22-23, 850:2-12; Petitioners' Ex. 393).

873.   Ms. Koertner converted the BIP into a "fidelity checklist" to make sure that it was being implemented properly.  (Tr. 1202:6-20; JE-1, p. 1740).

874.   Some of the pieces of the BIP will need to be adjusted according to the student's needs.  Ms. Koertner testified that BIPs should have a constant watermark that says "draft" because BIPs are data-based.  If a team has implemented a BIP for two or three weeks and it is not working, then the team can change the BIP as needed.  (Tr. 1232:11-21).

875.   On January 23, 2020, Ms. Waeckerle again expressed concerns about A.B.'s fine motor skills, describing in an email that "[h]e writes like a 3-year-old-multiple reversals and does not know how to hold his pencil properly," and requesting Mr. Hillyer commence an Occupational Therapy ("OT") evaluation.  (Tr. Vol. IV, 839:7-840:4; Pet. Ex. 372).

876.   In response to Ms. Waeckerle's OT evaluation request, the District's school psychologist, Laine Guerry, informed District staff that Mr. Hillyer could not conduct a formal evaluation without parental consent, and "[g]iven that his initial evaluation was completed less than a year ago, and that we just received consent to begin providing services, I am not recommending we initiate any evaluation of any sort at this time."  (Pet. Ex. 377).

877.   The District publishes a "Reevaluation Guidance" to its employees that instructs a reevaluation "should not occur more frequently than once a year."  (Tr. Vol. IV, 843:17-844:19; Pet. Ex. 543).

878.   A.B.'s fine motor evaluation occurred prior to the November 26, 2018, iteration of his 2018-2019 evaluation, and was therefore completed greater than one year prior to Ms. Waeckerle's request for an OT evaluation.  (Tr. Vol. III, 591:24-592:3; JE-1, pp. 821, 1127).

879.   District staff did not communicate or suggest that A.B. needed a reading goal or express concerns regarding A.B.'s fine motor skills to the Beers during the spring 2020

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

semester or any time thereafter.  (Tr. Vol. III, 627:14-25; Tr. Vol. IV, 838:24-839:1).  Ms. Waeckerle did not raise this concern at the January 31, 2020, IEP team meeting that included Ms. Beer.  (Tr. Vol. V, 1246:24-1247:10).

880.  A.B. qualified for Tier 3 reading supports again in both the fall of 2019 and in January 2020. (Tr. Vol. V, 1243:3-21).  Tier 3 indicates that a child is well below grade level.  (Tr. Vol. V, 1236:7-16).  A.B.'s December 31, 2019, reading score reflected that he was in the 17th percentile as compared to his peers, the same percentile score in A.B.'s September 28, 2018, testing.  (Tr. Vol. V, 1243:22-1246:3; Pet. Ex. 339; JE-1, p. 699).  Although the District's reading specialist, Libby Kramer, testified that A.B. was responding to reading intervention and that reading supports were working for A.B., his scores, continued qualification for Tier 3 reading support, lack of progress between September 28, 2018, and December 31, 2019, and observations by special education teacher Ms. Waeckerle all indicate A.B. was not progressing and needed a reading goal.  (Tr. Vol. V, 1235:2-19, 1239:13-1240:1).

881.  On January 22, 2020, A.B. informed his mom that he had been leaving his general education room during math.  (Tr. Vol. III, 628:1-24; Pet. Ex. 359).  Ms. Beer emailed the school, expressing concerns that his being sent from the room violated his IEP and BIP, and reinforced his escape behavior.  *Id.*

882.  Special education teacher Cindy Waeckerle responded to Ms. Beer's email.  (Tr. Vol. IV, 803:1-18; Pet. Ex. 359). Ms. Waeckerle's email provides, in part: "He has been responding to the additional instruction and experiencing success.  He has been very willing and cooperative when doing his work once he gets the one-on-one instruction." (Pet. Ex. 359).

883.  On January 23, 2020, Ms. Waeckerle sent Ms. Beer another email agreeing with Ms. Beer's suggestion that the IEP team meet because "[t]he current plan is no longer effective."  (Pet. Ex. 364).  Prior to this email, the District had not advised Ms. Beer that the current plan was no longer effective.  (Tr. Vol. III, 630:5-23, 632:10-14).

884.  Ms. Waeckerle believed that the motivational system in place was not working, and that A.B. was not making adequate progress. (Tr. Vol. IV, 848:21-849:1).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

885.   In a January 23, 2020, internal District email, Ms. Waeckerle requested guidance from Dr. Dancer and others, indicating that A.B. was "very content to sit and do absolutely nothing.  No reward, most of the time, is motivating even when given multiple choices.  He has stated that rewards are used to brainwash him to do his work.  He's not buying in."  (Pet. Ex. 360).

886.   On January 30, 2020, Ms. Waeckerle sent Ms. Beer yet another email explaining that she had no prior knowledge of A.B.'s leaving his general education classroom to come to her special education classroom, and that: "I began checking with other teachers that have him throughout the day.  Other teachers reported that on many occasions he was not engaged in their classroom."  (Tr. Vol. III, 631:14-632:2; Pet. Ex. 393).  Prior to this email, the District had not advised Ms. Beer that A.B. was not engaged in the classroom.  (Tr. Vol. III, 632:10-15).

887.   As it relates to lack of engagement, Ms. Judd reported that "A.B. was continuing to be A.B.," meaning that he was still refusing to do work.  (Tr. Vol. IV, 849:15-21).

888.   On January 31, 2020, A.B.'s IEP team met to discuss Mrs. Beer's concerns about the IEP Progress Report, BIP, a para for math, and communication; strengths and successes; current behavior observations; and ideas/plan for moving forward.  (JE-1, p. 1743 and 1744).

889.   During the January 31, 2020, meeting, Mrs. Beer submitted a proposed agenda as well as some information and questions that she wanted to have addressed during that meeting.   Mrs. Beer's agenda for the January 31, 2020, meeting included a request that the team consider a para during math "in light of recent events."  A.B. had received some support completing his math during that time frame.  (Tr. 1327:18-24; JE-1, p. 1744. (Tr. 1327:12-17; JE-1, p. 1744).

890.   During the January 31, 2020, meeting, the IEP team discussed the terms "break" versus "reinforcement" in A.B.'s IEP.  Ms. Koertner helped clarify and make sure that the team was all on the same page with what those terms meant.  (Tr. 1207:10-1208:2, 1208:25-12:091).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

891.   The team had discussed A.B. having a point person to go talk to when he was heightened.  Cindy Waeckerle was A.B.'s point person to "deheighten."  (Tr. 1208:11-25).

892.   The IEP team met on January 31, 2020.  (Tr. Vol. III, 635:11-13).  At the meeting, Ms. Beer requested paraprofessional support for A.B. during math. (Tr. Vol. III, 633:2-4; JE-1, pp. 1779-1783).  Ms. Beer requested paraprofessional support from 12:15 to 1:45 p.m.  (SMSD-12, p. 6437).  The District denied Ms. Beer's request for two reasons described in a March 10, 2020, PWN: (1) "it was determined it was the time of day rather than the academic subject A.B. exhibits difficulties in, and (2) paraprofessional support during math was not A.B.'s least restrictive environment." (JE-1, pp. 1779-1783).

893.   At the January 31, 2020, meeting, the team discussed defining the terms "break," "reinforcement," and "reset" within the BIP because there was confusion as to what those terms meant.  (Tr. Vol. III, 635:17-636:14; Tr. Vol. V, 1207:8-18; Pet. Ex. 461). Ms. Koertner agreed to define the terms and provide definitions to the team and Ms. Beer. (Tr. Vol. V, 1227:21-1228:23; Pet. Ex. 461).

894.   After the January 31, 2020, IEP team meeting, Ms. Koertner learned that although A.B.'s motivation system was not working, District staff were not reaching out to her for assistance as they should.  (Tr. Vol. V, 1209:6-18).

895.   Mrs. Beer stated A.B. was already meeting the IEP goals.  She shared that A.B. was doing really well socially and that she had gotten a chance to watch A.B. play a game with a friend and that he seemed like he was already doing some of the things that the IEP team had been talking about.  (Tr. 1214:23-12:15:5).

896.   During the January 31, 2020, meeting, the IEP team discussed:  progress reports; clarification on who was providing data; who was writing reports; clarification on what a check-in is; clarification on what a break is; and A.B.'s progress in math.  Mrs. Beer was also complimentary of the team for the progress that A.B. had been making and that they were noticing at home as well.  (Tr. 1328:12-24). Ms. Keith talked about not having any disciplinary office visits for A.B.  (Tr. 1331:12-19; SMSD 1.005 at 23m 39s - 24m 7s).

897.   The IEP team also discussed the behaviors that the BIP addressed to ensure everyone was clear on how to respond when a behavior is presented and if there was a

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

disciplinary action, Mrs. Beer was notified and communicated with.  (Tr. 1332:13-1333:3; SMSD 1.005 at 25m 28s - 27m 36s).

898.    The IEP team also discussed that A.B.'s behavior was not maladaptive. Maladaptive is bigger, more intensive pronounced behaviors.  The District has students who cannot emotionally regulate and therefore they became verbally or physically aggressive, such as tipping over desks or tearing apart a classroom.  That is not A.B.  A.B.'s BIP was more for those cognitive processes.  (Tr. 1333:4-18; SMSD 1.005 at 25m 28s - 27m 36s).

899.    After the January 31, 2020, IEP team meeting, Ms. Koertner learned that although A.B.'s motivation system was not working, District staff were not reaching out to her for assistance as they should.  (Tr. Vol. V, 1209:6-18).

900.    Mrs. Beer provided some positive affirmations to certain areas of the IEP and the services and to the team.  The meeting ended on a positive note.  Mrs. Beer stated that A.B. was making progress.  Mrs. Beer expressed appreciation for Ms. Judd and Ms. Grover.  Mrs. Beer said that Westwood View was an amazing school.  The team addressed Mrs. Beer's concerns and felt like they were continuing to move on in a positive direction. (Tr. 1334:19-1335:21; SMSD 1.005 59m 23s - 1h 1m 13s).

901.    After the January 31, 2020, IEP team meeting, Ms. Koertner learned that although A.B.'s motivation system was not working, District staff were not reaching out to her for assistance as they should.  (Tr. Vol. V, 1209:6-18).

902.    Initially, the only times that the District's paraprofessional Billie Varuska was available to work with A.B. was between 12:20-12:50 and 2:20-2:35 p.m.  (Tr. Vol. IV, 854:13-855:5; Pet. Ex. 397).

903.    Prior to the conclusion of the January 31, 2020, meeting, Mrs. Beer requested a paraprofessional in the afternoon in math.  Mrs. Beer expressed appreciation for Mrs. Judd's ABA analysis. Mrs. Judd had tried to determine whether A.B. need behavioral support in the afternoon for a skill-based need for math academics or whether he needed behavior reinforcement motivation.   Based on Mrs. Judd's data and Mrs. Beer's

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

request, the team wanted to explore providing some type of adult support in the afternoon.  (Tr. 1336:20-1337:19).

904.   Mrs. Beer initially indicated that she wanted Ms. Grover to be the afternoon para.  Ms. Grover was not available because she was assigned to another building in the afternoon.  (Tr. 1431:17-24).

905.   Dr. Dancer had subsequent conversations with Mrs. Beer about assigning a para to A.B. in the afternoon.  Although Mrs. Beer specifically wanted the para to cover the math the IEP team did not have any data that indicated that math was an issue. The IEP team had some anecdotal and observational information that indicated that [A.B.] was running out of steam, getting tired, exhibiting some difficulties in the afternoon. The IEP team's proposal was to gather data to pinpoint what A.B.'s need was by assigning adult support at different times in the afternoon (Tr. 1430:14-1431:5).

## February 2020

906.   On February 4, 2020, Dr. Dancer sent Mrs. Beer an email stating that the District was looking at staff schedules to provide afternoon support for A.B.  Dr. Dancer proposed a time that they thought would be beneficial according to Mrs. Judd.  (Tr. 1338:1-5; Ex. SMSD-12, p. 6436).

907.   On February 6, 2020, Mrs. Beer responding to Dr. Dancer's email.  Mrs. Beer said, "I took a few days to think about your offer.  As I stated in the meeting, whoever works with [A.B.] needs to have a sped background. In fact, what would be fair, appropriate, and consistent would be to have Mrs. Grover work 1:1 with [A.B.] for the entirety of Math.  (12:15-1:45 p.m.: Math.) Because, I have compromised in the past and it led to the IEP violation, I am limited on my ability to compromise further."  (Tr. 1338:10-21; SMSD-12, p. 6437).

908.   On February 6, 2020, Ms. Grover provided Ms. Koertner a copy of A.B.'s schedule and self-rating scale.  (JE-1, p. 1745 and 1746).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

909.   On February 12, 2020, Ms. Waeckerle and Ms. Keith rearranged a Westwood View para's schedule so that she could be available for two different times in the afternoon to provide the trial intervention to A.B.  (Tr. 1459:2, 1460:10-17, Petitioners' Ex. 397).

910.   On February 18, 2020, Mrs. Beer emailed the District stating, "Hello all, I have put together a PDF below that outlines my formal complaint for an IEP violation and I am requesting an investigation in to the leadership and practices by Principal Kathy Keith, at Westwood View Elementary School."  (Tr. 1474:18-24; Ex. SMSD-12, p. 6597-6609).

911.   A month after the District identified A.B.'s need for additional support, the District proposed paraprofessional support as a trial intervention between 12:20-12:50 and 2:20-3:05 p.m.  (SMSD-12, p. 6632; Pet. Ex. 397).  The District's paraprofessional proposals were limited by Ms. Varuska's availability.

912.   Dr. Yell testified that he did not believe the trial intervention proposal violated the IDEA because it was the parent's idea, and they did consent to it.  (Tr. Vol. VI, 1534:16-1535:5).  However, the District proposed the trial intervention and failed to request Ms. Beer's consent to implement the paraprofessional trial intervention services. (JE-1, pp. 1779-1781; Tr. Vol. VI, 1456:17-1458:25).  Dr. Yell's testimony on this issue lacks credibility.  Director of Special Education, Sherry Dumolien, testified that it was her belief the District did not need parental consent to implement the paraprofessional trial intervention.  (Tr. Vol. VI, 1497:1-6).  However, the IEP team, including Dr. Dancer, believed that consent was necessary.  (Tr. Vol. VI, 1497:7-23; Pet. Ex. 418).  Accordingly, Ms. Dumolien's testimony on this issue lacks credibility.

913.   Ms. Beer filed a formal complaint with the Kansas State Department of Education concerning (1) A.B. being sent from his general education classroom to Ms. Waeckerle's special education resource room, and (2) paraprofessional support, culminating in a KSDE investigator's report dated April 10, 2020.  (Tr. Vol. III, 633:5-15; Pet. Ex. 495).  Among other things, KSDE investigator Durkin's report describes the following findings:

a.   "According to the report of a special education evaluation conducted by the district at the request of the parent dated February 25, 2019, the student met

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

criteria for being considered a child with an exceptionality under the category of Autism…. The student was determined to be eligible for and in need of special education services. However, an individualized education plan (IEP) for the student was not developed until the 2019-20 school year."

b.    "According to the district, the Autism coach met on March 9, 2020, with the principal, case manager, classroom teacher, school psychologist, speech and language pathologist, and the paraeducator who would be working with the student under the proposed trial intervention. The purpose of the meeting was to review and clarify the language of the student's BIP."

c.    "The district confirms that the student had, on several occasions, been offered the option of completing independent math work in the resource room but reports that the student only exercised the option to leave the classroom on three occasions. Daily behavior data sheets provided by the district show that, on January 8, 21, and 22, 2020, the student chose to go to the resource room"

d.    "By proposing an option for the student to leave the general education setting and move to a special education setting where the student would receive specialized instruction from a special education teacher, the district effectively changed the student's placement. Further, the district provided approximately one hour and forty minutes of special education services to the student in a special education setting without providing prior written notice to the parent of the removal…. A violation of special education statutes and regulations is substantiated because the parent was not provided with prior written notice before the district removed the student from the regular education environment to the special education environment."

e.    "[A]t the time of the writing of this report, no changes have yet been made to the student's IEP or his behavior intervention plan that further define either "breaks" or "choices." It is clear to the investigator that the parties did not have a 'meeting of the minds' regarding the definitions of a 'break' and 'choices.'"

f.    "The district proposed a 'trial intervention' to address the parent's request for additional paraeducator support for the student during math. That intervention would have provided 60 additional minutes per day of special education services to the student beyond the 50 minutes of services specified in the student's November 2019 IEP….. Had [the trial intervention] been implemented, the special education services to the student in the general education setting would have more than doubled, well beyond the 25% level considered to be a material change in services. While prior written notice of the proposed action was given to the parent, parental consent for the proposed material change in services was neither

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

sought nor obtained.  Therefore, a violation of special education statutes and
regulations is identified."
(Tr. Vol. III, 633:16-635:1, 636:17-639:4; Pet. Ex. 495).

914.   In addition to the removals investigated by KSDE, the District pulled A.B.
from his general education classroom and did not inform the Beers.  Internal District
emails explain that the Beers were not informed because "nothing was in writing"—"…I
don't ever remember telling Lori to pull him.  I think she did this because she wanted to
get to know him.  I don't think however it was a big deal.  She won't moving forward and
nothing was in writing." (Tr. Vol. IV, 812:11-814:6; Pet. Ex. 273).

915.   Removing A.B. from his general education classroom and putting him into
the special education classroom constituted a change in placement.

916.   Mrs. Beer testified that when she filed her child complaint with the State of
Kansas, she did not say it was a complaint against Ms. Keith.  (Tr. 712:13-16).

917.   Mrs. Beer's February 18, 2020, complaint arose from the three occasions
A.B. was given the opportunity to go to the special education setting.  (Tr. 1475:3-9).

918.   Mrs. Beer's February 18, 2020, complaint stated, "As you will see in the
email correspondence, we have a leadership and accountability problem in regard to our
Principal Kathy Keith. This is not the first time I have encountered conflict with Mrs.
Keith." (Tr. 1475:10-17; Ex. SMSD-12, p. 6597-6609).

919.   Mrs. Beer's February 18, 2020, complaint stated, "Let me say this letter is a
formal complaint for principal Kathy Keith at Westwood View Elementary."  (Tr. 1475:21-
24; Ex. SMSD-12, p. 6597-6609).

920.   On February 19 and February 23, 2020, Ms. Grover emailed Ms. Koertner
and Ms. Waeckerle a copy of A.B.'s self-rating sheet.  (JE-1, p. 1778).

921.   On February 19, 2020, Ms. Guerry sent an email to Mrs. Beer and District
employees confirming that after lunch is a challenge for A.B., but again, it is not necessarily
the subject matter.  Ms. Guerry proposed to start by offering two different times a para
educator could provide some support as a trial. The IEP team wanted to keep data on the
adult's intervention to see what they could learn from the intervention - whether it

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

worked, or it didn't, and determine the level of support A.B. needed.  Further, if he responded to the afternoon adult assistance trial intervention the IEP team would have additional data of the amount of need A.B. required. (Tr. 1340:15-1341:8; Ex. SMSD-12, p. 6632).

922.   On February 19, 2020, Mrs. Beer responded to Ms. Guerry's email and said, "No joke. I am going to take my blood pressure medicine and get back to [you] by tomorrow evening.  This just put me at 180." (Tr. 1342:2-14; Ex. SMSD-12, p. 6641).

923.   While Mrs. Beer wanted para support for A.B. during math, the amount of time the adult would work with A.B. was more than just math. The IEP team proposed a total of 60 minutes, which would have been longer than the math section.  (Tr. 1342:15-1343:2).

924.   During the October 1, 2019, IEP meeting, Mrs. Beer told the IEP team that A.B. was great in math. (Tr. 1343:3-1344:5).

925.   Dr. Dancer and Ms. Guerry met with Mrs. Beer on February 27, 2020, to discuss the adult intervention issue.   They discussed the IEP team's proposal and tried to address Mrs. Beer's concerns regarding the proposal.  Mrs. Beer was concerned about the assignment of Billie Varuska as the adult to provide the afternoon intervention because Mrs. Beer wanted somebody with a special education background.  Mrs. Beer wanted to meet Billie Varuska before she agreed to the IEP team's proposal.  Dr. Dancer and Ms. Guerry assured Mrs. Beer that while Billie Varuska was not a certified teacher, she would be trained by Jill Koertner who is a BCBA.  Dr. Dancer and Ms. Guerry were trying to work with Mrs. Beer to gain consensus and move forward with helping A.B.  (Tr. 1344:6-1345:5, 1345:16-22).

926.   Jill Koertner, the District's BCBA and autism coach, was going to train Billie on the BIP.  Mrs. Beer told Dr. Dancer that she wanted to participate in the training of Billie.  (Tr. 1432:10-22).

927.   The afternoon adult intervention proposal was consistent with the kind of incremental approach that A.B.'s IEP had progressed on all the way along.  The IEP team was proposing to try a new intervention and see how it worked.  (Tr. 1346:12-18).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

928.   Assigning a para one-on-one with a student is a least restrictive environment concern. The IEP team would want to ensure there was data to substantiate intervention.  It does not matter whether the para was provided in the general education classroom.  It is an additional placement of services and so that must be data driven. Further, afternoon adult support had not previously been subject to evaluation.  (Tr. 1346:19-23).

## March 2020

929.   On March 3, 2020, Mrs. Beer sent an email to Dr. Dancer, Ms. Keith, and Ms. Guerry, stating: "I was also told that we would all meet together so we could be on the same page. Mrs. Grover communicating with Billie, Jill and myself. I feel like you are excluding me. Part of my agreement with Dance and Guerry for an aide that is not qualified to work with SPED students was to be part of an open process, meeting together and my approval of the training and aide. Why are you suddenly closing this information off to me?"  (Tr. 1466:6-16; Ex. SMSD-12, pp. 7002-7009). "I believe you are assuming that with just a brief individual meet up with Billie, that I am going to approve her to work with [A.B.]. That is not what we discussed. You are assuming that, by making a meeting to train her, without my consideration. I specifically asked you to have a meeting to see how she engaged with Mrs. Judd, Mrs. Grover, Jill, and myself. You and Laine said that we would have a meeting this week, so that I could ask questions with Mrs. Judd, Mrs. Grover and Jill. You then send me info that you are meeting to train Billie and mention that I can run into Billie when I drop [A.B.] off in the mornings. You are not asking to put [A.B.] with an aid that has no history or education in regards to Autism or ABA therapy. You are pushing it through and disregarding my consideration. Can you see my point of view? I think you need to find a qualified sped para to work with [A.B.] in the afternoon. I cannot count on your word or to follow thru on [A.B.'s] compensatory education. I am really shocked that you are doing this. It does not seem like your normal friendly self. Am I missing something?"  (Tr. 1467:20-1468:20; Ex. SMSD-12, pp. 7002-7009).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

930.    On March 10, 2020, Ms. Guerry emailed Mrs. Beer a Prior Written Notice of Action. The Prior Written Notice states that on January 31, 2020, the IEP team met and discussed A.B.'s progress & Mrs. Beer's request for para support during math.  The IEP team left the meeting agreeing that options for additional support would be reviewed and presented to Mrs. Beer.  On February 19, 2020, Mrs. Beer was presented with options for trial intervention for a push-in para during designated times in the afternoon.  The District rejected Mrs. Beer's request for an immediate assignment of a full-time para support during math as it was determined the time of day rather than the subject matter was when A.B. exhibits difficulties. The team proposed an initial trial intervention to assess how A.B. responds, assess A.B.'s progress and to help inform team if additional support should be added to A.B.'s IEP.  The Prior Written Notice stated, "At this time, [A.B.] is in his least restrictive environment, however the team will review data from the proposed trial intervention to determine later potential additions to his IEP."  Mrs. Beer did not sign this Prior Written Notice.  (Tr. 1347:17-1349:25; JE-1, p. 1779-1782; Exhibit SMSD-12, p. 7002-7009).

931.    The trial intervention of adult afternoon support for A.B. was never actually implemented.  (Tr. 1498:11-14).

932.    Sherry Dumolien is the director of special education at the District. 1471:12-15. Ms.  Dumolien has an undergraduate degree in elementary education and special education.  She has multiple master's degrees in various educational technology, leadership.  She is in the process of completing a doctorate degree in educational leadership.  (Tr. 1472:10-16).

933.    GEI, or general education interventions, provides a clear understanding as to where the student is performing in general education.  There are various interventions and resources available for students.  Some of them fall under what would be classified as GEI, available to all students, and then some of them would fall under the special education specific umbrella.  GEI is something that is available to all students within an organization.  At the Pre-K level, it is not a requirement in Kansas.  (Tr. 1473:5-22).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

934.   Sherry Dumolien testified that a Prior Written Notice is required before providing services or a change in placement.  (Tr. 1481:9-11).

935.   As of March 10, 2020, the District had never denied A.B.'s services under his IEP.  A.B. received the specialized instruction minutes that he was supposed to.  Lori Grover worked with A.B. every morning for 50 minutes in the classroom.  A.B. had a BIP in place to manage his behaviors.  (Tr. 1350:9-20).

936.   To Dr. Dancer's knowledge, Mrs. Beer had never alleged that the District did not provide A.B. a FAPE outside of the instant due process complaint.  (Tr. 1350:25-1351:4).

937.   Dr. Dancer has never heard any complaints about the goals that the team came together and drafted.  (Tr. 1351:5-8).

938.   On March 11, 2020, Mrs. Beer filed a complaint with the Kansas State Department of Education where she identified one issue as, "By allowing the student to leave the classroom during math in order to complete his work in the resource room, the district encouraged escaping behavior, violated the student's IEP, LRE, and his behavior intervention plan."  (Tr. 1478:21-1479:3; Petitioners' Ex. 497 at p. 3).

939.   On March 13, 2020, Ms. Waeckerle emailed Mrs. Beer a progress report for A.B.'s progress on IEP goals 2, 4, 5 and 6.  (JE-1, p. 1789-1792).

940.   On March 13, 2020, A.B.'s progress report on his IEP goals was updated. (Tr. 1351:9-22; JE-1, p. 1789).

941.   Ms. Grover was one of the collectors of the data sheets.  (Jenny Helzer, the speech pathologist, collected the data for the communication goal.  (Tr. 1403:7-16; JE-1789-1792).

942.   On March 13, 2020, Ms. Waeckerle transmitted A.B.'s third quarter progress report to Ms. Beer.  (Tr. Vol. IV, 827:3-11; Pet. Ex. 446).  As it relates to A.B.'s IEP "measurable annual goal 5," the progress report provides, in part: "A.B. is able to identify the emotion in himself, identify the emotion in others, identify a calming strategy, and use a calming strategy 53% of the time on observed data days."  (Pet. Ex. 446).  These benchmarks are reflected on data collection sheets, scoring A.B. on a scale of "1 = Did not

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

meet expectations," "2= some expectations met," and "3=met expectations."  (JE-1, pp. 1457-1503, 1748-1775).

943.   From December 6, 2019, through March 11, 2020, the goal progression sheets reflect the following scores:

    a.   Identify the emotion in himself:    Nine "1s," five "2s," and four "3s"

    b.   Identify the emotion in others:    No scores taken

    c.   Identify a calming strategy:    Ten "1s"

    d.   Utilize a calming strategy:    Eight "1s" and one "2"

(JE-1, pp. 1457-1503, 1747-1775) (JE-1, pp. 1457-1503, 1747-1775).

944.   The goal progression sheets do not demonstrate that A.B. was identifying an emotion in himself, identifying an emotion in others, identifying a calming strategy, and using a calming strategy 53 percent of the time.  (JE-1, pp. 1457-1503, 1747-1775).  The vast majority of scores were in the "did not meet expectations" range, and no scores were even taken to measure A.B.'s progress towards identifying the emotion in others. Moreover, it is not comprehendible how the District used this data to conclude A.B. was demonstrating these objectives 53 percent of the time.

945.   The District collected goal progression data for A.B. during only a 50 minute period in the morning.  (Tr. Vol. IV, 831:11-832:7).  Ms. Waeckerle is a special education teacher with an undergraduate degree in behavior disorders, a master's degree in regular education, and master's degree in learning disabilities.  (Tr. Vol. IV, 803:19-23). When presented with the data collection sheets, Ms. Waeckerle testified that she could not determine how Ms. Kramer-Grover reached the 53 percent reflected in A.B.'s progress report.  (Tr. Vol. IV, 828:2-830:12; JE-1, pp. 1748-1777).

946.   Ms. Waeckerle had concerns that the information collected by Lori Kramer-Grover was insufficient and testified that she did not know whether Ms. Kramer-Grover revised her data collection method after those concerns arose.  (Tr. Vol. IV, 832:23-833:7). The data collection method did not change.  (JE-1, pp.1439-1503, 1748-1777).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

947.   The District did not propose any changes to A.B.'s IEP or BIP, including any changes to address the concerns expressed in Ms. Waeckerle's emails that A.B.'s current plan was no longer effective and that A.B. was not engaged in the classroom.  (Tr. Vol. III, 640:9-13; Pet Exs. 364, 393).

948.   The District did not request parental consent to evaluate A.B. in any other area, including fine motor. (Tr. Vol. III, 640:18-20).

949.   Dr. Weigand testified that the District procedurally and substantively violated the IDEA during the 2017-2018, 2018-2019, and 2019-2020 school years.  (Tr. Vol. I, 227:23-229:3).  The District deprived A.B. of a Free Appropriate Public Education during the 2017-2018, 2018-2019, and 2019-2020 school years.  (Tr. Vol. I, 229:4-230:6).

950.   The March 13, 2020, Progress Report indicates A.B. is making adequate progress on Goal 2 (communication).  (Tr. 1352:13-15; JE-1, p. 1789).

951.   As discussed during the January 31, 2020, meeting, A.B.'s March 13, 2020, progress report included quantitative data such as, "[A.B.] now correctly names pictures containing the sounds at least 75% accuracy in the beginning, middle and end." and "[A.B.] is able to interact appropriately with his peers 90% of the time."  Further, Lori Grover included her name on the entries for March 13, 2020, to clarify who was writing that progress report.  (Tr. 1352:16-1353:19; JE-1, p. 1789-1792).

952.   On the March 13, 2020, progress report for Goal 6, it says, "[A.B.] is able to practice learning behaviors such as: following directions, being on task, or completing his work, 64% of the time on observed days. He continues to need help in asking for a break and utilizing his break card. [A.B.] is improving on communicating when he needs help with an assignment if prompted by the teacher. For example, when the teacher asked if [A.B.] needed help, he replied "its hard". During another observation, when [A.B.] was completing morning work the word "Thursday" was written for him to write down. He struggled however, with reading the teacher's handwriting and asked for clarification of the word and for it to be re-written."

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

953.   Based on the March 13, 2020, progress report, A.B. was making progress on his IEP goals.  There was no indication he was not making progress on his IEP goals.  (Tr. 1355:19-24).

## April 2020

954.   On April 10, 2020, KSDE investigator issued a report on Mrs. Beer's child complaint which stated with regard to the proposal to provide the afternoon trial intervention of adult support: "While a prior written notice of the proposed action was given to the parent, parental consent for the proposed material change in service was neither sought nor obtained."  The District does not agree with the investigator's conclusion because the initial proposal was a trial intervention.  If the District had received information from Mrs. Beer that she agreed with the District moving forward, the District would have documented the date and time of that information via another Prior Written Notice for that next step.  All along the way, there have been multiple Prior Written Notices showing incremental changes or progressions.  The circumstance would be no different.  (Tr. 1480:11-1481:8; Petitioners' Ex. 497).

955.   The District did not agree with child complaint investigator's conclusion that there was a compliance concern due to A.B. receiving assistance on with math in the resource room.  He was only there a very small amount of time. In addition, the team was working to further define supports for A.B.  (Tr. 1479:9-1480:7; Petitioners' Ex. 497 at p. 9).

956.   Sherry Dumolien sent a letter to KSDE stating that items 1 and 4 were resolved and the District would provide additional time for item 3. The District requested additional time to complete item 2 (training of staff) due to COVID and potential delay in school calendars and remote learning as well as some additional variables happening at that time.  (Tr. 1485:3-14; Ex.  SMSD-8, p. 60-62).

957.   On May 22, 2020, Ms. Waeckerle provided Mrs. Beer a progress report regarding A.B.'s progress on IEP goals 2, 4, 5 and 6.  The report noted that due to the COVID pandemic, the District had moved to continuous education through a home-based

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

remote or virtual program.  During the third week of instruction, Mrs. Beer responded that A.B. was working on pro(JEct-based learning vs. school supplied curriculum.  The SLP continued to provide weekly activities.  Social skills stories/lesson were provided on a weekly basis and Mrs. Beer stated she would choose which activities she felt were most appropriate/beneficial.  (JE-1, p. 1906-1909).

958.   The placement continuum in Kansas is quite broad and include least to most restrictive on either end. General education is the least restrictive.  GEI components fall under that general education umbrella.  Students on that end of the spectrum receive services within the general education setting. As student progress along the continuum services are provided in a special education setting and sometimes it is a combination of multiple settings. A determination of related services is also a part of the continuum. (Tr. 1486:24-1488:4).

959.   The more restrictive end of the placement continuum includes one-to-one services, potentially in a multitude of settings, and then private placement or homebound services.  (Tr. 1488:5-10).

960.   On the placement continuum in Kansas, sometimes there are more restrictive settings, but then there are also specialized education settings as well that would still technically fit under that umbrella but be more restrictive in nature because maybe it is not within a student's home building.  Students may not have access to general education peers or lose access to general education curriculum in addition to access to peers as well.  There are a multitude of spots along the continuum.  (Tr. 1488:13-1489:1).

961.   A.B.'s IEP placement is at the least restrictive end on the placement continuum at the very beginning. He receives services in the general education setting with the caveat of those services that he receives for speech, where it goes into the special education setting a couple of times a week.  (Tr. 1489:2-12).

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

## V.    CLAIMANT & RESPONDENT EXPERT WITNESSES:

1.    Dr. Patricia Weigand

Dr. Patricia Weigand is a special education and behavior expert retained by Petitioners, qualified to opine on all matters addressed in her testimony.  Dr. Weigand is a licensed Board Certified Behavior Analysist ("BCBA"), a licensed school counselor, has a Ph.D. in education, and has worked in Santa Fe Public School District for thirteen years in both special and general education.  Since 1989, Dr. Weigand has consulted with families, schools, and IEP teams in the area of autism.  Dr. Weigand is the director of a five-day intensive autism training for the Santa Fe Public School District.  Dr. Weigand plays a significant role on IEP teams by providing guidance related to behavioral strategies to reduce interfering behaviors and guidance regarding evidence-based instruction.  Dr. Weigand has experience in evaluating students as a member of a multidisciplinary team to determine whether a child is eligible and in need of special education.  (Tr. Vol. I, at 11:9-12:19, 128:22-133:21).

Dr. Weigand reviewed A.B.s' educational records pertaining to the 2017-2018, 2018-2019, and 2019-2020, school years.  (Tr. Vol. I, at 136:21-138:19, 157:20-158:11, 224:2-11; Pet. Ex. 503).

Dr. Weigand's conclusions rely solely on the educational records that were available to the District at the time the District made educational decisions pertaining to A.B. Beer.  (Tr. Vol. I, 220:8-18).

The Hearing Officer finds that Dr. Weigand's testimony in this matter is highly credible.

2.    Dr. Joseph Gentry:

Dr. Joseph Gentry is an expert on behavior analysis, school psychology, IEPs, and school-based evaluation assessment who was retained by Petitioners and is qualified to opine on all matters addressed in his testimony.  Dr. Gentry is a doctor of philosophy in psychology and a licensed BCBA.  Further, Dr. Gentry is a licensed psychologist in Arizona

and owner of Gentry Pediatric Behavioral Services. (Tr. Vol. I, 11:9-12:19; (Tr. Vol. III, 734:20-736:4, 761:11-14).

   Dr. Gentry reviewed A.B.'s educational records from 2015 through the 2019-2020, school year, and a report completed by Dr. Ostmeyer of Beyond the Individual concerning A.B.'s present levels. Dr. Ostmeyer's report is not the foundation for Dr. Gentry's compensatory education recommendation.  (Tr. Vol. III, 736:5-738:13, 764:14-765:15).

   3. <u>Dr. Mitchell Yell</u>

   Dr. Mitchell Yell was retained by Respondents, and is an expert in IEP development, the IDEA, parental involvement, classroom management, placement LRE issues and FBAs. He is the Fred and Francis Lester Palmetto Chair in teacher education and a professor in special education at the University of South Carolina. (Tr. Vol. VI, 1509:7-17, 1511:4-11).


## VI. CONCLUSIONS OF LAW

### Legal Standards

  1. The Hearing Officer has jurisdiction to decide the issues before him pursuant to K.S.A. 72-9720.

  2. The burden of proof and the burden of persuasion lie with the party challenging the IEP. *Schaffer ex. rel. Schaffer v. Weast*, 546 U.S. 49, 56-58 (2005); *Johnson v. Indep. Sch. Dist. No. 4 of Bixby, Tulsa County, Okla.*, 921 F.2d 1022, 1026 (10th Cir.1990).

  3. The party seeking relief bears the burden of proving the appropriateness or inappropriateness of the education. *L.E. v. Ramsey Bd. of Educ.*,435 F.3d 384, 391 (3rd Cir. 2006).

  4. In this matter, the Beers are the party seeking relief and bear the burden of proof.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

5.    "The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to a free and appropriate public education designed to meet their unique needs." *LB. v. Nebo Sch. Dist.*, 379 F.3d 966, 968 (10th Cir. 2004).

6.    The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., establishes a substantive right to a "free appropriate public education" ("FAPE"). *Board of Ed. of Hendrick Hudson Central School Dist., Westchesteray. v. Rowley*, 458 U.S. 176 (1982).

7.    "Free appropriate public education" (or "FAPE") means special education and related services that-- (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program. 20 U.S.C. §1401(9).

8.    A FAPE includes both "special education" and "related services". 20 U.S.C. § 1401 (9). "Special education" is "specially designed instruction...to meet the unique needs of a child with a disability." 20 U.S.C. § 1401.

9.    The U.S. Supreme Court expanded this definition in the *Rowley* case (cited below) holding that a district satisfied this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP.

10.    In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade. *Bd. Of Educ. Of the Hendrick Hudson Cent. Sch. Dist. V. Rowley*, 458 U.S. 176, 203-04 (1982).

11.    The U.S. Supreme Court in *Rowley* set forth a two-part test to determine whether the district has complied with federal special education law: First, has the State complied with the procedures set forth in the Act? And second, is the individualized

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? *Id*. at 206-07.

12.   In reviewing such cases to determine whether the above requirements have been met, the U.S. Supreme Court cautioned that the courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

13.   The U.S. Supreme Court reviewed the standard the Tenth Circuit Court of Appeals had applied to the second prong of the *Rowley* test and found the Tenth Circuit's de minimis benefit test lacking. Instead, the Supreme Court held that "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist.*, 137 S. Ct. 988, 999 (2017).

14.   The Supreme Court went on to explain that: The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials….The Act contemplates that this fact intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians….Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal. (*Id*. Internal citations omitted.)

15.   In *Endrew F.*, the Supreme Court reiterated *Rowley's* deference to school authorities with respect to educational policy, stating: We will not attempt to elaborate on what "appropriate" progress will look like from case to case. It is in the nature of the Act and the standard we adopted to resist such an effort: The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created. This absence of a bright-line rule, however, should not be mistaken for "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Endrew F.*, 137 S. Ct. at 1001 (quoting *Rowley*, 458 U.S., at 206, 102 S. Ct. 3034.)

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

16.   As modified by *Endrew F.* the two-prong *Rowley* test is now properly stated as: First, has the school compiled with the procedures set forth in the Act? And second, has the school offered an IEP reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances? (137 S.Ct. 988, 999, 2017).

17.   "'Medical services' means services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services."  K.A.R. 91-40-1(nn).

18.   The duty to offer a FAPE, and to issue an Individualized Educational Plan ("IEP"), resides with a child's home school district, or "local educational agency." 20 U.S.C. § 1414(b) (imposing obligations to create and administer IEPs on local educational agencies); Doe v. E. Lyme Bd. of Educ., 790 F.3d 440, 451 (2d Cir. 2015) ("the duty to offer a FAPE remains with the agency where the child resides; and a FAPE cannot be offered unless an IEP is issued"). "Generally, a 'local educational agency' is synonymous with the local school district." Timothy O. v. Paso Robles Unified Sch. Dist., 822 F.3d 1105, 1110 n.7 (9th Cir. 2016) (citing 20 USC. §1401(19)). The "local institution responsible for complying with the terms of the IDEA is the local school district in which the student actually resides." Joshua W. v. Bd. of Educ., No. 971042-JTM, 1997 U.S. Dist. LEXIS 9457, at *7 (D. Kan. June 10, 1997).

19.   The IDEA offers states federal funds to assist in educating children with disabilities.  See Arlington Central Sch. Dist. Bd. of Ed. v. Murphy, 548 U.S. 291 (2006).  In exchange for the funds, a state pledges to comply with a number of statutory conditions.  20 U.S.C. § 1412(a)(1); 34 C.F.R. 300.17; K.A.R. 91-40-2(b)(1).

20.   A child with a disability, who by reason thereof, needs special education and related services, qualifies for benefits under IDEA.  20 U.S.C. § 1401(3)(A); K.S.A. 72-3404(g), (z); K.A.R. 91-40-1(k).  A child with a disability is also known as an "exceptional child" in Kansas.  K.A.R. 91-40-1(w).

21.   Autism Spectrum Disorder ("ASD") is a qualifying disability under IDEA.  34 C.F.R. 300.8(a); K.A.R. 91-40-1(f). Kansas regulations define "Autism" as meaning "a developmental disability significantly affecting verbal and nonverbal communication and

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

social interaction, generally evident before age three but not necessarily so, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences. The term shall not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance."  K.A.R. 91-40-1(f).

22.   A.B. is a child with the disability of ASD, who by reason thereof, needs special education and related services.  Accordingly, A.B. qualifies for benefits under the IDEA. A.B. resided within the Shawnee Mission School District at all times relevant to this proceeding. Accordingly, the District was obligated to provide a FAPE to A.B.

23.   Under the IDEA, a request for due process hearing must be initiated within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint. 20 U.S.C. §1415(f)(3)(C).

24.   A due process hearing complaint presented more than two years after the occurrence of the facts giving rise to the complaint will be considered timely, if the school made specific misrepresentations that it had resolved the problem forming the basis of the complaint; or the school withheld information from the parent that is required to be given to the parent under the IDEA. K.S.A. 72-3415. Thus, as the IDEA makes clear, the limitations period is not the entire educational career of the child.

25.   If a procedural violation is found, then the court inquires whether the violation resulted in the denial of FAPE, specifically by analyzing whether the procedural violation caused (1) substantive harm to A.B. or his parents, (2) a deprivation of an IEP for A.B., or (3) the loss of an educational opportunity. *Systema ex rel. Systema v. Acad. Sch. Dist. No. 20*, 438 F.3d 1306, 1313 (10th Cir. 2008). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."  *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012).

26.   A parent may present a due process complaint relating to any matter governed by Kansas' Special Education for Exceptional Children Act, including the identification, evaluation, placement, or the provision of a FAPE to their child.  K.S.A. 72-3415; 20 U.S.C. § 1415(b)(6).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

27.   Prior written notices are a procedural safeguard afforded to parents.  Kansas schools must provide Prior Written Notice ("PWN") in at least the following circumstances:  (a) prior to any IEP team meeting; (b) when the agency proposes to conduct any evaluation or reevaluation procedures; (c) if the school refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; (d) if the school proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; and (e) if the school determines that additional data is required to determine the possible existence of a qualifying disability, the child's present levels of academic achievement, and the possible need for special education and related services.  34 C.F.R. 300.322(a)(1), .301(a), .501(b)(2), .503; K.A.R. 91-40-8(e)(1).

28.   The IEP "is a snapshot, not a retrospective." *Roland M v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990). As a result, "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *O'Toole v. Olathe Dist. Schs. Unifed Sch. Dist. No.* 233, 144 F.3d 692, 701 (10th Cir. 1998).

29.   "Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *Id* at 702 (citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 534 (3d Cir. 1995)). See also *Thompson R2-J Sch. Dist. v. Luke P.*, 540 F.3d 1143, 1 149 (10th Cir. 2008) (explaining that the adequacy of an IEP is not determined through hindsight "because the question before us is not whether the IEP will guarantee some educational benefit, but whether it is reasonably calculated to do so"); *Endrew F. v. Douglas Cty. Sch. Dist. Re-I,* 798 F.3d 1329, 1341 (10th Cir. 2015) (citing *O'Toole* and *Thompson* for the proposition that "the measure is whether the IEP is reasonably calculated to guarantee some educational benefit, not whether it will do so"); *LG. v. Fair Lawn Bd. of Educ.*, 486 F. App'x 967, 973 (3d Cir. 2012) ("Courts deciding whether this requirement has been met must avoid "Monday Morning Quarterbacking" and must evaluate the reasonableness of a school district's decision at the time that it was made."); *J.R. ex rel. S.R. v. Bd. of Educ.,* 345 F. Supp. 2d 386, 395 (S.D.N.Y. 2004) ("[W]e . . . must not engage in Monday morning quarterbacking guided by our knowledge of [the student J's subsequent

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

progress at [a particular school], but rather [must] consider the propriety of the IEP with respect to the likelihood that it would benefit [the student] at the time it was devised.").

30.   Only procedural inadequacies that (i) impeded the child's right to a FAPE, (ii) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child, or (iii) caused a deprivation of educational benefits may be found to result in the denial of FAPE. *L.M v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2008) (citing *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1484, 1483 (9th Cir. 1992), superseded by statute on other grounds by the Act); see also *O'Toole v. Olathe District Schools Unified School District No. 233*, 144 F.3d 692, 707 (10th Cir. 1998) (citing *Roland M v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990)).

31.   Unlike a procedural violation of the IDEA, a substantive violation is not subject to a harmlessness analysis. *A.K ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F 3d 672, 679 (4th Cir. 2007). (Procedural violations are subject to "harmlessness analysis," while substantive violations of the IDEA are not.)

32.   Although the "harmlessness" of a substantive violation is not considered in determining whether a denial of FAPE has occurred, the degree of harm is an important factor to be considered in the remedy analysis. A hearing officer may only grant a remedy that is appropriate based upon the evidence at the hearing. 20 U.S.C. § 1415(i)(2)(C)(iii) (Court to grant such relief as it determines is appropriate); *School Committee of Town of Burlington, Mass. v. Department of Educ. Of Mass.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002 (1985) (IDEA does not specify the type of relief, except that it must be "appropriate.").

33.   Whether Parents were meaningful participants in the IEP process is a procedural inquiry. *J.L. v. Mercer*, 592 F.3d 938, 953 (9th Cir. 2009). However, "not all procedural violations by a school district in implementing the IDEA will necessarily result in the denial of a FAPE. Procedural error constitutes the denial of a FAPE only when it results in lost educational opportunity for the child, or when it significantly restricts parental participation in the IEP formation." *ML. v. Federal Way Sch. Dist.*, 39443 F.3d 634, 653 (9th Cir. 2004) (collecting cases).

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

34.   While federal regulations require that parents be given the opportunity to meaningfully participate in the IEP process, see 34 C.F.R. § 300.345, those regulations do not require a school district to relinquish to parents all control over the substance of the IEP or what constitutes a FAPE. See *White v. Ascension Parish School Bd.*, 343 F.3d 373, 377 (5th Cir. 2003) ("we re(JEct the assertion that parents are denied input into a decision if their position is not adopted"). As one court noted, requiring an IEP team "to adopt an IEP as drafted by the students' parents . . . essentially nullify the whole IDEA framework." *T. ex rel. C. T. v. Lewiston Sch. Comm.*, No. 99-202-P-H, 2000 U.S. Dist. LEXIS 10674, at *53 (D. Me. July 27, 2000). "School officials must come to the IEP table with an open mind, but they need not come with a blank mind." *Bd. of Educ. v. Michael R., No.* 02 C 6098, 2005 U.S. Dist. LEXIS 17450, at *45 (N.D. Ill. Aug. 15, 2005).

35.   Courts routinely find that parents are afforded the opportunity to participate in the IEP process, even though the parents' desires are rejected. See, e.g., *Ms. S. ex rel. G v. Vashon Island Sch. Dist.*, 337 F.3d 1 1 15, I l 33 (9th Cir. 2003) (finding, despite the fact "the parent and the school district are in disagreement about aspects of the proposed plan," a school district complied with 34 C.F.R. § 300.345 where it provided "a meaningful opportunity for [a parent] to participate in the IEP process, developed an IEP plan to the best of its ability after [the district and parent could not come to a consensus about an IEP, and afforded [the parent] two due process hearings to establish the validity of its proposed plan"); *L.P. v. Longmeadow Pub. Schs, No. 10-40190-FDS*, 2012 U.S. Dist. LEXIS 115277, at *53 (D. Mass. Feb. 24, 2012) ("Her objection, then and now, to the opinion of others on the IEP team concerns the substance of the resulting proposal, not the procedure. This Court agrees that the record reveals no evidence that any procedural defects 'significantly impeded' plaintiffs' ability to participate in the IEP formation process.")

## **Timeliness**

36.   In "Problem I," Petitioners alleged substantive and procedural violations beginning in "fall 2017." Petitioners alleged the District failed to adequately identify A.B. as

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

a student with a disability, appropriately evaluate him for special education services, and provide him a FAPE.

37.     A due process hearing complaint presented more than two years after the occurrence of the facts giving rise to the complaint will be considered timely if the school made specific misrepresentations that it had resolved the problem forming the basis of the complaint; or the school withheld information from the parent that is required to be given to the parent under the IDEA. 34 CFR 300.511 and K.S.A. 72-3415. Thus, as the IDEA makes clear, the limitations period is not the entire educational career of the child. Hearing officers are charged with determining, on a case-by-case basis, whether the parent should have known about the alleged action that forms the basis of the complaint. 71 Fed. Reg. 46,706 (2006).

38.     As the due process complaint here was filed on August 14, 2020, any allegation upon which relief is requested must have occurred on or after August 14, 2018, to be timely unless an exception to the two-year statute of limitations exists.  As the party seeking relief, Petitioners have the burden of evidence and persuasion to justify expanding the jurisdiction of the Hearing officer beyond the two-year limitation period by presenting evidence of either specific misrepresentations by the District that it had resolved the problem forming the basis of the complaint; or the District withheld information from the parent that is required to be given to the parent under the IDEA. K.S.A. 72-3415. Petitioners have failed to meet this burden.

39.   During the six days of testimony heard by the Hearing Officer, no evidence was presented by which the Hearing Officer may conclude the District made any misrepresentations to Petitioners or withheld information regarding A.B. that was required to be provided to the Petitioners. A.B.'s classroom teacher, Emily Ruble, testified that she provided Mrs. Beer with frequent reports about A.B. during his Pre-K year (2017-18 school year).  The Hearing Officer found Ms. Ruble to be a credible witness in her testimony that she did not have reason to suspect A.B. was a student with a disability following the determination that he was not eligible for special education services on November 6, 2017.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

40.   The Pre-K Evaluation report adopted by the Pre-K Evaluation team (including Mrs. Beer) accurately and comprehensively reflected all of the data collected during the evaluation including the AEPS, observational reports, and the statements made by the classroom teacher and Mrs. Beer.  Mrs. Beer was fully apprised of the Pre-K evaluation team's actions.  Mrs. Beer was a member of the Pre-K evaluation team, provided substantial input in the evaluation process, and concurred in the evaluation team's conclusion that A.B. was not eligible for special education services at the Pre-K evaluation team meeting on November 6, 2017.

41.   Petitioners were provided with a Prior Written Notice of Action dated August 30, 2017, in which the District proposed to conduct an evaluation of A.B. in the area of Social/Emotional Status/Behavioral Status.  The Prior Written Notice of Action states the team considered evaluating A.B. in other areas, but data did not indicate a need for assessment in other areas. Mrs. Beer provided consent to evaluate as described in the Prior Written Notice of Action on August 31, 2017.

42.   The Pre-K evaluation report is comprehensive and accurate and contains all the information obtained by the evaluation team, including summaries of observations and the results of the assessments and other data obtained during the evaluation.

43.   The Pre-K evaluation team met on November 6, 2017, to discuss the results of the evaluation.    Mrs. Beer, Ms. Ruble and Ms. Seitnater testified that during this meeting the team agreed that A.B. was not eligible for special education and related services..  There was no disparity among the testimony by these witnesses and no inconsistency among their account of the information discussed and considered during the meeting.

44.   During the hearing of this matter, Petitioners did not present evidence of information that was misrepresented or withheld by the District at any time during the 2017-2018, school year which thereby prevented Petitioners from exercising their procedural safeguards to challenge the results of the Pre-K evaluation. Therefore, K.S.A. 72-3415 prohibits Petitioners from asserting claims arising from any action or non-action by the District regarding A.B. prior to August 14, 2018.

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

## 2017-2018 Child Find & Parental Participation

45.     Child Find "is a profound responsibility, with the power to change the trajectory of a child's life." *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 625 (3d Cir. 2015).

46.     The Child Find duty is an affirmative obligation of the school district to identify, locate, and evaluate all children within a reasonable time, that it suspects, knows, or should know is a child with a disability, regardless of the severity, that may need special education.  *E.g.* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(c); *Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1066 (10ᵗʰ Cir. 2002); *Timothy O. v. Paso Robles Unif. Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016); *Boutelle v. Bd. of Educ.*, No. 17-1232, 2019, WL 2061086, at \*9 (D.N.M. May 9, 2019); K.A.R. 91-40-7.

47.     The child find requirement for Kansas schools applies to children ages birth through 21. Kansas schools must adopt policies and procedures that meet the following requirements: "(1) For children younger than five years of age, observations, instruments, measures, and techniques that disclose any potential disabilities or developmental delays that indicate a need for evaluation, including hearing and vision screening; (2) for children from ages five through 21, observations, instruments, measures, and techniques that disclose any potential exceptionality and indicate a need for evaluation, including hearing and vision screening as required by state law; and (3) implementation of procedures ensuring the early identification and assessment of disabilities in children."  K.A.R. 91-40-7(b).

48.     "Although there is no bright-line rule, a school district generally has sufficient notice if it is aware of facts suggesting the child has a disability and that the child is struggling academically." *D.C. v. Klein Indep. Sch. Dist.*, ___ Fed. Appx. ___, 2021 U.S. App. LEXIS 18093, No. 20-20339, at \*12 (5th Cir. June 17, 2021).

49.     Knowledge or suspicion of a disability triggers a school district's Child Find duty, and may be inferred from written parental concerns, verbal communications, the behavior or performance of the child, teacher concerns, or parental request for an evaluation.  *See Weisenberg v. Bd. of Educ.*, 181 F. Supp. 2d 1307, 1311 (D. Utah 2002).

50.     The reasonableness of a school district's delay in evaluating a student is measured by the steps it takes during the relevant period.  *Klein Indep. Sch. Dist.*, 2021 U.S. App. LEXIS

18093, at *14.  Failing to take any appreciable steps toward complying with its Child Find for a three month period is an unreasonable delay.  *Id.*

51.     The school's Child Find duty continues during summer vacation.  *Klein Indep. Sch. Dist.*, 2021 U.S. App. LEXIS 18093, at *15.  When a school's Child Find duty is triggered in the spring semester, it "cannot get away with doing nothing" over summer break.  *Id.*  at *15-16, *15 n.6 (re(JEcting argument that child find is suspended over the summer based on the "school day" timeline in place after parental consent is requested and received).

52.     "[A] poorly designed and ineffective round of testing does not satisfy a school's Child Find obligations."  *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3d Cir. 2012). An evaluation is legally inadequate if it fails to address all areas of suspected disability.  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 233 (2009).

53.     Child Find obligations do not terminate once a student is first identified as likely having a disability.  School districts have a continuing duty to identify and evaluate students thereafter.  *Smith v. Cheyenne Mt. Sch. Dist. 12*, No. 15-00881-PAB-CBS, 2017 U.S. Dist. LEXIS 100475, *46-47 (D. Colo. May 11, 2017).

54.     Parents are members of the IEP Team and "must be afforded an opportunity to participate in meetings with respect to identification, evaluation, and educational placement" of their child and the provision of FAPE to their child. 34 CFR 300.321, .501(b).  Parents play "a significant role" in the IEP process, and their concerns must be considered by the team. *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007); 20 U.S.C. § 1400(c).  The IDEA "sought to maximize parental involvement in educational decisions affecting their disabled child." *Ellenberg v. New Mexico Military Institute*, 478 F.3d 1262, 1269 (10th Cir. 2007); *M.M. ex rel. C.M. v. Sch. Bd. of Miami-Date Cnty., Fla.*, 437 F.3d 1085, 1095-96 (11th Cir. 2006) ("parental involvement is critical; indeed, full parental involvement is the purpose of many of the IDEA's procedural requirements.").

55.     Ms. Ruble's suspicion arising in or about August 2017 failed to trigger the District's child-find obligation to evaluate the possibility that A.B. was a child with autism.

56.     The meetings and communications regarding A.B. in February and March 2018, including oral communications between the District and Ms. Beer concerning the

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

possibility of autism, separately triggered the District's Child Find obligation to evaluate the possibility that A.B. was a child with autism.

57.    The District's Child Find obligation to evaluate A.B.'s need for special education or related services to address deficits in his fine motor skills was triggered on November 1, 2019, and again on January 23, 2020.

58.    The "child-find" provisions of the IDEA requires schools to adopt and implement policies and procedures to ensure that all children with disabilities residing within its boundaries are "identified, located, and evaluated." 34 CFR 300.111(a). Either a parent of a student or a school district employee may initiate a request for an initial evaluation to determine if a student is a student with a disability under the IDEA. 34 CFR 300.301(b).

59.    School districts are not required to refer all students with academic or behavior struggles for an evaluation for special education. Referrals require a case-by-case determination about whether a student needs arise from a disability. School districts are charged with monitoring a student's progress, especially during the provision of general education interventions, as refer the student for an evaluation when it is apparent the student may require specialized education.

> In addition to providing an IEP for all students known to have disabilities, states receiving IDEA funding have an ongoing obligation to ensure that "[a]ll children with disabilities ... who are in need of special education and related services [ ] are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A). This obligation, known as Child Find, extends to all "[c]hildren who are suspected of being a child with a disability ... and in need of special education." 34 C.F.R. § 300.111(c). Failure to meet this obligation "may constitute a procedural violation of the IDEA." D.K. v. Abington Sch. Dist., 696 F.3d 233, 249 (3d Cir. 2012). But such a procedural violation "will be 'actionable' only 'if [it] affected the student's substantive rights.'" Leggett v. District of Columbia, 793 F.3d 59, 67 (D.C. Cir. 2015) (quoting Lesesne ex rel. B.F. v. District of Columbia, 447 F.3d 828, 832, 834 (D.C. Cir. 2006)).

*T.B., Jr. by and through T.B., Sr. v. Prince George's County Board of Education*, 897 F.3d 566, 571–72 (C.A.4 (Md.), 2018).

60.    The evidence presented at hearing demonstrates the District initially satisfied the "child find" requirement in 34 CFR 300.111(a) before A.B. even enrolled in the District.

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

During the summer of 2017, A.B. attended "Smiley-Face Camp," a one-week half day summer enrichment opportunity for young children provided by the District.  Summer enrichment is a general education program in the summer that families can enroll their children in for one week at a time or for a full entire summer.

61.    Ashlea Becker, a certified early childhood special education teacher, interacted with A.B. as the lead teacher for Smiley-Face Camp.  Part of Ms. Becker's job as a school employee is to communicate any concerns about a student to other District professionals.  On August 7, 2017, Ms. Becker sent an email to Lindsey Seitnater, a special educator teacher in the building where Ms. Becker believed A.B. would attend Pre-K.  Ms. Becker wanted to make Ms. Seitnater aware of A.B. so she could determine whether A.B. would need any extra supports to be successful in Pre-K.

62.    Ms. Becker sent the August 7, 2017, email to Ms. Seitnater because she noticed A.B. required additional prompting to complete directions, needed direct instructions, and pulled himself away from the group.  Ms. Becker anticipated that A.B. would need additional support when the school year started.  Ms. Becker was looking at the area of social-emotional/behavioral for A.B. Because summer enrichment did not have academics, Ms. Becker was not aware of A.B.'s academic skills.

63.    Ms. Becker recalled speaking with Mrs. Beer sometimes at pickup and drop-off.  She spoke with Mrs. Beer at length one time about reservations about going into Pre-K and what that might look like.  Ms. Becker recalls trying to reassure Mrs. Beer that there would be support for A.B. if he needed it.  Ms. Becker spoke with Mrs. Beer about observations she had made regarding A.B. and some of the challenges she saw throughout the day.

64.    Ms. Seitnater forwarded Ms. Becker's email on to Ms. Ruble, A.B.'s classroom teacher, on August 10, 2017.  On August 23, 2017, Ms. Ruble emailed Ms. Seitnater requesting some ideas for social stories that may help A.B.  On August 30, 2017, following Ms. Ruble's request to evaluate A.B. to determine if he was eligible for special education, the District proposed to conduct an evaluation to determine whether A.B. was a child with an exceptionality in need of special education and related services.  A mere twenty-three

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

calendar days passed following Ms. Becker's email to Ms. Seitnater and the initiation of an evaluation of A.B. by the District.

65.     As stated above, the District initiated an evaluation to determine whether A.B. was eligible for special education and related services on August 30, 2017, just a couple weeks following the beginning of that school year.

66.     Lindsey Seitnater oversaw the Pre-K evaluation of A.B. beginning on August 31, 2017. Ms. Seitnater has been employed with the District for thirteen years; this is her sixth year in her current position.  Ms. Seitnater has a bachelor's degree in early childhood education and elementary education, and a master's degree in special education.  As an early childhood special education teacher, Ms. Seitnater evaluates three, four- and five-year old children before kindergarten.

67.     Ms. Seitnater met with Mrs. Beer and discussed the scope of the evaluation. Ms. Seitnater got consent and told Mrs. Beer what to expect during the evaluation process. Ms. Seitnater testified that she knew A.B. was previously evaluated for eligibility for special education but did not qualify.

68.     Ms. Seitnater testified that an evaluation to determine eligibility for specialized instruction does not include an analysis of every possible qualifying factor; the evaluation only considers the area triggering the Child Find obligation. The area that the District evaluated for A.B. was the social-emotional category because of some behaviors he exhibited.  The evaluation was limited to just that one component because the evaluation team did not have concerns in other areas.  A.B. did not show any motor, communication, or cognitive concerns.  Mrs. Beer did not ask the District to evaluate A.B. in any other area.

69.     The evaluation for A.B. included a teacher interview, a parent interview, observations, as well as the AEPS II for ages three to six.  The AEPS II is a play-based assessment that involves observations of behaviors in both structured and unstructured activities.

70.     Ms. Seitnater completed the AEPS II for A.B.'s evaluation.  Ms. Seitnater conducted two observations of A.B.  On September 11, 2017, Ms. Seitnater observed A.B. right as school staff were starting interventions for him and she filled out the evaluator

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

protocol for the AEPS in the social area.  Ms. Seitnater conducted another observation again about six weeks later, on October 25, 2017, before the evaluation meeting.  Ms. Seitnater stated she wanted to give enough time for the interventions to work and make sure the team was still within the required 60 school days to complete the evaluation.  Ms. Seitnater observed A.B. in a variety of structured and unstructured settings in the classroom.  Ms. Seitnater looked at different pieces of that social area development in the classroom.  Ms. Seitnater also observed A.B. outside of the formal observations she recorded on the AEPS to make sure she was not missing anything and to confirm what she had found.

71.     At the end of Ms. Seitnater's AEPS report, there are calculations recorded on the bottom of the last page.  Ms. Seitnater has a score of 38% on September 11, 2017.  On October 25, 2017, she indicated a score of 68%.   Ms. Seitnater's analysis shows huge growth with the interventions put into place.  A.B. had 38% of the skills in September 2017, and he almost doubled his skills in about six weeks.  It showed that the interventions were working for A.B. and he was able to better participate socially in the classroom. At the beginning of the 2017/2018, school year, A.B. scored zeros in whole group instruction and small group instruction.  He was escaping and leaving the area or not coming to the area to begin with.  By October 2017, A.B. was getting 2's, which means he was performing the monitored tasks consistently in some of the areas and able to more fully participate in that whole group and small group instruction.

72.     Ms. Seitnater testified that parents are a valuable part of the evaluation team. Ms. Seitnater fully included Mrs. Beer on the evaluation team.

73.     Ms. Seitnater relied on what Mrs. Beer told her.  She reported it in the evaluation report under the parent interview piece.  The family also completes an AEPS report so that they can have a look at the whole child, not just what A.B. is doing at school. The evaluation team wants to see what he's doing at home to identify whether the concerns only arise at school.  Evaluators rely on what the parents tell them in the evaluation process.

74.     Mrs. Beer completed the AEPS family report for A.B.  This family report covers all areas of development where Ms. Seitnater was just doing the social piece of the AEPS.

The social piece of the family report and the social piece of Ms. Seitnater's report go hand in hand and informs the team exactly what A.B. is doing in those areas at home and at school. Ms. Seitnater combines those scores to get the total score for the protocol.

75.     Mrs. Beer never indicated that she had any additional concerns about A.B. Other than the information Ms. Ruble provided and Ms. Becker's email at the very beginning – which was another reason they moved forward quickly with doing an evaluation– once the evaluation was started, no one provided any information that caused Ms. Seitnater to conclude that A.B. had issues or discrepancies in other area that the team should consider.

76.     On October 30, 2017, Ms. Seitnater emailed Mrs. Beer with questions about A.B. for the evaluation.  Mrs. Beer responded that day and said, "Any relevant medical/health information? Vision/hearing screenings? Other than speech therapy we had, no. Dr. Slaymaker has evaluated [A.B.] and says he is 100 percent on target."  Mrs. Beer goes on to say, "How long did he attend Rainbow School? One day per week, right? Like a whole school year or just a few months? He was in a summer camp program at Rainbow School for three weeks in July 2016, then for one day a week 9:00 a.m. to 3:00 p.m. from August to November 2017 at Rainbow. I pulled [A.B.] out of Rainbow School because he was upset every day I picked him up. The director refunded my money and apologized. We were fortunate to get into Old Mission on Shawnee Mission Parkway three days a week from 9:00 to 11:30 a.m. with Mrs. Molly from January to May 2017. Mrs. Molly and I agreed that [A.B.] needed to be in school every day, needed more structure than she could offer, and that was when I found pre-K at Briarwood."

77.     Ms. Seitnater did not rely on the fact that A.B.'s pediatrician did not identify any concerns with A.B.'s development, but it helped confirm the evaluation team's findings. Mrs. Beer did not provide any information that was inconsistent with the outcome of the evaluation.

78.     Ms. Seitnater performed a teacher interview with Ms. Ruble to gather more information because Ms. Ruble was always with A.B.  Ms. Seitnater also conducted a record

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

review, where she learned A.B. had received infant/toddler services and was previously evaluated for special education and did not qualify.

79.     A.B.'s Pre-K Evaluation under the section for social/emotional/behavioral states, "Based on existing screening information additional data is needed." The evaluation report indicates additional data was needed because this was the area to be evaluated, not to indicate that the evaluation team ended the evaluation still needing to collect additional data to determine A.B.'s eligibility. Ms. Seitnater testified that there is never a circumstance where the box checked next to "additional data is needed" indicating a need to collect additional data after an evaluation is completed. When an evaluation team decides on a specific area to evaluate, they check the "additional data is needed" box in the evaluation report form specifically in early childhood because those students do not have much data to go off of – unlike a student that was in an elementary school who might have general education data to go off of.

80.     When Ms. Seitnater completed A.B.'s evaluation, she had all the data she needed. Ms. Seitnater did not need additional data after the evaluation was completed.

81.     By October 2017, A.B. was making huge gains in participating so his behaviors were not interfering with his ability to participate in the classroom. With the interventions in place to help him stay and participate, A.B. was participating the same as other students in the classroom. For instance, by October 2017, A.B. was sitting for a much longer period of time for circle time and then he was able to ask for a break but was sitting behind the table continuing to participate; he was receiving the instruction.

82.     After the evaluation data was collected and the report was prepared, Ms. Seitnater, Ms. Ruble, Mr. Lash (Briarwood Principal) and Mrs. Beer met on November 6, 2017. During the meeting, Ms. Seitnater provided Mrs. Beer with all the information she had collected during the evaluation. The evaluation team talked about whether there was a significant discrepancy between A.B. and his same age peers and whether what A.B.'s needs were beyond what is available in the general education classroom.

83.     The evaluation team determined that A.B. did not show a significant discrepancy from same age peers and that A.B. did not require resources beyond what was

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

available in Ms. Ruble's general education classroom.   On November 6, 2017, the
evaluation team determined that A.B. did not qualify for special education services.

84.   Mrs. Beer agreed with the evaluation determination on November 6, 2017.

85.   A Prior Written Notice was hand delivered to Mrs. Beer on November 6, 2017,
documenting that A.B. was not eligible for special education services.

86.   The Prior Written Notice states the evaluation team's conclusion that A.B. was
"evaluated and determined not eligible for special education services in the area of
social/emotional skills and he will benefit from continuing in his Pre-K general education
setting and exposure to age appropriate curriculum…[A.B.] is not discrepant from same age
peers and does not demonstrate a need for special education services at this time…It is
believed that [A.B.] will continue to progress through general education resources.
However, if concerns arise in the future, parent may contact the school district to discuss
further options."

87.   As of the November 6, 2017, meeting, Ms. Seitnater did not suspect that A.B.
was displaying some behaviors that are consistent with autism because all kids at ages four
and five have a variety of different behaviors so A.B. was within the realm.  Further, his
behaviors were not affecting his ability to participate in a classroom; A.B. was exhibiting
the variety of behaviors Ms. Seitnater would see at that age.  Based on the foregoing, the
Hearing Officer determines that the District satisfied the requirement under IDEA to
conduct a full and individual initial evaluation of A.B. The District evaluated A.B. in the area
of social/emotional status as this was the only area in which any concerns were identified.
Moreover, the scope of the evaluation was discussed with and consented to by Mrs. Beer.
The District administered the AEPS, obtained information through teacher and family
reports, conducted observations, and collected relevant data from other sources, including
the prior evaluation conducted of A.B. and the assessment by his physician that there were
no medical concerns.

88.   The evidence shows that within a matter of a couple of weeks into the 2017-
2018, school year, the District determined there was reason to suspect that A.B. could be a
student with a disability and therefore should be evaluated. Upon the request of A.B.'s

classroom teacher, Ms. Ruble, the District initiated an evaluation of A.B. on August 30, 2017. Accordingly, the Hearing Officer finds that even were the events of the 2017-2018, school year properly raised (notwithstanding the untimeliness of those events), the District appropriately discharged its child-find obligation with regard to A.B. and did not commit a procedural violation by failing to identify him as a student for whom there was reason to suspect a need for specialized education in a timely manner, prior to August 14, 2018.

## Evaluation and Re-Evaluation Requirements

89.    Failing to assess in-and-of itself constitutes lost educational opportunity. *Carrie I. v. Dep't of Educ.,* 869 F. Supp. 2d 1225, 1247 (D. Haw. 2012).

90.    The IDEA requires schools to "[u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining (i) whether the child is a child with a disability . . . (ii) the content of the child's IEP." 34 C.F.R. 300.304(b). Schools are required to "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." K.S.A 72-3428. Schools may not use any single measure or assessment as the sole criterion for determining eligibility or an educational program, and assessments must be conducted by trained and knowledgeable personnel in accordance with any instructions provided by the producer of the assessments. *Id.* at (c).

91.    An evaluation must assess all areas of suspected exceptionality, and assessment tools and strategies are provided that furnish relevant information to directly assist persons in determining the educational needs of the child. K.S.A. 72-3428(c).

92.    When a school suspects a child has a specific qualifying disability, such as ASD, it must specifically assess that suspicion using thorough and reliable procedures and technically sound instruments. The Gilliam Autism Rating Scale Third Edition ("GARS-3") is "an instrument to screen individuals that display behaviors indicative of ASD," and is recognized as a technically sound instrument that satisfies a school's obligation to assess the possibility of autism. *Jackson v. District of Columbia*, No. 19-197 TJK/DAR, 2020, U.S. Dist. LEXIS

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

108457, at *6, 52 (D.D.C. June 2, 2020); *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, (9th Cir. 2015) (when school suspects autism or observes autistic-like behavior, it must conduct an evaluation that assesses the possibility of autism).

93.     A school must ensure that the IEP team uses the results of the evaluations to develop the child's IEP and considers existing data.  K.A.R. 91-40-8(b)(2); 34 CFR 300.324. And if a school concludes that it needs additional data, it "shall administer those tests and evaluations that are appropriate to produce the needed data."  KAR 91-40-8(e); 34 C.F.R. 300.305.

94.     An evaluation team must also review current classroom-based observations and observations by teachers and related service providers.  K.A.R. 91-40-8(c)(1); 91-40-7(b); 91-40-10(a)(1)(C).

95.     The school district must conduct a reevaluation of a child with a disability if it "determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation." 34 C.F.R. 300.303.

96.     Kansas schools are required to conduct and complete an initial evaluation of a student within 60 school days after receipt of parental consent for an evaluation.  34 C.F.R. 300.301(c); KAR 91-40-8(f).  The District may extend its deadline to complete an evaluation only if it obtains informed, written parental consent.  KAR 91-40-8(f).

97.     "'Consent' means that <u>all</u> of the following conditions are met:

1) A parent has been fully informed of all information relevant to the activity for which consent is sought, in the parent's native language or other mode of communication.

2) A parent understands and agrees in writing to the carrying out of the activity for which consent is sought, and the consent describes that activity and lists the records, if any, that will be released and to whom.

3) A parent understands the following:

(A) The granting of consent is voluntary on the part of the parent and may be revoked at any time.

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

(B)   If the parent revokes consent, the revocation is not retroactive and does not negate an action that has occurred after the consent was given and before the consent was revoked.

(C)   The parent may revoke consent in writing for the continued provision of a particular service or placement only if the child's IEP team certifies in writing that the child does not need the particular service or placement for which consent is being revoked in order to receive a free appropriate public education."

K.A.R. 91-40-1(l) (emphasis added).

98.    The IDEA sets out the following required parameters for evaluations of students to determine eligibility.

In conducting the evaluation, the local educational agency shall--

A.    Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining:

    i.    whether the child is a child with a disability; and

    ii.    the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum, or, for preschool children, to participate in appropriate activities.

B.    Not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child; and,

C.    Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

Each local educational agency shall ensure that--

A.    Assessments and other evaluation materials used to assess a child under this section:

    i.    are selected and administered so as not to be discriminatory on a racial or cultural basis;

    ii.    are provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is not feasible to so provide or administer;

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

      iii.    are used for purposes for which the assessments or measures are valid and reliable;

      iv.    are administered by trained and knowledgeable personnel; and,

      v.    are administered in accordance with any instructions provided by the producer of such assessments;

    B.    The child is assessed in all areas of suspected disability;

    C.    Assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided; and,

    D.    Assessments of children with disabilities who transfer from 1 school district to another school district in the same academic year are coordinated with such children's prior and subsequent schools, as necessary and as expeditiously as possible, to ensure prompt completion of full evaluations.

20 USCA § 1414[2]

# **2018-19 Child Find**

99.    Once a school determines a child has a disability and needs special education and related services, the school must develop an IEP for the child.  34 CFR 300.306(c)(2).

100.  The IEP is the tool used by Kansas schools to deliver a FAPE.  E.g., K.A.R. 91-40-1(z); Garcia v. Bd. of Educ. of Albuquerque Pub. Schs., 520 F.3d 1116, 1120 ("In order to provide [A.B.] a FAPE, the school district was obligated to develop and implement an individualized education program ("IEP")).  It is the "centerpiece" of IDEA's education delivery system for disabled children and is the "means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.* ex rel. *Joseph F. v. Douglas Cnty. Sch. Dist.* RE-1¸137 S. Ct. 988, 994 (2017).

101.  The term IEP means a written statement for each exceptional child that describes the unique educational needs and the manner in which those needs are to be met, and is developed, reviewed, and revised in accordance with the IDEA.   20 U.S.C. § 1414(d); K.A.R. 91-40-1(gg).

---

[2] 34 CFR 300.301 and K.S.A. 72-3428 implement the requirements for evaluations set out in 20 USCA § 1414.

102.  The essential function of an IEP is to set out a plan for pursuing academic and functional advancement.  *Endrew F.*, 137 S. Ct. at 999.  This reflects the ambitious purpose of the IDEA, in response to Congress' concern that the majority of handicapped children in the United States "were either totally excluded from schools or were sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Id.*

103.  The IDEA contemplates IEP development will be a fact-intensive exercise informed by expertise of school officials, but also the expertise and input of the child's parents. *Endrew F.*, 137 S. Ct. at 999.  An IEP is not a form document: it must be constructed with "careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.*

104.  On September 28, 2018, a report was created by Itestation's Indicators of Progress (ISIP) for A.B.  ISIP measures a child's ability in critical areas of reading.  Ability scores are used to show reading growth throughout the school year.  As of September 28, 2018, A.B.'s overall reading tested at the Tier 3 level, which meant he was at significant risk of not meeting grade level expectations.  His testing on September 5 and 6, 2018, indicated A.B. was struggling in phonemic awareness, vocabulary, and letter knowledge.  He had ongoing difficulty in listening comprehension.

105.  Within 60 school days from the date parental consent to evaluate is received, Kansas schools must conduct a meeting to determine whether a child is an exceptional child (the "Evaluation Team Meeting") and, if so, conduct a meeting to develop an IEP for the child (the "IEP Team Meeting").  K.A.R. 91-40-8(f).

106.  Kansas schools must ensure that an IEP is developed for each exceptional child within 30 days from the date on which the child is determined to need special education and related services. (K.A.R. 91-40-8.

107.   It is the school district's responsibility to initiate and conduct IEP Team Meetings to develop, review, and revise the IEP of an exceptional child.  K.A.R. 91-40-16(a).

108.  The IEP Team Meeting "is the primary opportunity for parental involvement in the process of developing an IEP." *Knable v. Bexley City Sch. Dist.*, 238 Fed 755, 766 (6th Cir. 2001).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

109.  Evaluation Team Meetings held for purposes of discussing a student's evaluation do not satisfy the school's obligation to conduct IEP Team Meetings to develop an IEP.  *Knable v. Bexley Cty. Sch. Dist.,* 238 F.3d 755, 764-65 (6th Cir. 2001).  Nor do Evaluation Team Meetings that lack discussion and consideration of the student's special education needs, placement or the IEP document for the affected child.  Id.; 34 C.F.R. 300.324; K.S.A. 72-3429; K.A.R. 91-40-8(f)(2), (3), 91-40-16, 91-40-17.

110.  If a school determines a student has a qualifying disability and is in need of special education or related services, but fails to develop and implement an IEP, the student is denied access to specialized instruction, which necessarily results in lost educational opportunity to the student, a substantive violation of the IDEA.  *Knable,* 238 F.3d at 766-67.

111.  A school's failure to convene an IEP Team Meeting denies an exceptional child's parents of a meaningful opportunity to participate in the IEP process.  *Knable*, 238 F.3d at 766; *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001); 34 C.F.R. 300.322, 300.501.

112.  Within 60 school days from the date parental consent to evaluate is received, Kansas schools must develop and implement an IEP for an exceptional student, provided it has written consent to do so.  K.A.R. 91-40-8(f), 91-40-16.

113.  Petitioners did not consent to extend the 60-school day evaluation period, or consent to an extension of the period to develop and implement an IEP for A.B.  The District did not tender a PWN with sufficient information to obtain informed written parental consent to extend the evaluation and did not tender any PWNs requesting consent to extend development and implementation of an IEP for A.B.  As explained below, this is both a procedural and substantive violation of the IDEA.

114.  A request for an independent educational evaluation ("IEE") does not suspend the school's deadlines to complete its evaluation or develop and implement an IEP.  K.A.R. 91-40-8-12.  Nor does the absence of a parent signature on an evaluation report.  K.A.R. 91-40-10.

115.  Kansas schools must provide prior written notice to the child's parents if the school refuses to evaluate.  34 CFR 300.503(a)(2).  Choosing to ignore a child's disability

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

and not evaluate or re-evaluate is considered a refusal to assess, necessitating prior written notice to parents.  See Compton Unified Sch. Dist. V. Addison, 598 F.3d 1181, 1184-85, 1184 n.2 (9th Cir. 2010) (citing 34 C.F.R. 300.503).

116.  Petitioners did not consent to extend the 60 school day evaluation period, or consent to an extension of the period to develop and implement an IEP for A.B.  The District did not tender a PWN with sufficient information to obtain informed written parental consent to extend the evaluation and did not tender any PWNs requesting consent to extend development and implementation of an IEP for A.B.  As explained below, this is both a procedural and substantive violation of the IDEA.

117.  A request for an independent educational evaluation ("IEE") does not suspend the school's deadlines to complete its evaluation or develop and implement an IEP.  K.A.R. 91-40-8,-12.  Nor does the absence of a parent signature on an evaluation report.  K.A.R. 91-40-10.

118.  Kansas schools must provide prior written notice to the child's parents if the school refuses to evaluate.  34 CFR 300.503(a)(2).  Choosing to ignore a child's disability and not evaluate or re-evaluate is considered a refusal to assess, necessitating prior written notice to parents.  See *Compton Unified Sch. Dist. v. Addison,* 598 F.3d 1181, 1184-85, 1184 n.2 (9th Cir. 2010) (citing 34 C.F.R. 300.503).

119.  The District breached its Child Find duties in the following respects:

(a) The District breached Child Find in A.B.'s 2018-2019 school year by:

1)  Conducting an inadequate and ineffective evaluation with inaccurate information—a process that unnecessarily and unreasonably prolonged the evaluation period and A.B.'s identification beyond the 60 school day requirement;

2)  Unreasonably delaying identification of A.B. until he obtained a private diagnosis of ASD, Level II, with accompanying ADHD and language impairment;

3)  Intentionally engaging in a concerted effort to avoid identifying A.B. as a child with autism, in an attempt to prevent A.B. from receiving special education services, unreasonably prolonging the identification and evaluation process; and

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

    4)     Unilaterally ceasing all evaluation and IEP development processes on February 25, 2019.

(b) The District breached Child Find in A.B.'s 2019-2020 school year by:

    1)     Relying on outdated and inaccurate information from prior evaluators, rather than correcting known deficiencies in the 2018-2019 evaluation documents; and,

    2)     Unreasonably refusing to evaluate and identify A.B.'s needs in fine motor within a reasonably time after its Child Find duty to evaluate was triggered, despite knowledge and concern that A.B. "writes like a 3-year-old" and needed an OT evaluation.  The District also failed to tender a required PWN to the Beers, advising of its refusal to evaluate and/or requesting consent for an evaluation.

120.   The District's breach of its Child Find duties in 2018-2019 and 2019-2020 results in a substantive IDEA violation and denial of a FAPE to A.B.  The District's breach denied A.B. and his parents important and necessary information regarding his eligibility and need for special education or related services and Petitioners' ability to meaningfully participate, deprived A.B. of an IEP, and resulted in loss of educational opportunity and benefit to A.B.

121.   Petitioners did not discover the District's inadequate evaluation from the 2018-2019 school year until they obtained Dr. Lindberg's diagnosis on January 16, 2019.

## THE DISTRICT FAILED TO TIMELY DEVELOP A.B.'s IEP

122.   Once a school determines a child has a disability and needs special education and related services, the school must develop an IEP for the child.  34 CFR 300.306(c)(2).

123.   The IEP is the tool used by Kansas schools to deliver a FAPE.  *E.g.* K.A.R. 91-40-1(z); *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1120 ("In order to provide [A.B.] a FAPE, the school district was obligated to develop and implement an individualized education program ("IEP")).  It is the "centerpiece" of IDEA's education delivery system for disabled children and is the "means by which special education and

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

related services are 'tailored to the unique needs' of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1,* 137 S. Ct. 988, 994 (2017).

124.   The term IEP means a written statement for each exceptional child that describes the unique educational needs and the manner in which those needs are to be met, and is developed, reviewed, and revised in accordance with the IDEA.   20 U.S.C. § 1414(d); K.A.R. 91-40-1(gg).

125.   The essential function of an IEP is to set out a plan for pursuing academic and functional advancement.  *Endrew F.*, 137 S. Ct. at 999.  This reflects the ambitious purpose of the IDEA, in response to Congress' concern that the majority of handicapped children in the United States "were either totally excluded from schools or were sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Id.*

126.   The IDEA contemplates IEP development will be a fact-intensive exercise informed by expertise of school officials, but also the expertise and input of the child's parents. *Endrew F.*, 137 S. Ct. at 999.  An IEP is not a form document: it must be constructed with "careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.*

127.   Within 60 school days from the date parental consent to evaluate is received, Kansas schools must conduct a meeting to determine whether a child is an exceptional child (the "Evaluation Team Meeting") and, if so, conduct a meeting to develop an IEP for the child (the "IEP Team Meeting").  K.A.R. 91-40-8(f).

128.   Kansas schools must ensure that an IEP is developed for each exceptional child within 30 days from the date on which the child is determined to need special education and related services.  K.A.R. 91-40-8.

129.   It is the school district's responsibility to initiate and conduct IEP Team Meetings to develop, review, and revise the IEP of an exceptional child.  K.A.R. 91-40-16(a).

130.   The IEP Team Meeting "is the primary opportunity for parental involvement in the process of developing an IEP." *Knable v. Bexley City Sch. Dist.*, 238 Fed 755, 766 (6th Cir. 2001).

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

131.   Evaluation Team Meetings held for purposes of discussing a student's evaluation do not satisfy the school's obligation to conduct IEP Team Meetings to develop an IEP. *Knable v. Bexley Cty. Sch. Dist.*, 238 F.3d 755, 764-65 (6th Cir. 2001).  Nor do Evaluation Team Meetings that lack discussion and consideration of the student's special education needs, placement or the IEP document for the affected child. *Id.*; 34 C.F.R. 300.324; K.S.A. 72-3429; K.A.R. 91-40-8(f)(2), (3), 91-40-16, 91-40-17.

132.   If a school determines a student has a qualifying disability and is in need of special education or related services, but fails to develop and implement an IEP, the student is denied access to specialized instruction, which necessarily results in lost educational opportunity to the student, a substantive violation of the IDEA.  *Knable*, 238 F.3d at 766-67.

133.   A school's failure to convene an IEP Team Meeting denies an exceptional child's parents of a meaningful opportunity to participate in the IEP process.  *Knable*, 238 F.3d at 766; *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001); 34 C.F.R. 300.322, 300.501.

134.   Within 60 school days from the date parental consent to evaluate is received, Kansas schools must develop and implement an IEP for an exceptional student, provided it has written consent to do so.  K.A.R. 91-40-8(f), 91-40-16.

135.   Kansas schools have a duty to make "reasonable and prompt efforts to obtain informed consent from the child's parent to . . . make the initial provision of services to the child" via an IEP.  K.A.R. 91-40-27(b).

136.   The District did not satisfy its duty to develop an IEP for A.B. by creating an internal draft IEP and attaching proposed goals to one email to Ms. Beer.  *See Endrew F.*, 137 S. Ct. at 999 (describing IEP development as a fact-intensive exercise informed by meaningful parental participation). Even if this could satisfy the District's obligation and Ms. Beer's subsequent correspondence was perceived as rejecting the "proposed" IEP, she was right to reject it.  The draft IEP transmitted to Ms. Beer on February 13, 2019 was not reasonably calculated to enable A.B. to make appropriate progress in light of his circumstances. *See* Conclusion of Law, 90.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

137.   The District was obligated to complete its evaluation of A.B. no later than December 6, 2018.  By failing to complete A.B.'s evaluation during the required timeframe, the District substantively violated the IDEA and denied A.B. a FAPE.  The District unnecessarily prolonged the evaluation period beyond December 6, 2018 to correct evaluative errors, thereby denying A.B. and his parents important and necessary information regarding his eligibility and need for special education or related services, and ability to meaningfully participate.  The eventual results of the evaluation required the District to develop and implement an IEP for A.B., a process that should have been completed by the December 6, 2018 deadline.  Because it was not, the District deprived A.B. of an IEP, and he lost educational opportunity without the needed services provided by and through an IEP.

138.   Moreover, the District deprived Petitioners of the ability to meaningfully participate in that it failed to communicate critically important information revealed in its BASC-3 assessment—that A.B. was likely a child with ASD, a qualifying disability under the IDEA suspected by the District and the Beers; excluded the Beers from internal discussions regarding other areas of concern and eligibility by raising those issues after Ms. Beer left meetings; altered the Woodcock Johnson scores depicted in A.B.s' evaluation by (a) excluding Mr. McCarthy's reference to A.B.s' percentile scores (none of which were greater than the seventh percentile) and (b) changing Mr. McCarthy's conclusions that A.B. was "very low" in broad reading and "extremely low" in basic reading to reflect that A.B. was merely "low" in these categories, and excluding Mr. McCarthy's conclusions that A.B. was in the fifth percentile and "very low" in reading fluency altogether; and failed to accurately collect and communicate the number of times that A.B. was removed from the general education environment.  *See M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 855 (9th Cir. 2014) (failing to furnish parents with known data and failing to ensure it was "documented and carefully considered" by the entire IEP team prevented the parents from meaningfully participating in the IEP process) (quoting 34 C.F.R. 300.306(c)(1)); *Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877 (9th Cir. 2001) (holding a school's failure to disclose assessment results requested by parents revealing the possibility of autism denied parents

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

"from participating fully, effectively, and in an informed manner in the development of [their child's] IEP" was a substantive violation).

139.   The District eventually concluded its evaluation on February 25, 2019, determining that A.B. had a qualifying disability of autism and was in need of special education and related services, which triggered the District's obligation to promptly develop and implement an IEP for A.B.  But the District did not make any effort to convene an IEP Team Meeting to develop an IEP for A.B. in the spring of 2019.  Nor did the District make any reasonable and prompt efforts to obtain informed consent from the Beers to implement any services to A.B.  As a result, the district substantively violated the IDEA and deprived A.B. of a FAPE; the District caused substantive harm to A.B.'s parents by denying their ability to participate in the IEP process and deprived A.B. of an IEP until the following school year, which resulted in lost educational opportunity for A.B.

140.   An IEP must be in effect for each exceptional child at the beginning of each school year.  K.A.R. 91-40-16(a)(3); 34 C.F.R. 300.323(a).

141.   The District's failure to develop and implement an IEP for A.B. during the 2018-2019 school year resulted in A.B. beginning the 2019 school year without an IEP, thereby violating the rule that an IEP must be in effect for each exceptional child at the beginning of each school year.  K.A.R. 91-40-16(a)(3).  Accordingly, the District deprived A.B. of a FAPE by depriving him of an IEP and educational benefit, beginning on the first day of school, August 12, 2019, and continuing until an IEP was in effect on the date Ms. Beer consented to its implementation, December 2, 2019.

## A.B.s' IEP's ARE NOT REASONABLY CALCULATED, AND THE DISTRICT FAILED TO REVISE HIS CURRENT IEP DESPITE A RECOGNIZED NEED TO REVISE

142.   Every IEP must describe the child's present level of achievement, including an explanation of how the child's disability affects his involvement and progress in the general curriculum.  The IEP  must also set out "a statement of measurable annual goals,"

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

along with a description of specialized instruction and services that the child will receive. *Endrew F.*, 137 S. Ct. at 1000 (citing 20 U.S.C. § 1414(d)(1)(A)(i)).

143.   The IEP "must be appropriately ambitious in light of his circumstances," which is "markedly more demanding than" the *de minimis* test previously applied by the Tenth Circuit.  *Id.* at 1000.  For a child fully integrated in the regular classroom, an IEP should "be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'"  *Endrew F.*, 137 S. Ct. at 999 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 203-204 (1982)).

144.   The "Supreme Court has specifically rejected the proposition that a child is receiving a FAPE simply because he is 'advancing from grade to grade.'"  *Klein Indep. Sch. Dist.*, 2021 U.S. App. LEXIS 18093, at *21-22 (quoting *Endrew F.*, 137 S. Ct. at 000, n.2); *accord* 34 C.F.R. 300.101(c).

145.   "[A]n IEP must be drafted in compliance with a detailed set of procedures [that] . . .  emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances." *Endrew F.*, 137 S. Ct. at 994.

146.   "The purpose of present levels is to establish a baseline relative to which the teaching staff and IEP team may determine goals and objectives and against which they measure student progress. Present levels must be stated in specific terms in order to inform a revision of the IEP.  Present levels provide a roadmap to further integration, so that approaches for ensuring the child's involvement and progress in the general curriculum . . . can be identified."  *W.-Linn Wilsonville Sch. Dist. v. Student*, No. 3:12-CV-02364-ST, 2014 U.S. Dist. LEXIS 103844, at *39 (D. Or. July 30, 2014).

147.   An IEP with immeasurable goals causes substantive harm because the education agency cannot tell whether its methods are working or if a particular goal has been achieved, thus impeding progress.  *Somberg v. Utica Cmty. Schs*, 2016 U.S. Dist. LEXIS 41771, at *13 (E.D. Mich. Mar. 30, 2016).

148.   Although a failure to meet IEP goals is not dispositive of a failure to provide a FAPE, "it can aid in determining whether the IEP was reasonably calculated to make

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

progress." *A.D. v. Creative Minds In'l Pub. Charter Sch.*, No. 18-2430 CRC/DAR, 2020 U.S. Dist. LEXIS 184957, at *56 (D.D.C. Aug 14, 2020).

149. Even if the email transmitting an IEP to the Beers on February 13, 2019 could be perceived as "proposing" an IEP for A.B. without development or request for consent to implement, the IEP did not offer to confer a FAPE to A.B. and substantively violated the IDEA, in that it was not reasonably calculated to enable A.B. to make progress appropriate in light of his circumstances, for at least the following reasons:

    (a) The behavior, social and communication goals were immeasurable;

    (b) The data collected by the District and presented in its evaluation documents through February 13, 2019 contained material inaccuracies, lacked necessary baseline data, and was insufficient to develop IEP social or behavior goals;

    (c) The Socially Savvy was not sufficiently comprehensive to evaluate A.B.s' social skills; and

    (d) The BIP was founded upon Dr. Wiseman's FBA, which contained inaccurate and missing data.

    (e) The IEP and/or BIP did not adequately or properly address A.B.s' behaviors that disrupted his access to educational progress

150. The IEP transmitted to the Beers on August 13, 2019 suffered from the same immeasurable behavior goal as the February 13, 2019 iteration, and also failed to include material information pertaining to A.B.'s present levels derived from the District's second FBA and speech IEE. Indeed, the IEP incorporated a BIP founded upon inaccurate and incomplete behavior data collected during Dr. Wiseman's first FBA, as opposed to Jill Koertner's second FBA in May 2019. For these reasons and those articulated in Conclusion of Law 92, the August IEP iteration did not offer to confer a FAPE to A.B. and substantively violated the IDEA, and was not reasonably calculated to enable A.B. to make appropriate progress in light of his circumstances.

151. The proposed IEP dated October 1, 2019 suffered from all of the same defects as the August 13, 2019 version. The October 1, 2019 IEP did not offer to confer a FAPE to A.B. and substantively violated the IDEA, in that it was not reasonably calculated to

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

enable A.B. to make appropriate progress in light of his circumstances, for at least the following reasons:

    (a)   The IEP was founded upon evaluative data from the prior school year that District personnel recognized as contradictory;

    (b)   Present levels of academic and functional performance ("PLAAFP") excluded present level information from A.B.'s speech IEE, the second FBA conducted by the District, and the District's second Socially Savvy Assessment from February 2019;

    (c)   The behavior goal was immeasurable;

    (d)   The IEP proposed to provide no accommodations for state assessments because "State Assessments not required due to age/grade," an incorrect statement carried over from A.B.'s kindergarten year; and

    (e)   The IEP proposed to incorporate Dr. Wiseman's BIP that was drafted in reliance upon incorrect and inaccurate data from the District's first FBA, and not Ms. Koertner's more recent FBA that reached materially different conclusions.

    (f)   The IEP and/or BIP did not adequately or properly address A.B.s' behaviors that disrupted his access to educational progress.

152.    By repeatedly proposing IEPs with such obvious defects, the District unreasonably prolonged the IEP development process and substantively violated the IDEA. The District's actions deprived A.B. of an IEP and educational benefit.

153.    The November 20, 2019, IEP now in effect does not confer a FAPE to A.B. and substantively violates the IDEA, in that it was not and is not reasonably calculated to enable A.B. to make progress appropriate in light of his circumstances for at least the following reasons:

    (a)   The PLAAFP informing development of the communication goal and one social goal relied on a one-time Socially Savvy Assessment administered in October 2018 as a baseline, despite the District's own concern that "there was no data in that goal, no present level-based data based [sic] on his current levels of functioning.  Again, the evaluation was done a year prior and your data will change based on student needs and present levels a lot, especially over the course of a year"; additionally, the assessment was not administered according to its own requirements.  Further, the District administered a second Socially Savvy Assessment in February 2019 that

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

reflected a downward trend in scores, but the results were not reflected in A.B.'s present levels;

(b)   The PLAAFP informing development of a separate social goal baseline relied on data from Dr. Wiseman's first FBA in fall 2018, with admitted inaccuracies and missing data;

(c)   The goals were immeasurable, and the District's attempt to measure the goals demonstrated a lack of progress;

(d)   A.B. regressed socially, and did not progress as it related to his social goals;

(e)   A.B. did not demonstrate expected progress as it related to his refusal behaviors and work completion addressed by his BIP; the motivational system in place did not work and special education staff recognized that he was not "making adequate progress"; staff only partially implemented his BIP; and A.B.s' behaviors continued to impede his access to educational benefit and progress.  *See Endrew F. v. Douglas Cty. Sch. Dist.*, 290 F. Supp. 3d 1175, 1184 (D. Colo. Feb. 12, 2018);

(f)   The IEP and/or BIP did not adequately or properly address A.B.s' behaviors that disrupted his access to educational progress;

(g)   The District refused to incorporate a reading goal, even though A.B. demonstrated no progress from his September 28, 2018, reading scores (qualifying for Tier 3, with a percentile rank of 17 percent) and December 2019 (again qualifying for Tier 3, with a percentile rank of 17 percent).  *See Klein Indep. Sch. Dist.* 2021 U.S. App. LEXIS 18093, No. 20-20339, at *7-8. Further, the District internally recognized that it lacked sufficient baseline information to evaluate the need for a reading goal, but nonetheless rejected Ms. Beer's request for the same;

(h)   The District internally identified concerns regarding A.B.'s fine motor skills on November 1, 2019, but failed to evaluate those concerns and failed to notify the Beers of its concern so they could meaningfully participate in the IEP process; and

(i)   The District denied Ms. Beer's request for paraprofessional assistance for A.B. in the afternoon, describing it as a "want, not a need."

154.   The District must revise a child's IEP as appropriate to address the child's anticipated needs and other matters.  34 CFR 300.324(b)(ii).  "When a school district knows or should reasonably know that a student's behaviors, ineffectively addressed by the IEP in place, impedes that student's opportunity to receive a meaningful educational benefit, it ought to rectify the IEP's inadequacies in a timely fashion."  *Colonial Sch. Dist. v.*

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

*N.S.*, No. 194311, 2020 U.S. Dist LEXIS 55150, at *34 (E.D. Penn. Mar. 30, 2020).

155.     Schools must revise an IEP when a student demonstrates a lack of expected progress, to address the child's anticipated needs or "other matters."  34 C.F.R. 300.324(b). It is the responsibility of the school to initiate and conduct meetings to revise an IEP.  K.A.R. 91-40-16.

156.     The District failed to take necessary steps to revise A.B.'s November 20, 2019 IEP to address his anticipated needs in the areas of fine motor, need for a reading goal, and need for afternoon paraprofessional support despite internally observing (1) A.B. "writes like a 3 year old" (a corresponding request for OT evaluation was unsuccessful); (2) that A.B. "may, in fact, need a reading goal????" because he "cannot read anything on the page"; and (3) that "A.B. needs more support . . . he just needs help."  The District unreasonably delayed offering additional para support several months after recognizing A.B. needed the support and based its offer on staff availability and not A.B.'s need, a violation of the IDEA. *Tehachapi Unified Sch. Dist. v. K.M.*, No. 1:16-cv-01942-DAD-JLT, 2018 U.S. Dist. LEXIS 169526, at *14-15 (E.D. Cal. Sept. 28, 2018).  Moreover, it purported to deny Ms. Beer's para request based on (1) that A.B. was struggling with math because of the time of day rather than academic subject, and (2) para support was a more restrictive environment. Both of these reasons are inconsistent with the IDEA.  First, a student's inability to access the educational curriculum because his disability causes him to struggle during the afternoon is no basis to reject a request for special education or related services needed by the student to receive educational benefit.  Second, the "least restrictive environment applies to the type of classroom setting, not the level of additional support a student receives within a placement." *R.B. v. N.Y. City Dep't of Educ.*, 603 Fed. Appx. 36, 40 (2d Cir. 2015); K.A.R. 91-40-21; Kansas State Department of Education Special Education Process Handbook, chapter 6, pp. 119, 123 (discussing LRE in terms of classroom setting, not level of supports).   These failures deprived A.B. of an IEP reasonably calculated to enable him to make appropriate progress in light of his circumstances and resulted in lost educational benefit.  Further, the District failed to communicate its concerns to A.B.'s parents, depriving them of the ability to meaningfully participate in the IEP process. Accordingly, the District

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

substantively violated the IDEA.

157.     Violations of Kansas law and the IDEA occur where vague language in an IEP "'compromise[s] the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.'" *See O'Toole v. Olathe Dist. Sch. Unif. Sch. Dist. No. 233*, 144 F.3d 692, 707 (10th Cir. 1998) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990)).

158.     The District also failed to take necessary steps to revise A.B.'s November 20, 2019, IEP in that it recognized that vague terms in A.B.'s IEP and/or BIP resulted in staff confusion and A.B.'s removal from the general education environment; after recognizing the deficiency, the District failed to define those terms and failed to propose definitions to A.B.'s parents despite committing to do so.  Additionally, the District failed to include A.B.'s parents in subsequent team meetings convened for purposes of defining the vague terms, depriving Petitioners of the ability to meaningfully participate in the IEP process.  These violations deprived A.B. of an IEP reasonably calculated to enable him to make appropriate progress in light of his circumstances, and substantively violated the IDEA.

## THE DISTRICT FAILED TO IMPLEMENT A.B.'S NOVEMBER 20, 2019 IEP, ADEQUATELY TRACK GOAL PROGRESSION, AND PROVIDE STUDENT RECORDS REQUESTED BY THE BEERS.

159.     The District is legally obligated to provide A.B. with such "special education and related services 'in conformity with [his] individualized education program,' or IEP." *Endrew F.*, 137 S. Ct. 994 (citing § 1401(9)(D)); *Elizabeth B. v. El Paso Cty. Sch. Dist. 11*, No. 16-cv-02036-RBJ-NYW, 2019 WL 3774119, at *5 (D. Colo. Aug. 12, 2019).

160.     A student's behavior intervention plan is an important component of their IEP.  *E.C. v. U.S.D. 385 Andover,* No. 18-1106-EFM, 2020 U.S. Dist. LEXIS 92792, at *18-19 (D. Kan. May 27, 2020).  A material failure to implement an IEP or BIP substantively violates the IDEA.  *Id.*; Van Duyn v. Baker Sch. Dist., 502 F.3d 811, 822 (9th Cir. 2007); *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011). "A material failure occurs

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP" or BIP. *E.C.*, 2020 U.S. Dist. LEXIS 92792, at *18-19; *Van Duyn*, 502 F.3d at 822.  This "materiality standard" does not require that the child suffer demonstrable educational harm in order to prevail, but lack of progress may be probative.  *Van Duyn*, 502 F.3d at 822. "Rather, courts applying the materiality standard have focused on the proportion of services mandated to those actually provided, and the goal and import (as articulated in the IEP) of the specific service that was withheld."  *Wilson*, 770 F. Supp. 2d, at 275.

161.    The District materially failed to implement A.B.'s IEP and BIP, in that the District (1) changed A.B.'s placement by removing him from the general education classroom and sending him to a special education classroom on three occasions contrary to his placement in his IEP and then failed to send a required PWN notifying the Beers of the change in placement, (2) admitted that it did not fully implement six separate provisions of A.B.'s BIP, (3) inadequately or failed to measure A.B.'s goal progression (the goal progression data that it did collect was inconsistent with the District's progress report that A.B. was meeting four objectives 53 percent of the time), and (4) failed to alter its goal progression data collection after the District observed it was insufficient to track A.B.'s goals.

162.     These are material failures because the District failed to implement a significant proportion of services, A.B. did not demonstrate expected progress as it related to his refusal behaviors and work completion addressed by his BIP, and  A.B. did not demonstrate progress towards his social goal as reflected in the goal progression sheets. Accordingly, the District substantively violated the IDEA and deprived A.B. of a FAPE and educational benefit.

163.    Progress reporting lacking in detail or consisting of conclusory statements may inhibit meaningful parental participation, inhibit the IEP team's ability to craft and implement the student's IEP, and negatively affect the student's education.  *Endrew F. v. Douglas Cnty. Sch. Dist. Re-1,* 798 F.3d 1329, 1335 (10th Cir. 2015) *rev'd on other grounds*, 137 S. Ct. 988; *Escambia Cty. Bd. of Educ. v. Benton*, 406

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

F. Supp. 2d 1248 (S.D. Ala. 2005).

164.    Parents are entitled to complete access to their child's records with respect to identification, evaluation, and educational placement, and the provision of a FAPE.  20 U.S.C. § 1415(b)(1)(A).  "Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) (finding that summary documents that paraphrased more complete data was a procedural and substantive IDEA violation).

165.    The District committed both a procedural and substantive IDEA violation by providing conclusory progress reporting to Petitioners that (unknown to Petitioners) was inconsistent with goal progression data collected by the District, and by refusing to provide the same goal progression data sheets to the Beers—even though the data sheets were intended to be provided to the Beers and were requested by the Beers. These actions prevented Petitioners' meaningful participation in A.B.'s IEP, substantively harmed A.B. by depriving him of an IEP that adequately tracked his goal progression, and deprived A.B. of educational benefit.

## THE DISTRICT FAILED TO PROVIDE AN INDEPENDENT EVALUATION REQUESTED BY PETITIONERS

166.    "A parent has the right to an independent educational evaluation ["IEE"] at public expense if the parent disagrees with an evaluation obtained by the public agency."  34 CFR § 300.502(b)(1).  Upon such a request, the District must provide parents "information about where an [IEE] may be obtained."  *Id.* at (a)(2).  "At that point, the burden shifts to the school district to do one of two things:  (1) to honor the parent's request to pay for an IEE, or (2) to initiate a due process hearing."  *D.S. by and Through M.S. v. Trumbull Bd. of Ed.*, 357 F. Supp. 3d 166, 172 (D. Conn. 2019) (citing 34 CFR § 300.502(b)(2)).  The District "may not unreasonably delay" either providing the IEE or filing a due process complaint. 34 CFR § 300.502.  Failing to timely respond to a parent's IEE request is a substantive IDEA violation, because it results in the affected student languishing with an IEP that may not be sufficiently

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

tailored to meet the student's needs.  *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 64-(D.D.C. 2008) ("failure to act on a request for an independent evaluation is certainly not a mere procedural inadequacy; indeed, such inaction jeopardizes the whole of Congress' objectives in enacting the IDEA.").

167.    An FBA is an "educational evaluation" subject to a request for an independent educational evaluation pursuant to 34 C.F.R. 300.502.  *Harris v. District of Columbia*, 561 F. Supp. 2d 63, 68 (D.D.C. 2008).

168.    The District committed a procedural IDEA violation by refusing Ms. Beer's behavioral IEE request and pressing her to accept instead the District's offer to complete a second FBA to avoid the IEE expense.  The District committed a second procedural IDEA violation by failing to request informed parental consent to conduct a second FBA evaluation. These procedural violations substantively violated the IDEA, in that it deprived Petitioners of important information related to A.B.'s behaviors and their ability to use that yet-to-be-obtained information to meaningfully participate and advocate for an appropriate BIP and behavior goals. Further, by failing to provide required PWNs the District deprived the Beers of information necessary to thoughtfully consider the District's refusal, and the ability to provide informed consent (or not) for the second FBA.  A.B.'s lack of expected progress regarding his work refusal and completion of work behaviors, his poor scores collected on goal progression data sheets, the District's failure use Ms. Koertner's second FBA to promptly draft and propose a BIP despite the fact it was skewed toward development of a BIP, and deficiencies in the May 2019 FBA identified by Dr. Gentry and Dr. Weigand all demonstrate how the District's IEE refusal both deprived Petitioners of critical information and the ability to meaningfully participate, and deprived A.B. of educational benefit and a FAPE.

169.    A.B. did not receive a FAPE in school years 2018-2019, or 2019-2020, despite advancing from grade to grade.  *See Klein Indep. Sch. Dist.*, 2021 U.S. App. LEXIS 18093, at *21-22 (citing *Endrew F.*, 137 S. Ct. at 000, n.2); 34 C.F.R. 300.101(c).

170.    The Findings of Fact found in paragraphs 278-961 (above) demonstrate that beginning in November 2018 the Districts' attempts to meet IDEA requirements for A.B. failed to the extent that the educational program was not reasonably calculated to enable A.B. to

**Associates in Dispute Resolution LLC**
212 S.W. 8ᵗʰ Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

receive educational benefits.

171.     Dr. Weigand credibly testified that there were significant deficits in skill assessment, observations, incorrect baseline data, disciplinary data, evaluation data to develop goals, behavioral data in which the IEP was not reasonably calculated to enable A.B. to make appropriate progress through an evaluation process that was extenuated much longer than it should have.  See Findings of Fact, 82, 83, 104, 105, 106, 107, 135, 325, 335, 389, 504, 545, 546, 547, 549, 589, 648, 698, 756, 821, and 949.

## VII.     Decision

1.     For the reasons detailed in the Findings of Facts and Conclusions of Law above and, pursuant to K.S.A. 72-3430 and § 34 C.F.R. 300.507, the Hearing Officer rules as follows as to the issues herein:

   A.     The District failed to satisfy its' "Child Find Obligation" for the 2018-2019 and 2019-2020 school years with regard to A.B. as specifically alleged in Petitioner's Due Process Complaint.  K.S.A. 72-3428 and § 34 C.F.R. 300.111(a).

   B.     The District failed to evaluate A.B. to determine his eligibility to receive special education services as alleged in the Due Process Complaint.  K.S.A. 72-3428 and § 34 C.F.R. 300.301.

   C.     The District failed to appropriate determine A.B.'s educational placement through development of an Individualized Educational Program (IEP) as specifically alleged in Petitioner's Due Process Complaint.  K.S.A. 72-3428 and § 34 C.F.R. 300.324.

   D.     The District failed to implement A.B.'s IEP's such that he was denied a free and appropriate publication education as alleged in Petitioner's Due Process Complaint.  § 34 C.F.R. 300.17.

   E.     The District failed to satisfy IDEA's procedural requirements such that:

      1.     A.B.'s right to a free and appropriate public education was impeded.

**Associates in Dispute Resolution LLC**
212 S.W. 8th Ave., Suite 207
Topeka, KS   66603
(785)357-1800
(785)357-0002 (fax)

2. The parent's opportunity to participate in the decision-making process was significantly impaired.

3. A.B. was deprived of educational benefits as alleged in Petitioner's Due Process Complaint. K.S.A. 72-3416 and § 34 C.F.R. 300.513.

G.     There is insufficient evidence to establish the District failed to appropriate and timely evaluate A.B. for eligibility to receive special education services in pre-K or kindergarten.

H.     There is insufficient evidence to establish the District denied A.B. a FAPE by providing him instruction in math in the special education room on three occasions during the first grade.

I.     There is insufficient evidence to establish the District denied A.B. a FAPE by proposing to provide adult support for A.B. in the afternoon in response to the parents' demand that A.B. be assigned a para during math.

J.     Any party may appeal this decision to the State Board of Education, pursuant to K.S.A. 72-3418(b), by fling a written notice of appeal to:

> Notice of Appeal
> ATTN: Special Education and Title Services
> Landon State Office Building
> 900 SW Jackson Street, Suite 620
> Topeka, Kansas 66612-1212

The Notice of Appeal must be filed with Special Education and Title Services, designee of the Commissioner of Education, not later than 30 calendar days after the date of the postmark on the envelope containing this decision. Filing is complete upon receipt of the Notice of Appeal in the office of Special Education and Title Services. Emailed submissions will not be accepted for filing.

Be advised that upon receipt of a Notice of Appeal by either party, Special Education and Title Services will inform both parties of a Designated State Review Officer. Upon

Associates in Dispute Resolution LLC
212 S.W. 8th Ave., Suite 207
Topeka, KS  66603
(785)357-1800
(785)357-0002 (fax)

notification, the local education agency shall ensure the official record is transmitted in a timely manner by the Hearing Officer to the Designated State Review Officer.

**IT IS SO ORDERED.**

   July 23, 2021   

Date                                           Larry Rute, Hearing Officer

## CERTIFICATE OF SERVICE

I, Larry R. Rute, do verify that I have provided a true and correct copy of the above and foregoing Notice of Hearing Officer's Decision upon the following parties:

Mr. Matthew J. Rogers
The Law Offices of Barber Emerson LC
1211 Massachusetts Street
Lawrence, KS  66044
mrogers@barberemerson.com

Mr. Joshua E. Douglass
Mickes O'Toole LLC
12444 Powerscourt Drive, Suite 400
St. Louis, MO  63131
jdouglass@mickesotoole.com

by e-mailing only a copy to all parties, this 23rd day of July, 2021.

Larry R. Rute, Hearing Officer